1   **AKIN GUMP STRAUSS HAUER & FELD LLP**
    SUSAN KAY LEADER (SBN 216743)
2   STEPHANIE P. PRIEL (SBN 313085)
    sleader@akingump.com
3   spriel@akingump.com
    1999 Avenue of the Stars, Suite 600
4   Los Angeles, CA 90067-6022
    Telephone:  310.229.1000
5   Facsimile:   310.229.1001

6   **AKIN GUMP STRAUSS HAUER & FELD LLP**
    Lawrence D. Levien (*Pro Hac Vice*, application pending)
7   llevien@akingump.com
    1333 New Hampshire Avenue, N.W.
8   Washington, D.C. 20036
    Telephone: 202.887.4000
9
    Attorneys for Plaintiffs
10

11                  UNITED STATES DISTRICT COURT

12            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13                                          '18 CV 2763 H      KSC

14  EVANS HOTELS, LLC, a California limited          **COMPLAINT FOR:**
    liability company; BH PARTNERSHIP LP, a
15  California limited partnership; EHSW, LLC,
    a Delaware limited liability company,       1.  **UNLAWFUL SECONDARY**
16                                                   **BOYCOTT**
                    Plaintiffs,
17                                              2.  **ATTEMPTED MONOPOLIZATION**
           v.                                       **IN VIOLATION OF SECTION 2 OF**
18                                                   **THE SHERMAN ACT**
    UNITE HERE! LOCAL 30; BRIGETTE
19  BROWNING, an individual; SAN DIEGO         3.  **CONSPIRACY TO MONOPOLIZE IN**
    COUNTY BUILDING and                             **VIOLATION OF SECTION 2 OF THE**
20  CONSTRUCTION TRADES COUNCIL,                    **SHERMAN ACT**
    AFL-CIO; TOM LEMMON, an individual;
21  and DOES 1-10,                              4.  **VIOLATION OF THE RACKETEER**
                                                    **INFLUENCED AND CORRUPT**
22                  Defendants.                      **ORGANIZATIONS ACT, 18 U.S.C.**
                                                    **§ 1962(c)**
23
                                                5.  **VIOLATION OF THE RACKETEER**
24                                                  **INFLUENCED AND CORRUPT**
                                                    **ORGANIZATIONS ACT, 18 U.S.C.**
25                                                  **§ 1962(d), BY CONSPIRING TO**
                                                    **VIOLATE 18 U.S.C. § 1962(c)**
26                                              6.  **VIOLATION OF THE RACKETEER**
                                                    **INFLUENCED AND CORRUPT**
27                                                  **ORGANIZATIONS ACT, 18 U.S.C.**
                                                    **§ 1962(d), BY CONSPIRING TO**
28                                                  **VIOLATE 18 U.S.C. § 1962(a)**

                                                7.  **VIOLATION OF THE RACKETEER**
                                                    **INFLUENCED AND CORRUPT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ORGANIZATIONS ACT, 18 U.S.C. § 1962(d), BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(b)**

**8. INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

**9.  ATTEMPTED EXTORTION**

**DEMAND FOR JURY TRIAL**

Plaintiffs Evans Hotels, LLC; BH Partnership, LP; and EHSW, LLC (collectively "Evans Hotels" or "Plaintiffs") allege as follows:

## SUMMARY OF THE ACTION

1.      This is a case about unions and union leaders that, in their quest for increased dues and market power, have abandoned traditional (and legal) statutory systems of labor democracy in favor of a pattern of abusive and unlawful secondary boycotts, sham "environmental" and zoning opposition, extortion, threats, and intimidation.  Defendants Unite Here! Local 30, the San Diego County Building and Construction Trades Council, AFL-CIO, and their respective leaders, Brigette Browning and Tom Lemmon (collectively "Defendants"), have combined and conspired with a rotating cast of "concerned citizens" and groups–for hire–in an attempt to dominate, monopolize, and control the hospitality labor market and restrain trade in the prime tourism regions of San Diego.  Defendants have engaged in this illegal behavior not to protect hotel workers, but to advance their own economic self-interest and to eliminate the development of any new or redeveloped non-union hotels in the prime tourism regions of San Diego.

2.      For more than ten years, and with ever-increasing frequency, Defendants have followed and refined their "playbook":  hold any non-union owner and developer hostage by impeding, delaying, or shutting down projects through threats of political strong-arming, greenmail, and unlawful secondary boycott activities.  Defendants' conduct has delayed and, in many cases, shut down development of projects (and impeded the creation of tens of thousands of new jobs) at the expense of the residents of San Diego.

3.      Defendants' playbook is designed for one objective and one objective only—to use unlawful measures to unionize all labor in the construction and operation of hospitality properties in San Diego.  For Local 30 and Ms. Browning, this objective is achieved by securing a card check neutrality agreement at non-union properties.  For Mr. Lemmon and San Diego County Building and Construction Trades Council, AFL-CIO, this means ensuring that hospitality developers agree to enter a Project Labor Agreement ("PLA") for an upcoming construction project.  Defendants have made clear by their actions that they will stop at nothing to get what they want.

4.      Defendants' success hinges in part on an alliance between Ms. Browning (president of Defendant Local 30) and Mr. Lemmon (business manager of Defendant San Diego County Building and Construction Trades Council, AFL-CIO).  Ms. Browning and Mr. Lemmon jointly target projects with the aim of strong-arming their opponent into conceding to the unions' demands.  Ms. Browning and Mr. Lemmon pledge mutual support to one another regardless of whether the project in question would benefit the members of the union they represent.  Unless the developer agrees both to use union contractors for the construction of the project *and* to unionize the hotel workers, they will oppose the project.

5.      The latest target of Defendants' unlawful activity is the redevelopment of the Bahia Resort Hotel.  In the late 1980s, the Evans family submitted a redevelopment plan for the Bahia Resort Hotel in Mission Bay, San Diego.  The City of San Diego asked the Evans family to put the redevelopment plan on hold, so the City could finish updating its comprehensive land-use plan for the entirety of Mission Bay Park (the Mission Bay Park Master Plan Update, "MBMPU").  In 1994, after years of public input, over one hundred public meetings, and approval of the California Coastal Commission, the MBMPU was adopted by the City of San Diego.  The approved land use plan expressly contemplated the new and expanded footprint for the Bahia Hotel.

6.      Evans Hotels is now seeking an amendment to the Bahia lease agreement in order to redevelop the Bahia in accordance with the MBMPU.  Because the Bahia operates on City property and is subject to a ground lease, a lease amendment from the City is required as part of any significant redevelopment.  Defendants have not engaged in negotiations with Evans Hotels regarding the use of organized labor in either the development of the Bahia or its staffing.  Instead, Defendants presented sham environmental and zoning challenges to the lease amendment, made threats of extortion and delay, spearheaded misleading and false attacks on how or why the proposed amendment to the lease would be harmful for Mission Bay, and even unlawfully targeted Evans Hotels' business partners.

7.      Defendants' conduct not only violates Section 8(b)(4) of the National Labor Relations Act and Section 303 of the Labor Management Relations Act, but in the aggregate demonstrates a pattern of anti-competitive, coercive conduct that is designed to stifle development, competition and commerce in San Diego.

## THE PARTIES

8.     Evans Hotels was founded by San Diego natives William and Anne Evans in 1953.  It operates three hotel properties in and around San Diego: the Bahia Resort Hotel (the first commercial lessee on Mission Bay); the Catamaran Resort Hotel and Spa (on the northwest corner of Mission Bay); and The Lodge at Torrey Pines (a AAA Five Diamond resort located near Torrey Pines State Reserve and Torrey Pines Golf Course).

9.     Plaintiff Evans Hotels, LLC is a California limited liability company located at 998 West Mission Bay Drive in San Diego.  Evans Hotels, LLC is an employer within the meaning of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 152(s).  Evans Hotels, LLC is committed to its employees.  It employs over 1,186 individuals, many of whom have been with the company and its predecessors for more than a decade.  Indeed, 8% of Evans Hotels, LLC's employees have over 20 years of service, and the average tenure of all employees with over one year of service is 11 years.  Annually, Evans Hotels, LLC pays over $39 million to its employees and over $9.5 million in employee benefits.  Along with competitive health insurance and a matching 401(k) program, Evans Hotels, LLC offers all of its employees interest-free loans and hosts 35 free on-site health and wellness activities throughout the year.  Evans Hotels, LLC is committed to training its employees and promoting based on merit.  45% of Evans Hotels, LLC's managers have received advanced training in leadership development.

10.     The Bahia Resort Hotel, which opened in 1953, is located in the heart of Mission Bay on the Bahia Peninsula.  The Bahia is a full-service hotel, offering, among other things, luxury amenities, on-site restaurants and bars, a fitness center, and resort activities.  Plaintiff BH Partnership, LP is a California limited partnership located at 998 West Mission Bay Drive in San Diego.  BH Partnership, LP owns the Bahia and is a party to the Bahia lease with the City.  Members of the Evans family own and control BH Partnership, LP.

11.     Plaintiff EHSW, LLC is a Delaware limited liability company located at 998 West Mission Bay Drive in San Diego.  Members of the Evans family own and control EHSW, LLC.

12.     Plaintiffs are informed and believe, and thereon allege, that Defendant Unite Here! Local 30 ("Local 30") is an unincorporated association and a labor union.  Local 30 is the local affiliate

of the national UNITE HERE union (formed when the Union of Needletrades, Industrial and Textiles Employees combined with and the Hotel Employees & Restaurant Employees International).  Local 30 represents service workers in the San Diego region.  Local 30 maintains offices at 2436 Market Street (in San Diego) and at 5256 Mission Road (in San Diego County).  Local 30 is a labor organization within the meaning of Section 152(4)-(5) of the NLRA, 29 U.S.C. Section 152(4)-(5).

13.    Plaintiffs are informed and believe, and thereon allege, that Defendant Brigette Browning ("Ms. Browning") is the president of Local 30 and works in San Diego.  Defendant Browning is an individual capable of holding a beneficial interest in property.  On information and belief, Ms. Browning will receive increased salary and/or benefits if the number of union members increases.

14.    Plaintiffs are informed and believe, and thereon allege, that Defendant Tom Lemmon is the business manager of Defendant San Diego County Building and Construction Trades Council, AFL-CIO, and lives and works in San Diego County.  Defendant Lemmon is an individual capable of holding a beneficial interest in property.  On information and belief, Mr. Lemmon will receive increased salary and/or benefits if the number of union members increases.

15.    Plaintiffs are informed and believe, and thereon allege, that Defendant San Diego County Building and Construction Trades Council, AFL-CIO, consists of affiliated construction and trade unions in San Diego County.  San Diego County Building and Construction Trades Council, AFL-CIO maintains an office at 3737 Camino del Rio South, Suite 202 in San Diego.

16.    Plaintiffs are unaware of the true names or capacities, whether individual, corporate, associate, or otherwise, of Defendants sued herein as DOES 1 through 10, inclusive, and therefore sue these Defendants by such fictitious names.  Plaintiffs will seek leave of the Court to amend this pleading to set forth the true names and capacities of said Doe Defendants when the same are ascertained.  Plaintiffs are informed and believe, and on that basis allege, that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, or was acting in concert with, and with the permission, approval, and authorization of, the specifically named Defendants.

**JURISDICTION AND VENUE**

17.     This Court has jurisdiction over the subject matter of Plaintiffs' Complaint under 28 U.S.C. § 1331 and § 1337, because the Complaint arises under federal statutes: the NLRA; the Labor Management Relations Act ("LMRA"); the Sherman Act, 15 U.S.C. § 2; the Clayton Act, 15 U.S.C. §§ 15, 26; and the Racketeering Influenced and Corrupt Practices Act ("RICO"), 18 U.S.C. § 1964(a).

18.     The conduct alleged in this Complaint occurred in interstate commerce, and has substantially affected and will continue to substantially and directly affect interstate commerce.

19.     The Court has personal jurisdiction over the Defendants and venue is proper in the Southern District of California because: (1) the Defendants reside and/or conduct business in the State of California and at least one of the Defendants resides and/or conducts business in this District; and (2) substantial parts of the events or omissions giving rise to the claims alleged herein occurred in this District.

20.     Plaintiffs are informed and believe, and thereon allege, that at all times mentioned herein and unless otherwise alleged, each Defendant was the agent, employee, partner, and/or representative of one or more of the other Defendants, and was acting within the course, scope, and authority of such relationship.  Plaintiffs are further informed and believe, and thereon allege, that each of the Defendants herein consented to, ratified, and/or authorized the acts alleged herein as to each of the remaining Defendants.

**DEFENDANTS' UNLAWFUL CONDUCT**

**Defendants' Goal: Increase Union Dues By Securing a Card Check Neutrality Agreement**

21.     The differences between traditional, lawful labor organization and Defendants' playbook cannot be overstated.  Traditional, statutory NLRA rules focus on *employees*' wants and demands – only once 30% of a group of employees at a given location expresses an interest in a particular union can a union then seek a secret ballot election.  The time period prior to the secret ballot allows employees to hear the pros and cons of unionization to fully inform and determine for themselves whether unionization is best for them.  If the union prevails in the secret ballot, only then can the union negotiate with the employer on the employees' behalf.  This process takes time, effort,

and money, and the union does not always prevail if the employees choose that unionization is not right for them after coming to an informed decision.

22. By contrast to an NLRA sanctioned election, a card check neutrality agreement effectuates a process that allows the union to bypass those legal requirements to unionize a property. Once a card check neutrality agreement is in place, the employer is required to provide the union with a list of all of its employees' names, addresses and home telephone numbers without the employees' knowledge or consent. Then, the employer must allow the union not just access to the property but to affirmatively provide a meeting room during employee work hours at the employer's facility for the representatives to meet with the employees while they are working. Regardless of how the employer feels, or what relevant information the employer holds, the employer is restricted from speaking with its employees about the ramifications of joining the union other than to say it "welcomes the union." The result of this sham employer "welcome" is that the employees never hear the practical consequences of joining the union so that they can make an informed decision.

23. And there are practical considerations that employees may want to consider in deciding whether to join a union. For instance, Evans Hotels' employees would not be able to consider that employee contributions to the Evans Hotels' 401(k) plan vest immediately and employer contributions vest in 25% increments over the course of five years. If an employee decides to leave Evans Hotels at any time, that employee keeps his or her vested account balance and may leave it in the Evans Hotels' 401(k) plan, directly roll it over into another qualified plan, or withdraw the account balance (subject to taxes and penalties for early distribution), regardless of where he or she decides to work, or what he or she decides to do. By contrast, the union's pension plan's benefits are generally not portable and are contingent on the employee working the required number of years at a union hotel that contributes to the pension plan. If that same employee leaves a contributing union hotel without a full five years of vesting service to work at a non-union property, the employee loses all his or her accrued benefits— even though these benefits were earned through contributions that came of out of the employee's wage and benefits package.

24. For obvious reasons, Defendants prefer a process where they control the information presented to employees and where the employer is forced to stay silent as to the consequences of

unionization.  Defendants do not want to invest the time, effort, and money to allow employees to make an informed choice and face the risk of recovering nothing in the way of union dues and fees.  Rather than seek employees' support, they pursue employers' surrender.  Defendants seek to circumvent employees' rights to information, voting, and consent by seeking card check neutrality agreements as their preferred strategy for unionization.

25.    Defendants know that if they are forced to try to organize workers the traditional way, there is a significant chance that they will be unsuccessful.  With a card check neutrality agreement, there is no vote by the employees as to whether to join the union, much less a secret ballot.  Instead, the union simply collects cards from the employees.  Once a majority of cards are signed, the union declares that there is a "voluntary recognition" to join the union.  It is very rare that a "card check vote" under this process results in a "no" for unionization.  With a secret ballot alone, unions win about 50% of the time.   When unions obtain card check neutrality agreements, however, that number increases to 80%.  Such an increase in dues-paying members gives a financial benefit in the form of increased union dues, initiation fees, and employer payments into union pension and health plans.  In fact, Local 30 receives a substantial portion of its income in the form of dues from its members.  On average, a member pays the union $400 a year in dues.  Local 30 also imposes one-time "initiation fees"—ranging from $60-$124—for each new member.  Thus, an increase in dues-paying members causes an immediate increase in income to Local 30 and ongoing increases over time.  On information and belief, those union dues and fees both fund the Defendants' playbook, and benefit Defendants Ms. Browning and Mr. Lemmon personally in both salary and stature.[1]  Local 30 received 99.6% of its $3,494,626 income from dues and dues related fees alone.

26.    Unsurprisingly, employers are generally not inclined to agree to a card check neutrality agreement–a process that denies them the right to oppose unionization and communicate with their employees.

27.    Defendants have resorted to unlawful means, including threats and blackmail, to secure employers' "consent" and effectively move forward with their plan to force the non-unionized hotels

---

[1] Brigette Browning was compensated a total of $117,227 from her vice president role at UNITE HERE, and president role at UNITE HERE Local 30 in 2017.

and their employees to go union.  If Defendants had faith in their ability to lawfully convince employees of the benefits of unionization, Defendants would not need to resort to breaking the law. But when market power and millions of dollars of union dues and fees are on the line, Defendants have instead chosen the route to economically back employers into a corner through unlawful acts.  Once the employer agrees to a card check neutrality agreement, the employer's hands are tied and it must order its employees to listen to the union.  This repeatable, decade-old "playbook" continues to threaten the competitive market for San Diego hospitality jobs and tourist accommodation, as described below.

**Part 1 of the Playbook:  Attack the Non-Union Project on Environmental Grounds**

28.     For each target, Defendants delay, oppose and, if necessary, eliminate the project by painting it as environmentally harmful.  First, they send letters to public officials to express their concern that a new development plan does not align with governing environmental regulations and zoning requirements.  They also request documents from governmental agencies, namely all environmental materials applicable to the development.  Next, they draw public attention to the purported environmental issues, feigned environmental concerns, and sham zoning issues by creating websites (dedicated solely to opposing the project) and/or posting on social media.

29.     Defendants then aggressively pursue frivolous challenges to the development at every level (*e.g.*, City Council first, then the California Coastal Commission, and finally by initiating litigation either directly or indirectly under state statutes such as the California Environmental Quality Act ("CEQA")).  Defendants are not interested in mitigation measures or improvements to the project. Rather, they openly and blatantly pursue the environmental and zoning challenges to the highest level for the sole purpose of delay and, in many cases, complete obstruction.  This sham opposition—a form of "greenmail"—results in a huge expenditure of resources for owners/developers, who are required to respond to hundreds or thousands of pages of drummed up environmental comments and to prepare environmental assessments that would not otherwise be required for the project to be permitted (resulting in high legal and other professional fees).  In addition to the expense incurred, these challenges also delay development for years, oftentimes causing the owners/developers to lose financing and incur other financial disincentives, including land costs as a result.  Thus, the

environmental and zoning opposition has the effect of maintaining the status quo in the development cycle, resulting in less competition, development, and commerce in the San Diego market.

**Part 2 of the Playbook: Threaten Third Parties**

30.     While pursuing the frivolous environmental and zoning challenges, Defendants utilize additional unlawful tactics, such as threatening third parties.  Defendants may threaten neutral third parties who do business with the non-union developer, using the risk of disrupting the third party/non-union developer's business relationship as leverage to force the developer to accede to Defendants' demands.

31.     Defendants also strong-arm city councilmembers or Coastal Commissioners by offering union money and support for their election(s) or reelection(s) if they vote against the project regardless of whether it is in the best interest of the residents of San Diego.[2]

**The Playbook in Action**

32.     Defendants' playbook is common knowledge among owners, developers and local government in San Diego.  Defendants have followed this playbook of unlawfully interfering with and obstructing non-union projects to attain control of any new or redeveloped hotels in the prime tourism areas in San Diego:  Mission Bay, Downtown, and Mission Valley.  Defendants target each non-union project not simply to unionize each individual project, but to send a broader message to hotel developers and owners in San Diego that Local 30 is the gatekeeper of the hospitality labor market in the prime tourism areas of the City.

33.     Over the last ten years, Defendants have used this playbook to cause non-union projects in the market to grind to a halt, at times for years, and/or to cease entirely.  Some of the more recent victims of Defendants' misconduct include the notorious Ritz-Carlton/Cisterra development at 7th and Market Streets in Downtown San Diego (delay of over three years, resulting in Whole Foods backing out of the project); the Town and Country Hotel and Convention Center in Mission Valley (delay of one and a half years prior to entering into card check neutrality agreement); the Sunroad Hotel on Harbor Island (delay of over five years before card check agreementsigned, and hotel project still not

---

[2] The California Coastal Commissioners are appointed variously by the California Governor, Speaker of the California Assembly and California Senate Rules Committee.

constructed); the Lane Field development (including the InterContinental and SpringHill Suites & Residence Inn) (delay of over one year); and the Hotel Del Coronado (delay of approximately eighteen months).

34.     Not only do the owners and developers of the projects incur the cost associated with defending against Defendants' sham litigation and coercive misconduct, but the residents of San Diego are also held hostage by the Defendants' misconduct.  Specifically, new projects and redevelopment efforts translate into more jobs, increased tourism and revenue for the city and healthy competition. Likewise, having union and non-union properties (as determined by legal and fair union voting practices) allows for competition in the hospitality industry and choices for workers.  Defendants' anti-competitive and abusive conduct exploits the time and resources of public agencies and the courts, to Defendants' exclusive financial benefit.

35.     In repeating the playbook, Defendants count on the fact that non-union developers and owners will surrender without a fight after seeing what others, including Evans Hotels, have lost once Local 30 stamped a red "X" on their back.  A few examples of Defendants' real life targets follow:

**The Cisterra Development**

36.     In December 2013, Cisterra Development ("Cisterra"), a real estate development company based in San Diego, began the process of completing a Request for Qualifications and Proposals (issued by Civic San Diego) to complete a $400 million project on Market Street that would combine residential, hotel, office, and public parking uses.  Unfortunately, although Cisterra agreed to sign a PLA and use union labor for construction, it did not have authority or control to commit the owner of the housing/hotel complex (Marriott) to agree to a card check neutrality agreement.  Thus, Defendants Local 30 and Ms. Browning targeted Cisterra, a third party "secondary employer," in order to exert pressure on Marriott, the primary employer, to agree to sign a card check agreement for its employees.  Although Cisterra's comparable projects typically take three years to complete from planning through construction, the project to date has still not been constructed.  Defendants' efforts to block this development include the following acts:

- Forcing delay in negotiations between the city and Cisterra by insisting on a requirement the San Diego City Attorney found illegal: that all businesses operating in the development accept a card check neutrality agreement;

- Having staff members of Local 30, such as Rick Bates, speak at public hearings to oppose the project for a number of sham reasons, including the adequacy of the environmental review that was completed for the project;

- Through San Diegans for Responsible Planning and a nominal plaintiff who, on information and belief, is a member of Local 30's Executive Board, filing a sham CEQA suit against the City of San Diego and Cisterra that challenged the City's approval of the project; and

- Appealing the Court's finding that substantial evidence existed to support the City's approval.

On information and belief, Marriott entered into a card check neutrality agreement with Local 30. However, that was after the delays engendered by Defendants had already caused Whole Foods to terminate its agreement to lease space in the Cisterra project.

**Town and Country Development**

37.    Atlas Hotels, the owner of the Town and Country Hotel and Convention Center site in the Mission Valley area of San Diego, formed a joint venture with financial backers in 2015 to consolidate and renovate the hotel and convention center, create a new compact multi-family residential neighborhood, restore San Diego River open space habitat, and establish recreational areas. Defendants' efforts to block this development and coerce Town and Country into signing a card check neutrality agreement include the following acts:

- Sending a letter, through its local counsel Tony LoPresti (an attorney with the firm Altschuler Berzon LLP), to the Wetlands Advisory Board falsely claiming to have identified "serious flaws" in Town and Country's Draft Environmental Impact Report (EIR);

- Sending a 123-page letter, signed by Tony LoPresti, to the City of San Diego raising environmental challenges to the Draft EIR;

- Having staff members of Local 30 speak on behalf of Local 30 at public hearings to oppose the project, including the adequacy of the environmental review that was completed for the project.

38.     The above-mentioned actions effectively stalled City Council's consideration of the project by over eight months.  Town and Country ultimately entered into a card check neutrality agreement with Local 30.  Tellingly, no environmental litigation ensued, and at the next City Council meeting, not a single person from Local 30 objected to the project on environmental grounds and the San Diego City Council approved all actions necessary to begin the project.

**Sunroad Project**

39.     In 2014, Sunroad Enterprises ("Sunroad") began in earnest the process of developing a restaurant and hotel on Harbor Island in San Diego.  Because Sunroad is non-union, Local 30 pushed to block the development by engaging in the following acts:

- Appealing the Port of San Diego's determination to exclude the restaurant from coastal development permit requirements;
- Having its counsel submit a letter in support of its challenge, claiming that a proposed Port Master Plan Amendment sought for the property required the California Legislature to amend that California Coastal Act and that the proposed amendment should be denied because a proposed hotel on the property did not provide lower cost overnight accommodations;
- Having Ms. Browning meet with the President of Sunroad Holding Corp. to clarify that Local 30 was opposing the project because it wanted to set precedent that everyone who goes through the Port has to sign a card check neutrality agreement with Local 30;
- Threatening Sunroad to do everything in its power to block the project with the California Coastal Commission; and
- Pressuring the California Coastal Commission to veto the project.  On information and belief, Ms. Browning and Mr. Lemmon met with Coastal Commissioners in the days before the Sunroad project was heard (and voted against) by the Coastal

Commission on August 13, 2015 and instructed them unlawfully to vote against the project unless and until Sunroad agreed to a card check neutrality agreement.

40. After years of opposition, Sunroad acquiesced in 2018 and signed a card check agreement. Once this happened, Local 30 dropped its opposition to the project.

**The Hotel Del Coronado**

41. Hotel Del Coronado is a national historic landmark that opened in 1888. Between 2003 and 2008, KSL Resorts and CNL Hospitality Properties (hereafter "KSL Resorts") sought and received permits to revise the Hotel Del Coronado's Master Plan to allow for physical improvements to the property. KSL Resort's contract with Local 30 was set to expire in 2009, and with labor uncertainty on the horizon in 2008, Local 30 exploited Hotel Del Coronado's plans to expand and again turned to its pattern of coercion by completing the following acts:

- Appealing the approval of the permits to the California Coastal Commission;
- Filing a complaint against the City of Coronado, the City Council of Coronado, the Hotel Del Coronado, Hotel Del Partners, and KSL Management, with frivolous CEQA claims. On December 4, 2009, the Superior Court of San Diego found that the City did not violate CEQA and that there was substantial evidence to support the City's decision to approve the Project;
- Demanding a full-blown and unnecessary Environmental Impact Report to further stall the City Council's approval process and pressure the Hotel into agreeing to provide health care benefits only through Ms. Browning's health care organization.

42. Unsurprisingly, once the hotel came to an agreement with Local 30 regarding health benefits, Local 30 withdrew its appeal of the Coastal Development Permits, and did not again threaten to block the Hotel's expansion

**San Diego Marriott Marquis & Marina**

43. The San Diego Marriott Marquis & Marina (the "Marriott Marquis") is a hotel located at 333 West Harbor Drive in Downtown San Diego. In 2011, the Marriott Marquis proposed a redevelopment project that would result in reconstruction of its existing facilities, as well as

construction of a public access way and a 25,000-square-foot public promenade.  Consistent with its playbook, Local 30 engaged in the following acts to halt the Marriott's proposed expansion:

- Appealing the City Council's water easement determination in connection with the Marriott Marquis project, making the sham allegation that the project required further analysis under CEQA;
- Opposing the Board of Port Commissioners' approval of a Port Master Plan Amendment for the Marriott's expansion; and
- Sending a letter of opposition to the Coastal Commission through its attorneys regarding the Coastal Commission's consideration of the Port Master Plan Amendment.

44.    This repeated unfair and unlawful strategy from UNITE HERE Local 30 stems from the highest level of management within the union, as the former General President of its parent union, UNITE HERE, publically asserted that: "[T]o be successful [in unionizing target companies], I believe you have to be relentless . . . We're not businessmen, and at the end of the day they are.  **If we're willing to cost them enough, they'll give in**."  (Bruce Raynor's presentation at the annual meeting of the American Political Science Association, Atlanta, Georgia, September 3, 1999) (emphasis added).

45.    In addition to the projects discussed above, Defendants have targeted other developments.  As shown in the graphic below, Defendants have targeted virtually all significant, non-union projects on the coastline or in downtown San Diego over the course of the last fifteen years.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Defendants' Targets



A. Bahia Hotel
B. Town & Country
C. Sunroad Project
D. Fat City Hotel Project
E. Lane Field Hotel Development

F. AC Hotel Project
G. Marriott Marquis & Marina
H. Cisterra Development
I. Convention Center Expansion
J. Hotel Del Coronado

46.     As they did with each of the projects described above, Defendants are now using the same illegal playbook with the Bahia Resort Hotel redevelopment project.  Defendants seek not only to unionize the Bahia Hotel, but also to make an example out of Evans Hotels.  The message to all other non-union developers and owners is clear: see how much you will spend and lose if you present Local 30 with any opposition.

**Local 30 Targets Evans Hotels in the 1990s**

47.     This is not the first time Local 30 has used the playbook against Evans Hotels or the Bahia.

48.     In 1996, Local 30, then under the helm of Ms. Browning's stepfather, Jef Eatchel, and Ms. Browning's mother, Nancy Browning, targeted the Bahia and the Catamaran, another Evans family owned hotel.  Specifically, Local 30 called and wrote letters to at least three of Evans Hotels' clients, including the ACLU, and threatened that if they did not cancel their reservation at Evans Hotels, Local 30 would disrupt their trip by picketing the hotel.   When one of Evans Hotels'  clients asked an agent of Local 30 why it was targeting Evans Hotels, the agent responded that it was due to purported anti-union actions that Bill Evans had taken in his role on the Board of the San Diego Convention Center Corporation.  As a result of Local 30's unlawful secondary threats and conduct, at least two of Evans Hotels' clients canceled their scheduled conferences.  It was only after Evans Hotels filed a lawsuit against Local 30 that Local 30 agreed to stop unlawfully targeting Evans Hotels.  In fact, Local 30 agreed to cease any attempt to unionize the Bahia (or any other Evans Hotels owned property) for a period of 5 years.  While twenty years have now passed and the reigns of Local 30 have passed from Jef Eatchel and Nancy Browning to daughter Brigette Browning, Local 30 continues to resort to the same unlawful conduct in an effort to impede competition and commerce.[3]

**Local 30 Targets the Bahia Redevelopment Project in 2018**

49.     On November 5, 2015, Evans Hotels requested City Council approval of the lease amendment for the Bahia.

---

[3] Nancy Browning, Ms. Browning's mother, earns an annual salary of $91,312 from Local 30 for work as a contract administrator.

50.     As expected, Defendants responded by implementing Part 1 of their playbook.  On February 28, 2018, Tony LoPresti of the Altshuler Berzon firm (not coincidentally the same attorney who represented Local 30 in the Town and Country dispute referenced above) sent a letter on behalf of Local 30 to San Diego Mayor Faulconer and San Diego City Council members.  Its re line read: "Access to information regarding environmental review of the Bahia Resort Hotel Lease Amendment."  Mr. LoPresti stated that he wrote on behalf of his client, Local 30, "to express concern regarding the lack of transparency and access to information pertaining to environmental review of the proposed Lease Amendment for the Bahia Resort Hotel Renovation Project . . . ."  Mr. LoPresti expressed his concern that the Bahia redevelopment was being processed "to preclude public comment on environmental review under [CEQA]" because the project was being analyzed under an EIR addendum to the EIR previously approved for the MBMPU, which is not subject to public comment.

51.     On May 11, 2018 Mr. LoPresti sent another letter to the Mayor and the City Council, this time claiming that because the project purported to eliminate Gleason Road it was not consistent with the 1997 MBMPU and therefore would require Evans Hotels to amend the MBMPU in order to move forward.

52.     Defendants knew or had reason to know that the retention of Gleason Road was not a part of the MBMPU.  Although the words "Retain Gleason Road" mysteriously appear on an unapproved, amended graphic that was prepared after the approvals for the Bahia redevelopment were articulated, this requirement is nowhere to be found in the administrative record.  In fact, the Planning Department of the City of San Diego formally issued a memo on October 3, 2018, stating that the City conducted a thorough examination of the administrative record and concluded again that the retention of Gleason Road is not part of the MBMPU.  Therefore, the Bahia's proposed lease amendment does not require an amendment to that plan.  Notwithstanding this, Defendants continue to propagate false information that the MBMPU forbids the elimination of Gleason Road.  Specifically, Defendants created and sponsored a website, "nomissionbaylandgrab.org," and a related Facebook page to disseminate the false message that the Bahia redevelopment violates the MBMPU.  In fact, users on Facebook have shared a link to the website over 330 times.

53.     Because Defendants' opposition is unrelated to the proposed changes to the Bahia (but rather is directed at keeping a non-union project out of the market), Defendants continued their obstructive (and destructive) conduct.  They met individually with city councilmembers and demanded that they revoke or change their position regarding the proposed Bahia lease amendment unless Evans Hotels agreed to meet with Ms. Browning.  Plaintiffs allege on information and belief that these meetings with city councilmembers were conducted by Ms. Browning on behalf of Defendants.

54.     Plaintiffs first learned of Ms. Browning's action in the February/March 2018 timeframe. On February 23, 2018, Grace Cherashore, the Executive Chairwoman of Evans Hotels, (hereinafter "Ms. Cherashore") met with a San Diego City Councilmember (hereinafter "Councilmember I") in an office at 10:00 a.m.  At this meeting, Ms. Cherashore presented materials regarding the project and Evans Hotels generally.  Ms. Cherashore specifically addressed why Evans Hotels did not want to unionize, including the fact that it would hinder Evans Hotels' ability to have a direct relationship with its employees and promote based on merit.  Ms. Cherashore talked about different employee programs, including the interest free loans it offers to employees, its high quality health insurance, and matching 401k program.  The fact that Evans Hotels' employees commute right past unionized hotel properties with job postings on the way to work, such as the Hilton or the Hyatt, speaks to the fact that many workers prefer a non-unionized work environment.  Ms. Cherashore also noted that each of Evans Hotels' hotels are listed in the top 40 of Trip Advisor ratings, while competing union properties are all ranked significantly lower.  Evans Hotels has scores of employees who have been with the business for more than a decade.  For these reasons, Ms. Cherashore stated that although Evans Hotels was committed to the City of San Diego and prepared to invest hundreds of millions of dollars in the Bahia redevelopment, it would do so only if it could continue to operate in a non-unionized environment. Ms. Cherashore concluded by pointing out that the City would benefit to the tune of almost *half a billion dollars* in increased revenue over the course of the lease.

55.     In response, Councilmember I indicated personal support for the proposal and strategized as to who else Ms. Cherashore should speak with in order to assure that the project get the necessary approvals from the City (e.g., Municipal Employees Association).  Councilmember I stated

1   that a lunch meeting was already scheduled with Ms. Browning and that Councilmember I would

2   speak to her and attempt to gain her support for the project.

3        56.    Weeks later, Mr. Evans received a call from one of Councilmember I's staff members.

4   The staff member indicated on this call that there was now a "problem" with the Bahia proposal and

5   that Councilmember I (and others on City Council) can "no longer support it."  When Mr. Evans

6   pressed as to what had caused the City to change its stance, the staff member indicated that

7   Councilmember I had met with Ms. Browning and that Ms. Browning had pressured Councilmember I

8   to agree to oppose the project, regardless of what this would mean in terms of lost revenue for the City.

9   On information and belief, Ms. Browning "pressured" Councilmember I by conditioning future

10   funding and political support for Councilmember I on her agreement to unlawfully oppose the Bahia

11   unless Evans Hotels agreed to sign a card check neutrality agreement.  On information and belief,

12   Councilmember I was aware that conditioning project approval on an employer's agreement to sign a

13   card check neutrality agreement was unlawful:  the City Attorney previously addressed this issue in a

14   letter directed to the Mayor and City Council members on December 2, 2015.  Mr. Evans expressed his

15   disappointment that the City's change in stance ignored the merits of the project and the benefits to the

16   City.  Mr. Evans asked that Councilmember I communicate the change in position directly to Ms.

17   Cherashore.

18        57.    On March 23, 2018, Councilmember I spoke with Ms. Cherashore at a luncheon they

19   both attended at the Bahia Hotel.  Councilmember I pulled Ms. Cherashore aside so they could speak

20   privately.  Councilmember I indicated that the lunch meeting with Ms. Browning took place, and that

21   unless Evans Hotels agreed to a card check neutrality agreement at the Bahia, Councilmember I would

22   have to oppose the project.  When Ms. Cherashore reiterated the benefits of being a non-union property

23   and how the proposed redevelopment would benefit the city of San Diego,  Councilmember I

24   responded that "not all card check neutrality agreements are the same."  Councilmember I insisted that

25   Evans Hotels would need to sign some form of a card check neutrality agreement for Councilmember I

26   to support the project.  Councilmember I made it clear that this position was based solely on the

27   discussion Councilmember I had with Ms. Browning and that Councilmember I's personal view that

28   the project would benefit the residents of San Diego had not changed.

58.     Conditioning City Council support for a development on the developer's acceptance of a card check neutrality agreement is unlawful and preempted by the NLRA.  The San Diego City Attorney expressly advised the City Council of this in a 2015 Memorandum in response to efforts to force Cisterra to accept a card check neutrality agreement.  On information and belief, Local 30 knew such a demand was unlawful and contrary to the City Attorney's analysis when Ms. Browning pressured Councilmember I to unlawfully require that Evans Hotels agree to a card check neutrality agreement.

59.     When Evans Hotels refused to acquiesce, Ms. Browning sent her cohort, Tom Lemmon to meet with Mr. Evans and personally deliver a message.  Specifically, on the morning of June 30, 2018, Mr. Lemmon texted Mr. Evans to meet him at the Catamaran Hotel for a drink.  After making small talk, Mr. Lemmon raised the Bahia redevelopment, initially stating that he thought the redevelopment would result in a lack of access on Bahia Point.  After discussing this point with Mr. Evans, Mr. Lemmon agreed that the new walkway proposed as part of the redevelopment would be better for bike and pedestrian access than the current road (Gleason), which is designed for cars.

60.     Mr. Lemmon then abruptly shifted gears to the reason for the meeting and stated firmly that Evans Hotels needed to sign a card check neutrality agreement with Ms. Browning and Local 30. Initially, Mr. Lemmon focused on the benefit to Evans Hotels of unionizing—claiming that it would result in union money and guests flowing to Evans Hotels' properties.  When Mr. Evans made it clear that Evans Hotels would not voluntarily sign a card check neutrality agreement, the discussion quickly shifted to greenmail and other union tactics.  Mr. Evans told Mr. Lemmon that Ms. Browning and Local 30 had already hired lawyers to threaten the redevelopment.  He noted that those attorneys had already sent letters to the Mayor and City Council.  Mr. Lemmon appeared excited by the reference to the letters, and told Mr. Evans that those were "my lawyers" and that "they always win."  He admitted to Mr. Evans that it was greenmail, but said the union would cover its tracks if Evans Hotels agreed to the neutrality agreement by requiring a couple of "small mitigation measures."  Mr. Lemmon made it clear to Mr. Evans that Local 30 and its allies, including Mr. Lemmon, intended to use CEQA and other environmental challenges to hold the Bahia redevelopment project hostage.  Although Mr. Lemmon is not associated with Local 30, he did not hide the fact that Ms. Browning was behind the meeting and

exchanged numerous text messages with Ms. Browning during the course of the discussion. Mr. Lemmon concluded the meeting by threatening Mr. Evans that if he did not meet with Ms. Browning, his project would be doomed as the union would hold it up—stating "we know how to do it, we do it all the time."

61.     The threats were not idle. On September 11, Local 30 posted links on its Facebook pages to a website that it funded and created. This website, called "No Mission Bay Land Grab at Bahia Point by UNITE HERE Local 30," contains false and misleading information regarding the Bahia Project.

62.     On September 19, 2018, Evans Hotels' CEO, Robert Gleason, ran into Mr. Lemmon in the lobby of City Hall. Mr. Lemmon asked Mr. Gleason if he had seen all the social media about the Bahia project, to which Mr. Gleason responded that he had. Mr. Lemmon then asked Mr. Gleason if he was interested in sitting down to talk about it, and advised that, "just so you know, we're going to turn up the volume."

63.     In early October, 2018, the City Real Estate Assets Department was trying to schedule a hearing on the Bahia lease amendment with a City Council Committee. Mr. Gleason learned that the Bahia lease amendment would not be put on the agenda for the Committee meeting in mid-October because there were too many items on the agenda.

64.     On October 9, 2018, a representative Evans Hotels spoke with a staff member representing a different San Diego City Councilmember (hereinafter "Councilmember II") on scheduling the Committee hearing. The staff member noted that Councilmember II would not calendar the Bahia lease amendment on the requested date because Ms. Browning and Councilmember II are "best friends" and that Ms. Browning, had been "very good" to Councilmember II, and has helped Councilmember II out on many occasions.

65.     Not surprisingly, far from being "too busy," there were only three agenda items heard at one of the requested Committee hearing dates and the other Committee hearing date was taken completely off calendar.

66.     Sensing weakness, on October 19, 2018, Mr. Lemmon initiated a text message communication with Ms. Browning and Gleason, in which he said, "**Bahia** We should all huddle up."

1  Mr. Lemmon then told Ms. Browning to "send Robert [Mr. Gleason] [her] card check language in

2  advance . . . . I got the feeling he's gonna need it." After Ms. Browning responded, "Yep," Mr.

3  Lemmon then added, "Robert I'd like to see all construction and future maintenance done by Union

4  signatory contractors."

5  **Defendants Threaten SeaWorld, Evans Hotels' Business Partner**

6      67.    While successfully carrying out Part 1 of their playbook and delaying a vote on the

7  Bahia lease amendment, Defendants further turned up the volume by implementing Part 2.  At the

8  same time that Defendants were drumming up environmental opposition, strong-arming City Council

9  officials to impose unlawful conditions and delay hearings, and posting false messages on its website,

10 they also turned up the heat by going after Evans Hotels' business partners, specifically Sea World

11 LLC ("SeaWorld").

12     68.    Evans Hotels' relationship with SeaWorld is long-standing.  Evans Hotels first entered

13 into a business venture with SeaWorld several years ago, on April 21, 2015, when the parties signed a

14 Letter of Intent to explore hotel development opportunities on the property of SeaWorld's San Diego

15 Park.  Later that year, on November 4, 2015, SeaWorld and Evans Hotels entered into a Preliminary

16 Project Agreement to develop an upscale, full service SeaWorld themed and branded hotel of

17 approximately three hundred rooms adjacent to the theme park.  Evans Hotels' business agreement

18 with SeaWorld was a matter of public knowledge as the parties issued a press release on November 9,

19 2015 announcing their intention to develop the hotel next to the theme park.  In the ensuing days, the

20 LA Times, Fox News and the San Diego Tribune wrote articles about the expected success of the joint

21 venture.

22     69.    After years of further negotiation and collaboration, on January 22, 2018, the parties

23 formally agreed to a Joint Venture to develop, own and operate a hotel project (hereinafter "SeaWorld

24 hotel") leased by SeaWorld.

25     70.    Defendants knew about the Joint Venture and the significance of this opportunity for

26 Evans Hotels' business.  SeaWorld is one of the top tourist attractions in San Diego and the Joint

27 Venture contemplated Evans Hotels' hotel to be the first hotel in the country branded with SeaWorld's

28 name.

71.     Defendants also knew that it was important to SeaWorld to build new attractions in the San Diego park.  These new attractions require Coastal Commission approval.   SeaWorld had already encountered problems with the Coastal Commission in 2016 when the Commission had conditioned approval of SeaWorld's $100 million proposed expansion to the orca tank and habitat (referred to as "Blue World") on SeaWorld's agreement to discontinue its orca breeding program.  Although SeaWorld initially sued the Coastal Commission on the ground that it had no legal basis to take the action it did, ultimately SeaWorld absorbed the loss and focused its energy on developing new rides for its parks.  SeaWorld was not back before the Coastal Commission until Summer 2017 when it sought approval of a new ride for its San Diego theme park called the "Electric Eel."

72.     By 2018, SeaWorld had retained a consultant, Allison Rolfe, President of Collaborative Land Use Solutions, and former environmental activist to facilitate its dealings with the California Coastal Commission and other environmental groups.  Not coincidentally, Ms. Rolfe is also very close friends with Ms. Browning.  Although SeaWorld is not unionized, the union did not to oppose the Electric Eel ride because of the large number of new union jobs that would be created in constructing it.  SeaWorld was also able to get approval of a new roller coaster for construction and release in 2019.  The union's support, however, was limited and ultimately designed to send a message to SeaWorld that if it wanted to move forward with its new attractions it would need Defendants' continued support.

73.     At the same time that Ms. Rolfe was advising SeaWorld in its dealings with the union, Ms. Rolfe was also meeting with Mr. Evans regarding the Bahia.  Specifically, Ms. Rolfe met Mr. Evans for lunch on or around March 22, 2018 to discuss the Bahia proposal and how it could negatively impact the SeaWorld hotel.  While Ms. Rolfe communicated that she could get Ms. Browning to agree to "back off" the SeaWorld hotel, to do so Evans Hotels would need to first agree to do a deal with Ms. Browning for the Bahia.  Ms. Rolfe shared with Mr. Evans that Mr. LoPresti had sent a letter to the San Diego City Council on behalf of Local 30 opposing the Bahia.  Because no one at City Council had shared this letter with Mr. Evans, he was unaware of its existence until he met with Ms. Rolfe.   On information and belief, Ms. Rolfe knew about this letter from Ms. Browning.  In this lunch meeting, Ms. Rolfe told Mr. Evans that Ms. Browning has "a real problem with you" and that unless he did a deal with Ms. Browning she would target all of Evans Hotels' projects and SeaWorld as

Evans Hotels' business partner. By contrast, if Evans Hotels agreed to the card check agreement, the environmental opposition would resolve itself. By way of example, Ms. Rolfe referenced her work in securing entitlements for Pacifica Hotels to build a 30-story hotel on environmentally sensitive land. Put simply, Ms. Rolfe conveyed that Pacifica Hotels was able to build its hotel by doing what she urged Evans Hotel to do—i.e., sign a card-check neutrality agreement with Ms. Browning.

74. Ms. Rolfe spoke regularly with Mr. Evans during the Spring 2018 time frame and relayed the same message again and again: If you want to be able to move forward with SeaWorld, you need to do a deal with Ms. Browning for the Bahia.

75. In or around June or July 2018, when Evans Hotels refused to acquiesce to Defendants' threats and demands, Ms. Browning turned her focus instead on SeaWorld, Evans Hotels' business partner. Through Ms. Rolfe, Ms. Browning communicated to SeaWorld that if SeaWorld continued its partnership with Evans Hotels, SeaWorld would face severe opposition from the union and other union allies in connection with getting approval for its master plan amendment. Not only would opposition to the master plan amendment jeopardize the SeaWorld hotel, but also, more importantly, it would frustrate SeaWorld's ability to open new attractions contemplated in the plan and currently pending in the pipeline for approval. The message to SeaWorld was clear: Either terminate your deal with Evans Hotels or face years of delay and opposition in getting future rides passed through the Coastal Commission.

76. As expected, when faced with the prospect of the union targeting its core business plan to open up new attractions in San Diego, SeaWorld had no choice but to agree to abandon its Joint Venture with Evans Hotels and pay out more than $2.8M in termination fees.

77. In mid-July 2018, Bill Evans received a phone call from John Reilly, the interim CEO of SeaWorld regarding the Joint Venture. Mr. Reilly stated on the call that he understood there was "a big problem" with the union relating to the Bahia and that SeaWorld could not afford to be involved with anyone or any projects that could delay SeaWorld's ability to get its master plan approved. Mr. Reilly said that while SeaWorld still liked conceptually the idea of a SeaWorld hotel and believed that it would bring millions of dollars in increased revenue to the city, SeaWorld's stock price is dependent on developing new rides and that SeaWorld could not afford to become a target of the union. Given

the choice of keep the hotel and spend years fighting the union or drop the hotel and move forward with the planned opening of key attractions for the park, SeaWorld had no choice but to break its venture with Evans Hotels.

78.     Evans Hotels' CEO, Robert Gleason, had a subsequent phone call with Mr. Reilly on the same subject on or around July 26, 2018.  On this call, Mr. Reilly reiterated SeaWorld's concern regarding the union and asked that the parties arrange for an in person meeting in San Diego to discuss. Without going into much detail, Mr. Reilly reiterated that while there was still "interest" conceptually in doing a SeaWorld hotel, he said that rides are the "lifeblood" of the organization and that would have to take priority.  Mr. Reilly expressed concern that doing a hotel with Evans Hotels would make SeaWorld a target to union opposition and reiterated that SeaWorld could not afford any "wrinkle" in the master plan relating to the approval of new attractions at the San Diego Park.

79.     On or around August 10, 2018 the parties convened at SeaWorld's office in San Diego. Mr. Reilly again reiterated that SeaWorld's focus was on its new attraction cadence and that being able to open up new attractions on an annual basis was critically important to SeaWorld's success. Although SeaWorld had been able to get its new ride Electric Eel approved by the Coastal Commission for 2018, there were other rides in the pipeline pending approval because they need an amendment to the SeaWorld Master Plan.  While SeaWorld still saw the value in a branded hotel, it told Evans Hotels that it could not move forward with this plan at the expense of its core business of opening new attractions at its parks.

80.     SeaWorld pointedly asked about the status of the Bahia and whether Evans Hotels had agreed to meet with Ms. Browning or anyone else at Local 30.  When Mr. Evans responded that Evans Hotels had not agreed to meet with Ms. Browning, Corrine Brindley, SeaWorld's Vice President of State Affairs, said that SeaWorld's concern is that if Evans Hotels did not do a deal with Ms. Browning for the Bahia, Defendants would come after SeaWorld and its proposed new attractions with "pitchforks in air."

81.     Mr. Reilly acknowledged that SeaWorld's decision effectively threw Evans Hotels under the bus but said again that SeaWorld had no choice but to "protect its bread and butter" from union interference.

82.     On September 19, 2018, Tony Taylor, the General Counsel of SeaWorld, called Robert Gleason and formally terminated the Joint Venture with Evans Hotels.  He stated that while SeaWorld valued its relationship with Evans Hotels, SeaWorld's leadership had decided that they could not move forward with the Joint Venture as it would jeopardize SeaWorld's underlying capital strategy of opening up new attractions at its theme park.  He then stated that SeaWorld would move forward without Evans Hotels in the Master Plan Amendment so that it could formally get the entitlement process moving forward on its new attraction.   Mr. Taylor reiterated that while it was a difficult decision to make given the amount of time, energy and money invested by the parties in the SeaWorld hotel, SeaWorld had no choice but to protect its core business.

83.     On November 7, 2018, SeaWorld issued an SEC filing formally announcing its decision to abandon the SeaWorld hotel.  Although SeaWorld did not share in the press release the real reason why it was that it had decided at significant cost to abandon a hotel destined to bring thousands of jobs and hundreds of millions of dollars in anticipated revenue to the city of San Diego, the message was clear.  In fact, the following day Mayor Faulconer pulled aside Mr. Evans and asked why it was that SeaWorld abandoned the project after years of investment and collaboration with Evans. When Mr. Evans declined to respond, the Mayor leaned in and said, "It was the Union, right?"

84.     Approximately one week later, a SeaWorld executive confirmed to Evans Hotels that the reason why the Board of Directors terminated the joint venture with Evans Hotels was based on the union's threats to target SeaWorld if it continued in its joint venture with Evans Hotels.  The SeaWorld representative's confirmation that it terminated the joint venture because of the union's threats closed the latest chapter of the illegal extent to which Defendants will engage in anti-competitive behavior.

**Defendants Continue to Interfere with the Bahia Project**

85.     When Councilmember II refused to schedule the Bahia lease amendment for a hearing at the Committee level, Evans Hotels requested that City Council President, Myrtle Cole, direct docket the Bahia lease amendment.  Ms. Cole refused.  When Mr. Evans called Ms. Cole to ask why the Bahia would not be docketed, Ms. Cole admitted that the unions had given her "hundreds of thousands of dollars to win this thing" and that they (Ms. Browning and Mr. Lemmon) would be upset if the Bahia was to get docketed before the newly-elected city councilmembers take office.  Ms. Cole offered to

check with her Chief of Staff to see if he could make a change but said she thought it was very unlikely.

86.     After hearing that the President of City Council was unable to docket an item out of fear of Ms. Browning and Mr. Lemmon's reaction, Evans Hotels turned to the Mayor of San Diego for help.  Unfortunately, Defendants were undeterred.  On November 26, 2018, Local 30 contacted the Mayor's office and demanded that he stop asking the City Council to docket the Bahia for December 3, 2018.

87.     Then and only then, after surrender by Evans Hotels was all but certain, Ms. Browning and Mr. Lemmon met with Robert Gleason and Bill Evans at the Patio in Mission Hills on November 27, 2018 at 4 p.m.  After exchanging brief pleasantries, Mr. Gleason raised the issue of the numerous environmental challenges to the Bahia and Evans Hotels' belief that the opposition all stemmed from Defendants' desire to unionize the Bahia.  Although Mr. Lemmon was careful not to discredit the environmental opposition, he acknowledged that neither he nor Ms. Browning could speak to any of the purported environmental concerns.  Instead, he rationalized their opposition by stating that the union is a business and its objective is to sign up members via a signed PLA and card check neutrality agreement.  When Mr. Evans posed the question as to why they should agree to do this, Ms. Browning responded bluntly "so that you can go forward with your project" and be able to pursue other opportunities in San Diego.  In case the message was not clear enough, Mr. Lemmon likened the union's conduct to a "grenade with the pin on the table."  Mr. Lemmon said that although the "pin" had been taken out of the grenade, there was still time to put it back in.  Ms. Browning made clear that the alternative for Evans Hotels would not be pretty.  Citing her sham environmental suit with the Cisterra development and the affordable accommodation challenge she pulled out of "thin air" to oppose the SunRoad development, Ms. Browning assured Evans Hotels that they would stop at nothing to prevent the Bahia from going forward.  When Mr. Evans asked why they were targeting Evans Hotels, as they were good employers, Mr. Lemmon appeared surprised and said this has nothing to do with Evans Hotels being "bad people" or a "bad employer."  To the contrary, both he and Ms. Browning reiterated that it is a "new era" for the unions.  Mr. Lemmon summed it up by saying "we have a business just like you have a business" and that their focus was on increasing the number of members because that

translates into increased dues.  Ms. Browning added that the plan is to have 10,000 members within a year's time and ultimately to use their control over the City Council[4] and the California Coastal Commission to unionize "each and every hotel in San Diego."  In other words, non-union hotel owners/developers in the market would need to sign up or be forced out of the Mission Bay and Downtown market.

88.     Defendants have taken all of these surreptitious actions knowing full well that that their ultimate objective–Evans Hotels' forced execution of a card check neutrality agreement–is an unlawful act that neither the City Council nor any other state or local governmental entity may impose upon Evans or any other employer.  Indeed, the San Diego City Attorney, in his 2015 Memorandum to the San Diego City Council, specifically advised the Council and the public of this federal prohibition.

89.     Defendants have taken the steps described herein in an attempt to allow Local 30 to control and monopolize the prime tourist regions of San Diego, including the waterfront along Mission Bay and Downtown and to eliminate competition and development from non-union hotels.  Defendants' actions in opposing any hospitality development project by a full-service hotel in these areas whose labor is not represented by Local 30 has the effect of forcing all existing hotels undergoing renovation and/or expanding their footprint (which all hotels must do regularly to continue to attract guests) to "go union" and forcing all newcomers to the San Diego hotel market to either use union labor, both in the construction and operation of the properties, or to build elsewhere.  This is harmful to competition in the San Diego hospitality market in multiple ways, including but not limited to the following:

a.   **First**, Defendants' actions in forcing San Diego hotels to "go union" has the effect of imposing certain wage scales and work rules on all full-service hotels in the San Diego waterfront, regardless of a hotel's ability to pay or desire to use non-union workers for reasons unrelated to wage scale (*e.g.,* because the hotel has found that its efficiency and performance is tied to its long-term employees, who have consistently refused to vote to

---

[4] On information and belief, Ms. Browning has repeatedly mentioned that she is "best friends" with Councilmember II, and that her husband was responsible for getting Councilmember II elected to office.  Ms. Browning even referred to Councilmember II as the Council President, even though the election for that position had not yet occurred.

unionize, and other more efficient operating methods).  This has the effect of eliminating competition in the market.

b. **Second**, Defendants are successfully blocking hoteliers from entering the market with non-union labor workforce, just as they did with the SeaWorld hotel.  These barriers to entry will stifle competition and result in Defendants' monopoly power in the San Diego hospitality labor market.

c. **Third**, Defendants' actions in forcing San Diego full-service hotels to "go union" harms competition by restraining hospitality developers' and their hotel employees' rights to recognize a union or not.  As discussed above, there are benefits to working at non-union hotels that would be eliminated if all full-service hotels in the area are forced to unionize.

90.     Defendants will not stop their abusive and unlawful behavior with respect to the Bahia redevelopment until they receive what they want—a signed card check neutrality agreement.  And they will not stop this behavior in the City of San Diego going forward.  Their illegal actions, violating the Sherman Act and state laws, ensure that they maintain control over the relevant hospitality labor market.

## FIRST CAUSE OF ACTION

### (Unlawful Secondary Boycott)

### (Against Defendant Unite Here! Local 30)

91.     Evans Hotels incorporates by reference the allegations contained in Paragraphs 1 through 90, as if fully set forth herein.

92.     Evans Hotels brings this action pursuant to Section 303 of the Labor Management Relations Act ("LMRA"), which states in pertinent part that "[i]t shall be unlawful . . .  for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title."  29 U.S.C. § 187(a).

93.     Section 8(b)(4) of the National Labor Relations Act ("NLRA") states in pertinent part that "[i]t shall be an unfair labor practice for a labor organization or its agents . . . to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case

an object thereof is . . . forcing or requiring any person . . . to cease doing business with any other person."  29 U.S.C. § 158(b)(4)(ii).

94.     Local 30 is a "labor organization" under Section 303(a) of the LMRA and Section 8(b)(4) of the NLRA.

95.     Sea World LLC is a "person" under 29 U.S.C. § 152(1).  SeaWorld is engaged in "commerce" and/or activities that "affect commerce," including (but not limited to) operating SeaWorld branded theme parks.

96.     SeaWorld and Evans Hotels, through EHSW, entered into a Joint Venture in January 2018 to develop, own and operate a SeaWorld hotel.  SeaWorld and Evans Hotels began working on the Joint Venture before April 2015 when they first entered into a letter of intent and had already started the initial stage of getting the approvals for the project.

97.     Defendants knew about the Joint Venture and the significance of this opportunity for Evans Hotels' business, as the plans to develop a SeaWorld branded hotel were released to the public on November 9, 2015.  Defendants also knew about the importance to SeaWorld of meeting its business objective to get its new rides passed through the coastal commission.

98.     When Defendants were unsuccessful in getting Evans Hotels to agree to sign a card check neutrality agreement at the Bahia, they decided to increase the pressure by targeting SeaWorld, Evans Hotels' partner in the recently signed Joint Venture (i.e., a secondary party).

99.     Defendants, specifically Mr. Lemmon and Ms. Browning, communicated with representatives of SeaWorld in the Spring/Summer 2018 and communicated the message to them that if Evans Hotels did not agree to a card check neutrality agreement at the Bahia they would target not just Evans Hotels' other projects, but anyone doing business with Evans Hotels, including SeaWorld.  Specifically, Defendants threatened that they would impede SeaWorld's ability to get rides approved by the Coastal Commission and/or collaborate with opponents to disrupt SeaWorld's business and harm its name and reputation.

100.    After these meetings with Defendants, SeaWorld did a sudden about face and within months of signing a deal that had been negotiated and developed over more than three years, it announced to Evans Hotels in a meeting that took place on August 10, 2018 that it could no longer

move forward as planned with the SeaWorld hotel.  When pressed as to what prompted SeaWorld to suddenly abandon a project that it had so eagerly pursued for years, SeaWorld stated its concern that if Evans Hotels did not come to an agreement with Ms. Browning and Local 30 regarding the Bahia, that Defendants would target SeaWorld based on its relationship with Evans Hotels.  SeaWorld said that while it understood why Evans Hotels did not want to do a deal with Defendants, SeaWorld did not want Defendants to come after SeaWorld with "pitchforks in air" and block its new projects that were pending city approval.  SeaWorld indicated that it could not afford to be targeted by the union as this would hurt its stock price and disrupt its core business.

101.    On September 19, 2018, SeaWorld notified Evans Hotels of its decision to terminate the Joint Venture.

102.    SeaWorld's decision to terminate was a direct result of Defendants' threat to target SeaWorld based on its relationship with Evans Hotels.

103.    Defendants' conduct was designed to and has in fact injured Evans Hotels.  As a direct result of Defendants' unlawful conduct, Evans Hotels has suffered substantial injury to its property and/or business, including but not limited to, lost profits in excess of $100 million in connection with the opportunity to build a SeaWorld branded hotel, legal fees and other costs incurred because of, and in response to, Defendants' coercive threats made in violation of NLRA Section 8(b)(4).

## SECOND CAUSE OF ACTION

### Attempted Monopolization in Violation of Section 2 of the Sherman Act

### (Against All Defendants)

104.    Evans Hotels incorporates by reference the allegations contained in Paragraphs 1 through 103, as if fully set forth herein.

105.    Evans Hotels competes or has attempted to compete with Local 30 in the Mission Bay and Downtown San Diego hospitality labor market for full-service, waterfront hotels in San Diego (hereinafter the "Relevant Market") by providing non-union labor alternatives.  The Relevant Market includes the use of labor in the construction and operation of hospitality properties in San Diego along the coastline of and in downtown San Diego.

106.     Plaintiffs are informed and believe, and thereon allege that Local 30 has a dominant presence in the Relevant Market and, if Local 30 continues to rely on unlawful practices to prevent non-union hotels from entering the market, it will achieve control of the Relevant Market. Specifically, as alleged above, Defendants have relied on their unlawful playbook to halt or stop the development of ten or more new non-union hotels in the San Diego market.  Plaintiffs are informed and believe, and thereon allege that Defendant Local 30 possesses at a minimum a 60% share and up to a 70% share of the Relevant Market.

107.     By virtue of Local 30's threats, statements, behavior, conduct, acts and omissions (and in combination with other groups in connection with said behavior), to prevent Evans Hotels and the other developers described herein from competing in the Relevant Market, Local 30 has a specific intent to control labor and destroy competition in the Relevant Market.  Local 30's behavior described in this Complaint demonstrates its specific intent to do so.

108.     Local 30 has engaged in predatory and/or anti-competitive conduct to attempt to exercise control over the Relevant Market and do whatever it takes to prevent non-union hotels from developing in San Diego.  This conduct includes Local 30's actions with respect to the other non-union development projects (described in paragraphs 32 through 45), as well as the actions taken with respect to the Bahia redevelopment.  One example of an unfair, unlawful and fraudulent action is Local 30's attempt to combine with Tom Lemmon and non-labor groups (including but not limited to Citizens and Paddlers Against the Bahia Hotel Land Grab on Bahia Point, San Diegans for Responsible Planning, and Rick Bates) to initiate or threaten to initiate sham CEQA, environmental, and zoning opposition that will prevent or delay the development of non-union hotel properties.  Pursuant to its playbook, Defendants initiate these proceedings without regard to the merits of a CEQA claim.  Another example is to threaten and engage in unlawful secondary boycotts against third parties, such as SeaWorld, with the purpose of forcing the third party to cease doing business with the non-union hospitality developer. Defendants have engaged in this conduct with the stated objective of dominating the market by unionizing each and every hotel in San Diego.

109.     Defendants' intent, power, and resources create a dangerous probability that Local 30 will succeed in monopolizing the Relevant Market.  In fact, Local 30's illegal behavior to date (with

respect to the Bahia redevelopment and other development projects described herein) and exclusionary intent that is evident in this behavior, poses such a danger to competition in the Relevant Market that, if left unchecked, it will result in Local 30's acquisition of monopoly power.

110.    Defendants are not involved in a labor dispute for the purpose of acting in their own self-interest. Evans Hotels is not unionized and there is not a petition for an election.  Further, the unfair, unlawful, and fraudulent business practices described herein are not traditional organizational activities.  Local 30's use of these practices demonstrates that it is acting illegitimately, outside its legitimate self-interest.

111.    Defendants have violated and continue to violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

112.    As a direct and proximate result of Defendants' anti-competitive activities in violation of Section 2 of the Sherman Act, Evans Hotels has suffered business injuries and/or loss of property in excess of $100 million.  Plaintiff's damages include but are not limited to the loss of its right to develop the Bahia in accordance with the MBMPU, the lost opportunity to develop a non-union SeaWorld branded hotel, loss of goodwill, lost profits, and lost property value.  Evans Hotels has suffered, and will continue to suffer, irreparable harm if Local 30 is not enjoined from engaging in its anti-competitive conduct.

113.    Defendants' anti-competitive activities have also caused, and continue to cause, among other things, a loss of revenue due to unlawful delays, increased prices to consumers in the Relevant Market due to the lack of meaningful market competition, reduced competition and reduced supply due to Defendants' unlawful practice of preventing the development of non-union hotels, and blocked entry or reduced desirability of entry into the Relevant Market that would be competitors of Defendants (i.e., non-union labor market).

114.    As a proximate result of the wrongful acts herein alleged, Evans Hotels has been damaged in excess of $100 million.  Evans Hotels is also entitled to recover treble damages, costs of suit, and attorneys' fees.

## THIRD CAUSE OF ACTION

### Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act

### (Against All Defendants)

115.     Evans Hotels incorporates by reference the allegations contained in Paragraphs 1 through 114, as if fully set forth herein.

116.     Defendants knowingly and willfully conspired among themselves and others, including but not limited to Citizens and Paddlers Against the Bahia Hotel Land Grab on Bahia Point, San Diegans for Responsible Planning, and Rick Bates, to monopolize the Relevant Market, as defined in paragraph 105.

117.     Plaintiffs are informed and believe, and thereon allege that Local 30 has a dominant presence in the Relevant Market for new and redeveloping hotels and, if Local 30 continues to rely on unlawful practices to prevent non-union hotels from entering the market, it will achieve control of the market.  Specifically, as alleged above, Defendants have relied on their unlawful playbook to halt or stop the development of non-union hotels in the Relevant Market.  On information and belief, over 20 non-union hotels that have attempted to enter the market or attempt a significant expansion in the same have confronted unlawful opposition from Local 30.  Plaintiffs are informed and believe, and thereon allege that Local 30 possesses at a minimum a 60% share and up to a 70% share of the Relevant Market.

118.     Defendants are not involved in a labor dispute for the purpose of acting in their own self-interest.  Evans Hotels is not unionized and there is not a petition for an election.  Further, the unfair, unlawful, and fraudulent business practices described herein are not traditional organizational activities.  Local 30's use of these practices demonstrates that it is acting illegitimately, outside its legitimate self-interest.

119.     Defendants' specific intent to monopolize the Relevant Market is apparent from the character of Defendants' conduct and their actions as alleged in paragraphs 85 through 90.

120.     Defendants committed overt acts and engaged in other conduct pursuant to, and in furtherance of, the conspiracy, including the acts alleged in this Complaint.  Defendants have engaged in anti-competitive conduct directed toward achieving the objective of removing developers' and their

employees' rights to determine whether or not to recognize a union, and destroying competition in the Relevant Market.  Defendants did these acts and things pursuant to, and in furtherance of, the conspiracy.

121.    Recent overt acts in pursuit of the above-described conspiracy include: actions taken against other non-union properties as described in paragraphs 30 through 45; Ms. Browning's communications with Councilmember I that she would not back down unless Evans Hotels signed a card check neutrality agreement as described in paragraphs 55 through 57; Mr. Lemmon promising that Defendants are "going to turn up the volume" in opposing Evans Hotels, described in paragraph 62; and text messages from Mr. Lemmon and Ms. Browning to Mr. Gleason, described in paragraph 66.

122.    As a direct and proximate result of Defendants' anti-competitive activities in violation of Section 2 of the Sherman Act, Evans Hotels has suffered business injuries and/or loss of property.  Plaintiff's damages include but are not limited to the loss of its right to develop the Bahia in accordance with the Master Plan, the lost opportunity to develop a non-union SeaWorld branded hotel, loss of goodwill, lost profits, and lost property value.  Evans Hotels has suffered, and will continue to suffer, irreparable harm if Local 30 is not enjoined from engaging in its anti-competitive conduct.

123.    Defendants' anti-competitive activities have also caused, and continue to cause, among other things, a loss of revenue due to unlawful delays that will impact prices paid by consumers in the Relevant Market, increased prices to consumers in the Relevant Market due to the lack of meaningful market competition, reduced competition and reduced supply due to Defendants' unlawful practice of preventing the development of non-union hotels, and blocked entry or reduced desirability of entry into the Relevant Market of Evans Hotels that would be competitors of Defendants (i.e., non-union labor market).

124.    As a proximate result of the wrongful acts herein alleged, Evans Hotels has been damaged in excess of $100 million.  Evans Hotels is also entitled to recover treble damages, costs of suit, and attorneys' fees.

**FOURTH CAUSE OF ACTION**

**Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)**

**(Against All Defendants)**

125.    Evans Hotels incorporates the allegations contained in Paragraphs 1 through 124, as if fully set forth herein.

126.    Evans Hotels, LLC, BH Partnership LP, and EHSW, LLC are each a "person" under 18 U.S.C. §§ 1961(3) and 1964(c).

127.    Each of the Defendants is a "person" under 18 U.S.C. §§ 1961(3), 1962(c), and 1962(d).

128.    Defendants Local 30 (and its affiliated entities and/or any subsidiaries), Ms. Browning, San Diego County Building and Construction Trades Council AFL-CIO, and Mr. Lemmon, along with Tony LoPresti, San Diegans for Responsible Planning, and Rick Bates, constitute an "enterprise" engaged in, and whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "Local 30 Enterprise").  The Local 30 Enterprise exists separate and apart from the pattern of racketeering activity alleged and the Defendants themselves.

129.    As part of the Local 30 Enterprise, each of the Defendants was and is associated with the Local 30 Enterprise and has conducted or participated, directly or indirectly, in the management and operation of the affairs of the Local 30 Enterprise in relation to Evans Hotels and other developers, including, but not necessarily limited to, Cisterra, Atlas Hotels, Sunroad, KSL Resorts, and Marriott, through a pattern of activity unlawful under 18 U.S.C. § 1961(A) and (B), including multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under 18 U.S.C. § 1951 and California Penal Code §§ 518, 522, 524.

130.    Defendants also have engaged in multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under 18 U.S.C. § 1951 and California Penal Code §§ 518, 522, 524, by threatening entities that engage in business with employers like Evans Hotels as a means of forcing the employers to accede to Defendants' demands.  Defendants took such actions against SeaWorld in an effort to extort Evans Hotels, against Cisterra as a means of forcing Marriott to agree to Defendants' demands, and, on information and belief, have taken similar actions against other employers.

131.    On information and belief, Defendants also have violated California Penal Code §§ 7(6), 85, by giving, offering, or promising something of value or advantage in the form of future monetary and political support to Councilmembers to influence them to withdraw support for the Bahia Project and cast a vote against the project when it is reviewed by the City Council.

132.    These acts or threats form a pattern of racketeering activity as they all have occurred within 10 years of one another, are related insofar as they involve the same participants, share the same purpose of forcing developers to cave to the demands made to enrich the Local 30 Enterprise, and employ the same methods, including, but not limited to pursuing sham opposition to and litigation over projects in City Council, administrative, Coastal Commission, and civil proceedings in an effort to hold projects hostage unless Evans Hotels and the other developers accede to Local 30's demands.  Evans Hotels also alleges on information and belief, including Defendant Local 30's past conduct toward Evans Hotels in the 1990s and its actions toward SeaWorld, that Defendants also have employed the method of targeting third parties that do business with other developers such as Marriott and Cisterra, to force them to cease doing business unless the other developers caved to the demands of the Local 30 Enterprise.  These acts reflect a continuous use of Defendants' "playbook" dating back to the 1990s and including the multiple acts of racketeering activity in the last 10 years set forth herein.

133.    Using the threat of injury to Evans Hotels' business interests, including the Bahia redevelopment project and the development of the SeaWorld branded hotel, Defendants have conspired and attempted to take property from Evans Hotels, including money in the form of per capita payments, union dues, union fees, and other payments, such as contributions to union pension and health plans, as well as Evans Hotels' rights to have a vote for unionization be carried out by secret ballot.

134.    Defendants' activities described herein were taken knowingly and willfully and have obstructed, delayed, or otherwise affected commerce.

135.    Defendants' conduct was designed to, and has in fact, injured Evans Hotels.  As a direct result of Defendants' unlawful and ongoing threats of extortion in violation of 18 U.S.C. § 1951 and Cal. Penal Code §§ 518, 522, and 524, SeaWorld terminated its contract with Evans Hotels as a direct result of Defendants' threat to target SeaWorld based on its relationship with Evans Hotels.

136.     Evans Hotels has suffered substantial injury to its property and/or business, including but not limited to, lost profits in excess of $100 million in connection with the opportunity to build a SeaWorld branded hotel, legal fees and other costs incurred because of, and in response to, Defendants' extortionate conduct.

## FIFTH CAUSE OF ACTION

**Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), by Conspiring to Violate 18 U.S.C. § 1962(c)**

**(Against All Defendants)**

137.     Evans Hotels incorporates the allegations contained in Paragraphs 1 through 136, as if fully set forth herein.

138.     Evans Hotels, LLC, BH Partnership LP, and EHSW, LLC are each a "person" under 18 U.S.C. §§ 1961(3) and 1964(c).

139.     Each of the Defendants is a "person" under 18 U.S.C. §§ 1961(3), 1962(c), and 1962(d).

140.     Defendants Local 30 (and its affiliated entities and/or any subsidiaries), Ms. Browning, San Diego County Building and Construction Trades Council AFL-CIO, and Mr. Lemmon, along with Tony LoPresti, San Diegans for Responsible Planning, and Rick Bates, constitute the Local 30 Enterprise engaged in, and whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The Local 30 Enterprise exists separate and apart from the pattern of racketeering activity alleged and the Defendants themselves.

141.     Each of the Defendants was and is associated with the Local 30 Enterprise and has conspired among themselves within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c).  Specifically, each of the Defendants agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: to conduct or participate, directly or indirectly, in the management and operation of the affairs of the Local 30 Enterprise in relation to Evans Hotels and other developers, including, but not necessarily limited to, Cisterra, Atlas Hotels, Sunroad, KSL Resorts, and Marriott, through a pattern of activity unlawful under 18 U.S.C. § 1961(A) and (B), including multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under 18 U.S.C. § 1951 and California Penal Code §§ 518, 522, 524.

142.    Defendants also have engaged in multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under 18 U.S.C. § 1951 and California Penal Code §§ 518, 522, 524, by threatening entities that engage in business with employers like Evans Hotels as a means of forcing the employers to accede to Defendants' demands.  Defendants took such actions against SeaWorld in an effort to extort Evans Hotels, against Cisterra as a means of forcing Marriott to agree to Defendants' demands, and, on information and belief, have taken similar actions against other employers.

143.    On information and belief, Defendants violated California Penal Code §§ 7(6), 85, by giving, offering, or promising something of value or advantage in the form of future monetary and political support to Councilmembers to influence them to withdraw their support for the Bahia Project and cast a vote against the project when it is reviewed by the City Council.

144.    These acts or threats form a pattern of racketeering activity as they all have occurred within 10 years of one another, are related insofar as they involve the same participants, share the same purpose of forcing developers to cave to the demands made to enrich the Local 30 Enterprise, and employ the same methods, including, but not limited to pursuing sham opposition to and litigation over projects in City Council, administrative, Coastal Commission, and civil proceedings in an effort to hold projects hostage unless Evans Hotels and the other developers accede to Local 30's demands.  Evans Hotels also alleges on information and belief, including Defendant Local 30's past conduct toward Evans Hotels in the 1990s and its actions toward SeaWorld, that Defendants also have employed the method of targeting third parties that do business with other developers to force them to cease doing business unless the other developers caved to the demands of the Local 30 Enterprise.  These acts reflect a continuous use of Defendants' "playbook" dating back to the 1990s and including the multiple acts of racketeering activity in the last 10 years set forth herein.

145.    Using the threat of injury to Evans Hotels' business interests, including the Bahia redevelopment project and the development of the SeaWorld branded hotel, Defendants have conspired and attempted to take property from Evans Hotels, including money in the form of per capita payments, union dues, union fees, and other payments, such as contributions to union pension and

health plans, as well as Evans Hotels' right to have a vote for unionization be carried out by secret ballot.

146. Defendants' activities described herein were taken knowingly and willfully and have obstructed, delayed, or otherwise affected commerce.

147. Defendants' conduct was designed to and has in fact injured Evans Hotels. As a direct result of Defendants' unlawful and ongoing threats of extortion in violation of 18 U.S.C. § 1951 and Cal. Penal Code §§ 518, 522, and 524, SeaWorld terminated its contract with Evans Hotels as a direct result of Defendants' threat to target SeaWorld based on its relationship with Evans Hotels.

148. Evans Hotels has suffered substantial injury to its property and/or business, including but not limited to, lost profits in excess of $100 million in connection with the opportunity to build a SeaWorld branded hotel, legal fees and other costs incurred because of, and in response to, Defendants' extortionate conduct.

## SIXTH CAUSE OF ACTION

### Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), by Conspiring to Violate 18 U.S.C. § 1962(a)

### (Against All Defendants)

149. Evans Hotels incorporates the allegations contained in Paragraphs 1 through 148, as if fully set forth herein.

150. Evans Hotels, LLC, BH Partnership LP, and EHSW, LLC are each a "person" under 18 U.S.C. §§ 1961(3) and 1964(a).

151. Each of the Defendants is a "person" under 18 U.S.C. §§ 1961(3), 1962(c), and 1962(d).

152. Defendants Local 30 (and its affiliated entities and/or any subsidiaries), Ms. Browning, San Diego County Building and Construction Trades Council AFL-CIO, and Mr. Lemmon, along with Tony LoPresti, constitute the Local 30 Enterprise engaged in, and whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a). The Local 30 Enterprise exists separate and apart from the pattern of racketeering activity alleged and the Defendants themselves.

153. Each of the Defendants was and is associated with the Local 30 Enterprise and has conspired among themselves within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C.

§ 1962(a).  Specifically, each of the Defendants agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: that payments to the union, in the form of per capita fees, union dues, and other payments, including contributions to union pension and health plans, and other financial concessions, would be received by Defendants Local 30 and San Diego County Building and Construction Trades Council AFL-CIO.  Such income would be derived, directly or indirectly, from activities in relation to Evans Hotels and other developers, including, but not necessarily limited to, Cisterra, Atlas Hotels, Sunroad, KSL Resorts, and Marriott, through a pattern of activity unlawful under 18 U.S.C. §§ 1961(1), 1961(5), and 1962(a), including multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under 18 U.S.C. § 1951 and California Penal Code §§ 518, 522, 524.

154.    Defendants also have engaged in multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under 18 U.S.C. § 1951 and California Penal Code §§ 518, 522, 524, by threatening entities that engage in business with employers like Evans Hotels as a means of forcing the employers to accede to Defendants' demands.  Defendants took such actions against SeaWorld in an effort to extort Evans Hotels, against Cisterra as a means of forcing Marriott to agree to Defendants' demands, and, on information and belief, have taken similar actions against other employers.

155.    On information and belief, Defendants also have violated of California Penal Code §§ 7(6), 85, by giving, offering, or promising something of value or advantage in the form of future monetary and political support to Council members to influence them to withdraw their support for the Bahia Project and cast a vote against the project when it is reviewed by the City Council.

156.    These acts or threats form a pattern of racketeering activity as they all have occurred within 10 years of one another, are related insofar as they involve the same participants, share the same purpose of forcing developers to cave to the demands made to enrich the Local 30 Enterprise, and employ the same methods, including, but not limited to pursuing sham opposition to and litigation over projects in City Council, administrative, Coastal Commission, and civil proceedings in an effort to hold projects hostage unless Evans Hotels and the other developers accede to Local 30's demands.  Evans Hotels also alleges on information and belief, including Defendant Local 30's past conduct toward

Evans Hotels in the 1990s and its actions toward SeaWorld, that Defendants also have employed the method of targeting third parties that do business with other developers to force them to cease doing business unless the other developers caved to the demands of the Local 30 Enterprise.  These acts reflect a continuous use of Defendants' "playbook" dating back to the 1990s and including the multiple acts of racketeering activity in the last 10 years set forth herein.

157.    Using the threat of injury to Evans Hotels' business interests, including the Bahia redevelopment project and the development of the SeaWorld branded hotel, Defendants have conspired and attempted to take property from Evans Hotels, including money in the form of per capita payments, union dues, union fees, and other payments, such as contributions to union pension and health plans, as well as Evans Hotels' right to have a vote for unionization be carried out by secret ballot.

158.    An object of Defendants' conspiracy to violate 18 U.S.C. § 1962(a) was and is that the income described above, or the proceeds of such income, would thereafter be used and invested in the operation of the aforementioned enterprises for numerous legitimate and illegitimate purposes including, inter alia, the conduct of additional extortionate corporate campaigns against Evans Hotels and other employers and business entities, the payment of salaries and fees to the other Defendants for the purpose of engaging in future extortionate corporate campaigns and otherwise, and the ongoing operation of the enterprises described above.

159.    Defendants' activities described herein were taken knowingly and willfully, and have obstructed, delayed, or otherwise affected commerce.

160.    Defendants' conduct was designed to and has in fact injured Evans Hotels.  As a direct result of Defendants' unlawful and ongoing threats extortion in violation of 18 U.S.C. § 1951 and Cal. Penal Code §§ 518, 522, and 524, SeaWorld terminated its contract with Evans Hotels as a direct result of Defendants' threat to target SeaWorld based on its relationship with Evans Hotels.

161.    Evans Hotels has suffered substantial injury to its property and/or business, including but not limited to, lost profits in excess of $100 million in connection with the opportunity to build a SeaWorld branded hotel, legal fees and other costs incurred because of, and in response to, Defendants' extortionate conduct.

**SEVENTH CAUSE OF ACTION**

**Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §**

**1962(d), by Conspiring to Violate 18 U.S.C. § 1962(b)**

**(Against All Defendants)**

162.    Evans Hotels incorporates the allegations contained in Paragraphs 1 through 161, as if fully set forth herein.

163.    Evans Hotels, LLC, BH Partnership LP, and EHSW, LLC are each a "person" under 18 U.S.C. §§ 1961(3) and 1964(b).

164.    Each of the Defendants is a "person" under 18 U.S.C. §§ 1961(3), 1962(b), and 1962(d).

165.    Defendants Local 30 (and its affiliated entities and/or any subsidiaries), Ms. Browning, San Diego County Building and Construction Trades Council AFL-CIO, and Mr. Lemmon, along with Tony LoPresti, constitute the Local 30 Enterprise engaged in, and whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(b).  The Local 30 Enterprise exists separate and apart from the pattern of racketeering activity alleged and the Defendants themselves.

166.    Each of the Defendants were and are associated with the Local 30 Enterprise and has conspired among themselves within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(b). Specifically, each of the Defendants agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: to acquire or maintain, directly or indirectly, an interest in or control of Evans Hotels and other developers through a pattern of activity unlawful under 18 U.S.C. §§ 1961(1), 1961(5), and 1962(b), including multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under 18 U.S.C. § 1951 and California Penal Code §§ 518, 522, 524.

167.    Defendants also have engaged in multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under 18 U.S.C. § 1951 and California Penal Code §§ 518, 522, 524, by threatening entities that engage in business with employers like Evans Hotels as a means of forcing the employers to accede to Defendants' demands.  Defendants took such actions against SeaWorld in an effort to extort Evans Hotels, against Cisterra as a means of forcing

Marriott to agree to Defendants' demands, and, on information and belief, have taken similar actions against other employers.

168.     On information and belief, Defendants also have violated California Penal Code §§ 7(6), 85, by giving, offering, or promising something of value or advantage in the form of future monetary and political support to Council members to influence them to withdraw their support for the Bahia Project and cast a vote against the project when it is reviewed by the City Council.

169.     These acts or threats form a pattern of racketeering activity as they all have occurred within 10 years of one another, are related insofar as they involve the same participants, share the same purpose of forcing developers to cave to the demands made to enrich the Local 30 Enterprise, and employ the same methods, including, but not limited to targeting secondary employers,  pursuing sham opposition to and litigation over projects in City Council, administrative, Coastal Commission, and civil proceedings in an effort to hold projects hostage unless Evans Hotels and the other developers accede to Local 30's demands.  Evans Hotels also alleges on information and belief, including Defendant Local 30's past conduct toward Evans Hotels in the 1990s and its actions toward SeaWorld, that Defendants also have employed the method of targeting third parties that do business with other developers to force them to cease doing business unless the other developers caved to the demands of the Local 30 Enterprise.  These acts reflect a continuous use of Defendants' "playbook" dating back to the 1990s and including the multiple acts of racketeering activity in the last 10 years set forth herein.

170.     Using the threat of injury to Evans Hotels' business interests, including the Bahia redevelopment project and the development of the SeaWorld branded hotel, Defendants have conspired and attempted to take property from Evans Hotels, including money in the form of per capita payments, union dues, union fees, and other payments, such as contributions to union pension and health plans, as well as Evans Hotels' right to have a vote for unionization be carried out by secret ballot.

171.     Defendants' activities described herein were taken knowingly and willfully, and have obstructed, delayed, or otherwise affected commerce.

172.     Defendants' conduct was designed to, and has in fact, injured Evans Hotels.  As a direct result of Defendants' unlawful and ongoing threats of extortion in violation of 18 U.S.C. § 1951 and

Cal. Penal Code §§ 518, 522, and 524, SeaWorld terminated its contract with Evans Hotels as a direct result of Defendants' threat to target SeaWorld based on its relationship with Evans Hotels.

173.    Evans Hotels has suffered substantial injury to its property and/or business, including but not limited to, lost profits in excess of $100 million in connection with the opportunity to build a SeaWorld branded hotel, legal fees and other costs incurred because of, and in response to, Defendants' extortionate conduct.

## EIGHTH CAUSE OF ACTION

### Interference with Prospective Economic Advantage

### (Against All Defendants)

174.    Evans Hotels incorporates by reference as if set forth herein the allegations contained in Paragraphs 1 through 27, 48 through 84, and 96 through 102. This interference alleged in this Eighth Cause of Action is predicated solely on Defendants' actions toward Evans Hotels and SeaWorld, resulting in the termination of their business relationship.

175.    Evans Hotels had a valid, existing, and valuable business relationship with SeaWorld in that EHSW and SeaWorld entered into a Joint Venture in January 2018 to develop, own and operate a SeaWorld hotel.

176.    Defendants knew of the business relationship and Joint Venture between Evans Hotels and SeaWorld.

177.    Defendants intentionally interfered with the business relationship between Evans Hotels and SeaWorld in order to induce SeaWorld to terminate the Joint Venture. Defendants' unlawful conduct includes threatening to impede SeaWorld's ability to get rides approved by the Coastal Commission and/or to disrupt SeaWorld's business and harm its name unless SeaWorld terminated its Joint Venture with Evans Hotels. In order to protect its stock price and plan to develop new rides, SeaWorld had no reasonable choice but to terminate the Joint Venture and its business relationship with Evans Hotels.

178.    Defendants' misconduct (and/or that of their agents) was intentional and committed with the purpose of causing economic injury to Evans Hotels. Plaintiffs took these illegal actions for their own pecuniary benefit.

179.    Defendants' misconduct caused an actual disruption of the business relationship between Evans Hotels and SeaWorld.  SeaWorld publicly announced its formal termination of the Joint Venture on November 7, 2018.

180.    Defendants' conduct was designed to and has in fact injured Evans Hotels.  As a direct result of Defendants' unlawful conduct, Evans Hotels has suffered substantial injury to its property and/or business, including but not limited to, lost profits in excess of $100 million in connection with the opportunity to build a SeaWorld branded hotel, legal fees and other costs incurred because of, and in response to, Defendants' unlawful conduct.  Defendants' misconduct is intentional and malicious to such a degree that Evans Hotels is entitled to punitive or exemplary damages.

## NINTH CAUSE OF ACTION

### Attempted Extortion

### (Against All Defendants)

181.    Evans Hotels incorporates by reference as if set forth herein the allegations contained in Paragraphs 1 through 27, 30, and 47 through 88.  This cause of action is based solely on Defendants' actions toward Evans Hotels and SeaWorld, resulting in the termination of their business relationship, and Defendants' direct communications to Evans Hotels.  Evans Hotels does not base this cause of action on any actions Defendants have taken before the City Council, in communications with members of the City Council or the Mayor, on any statements made on Defendants' website.

182.    Defendants intended by their actions to commit extortion, by using the threat of and Evans Hotels' fear of economic harm and injury to Evans Hotels' business interests to induce Evans Hotels to give up its property, including money in the form of per capita payments, union dues, union fees, and other payments, such as contributions to union pension and health plans, as well as Evans Hotels' rights to recognize or not recognize a union and to have a vote for unionization be carried out by secret ballot.

183.    Defendants have engaged in multiple acts in furtherance of their attempt to extortion Evans Hotels' property, including threatening SeaWorld with economic harm to cause it to cancel its contract for the SeaWorld branded hotel; threatening Evans Hotels with sham opposition to and lawsuits against the Bahia Project despite admitting there is no basis for such actions; and demanding

that Evans Hotels agree to sign a PLA and card check neutrality agreement so that Evans Hotels "can go forward with your project" and put the pin back in the "grenade."

184.   Although Defendants have been unsuccessful so far in their efforts, Evans Hotels has suffered substantial injury to its property and/or business, including but not limited to, lost profits in excess of $100 million in connection with the opportunity to build a SeaWorld branded hotel, legal fees and other costs incurred because of, and in response to, Defendants' unlawful conduct.  Defendants' misconduct is intentional and malicious to such a degree that Evans Hotels is entitled to punitive or exemplary damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Evans Hotels, LLC, BH Partnership LP, and EHSW, LLC respectfully request that the Court issue the following relief:

**ON THE FIRST CAUSE OF ACTION:**

    A.  Compensatory damages;

    B.  Costs of suit incurred, including all costs, expenses, attorneys' and experts' fees;

    C.  Punitive damages; and

    D.  Such other relief as the Court deems just and proper.

**ON THE SECOND AND THIRD CAUSES OF ACTION:**

    A.  Defendants and their agents be enjoined during this litigation and permanently thereafter, from ongoing and future acts constituting violations of federal antitrust laws to maintain and/or secure a monopoly, as provided by 15 U.S.C. § 26;

    B.  Treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15, arising from harm Evans Hotels has suffered as a result of Defendants' violation of section 2 of the Sherman Act, 15 U.S.C. § 2;

    C.  Prejudgment interest;

    D.  Costs of suit incurred, including all costs, expenses, attorneys' and experts' fees; and

    E.  Such other relief as the Court deems just and proper.

**ON THE FOURTH, FIFTH, SIXTH, AND SEVENTH CAUSES OF ACTION:**

    A.  Defendants and their agents be enjoined from engaging in further extortion and bribery in an effort to oppose Evans Hotels and/or the Bahia project;

    B.  Damages against Defendants, jointly and severally, for a sum of money equal to the amount of damages Evans Hotels has sustained or will sustain (trebled pursuant to 18 U.S.C. § 1964(c);

    C.  Prejudgment interest;

    D.  Costs of suit incurred, including all costs, expenses, attorneys' and experts' fees;

    E.  Punitive damages; and

    F.  Such other relief as the Court deems just and proper.

**ON THE EIGHTH AND NINTH CAUSES OF ACTION:**

    A.  Compensatory damages;

    B.  Costs of suit incurred, including all costs, expenses, attorneys' and experts' fees;

    C.  Punitive damages; and

    D.  Such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated:  December 7, 2018        **AKIN GUMP STRAUSS HAUER & FELD LLP**
                                 Susan Leader
                                 Stephanie P. Priel

                                 By:         *s/* Susan Kay Leader
                                            Susan Leader
                                     Attorneys for Plaintiffs

COMPLAINT