1 | **AKIN GUMP STRAUSS HAUER & FELD LLP**
2 | SUSAN KAY LEADER (SBN 216743)
JESSICA M. WEISEL (SBN 174809)
3 | REBECCA A. GIROLAMO (SBN 293422)
sleader@akingump.com
4 | jweisel@akingump.com
bgirolamo@akingump.com
5 | 1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067-6022
6 | Telephone:  310.229.1000
Facsimile:   310.229.1001

7 | **AKIN GUMP STRAUSS HAUER & FELD LLP**
LAWRENCE D. LEVIEN (*Pro Hac Vice*, application pending)
8 | llevien@akingump.com
2001 K Street, N.W.
9 | Washington, D.C. 20006
Telephone: 202.887.4000
10 |
Attorneys for Plaintiffs
11 |

12 | UNITED STATES DISTRICT COURT

13 | FOR THE SOUTHERN DISTRICT OF CALIFORNIA

14 |

| | |
|---|---|
| EVANS HOTELS, LLC, a California limited liability company; BH PARTNERSHIP LP, a California limited partnership; EHSW, LLC, a Delaware limited liability company, | Case No. 3:18-cv-2763-WQH-KSC  [Judge:  Hon. William Q. Hayes] |
| Plaintiffs, | |
| v. | **PLAINTIFFS' OPPOSITION TO UNITE HERE LOCAL 30 AND BRIGETTE BROWNING'S MOTION TO DISMISS AMENDED COMPLAINT** |
| UNITE HERE! LOCAL 30; BRIGETTE BROWNING, an individual; SAN DIEGO COUNTY BUILDING and CONSTRUCTION TRADES COUNCIL, AFL-CIO; TOM LEMMON, an individual; and DOES 1-10, | Date:        TBD  Time:        TBD  Dept.:        TBD |
| Defendants. | Date Action Filed: Dec. 7, 2018 |

# **TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT ....................................................................1

II.  THE LEGAL STANDARD FOR A 12(B)(6) MOTION TO DISMISS .........2

III. SUMMARY OF PERTINENT ALLEGATIONS IN THE FAC ...................5

    A.   Defendants' Conduct Relating to the Bahia Project............................5

    B.   Control and Bribery of City Council Members...................................8

    C.   A Pattern of Conduct Targeting Non-Union Projects...........................9

IV.  THE COURT SHOULD DENY LOCAL 30'S MOTION TO DISMISS ......9

    A.   Evans Has Adequately Pleaded Causes of Action under Labor
        Management Relations Act ("LMRA") § 303. ...................................9

        1.   The National Labor Relations Act bars the use of threats or
            coercion to apply unlawful pressure on third parties................10

        2.   Evans has adequately pleaded violations of § 8(b)(4)(ii)(B)....11

        3.   Evans has adequately pleaded violations of § 8(b)(4)(ii)(A). ..16

    B.   Evans' State Law Claims Are Not Preempted by § 303.....................19

    C.   Evans Has Alleged a Claim for Interference with Contractual
        Relationship Under California Law.....................................................21

    D.   Defendants' Conduct Is Not Protected By *Noerr-Pennington*............22

        1.   Because Evans' claims are predicated on conduct that is
            neither petitioning activity nor incidental to petitioning
            activity, *Noerr-Pennington* does not bar Evans' claims. ..........23

        2.   Defendants' lobbying and litigation-related conduct is sham
            and not protected petitioning activity........................................24

V.   CONCLUSION.......................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*180s, Inc. v. Gordini U.S.A., Inc.*,
   602 F. Supp. 2d 635 (D. Md. 2009)..................................................23

*520 S. Mich. Ave. Assocs. v. Unite Here Local 1*,
   760 F.3d 708 (7th Cir. 2014) .........................................................13

*Airline Serv. Providers Ass'n v. L.A. World Airports*,
   873 F.3d 1074 (9th Cir. 2017) .........................................................6

*Allied Tube & Conduit Corp. v. Indian Head*,
   486 U.S. 492 (1988)........................................................................24

*Am. President Lines, Ltd. v. Int'l Longshore & Warehouse Union, Alaska
   Longshore Div., Unit 60*,
   721 F.3d 1147 (9th Cir. 2013) .......................................................16

*Am. Trucking Ass'ns v. City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009) .........................................................6

*Arista Records LLC v. Doe 3*,
   604 F.3d 110 (2d Cir. 2010) .......................................................3, 4

*In re Asacol Antitrust Litigation*,
   233 F. Supp. 3d 247 (D. Mass. 2017)..............................................3

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...................................................................3, 29

*Bank of New York v. Fremont Gen. Corp.*,
   523 F.3d 902 (9th Cir. 2008) ..........................................................22

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007).................................................................3, 29

*Brewer v. Salyer*,
   2007 WL 1454276 (E.D. Cal. May 17, 2007) ..................................2

*Cal. Motor Trans. Co. v. Trucking Unlimited*,
   404 U.S. 508 (1972)................................................15, 22, 27, 30

*Carpenters Kentucky State Dist. Council*,
    308 N.L.R.B. 1129 (1992) ........................................................................ 12

*Carpenters (Society Hill)*,
    335 N.L.R.B. 814 (2001) .......................................................................... 13

*Cascades Computer Innovation LLC v. RPX Corp.*,
    2013 WL 6247594 (N.D. Cal. Dec. 3, 2013) ............................................ 24

*Catch Curve, Inc. v. Venali, Inc.*,
    519 F. Supp. 2d 1028 (C.D. Cal. 2007) .................................................... 26

*Charvet v. Int'l Longshoremen's Ass'n*,
    736 F.2d 1572 (D.C. Cir. 1984) ............................................................... 16

*City of Columbia v. Omni Outdoor Advertising*,
    499 U.S. 365 (1990) ............................................................22, 23, 24, 27

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
    690 F.2d 1240 (9th Cir. 1982) ..................................................25, 28, 30

*Connell Constr. Co. v. Plumbers & Steamfitters Local 100*,
    421 U.S. 616 (1975) ...........................................................................17, 18

*Daniels-Hall v. Nat'l Educ. Ass'n*,
    629 F.3d 992 (9th Cir. 2010) ..................................................................... 2

*Dist. 30, United Mine Workers of Am. v. NLRB*,
    819 F.2d 651 (6th Cir. 1987) ................................................................... 16

*Eastern R.R. Pres. Conf. v. Noerr Motor Freight*,
    365 U.S. 127 (1961) ................................................................................ 24

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. and Cosntr.*
    *Trades Council*,
    485 U.S. 568 (1988) ...........................................................................14, 15

*Fikre v. FBI*,
    904 F.3d 1033 (9th Cir. 2018) ................................................................... 2

*Freeman v. Lasky, Haas & Cohler*,
    410 F.3d 1180 (9th Cir. 2005) ................................................................. 23

TABLE OF AUTHORITIES

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949)................................................................................14, 15

*Hernandez-Cuevas v. Taylor*,
    723 F.3d 91 (1st Cir. 2013).................................................................................3

*Hirsch v. Building & Constr. Trades Council*,
    530 F.2d 298 (3d Cir. 1976) ............................................................................12

*IBEW, Local 5 (Jonel Constr.)*,
    164 N.L.R.B. 455 (1967) ..................................................................................16

*IBEW Local 501 v. NLRB*,
    341 U.S. 694 (1951).........................................................................................14

*Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*,
    164 F. Supp. 3d 1117 (D. Minn. 2016)..........................................................23

*Int'l Longshoremen's Ass'n v. Allied Int'l, Inc.*,
    456 U.S. 212 (1982).........................................................................10, 13, 19

*International Audiotext Network, Inc. v. American Tel. & Tel. Co.*,
    62 F.3d 69 (2d Cir. 1995) ................................................................................29

*Kottle v. Northwest Kidney Ctrs.*,
    146 F.3d 1056 (9th Cir. 1998) ...................................................................26, 27

*Lechmere, Inc. v. NLRB*,
    502 U.S. 527 (1992).........................................................................................16

*Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton*,
    377 U.S. 252 (1964).........................................................................................20

*Local 761, Int'l Union of Elec., Radio & Mach. Workers v. NLRB*,
    366 U.S. 667 (1961).........................................................................................10

*Manistee Town Ctr. v. City of Glendale*,
    227 F.3d 1090 (9th Cir. 2000) .........................................................................26

*Mautz & Oren, Inc. v. Teamsters, Local No. 279*,
    882 F.2d 1117 (7th Cir. 1989) .........................................................................11

*McGary v. City of Portland*,
    386 F.3d 1259 (9th Cir. 2004) ...........................................................................3

iv

*Mead v. Retail Clerks Int'l Ass'n, Local Union No. 839, AFL-CIO*,
    523 F.2d 1371 (9th Cir. 1975) ............................................................... 11, 16

*Mediacom Southeast LLC v. BellSouth Telecomm., Inc.*,
    672 F.3d 396 (6th Cir. 2012) ........................................................................ 29

*Menzel v. Scholastic, Inc.*,
    2018 WL 1400386 (N.D. Cal. Mar. 19, 2018) ................................................ 4

*Netflix, Inc. v. Blockbuster, Inc.*,
    2006 WL 2458717 (N.D. Cal. Aug. 22, 2006) ............................................. 26

*NLRB v. Denver Bldg. & Constr. Trades Council*,
    341 U.S. 675 (1951).................................................................................. 10, 11

*NLRB v. Elec. Workers Local 769*,
    405 F.2d 159 (9th Cir. 1968) ..................................................................... 13, 17

*NLRB v. IBEW, Local 453*,
    432 F.2d 965 (8th Cir. 1970) ..................................................................... 12, 14

*NLRB v. Local 1976, United Bhd. of Carpenters & Joiners of Am.*,
    241 F.2d 147 (9th Cir. 1957), *aff'd*, 357 U.S. 93 (1958)............................. 10

*NLRB v. Operating Eng'rs, Local 571*,
    317 F.2d 638 (8th Cir. 1963) ....................................................................... 12

*NLRB v. Teamsters Local 445*,
    473 F.2d 249 (2d Cir. 1973) ........................................................................ 12

*Oakley, Inc. v. Nike, Inc.*,
    988 F. Supp. 2d 1130 (C.D. Cal. 2013) ...................................................... 22

*Operating Engineers Local 542 (Noonan)*,
    142 N.L.R.B. 1132 (1963), *enf'd*, 331 F.2d 99 (3d Cir. 1963)................... 18

*Or. Nat. Res. Council v. Mohla*,
    944 F.2d 531 (9th Cir. 1991) ....................................................................... 27

*Otter Tail Power Co. v. U.S.*,
    410 U.S. 366 (1973)..................................................................................... 26

*In re Outlaw Lab., LP Litig.*,
    2019 WL 1205004 (N.D. Cal. Mar. 14, 2019) ...................................... 25, 26

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
    50 Cal. 3d 1118 (1990) ......................................................................................21

*In re Packaged Seafood Prods. Antitrust Litig.*,
    338 F. Supp. 3d 1118 (S.D. Cal. 2018).................................................................3

*Printing Specialties & Paper Converters Union, Local 388 v. Le Baron*,
    171 F.2d 331 (9th Cir. 1948) ............................................................................10

*Prof'l Real Estate Inv., Inc. v. Columbia Pictures Indus.*,
    508 U.S. 49 (1993).............................................................................................28

*Pye v. Teamsters Local 122*,
    875 F. Supp. 921 (D. Mass. 1995), *aff'd*, 61 F.3d 1013 (1st Cir. 1995) ...................13

*Rescuecom Corp. v. Google, Inc.*,
    562 F.3d 123 (2d Cir. 2009) ...............................................................................2

*Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*,
    768 F.3d 938 (9th Cir. 2014) ......................................................................19, 20

*Savage v. Pac. Gas & Elec. Co.*,
    21 Cal. App. 4th 434 (1993) ..............................................................................22

*Serv. Emps. Int'l Local 525*,
    329 NLRB 638 (1999), *enf'd*, 2002 WL 31724293 (9th Cir. 2002) ........................13

*Serv. Emps. Local 87 (Trinity Bldg.)*,
    312 N.L.R.B. 715 (1993), *enf'd*, 103 F.3d 139 (9th Cir. 1996) ...............................11

*Sonus Networks, Inc. v. Inventergy, Inc.*,
    2015 WL 4539814 (N.D. Cal. July 27, 2015) ......................................................26

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ............................................................................23

*Teamsters Local 122*,
    334 N.L.R.B. 1190 (2001), *enf'd*, 2003 WL 880990 (D.C. Cir. 2003).....................12

*United Bhd. of Carpenters*,
    81 N.L.R.B. 802 (1949) ....................................................................................11

*United States v. Osinger*,
    753 F.3d 939 (9th Cir. 2014) ............................................................................15

TABLE OF AUTHORITIES

*USS-POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades
    Council, AFL–CIO,*
    31 F.3d 800 (9th Cir. 1994) .............................................................23, 25, 28

*Vaughn v. Teledyne, Inc.,*
    628 F.2d 1214 (9th Cir. 1980) .......................................................22

*Watson Carpet & Floor Covering, Inc. v. Mohawk Industries, Inc.,*
    648 F.3d 452 (6th Cir. 2011) .........................................................3

*Waugh Chapel South, LLC v. United Food & Commerical Workers Union,
    Local 27,*
    728 F.3d 354 (4th Cir. 2013) .........................................................13

*Wells v. NLRB,*
    361 F.2d 737 (6th Cir. 1966) .........................................................12

*Wisconsin v. Mitchell,*
    508 U.S. 476 (1993).......................................................................15

*Woelke & Romero Framing, Inc. v. NLRB,*
    456 U.S. 645 (1982).......................................................................17

*Wright v. North Carolina,*
    787 F.3d 256 (4th Cir. 2015) .........................................................3

**Statutes**

29 U.S.C. § 157.................................................................................16, 21

29 U.S.C. § 158.................................................................................17

**Other Authorities**

2 Leg. Hist. of LMRDA 1079 ..........................................................18

105 Cong. Rec. 6428 (1959) ............................................................18

105 Cong. Rec. 10104 (1959) ..........................................................18

H.R. Rep. No. 245, 80th Cong., 1st Sess. (1947) ...........................11

H.R. Rep. No. 1147, 86th Cong., 1st Sess. (1959) .........................17, 18

# I.      PRELIMINARY STATEMENT

This case is about unions and union leaders that have forsaken traditional organizing tactics for threats, unlawful intimidation, secondary boycotts, and sham challenges in a combined effort to control and monopolize the full-service, waterfront hotel market in San Diego's prime tourism regions.  But, in their motions to dismiss, Defendants UNITE HERE! Local 30, Brigette Browning, Building Trades, and Tom Lemmon (collectively, "Defendants")[1] take the position that *any* activity in which they or any other union are engaged that has some connection to a legislative body—no matter how remote—is "protected petitioning activity" and immune from judicial scrutiny.

Defendants' view that unions and their leaders have carte blanche authority to achieve their goals distorts the law and defies logic.  Defendants' arguments, if accepted, would mean their acts of bribing government officials, extorting money and agreements from hotel owners and developers, threatening economic destruction to neutral third parties, and engaging in what they themselves describe as "greenmail" are perfectly acceptable means to achieve their goals.

Defendants' position does not meet the test of human experience and, quite simply, is not the law.  Asserting serial sham environmental and zoning challenges against every non-union developer without regard for the merits of the challenges and based on theories pulled "out of thin air" for the purpose of obtaining a completely unrelated objective is not protected.  Threats to blow up Evans and its businesses unless they accede to Defendants' demands are not protected (and, in any event, not petitioning

---

[1] Defendants divide their arguments among their moving papers.  Local 30 argues that its conduct is protected petitioning under *Noerr-Pennington*, challenges the secondary boycott claims, and argues that the Eighth and Ninth claims for relief are preempted by the NLRA.  Building Trades address the antitrust and RICO claims.  Because the allegations and subject matter in both Oppositions overlap, Evans will avoid repeating points in both Oppositions, instead cross-referencing between its briefs.  The Local 30 Opposition will set forth the relevant factual allegations and arguments related to the claims for Secondary Boycott (LMRA § 303), Preemption, Intentional Interference with Contract, and *Noerr-Pennington*.  The Building Trades' Opposition will address arguments related to antitrust liability and violations of RICO.

activity).  Collusion with competitors to violate antitrust laws and squeeze non-union developers out of the market is not protected.  Bribing public officials to prevent projects from being docketed for a public hearing is, of course, not protected.

Notably, Defendants do not *dispute* that they have engaged in conduct designed to block the development of non-union hotels.  Indeed, as detailed in the FAC, Defendants openly bragged that their lawyers are "the best" at greenmail and that they use their control over City Council members to block projects from consideration on their merits unless their unrelated demands are met.  Defendants further inflicted economic harm by threatening those third parties who do business with developers: when Evans refused to sign a neutrality agreement and PLA for the Bahia project, they targeted Evans' partner in a joint venture, SeaWorld, threatening it with economic ruin unless it ceased doing business with Evans.

We next address the legal standard governing this Motion to Dismiss.  Part III then provides a brief review of some pertinent allegations from the FAC, Docket #19.  Part IV shows that Evans has adequately pled each of its claims for relief, including the Secondary Boycott claims under LMRA § 303, the intentional interference with contract claims, and that the direct threats made to Evans and SeaWorld and Defendants' sham opposition to projects are not protected by the *Noerr-Pennington* doctrine.

## II.   THE LEGAL STANDARD FOR A 12(B)(6) MOTION TO DISMISS

A motion to dismiss under Rule 12(b)(6) tests plaintiff's compliance with the liberal requirements of Rule 8 of the Federal Rules of Civil Procedure.[2]  On such a motion, the court must "accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally."  *Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123, 127 (2d Cir. 2009); *Fikre v. FBI*, 904 F.3d 1033, 1035 n.1 (9th Cir. 2018); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (court must "accept

---

[2] RICO claims that do not plead fraud are not subject to heightened pleading requirements.  *E.g., Brewer v. Salyer*, 2007 WL 1454276, at *2 n.2 (E.D. Cal. May 17, 2007).

as true all well-pleaded allegations of material fact, and construe them in the light most favorable to the non-moving party").  While the complaint must contain sufficient facts to state a claim that is plausible on its face, this inquiry is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  The "complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 103 (1st Cir. 2013) (internal quotes omitted).

Contrary to Defendants' suggestion, this "standard is not akin to a 'probability requirement. . . .'" *Iqbal*, 556 U.S. at 678.  It "only requires enough factual matter to nudge allegations from mere possibility to plausible."  *In re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1181 (S.D. Cal. 2018).  Indeed, "plaintiffs can 'proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely' …. Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage." *Watson Carpet & Floor Covering, Inc. v. Mohawk Industries, Inc.*, 648 F.3d 452, 458 (6th Cir. 2011) (quoting *Twombly*, 550 U.S. at 556).  Indeed, Rule 12(b)(6) dismissals "are especially disfavored in cases where the complaint sets forth a novel legal theory that can be best assessed after factual development,"  *Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015) (quoting *McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004)) and in antitrust cases, *In re Asacol Antitrust Litigation*, 233 F. Supp. 3d 247, 254 (D. Mass. 2017) ("In antitrust cases, 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'").

While Defendants also suggest that the Court should disregard allegations made on information and belief, such allegations are permissible, even after *Twombly* and *Iqbal*.  *See, e.g., Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010).  Such allegations are "a practical necessity" and a "desirable and essential expedient" when "matters… are not within the knowledge of the plaintiff but he has sufficient data to

3

justify interposing an allegation on the subject."  5 Wright & Miller, Fed. Prac & Procedure §1224 (3d ed. 2019).  Such allegations are particularly apt when the pleader must rely on information furnished by others, *id.*, or when "'facts *are peculiarly within the possession and control of the defendant*.'"  *Menzel v. Scholastic, Inc.*, 2018 WL 1400386, at *2 (N.D. Cal. Mar. 19, 2018) (quoting *Arista Records*, 604 F.3d at 120) (emphasis added).[3]  Many of the alleged communications among Defendants and between Defendants and third parties at issue here—text messages, offline conversations, etc.— are based on information furnished by others or are "peculiarly within" Defendants' possession and knowledge.  Thus, they are properly pled on information and belief, and must be considered by the Court.

Defendants pretend that many of the allegations in the FAC simply do not exist, spinning a distorted interpretation of events and suggesting that Evans must refute Defendants' characterization of their own conduct.  This is not the test at the pleading stage, where the only issue is whether the alleged facts, if accepted as true and drawing inferences in Evans' favor, make Evans' theories of liability plausible.  By way of example, Defendants maintain that Allison Rolfe merely "offered independent advice to SeaWorld on labor issues."  Building Trades Mot. at 12.  In reality, the FAC provides detailed facts about Ms. Rolfe and the context in which she communicated to Evans and others that show she was the conduit for Defendants' threats to Evans and SeaWorld.  Specifically, Evans alleges that: (1) Rolfe had close relationships with the unions, including as Browning's close friend (FAC ¶ 105); (2) Rolfe had a history of communicating with the unions about their use of greenmail to secure card check

---

[3] Defendants conveniently omit the full quote authorizing Court's consideration of allegations made on information and belief when the facts are within the possession and control of defendants.  Page 11 of Building Trades Motion quotes *Menzel* as stating: "'"An allegation made on information and belief must still be based on *factual information* that makes the inference of culpability plausible."'" (emphasis in Motion).  This quotation conveniently omits the second half of the sentence which provides that, in determining if an inference is plausible, "*a court may take into account whether 'facts are peculiarly within the possession and control of the defendant*.'"  2018 WL 1400386, at *2 (quoting *Arista Records*, 604 F.3d at 120) (emphasis added).

agreements evidenced by her expressly detailing to Mr. Evans conversations she had with Browning (*id.* ¶¶ 106, 108); (3) Rolfe disclosed facts that she could only have obtained from the unions, such as the existence of a letter from Local 30 about the Bahia to City Council that even Evans at the time was unaware of (*id.*, ¶ 107); (4) at the same time Rolfe was communicating with Evans about the joint venture with SeaWorld, Local 30 sought public records about that relationship (*id.*); (5) Rolfe told Evans that it had to enter into agreements with the unions to avoid problems (*id.*, ¶¶ 108-09); (6) Rolfe explicitly linked reaching an agreement with the unions about the Bahia with the unions not causing problems for SeaWorld (*id.*, ¶¶ 108-10); Rolfe communicated with SeaWorld simultaneously (*id.*, ¶ 110); (7) SeaWorld pressured Evans to do what Rolfe was pushing Evans to do (i.e., sign a card check agreement for the Bahia) (*id.*, ¶ 110); (8) when Evans did not sign a card check agreement for the Bahia, SeaWorld's CEO communicated that it could not do business with Evans because of union problems relating to the Bahia (*id.*, ¶ 112); (9) San Diego's Mayor recognized that SeaWorld abandoned the joint venture with Evans because of "the Union" (*id.*, ¶ 118); and (10) a SeaWorld executive confirmed that it pulled out of the joint venture "because the unions threatened to target SeaWorld, including its plans to open up new attractions on an annual basis, if it continued in its Joint Venture with Evans" (*id.*, ¶ 119).  These allegations make it more than plausible that Ms. Rolfe did far more than "offer independent advice" to SeaWorld.

This selective characterization of the FAC is endemic through Defendants' Motions.  While specific allegations supporting Evans' claims are identified throughout the Oppositions, a brief review of some pertinent allegations in the FAC is appropriate.

## III. SUMMARY OF PERTINENT ALLEGATIONS IN THE FAC

### A. Defendants' Conduct Relating to the Bahia Project

While Evans was seeking to obtain an amendment of its lease with the City of San Diego so that it could renovate and expand the Bahia Resort Hotel, Defendants demanded that Evans enter into contracts with the two unions regarding the Bahia – a

card check neutrality agreement with Local 30 and a Project Labor Agreement with Trades Council.  FAC ¶¶ 84.

Defendants are using opposition to the project as leverage to force Evans accede to their demands.  Evans learned of Defendants' tactics from a member of the City Council who Defendants later bribed to oppose the project unless Evans agreed to unionize the Bahia.[4]  FAC ¶¶ 85-90.  In February and May 2018, Local 30's lawyer wrote the Mayor and City Council raising alleged concerns first about the environmental review of the project and then claiming that the proposed redevelopment was inconsistent with the Mission Bay Master Plan Update ("MBMPU") because the plan provides for the elimination of Gleason Road, which would affect public access to Bahia Point.  FAC ¶¶ 80-81. Evans had learned of Defendants' letters from Rolfe in March 2018.

In June 2018, defendant Tom Lemmon met with Bill Evans, Executive Board Member.  During that meeting, Lemmon mentioned that the Bahia's redevelopment would restrict access to Bahia Point, but, after discussing Evans' plans, conceded that the plans' proposed walkway would provide better access for bike and pedestrian access than the current road.  FAC ¶ 91.  Nonetheless, Lemmon said that the unions would engage in "greenmail" and intended to use CEQA and other environmental challenges to hold the Bahia redevelopment project hostage.  FAC ¶ 92. Unless Evans capitulated, the

---

[4] The City Attorney issued a written opinion concluding that it is unlawful for members of the City Council to condition their support for a project on the developer agreeing to hire union labor. FAC ¶¶ 88, 123. Defendants argue that this is incorrect, because the City leases the land to Evans and is thus a market participant (Mot. at 15), but the mere fact that the City owns the land is not dispositive.  *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) (despite owning port where trucking services occurred, Port of Los Angeles was not a market participant for purpose of regulating those services). Whether a government is a market participant involves a two-step analysis that considers, *inter alia*, the purpose behind the government's actions. *Airline Serv. Providers Ass'n v. L.A. World Airports*, 873 F.3d 1074, 1080 (9th Cir. 2017) (test is: (1) whether action was "undertaken in pursuit of the efficient procurement of needed goods and services, like a private business would"; and (2) "does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than [to] address a specific proprietary problem." *Id.* (quotations and citations omitted).  At this preliminary stage, it is impossible to find that the City's insistence on union laborers at any hotel on leased land satisfies either factor of this test.

Bahia redevelopment would be doomed because the unions would hold it up by any and all means, adding "we know how to do it, we do it all the time."  *Id.*  A few months later, Lemmon again asked Bill Evans to accept Defendants' demands, warning that, if Evans did not, "we're going to turn up the volume."  FAC ¶ 94.

When Evans refused, Defendants turned their attention to SeaWorld, Evans' business partner in a separate joint venture to develop an unrelated hotel.  FAC ¶¶ 99-119.  Specifically, through a third-party consultant and close friend of defendant Browning, Defendants indicated that if Evans agreed to a deal over the Bahia, they would not target SeaWorld.  FAC ¶¶ 108-09.  But if Evans refused, the unions would come after SeaWorld – Evans' business partner.  FAC ¶ 109.

When Evans refused to capitulate, Defendants did as threatened.  Although they had not opposed SeaWorld's plans to develop new attractions, including a then-pending application before the Coastal Commission to build a new roller coaster, Defendants warned that if SeaWorld continued its partnership with Evans, Defendants would oppose SeaWorld's plans to build future attractions, and collaborate with SeaWorld opponents, such as People for the Ethical Treatment of Animals ("PETA"), to disrupt SeaWorld's business and harm its reputation and public image.  FAC ¶¶ 110, 134.

Faced with these threats, on August 10, 2018, SeaWorld attempted to force Evans to agree to Defendants' demands.  Because SeaWorld's economic survival depends on its ability to build new attractions, it told Evans that it could not move forward with the hotel plans at the expense of its core business.  FAC ¶ 114.  Corrine Brindley, SeaWorld's Vice President of State Affairs, said that SeaWorld's concern was that if Evans did not do a deal with Defendants for the Bahia, they would come after SeaWorld and its proposed new attractions with "pitchforks in air[,]" potentially damaging SeaWorld's reputation and image. F AC ¶ 115.  When Evans did not agree, SeaWorld terminated the joint venture.  FAC ¶ 117.

Defendants' actions against SeaWorld significantly harmed Evans.  Evans anticipated that the SeaWorld-branded hotel would result in profits exceeding $100

1  million.  FAC ¶¶ 100-01, 288.

2       Having inflicted this economic harm, Defendants continued to demand that Evans

3  agree to the card check neutrality agreement and PLA.  On November 27, 2018, Bill

4  Evans and Robert Gleason, Evans' CEO, met with Browning, Lemmon, and Carol Kim,

5  Trade Council's Political Director. FAC ¶ 122.  Gleason tried to get Browning and

6  Lemmon to discuss Defendants' environmental opposition, but neither could speak on

7  this subject.  *Id.*  When Bill Evans asked why Evans should agree to Defendants'

8  demands, Browning responded "so that you can go forward with your project" and be

9  able to pursue other opportunities in San Diego.  *Id.*  She stated that they had the vote of

10  the new City Council President "all locked up" and future City Councils would be even

11  worse.  *Id.*

12       Lemmon then added that the unions' conduct was like a "grenade with the pin on

13  the table."  *Id.*  While the "pin" was out, there was still time to put it back in.  *Id.*

14       Browning also referred to past opposition that the unions had raised against other

15  developments, including bragging about a challenge that she pulled out of "thin air[.]"

16  *Id.*  She warned Evans that Defendants would stop at nothing to prevent the Bahia from

17  going forward.  *Id.*

18      **B.**    **Control and Bribery of City Council Members**

19       Not only did Ms. Browning brag that the new City Council President was "all

20  locked up," but Mr. Lemmon has bragged to multiple people that he "owns five city

21  council members." FAC ¶¶ 4, 122. In fact, when Evans asked the City Council President

22  why she would not docket the Bahia project, she stated that she could not because the

23  unions had given her "hundreds of thousands of dollars to win this thing." FAC ¶ 120.

24  Shortly after committing to support the project, current San Diego City Councilmember

25  (referred to in the FAC as "Councilmember I") and staff informed Evans that while

26  Councilmember I favored the project, Browning required that Councilmember I "oppose

27  the project, regardless of what this would mean in terms of lost revenue for the City"

28  and Evans would have to sign a neutrality agreement. *Id.* ¶¶ 87-90.

### C.    A Pattern of Conduct Targeting Non-Union Projects

Defendants have alleged similar conduct (threats, sham environmental challenges, etc.) for many other projects in San Diego. *See, e.g.,* FAC ¶¶ 50; 51-54 (San Diego Convention Center expansion not yet approved); 57-58 (Cisterra Development not yet constructed); 59-60 (Town and Country Development delayed by at least 8 months), 61-62 (Sunroad Project delayed for years until signing card check neutrality agreement), 70-71 (Hotel Del Coronado). Defendants' conduct also extends to colluding with competitor developers to stop non-union projects. In October 2015, Evans partnered with Oliver McMillan to submit a proposal to the Board of Port of Commissioners (the "Port") to develop the Seaport Village project. *Id.* ¶ 63. The Evans/Oliver McMillan proposal was one of six which met the Port's criteria for the project. *Id.* While its proposal was pending, Defendant Browning contacted Evans' partner, Oliver McMillan, and stated that Defendants could ensure that they won the bid by agreeing to sign a card check neutrality agreement and PLA. *Id.* ¶ 64. When Evans and Oliver McMillan declined, Defendants combined with Protea, a competing developer that agreed to sign a card check neutrality agreement and PLA for the project. *Id.* ¶ 65-66. One month later, the Port held a public hearing to discuss the proposals at which a Protea representative told the Port it would enter into agreements with the unions (and at which Browning also spoke publicly about Local 30's support for Protea). *Id.* ¶ 67. The Port Commissioners abruptly stopped the announced process and voted to continue further discussions about the project exclusively with Protea. *Id.* ¶ 68-69.

## IV.    THE COURT SHOULD DENY LOCAL 30'S MOTION TO DISMISS

### A. Evans Has Adequately Pleaded Causes of Action under Labor Management Relations Act ("LMRA") § 303.

Section 303 of the LMRA creates a cause of action for violations of § 8(b)(4) of the National Labor Relations Act ("NLRA"). Evans has alleged facts and inferences that support two distinct causes of action under § 303: (1) that Defendants' threats to harm SeaWorld violated § 8(b)(4)(ii)(B) of the NLRA; and (2) that Defendants' attempt

to force Evans to enter into a PLA with Trades Council that forecloses the use of non-union labor violates § 8(b)(4)(ii)(A) of the NLRA.

        1.    <u>The National Labor Relations Act bars the use of threats or coercion to apply unlawful pressure on third parties.</u>

Since 1947, § 8(b)(4) of the NLRA has restricted unions in their use of a tactic "known as the secondary boycott," in which the union engages in activity "whose sanctions bear, not upon the employer" with whom the union has a labor dispute, "but upon some third party who has no concern in it." *Local 761, Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 366 U.S. 667, 672 (1961) (citation and internal quotation marks omitted). Secondary boycotts have long been proscribed because of their disruptive and—in the judgment of Congress and the courts—unjustified expansion of economic warfare to injure neutral businesses and impair commerce. *See Int'l Longshoremen's Ass'n v. Allied Int'l, Inc.*, 456 U.S. 212, 223 (1982) (secondary activity imposes "heavy burden" on neutral employers and widens "industrial strife").

Prohibiting secondary boycotts serves "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." *NLRB v. Denver Bldg. & Constr. Trades Council*, 341 U.S. 675, 692 (1951). Section 8(b)(4)'s prohibitions were necessary, in Congress's view, "in order to protect the public welfare which is inextricably involved in labor disputes." *NLRB v. Local 1976, United Bhd. of Carpenters & Joiners of Am.*, 241 F.2d 147, 155 (9th Cir. 1957), *aff'd*, 357 U.S. 93 (1958); *see Printing Specialties & Paper Converters Union, Local 388 v. Le Baron*, 171 F.2d 331, 334 (9th Cir. 1948) (noting prohibition of secondary activity is necessary "to safeguard the national interest in the free flow of commerce").

"Recognizing that '[i]llegal boycotts take many forms,' . . . Congress intended [§ 8(b)(4)'s] prohibition to reach broadly." *Int'l Longshoremen's Ass'n*, 456 U.S. at 225 (quoting H.R. Rep. No. 245, 80th Cong., 1st Sess., 23–24 (1947)). "[I]t can hardly be

supposed that Congress, in enacting § 8(b)(4)[ ] as the legislative response to the asserted evils of secondary boycotts, did not envisage the whole gamut of union activities by which such boycotts are achieved." *United Bhd. of Carpenters*, 81 N.L.R.B. 802, 810-11 (1949)).

2.   Evans has adequately pleaded violations of § 8(b)(4)(ii)(B).

Section 8(b)(4)(ii)(B) contains two elements: (1) a union must engage in conduct that threatens, coerces, or restrains any person with (2) the object of forcing the person to cease or refrain from doing business with an employer whose employees the union seeks to represent. *See, e.g.*, *Serv. Emps. Local 87 (Trinity Bldg.)*, 312 N.L.R.B. 715, 742–43 (1993), *enf'd*, 103 F.3d 139 (9th Cir. 1996). Defendants do not dispute that Evans has sufficiently pleaded the second element – a secondary objective.[5] Their arguments center entirely on whether their threats against SeaWorld satisfy the first element. But Defendants' actions plainly qualify as threats and coercive activity within the meaning of § 8(b)(4)(ii).

The phrase "threaten, coerce, or restrain," as used in labor-management relations law, has long been understood to encompass the kind of indirect pressure involved in this case: a message from a union to third parties (here, SeaWorld) directing them to take specified action (convince Evans to unionize the Bahia) or face economic harm from the union drumming up negative publicity on issues like animal welfare or

---

[5] Although they have not argued it in their Motion, Defendants may argue that their threats to engage in union organizing against SeaWorld could not be secondary because one of their objectives might have been to represent SeaWorld's workforce. But that objective is immaterial; "it is not necessary to find that the sole object . . . was secondary so long as one of the union's objectives was to influence the secondary employer to bring pressure to bear on the primary." *Mautz & Oren, Inc. v. Teamsters, Local No. 279*, 882 F.2d 1117, 1120–21 (7th Cir. 1989). Even if the union acts with "mixed motives," partially primary (to pressure the primary employer) and partially secondary (cause the secondary employer to exert pressure on the primary employer), the conduct is still unlawful under § 8(b)(4)(ii)(B). *Mead v. Retail Clerks Int'l Ass'n, Local Union No. 839, AFL-CIO*, 523 F.2d 1371, 1379 n.9 (9th Cir. 1975) ("presence of mixed motives does not bar relief" under Section 8(b)(4)). Thus, even if Evans "is unable to establish that the unlawful secondary motive is a substantial cause of the coercive activity by the union, § 8(b)(4)[ ] is violated if the secondary clause is 'an object'" of the coercive activity. *Id.* (quoting *Denver Bldg. & Constr. Trades Council*, 341 U.S. at 689).

blocking future SeaWorld attractions.  *E.g.*, FAC ¶134 (alleging that Defendants threatened to join with SeaWorld's opponents such as PETA to disrupt SeaWorld's business); FAC ¶¶ 110, 115 (alleging that Defendants told Evans and SeaWorld that they would come after SeaWorld with "pitchforks in air," impede SeaWorld's ability to get attractions approved at the Coastal Commission and City Council, and engage in union-organizing tactics against SeaWorld).  The purpose was to use SeaWorld's business relationship with Evans for one hotel – the proposed SeaWorld-branded hotel – to compel Defendants' target, Evans, to act in a desired manner regarding a different hotel, the Bahia.

Those kinds of statements fall squarely within the category of statements that have been found to be "threats" prohibited by § 8(b)(4)(ii).  Warning a neutral third party not to be "surprised if you have pickets on your plant tomorrow" is a threat of illegal activity.  *Hirsch v. Building & Constr. Trades Council*, 530 F.2d 298, 302, 305-06 (3d Cir. 1976); *see also NLRB v. IBEW, Local 453*, 432 F.2d 965, 969 (8th Cir. 1970).  Telling a neutral third party "not a wheel will turn[,] nothing will move" is a prohibited threat.  *NLRB v. Teamsters Local 445*, 473 F.2d 249, 252 (2d Cir. 1973); *see also Wells v. NLRB*, 361 F.2d 737, 742 (6th Cir. 1966) ("Just don't act like a school kid.  You know what I am talking about" and "we are going to have to stop this job" are prohibited threats where work stoppage took place); *NLRB v. Operating Eng'rs, Local 571*, 317 F.2d 638, 641 (8th Cir. 1963) (prohibited threat where union representative stated that "if you don't have [subcontractor] shut down, I am going to have to shut you down").

Moreover, Defendants' conduct also meets the definition of "coerce."  "[T]hreaten, coerce, or restrain" has been defined as "acts of a compelling or restraining nature, applied by way of concerted self-help consisting of a strike, picketing, or other economic retaliation and pressure in the background of a labor dispute."  *Carpenters Kentucky State Dist. Council*, 308 N.L.R.B. 1129, 1130 n.2 (1992); *see also Teamsters Local 122*, 334 N.L.R.B. 1190, 1204 (2001) (section 8(b)(4)(ii)(B) "proscribes all conduct where it was the union's intent to coerce, threaten or restrain third parties"),

*enf'd*, 2003 WL 880990 (D.C. Cir. 2003). Such coercive conduct includes less traditional forms of union activity directed at neutral third parties. Ultimately, whether an activity is prohibited "is keyed to the coercive nature of the conduct, whether it be picketing or otherwise." *520 S. Mich. Ave. Assocs. v. Unite Here Local 1*, 760 F.3d 708, 720 (7th Cir. 2014); *Pye v. Teamsters Local 122*, 875 F. Supp. 921, 927 (D. Mass. 1995) (threats and coercion "can take many forms and is often most effective when it is very subtle"), *aff'd*, 61 F.3d 1013 (1st Cir. 1995).

Thus, many types of non-picketing activity can be coercive. Bad faith, baseless, or harassing litigation has been found to be coercive. *Waugh Chapel South, LLC v. United Food & Commerical Workers Union, Local 27*, 728 F.3d 354, 364–65 (4th Cir. 2013). Threatening to cancel a labor agreement is coercive. *NLRB v. Elec. Workers Local 769*, 405 F.2d 159, 161–62 (9th Cir. 1968). Crowding small retail stores with persons using large bills to make small purchases is coercive. *Pye*, 875 F. Supp. at 927. Aiming loudspeakers that emit excessive noise at residential buildings is coercive. *Carpenters (Society Hill)*, 335 N.L.R.B. 814, 817, 826–29 (2001). And the assertedly symbolic act of emptying shredded paper from trash bags into the lobbies of neutral office buildings to dramatize janitors' concerns, while disturbing tenants and other visitors, is coercive. *Serv. Emps. Int'l Local 525*, 329 NLRB 638, 638–639, 680 (1999), *enf'd*, 2002 WL 31724293 (9th Cir. 2002). If actions such as those are coercive within the meaning of § 8(b)(4)(ii)(B), so too must be direct threats of economic harm from negative public relations campaigns and baseless opposition to future projects.[6]

Despite the Supreme Court's recognition in *Int'l Longshoremen's Ass'n*, 456 U.S. at 225, that § 8(b)(4)(ii) should be read broadly, Defendants urge a narrow reading of the law that would extend First Amendment protection to nearly all communications aimed at enmeshing neutrals in a labor dispute. Mot. at 24. That argument was rejected

---

[6] Defendants argue that threatening future opposition to SeaWorld projects is protected petitioning activity. But Defendants cannot have an objectively reasonable basis for opposing projects that have not yet been proposed.

by the Supreme Court. *IBEW Local 501 v. NLRB*, 341 U.S. 694, 705 (1951) ("The prohibition of inducement or encouragement of secondary pressure by § 8(b)(4)(A) carries no unconstitutional abridgment of free speech."). In *IBEW*, the Court held that union communications are not immunized by First Amendment rights when they are used as an integral part of the conduct that violates a valid statute like the NLRA. *See id.* at 705 & n.10 (citing *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949)).

Defendants nonetheless contend that the Supreme Court in *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. and Cosntr. Trades Council*, 485 U.S. 568 (1988), limited § 8(b)(4)'s proscriptions to picketing or "picketing-like" conduct. Mot. at 21. Defendants are wrong. *DeBartolo* involved a claim that a union violated § 8(b)(4) by peacefully distributing handbills to customers at a shopping mall informing them that a department store in the mall was being built by non-union contractors and urging them not to shop at the store until the mall owner promised to employ contractors who paid fair wages and benefits. The mall owner claimed this was unlawful secondary activity, but the Supreme Court held that handbilling was not prohibited secondary activity to avoid a construction of § 8(b)(4) that would infringe on First Amendment speech.

Importantly, the Court explained that the handbills "revealed the existence of a labor dispute and urged potential customers of the mall to follow a wholly legal course of action, namely, not to patronize the retailers doing business in the mall." 485 U.S. at 575. This was "expressive activity," similar to leafletting, that clearly would be protected by the First Amendment. *Id.* at 576. The Court distinguished handbilling from picketing, as it "is qualitatively different from other modes of communication" *Id.* at 579-80 (internal quotations omitted). The response picketing seeks to elicit does not solely depend upon the persuasive force of the idea being communicated, but rather on "the conduct element [which] often provides the most persuasive deterrent to third persons about to enter a business establishment." *Id.* at 580.

Nothing in *DeBartolo* suggests that the Supreme Court intended to limit § 8(b)(4)(ii) to picketing only. To the contrary, the Court has long held that unlawful

secondary activity is "as in most instances brought about through speaking and writing." *Giboney*, 336 U.S. at 502. And "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.* Consistent with that principle, courts have repeatedly held that "First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils'" that the legislature has the power to control. *Cal. Motor Trans. Co. v. Trucking Unlimited*, 404 U.S. 508, 514 (1972); *see also Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) ("First Amendment . . . does not prohibit evidentiary use of speech to establish the elements of a crime or to prove motive or intent"); *United States v. Osinger*, 753 F.3d 939, 946 (9th Cir. 2014) ("[W]here speech becomes an integral part of the crime, a First Amendment defense is foreclosed even if the prosecution rests on words alone.").

Defendants' threats against SeaWorld are more akin to picketing than pure speech like handbilling. Defendants do not suggest (nor can they) that their conduct toward SeaWorld and Evans, often through Rolfe, was merely ideas being communicated. Defendants' statements encompassed threats of conduct – actions in concert with groups like PETA to shower SeaWorld with bad publicity and block SeaWorld's future attractions. That makes their threats qualitatively different from the speech that fell outside § 8(b)(4)(ii) in *DeBartolo*.[7]

Further, Defendants contend that their conduct, as alleged, was too "vague" and "nonspecific" to constitute a threat or coercion for purposes of § 8(b)(4). Mot. at 23–26.[8] Defendants rely on cases decided on summary judgment, following a bench trial,

---

[7] For reasons discussed in section E below, Defendants' threats to SeaWorld and to Evans are separate from any purported lobbying activity in which they claim to have been engaged. Thus, those threats do not constitute protected petitioning activity.

[8] In this regard, Defendants suggest that Evans lacks standing to make claims under Section 303 of the LMRA. Mot. at 26. However, to the extent that Evans has pleaded facts sufficient to support a plausible theory of a Section 8(b)(4) violation (it has), Evans has standing as a matter of law. *See Am. President Lines, Ltd. v. Int'l Longshore & Warehouse Union, Alaska Longshore Div., Unit 60*, 721 F.3d 1147, 1154

or after making their way through the NLRB's administrative channels where factfindings were made. Courts and the NLRB routinely hold that the type of conduct alleged in the FAC is sufficiently specific to constitute a threat or coercion under Section 8(b)(4)(ii) and survive a motion to dismiss. *See, e.g.*, *IBEW, Local 5 (Jonel Constr.)*, 164 N.L.R.B. 455, 457 (1967) (finding threat of "trouble" sufficient to violate NLRA where linked to unlawful secondary objective).

Finally, Defendants cannot avoid liability under § 303 by arguing that their threats to organize SeaWorld were protected by § 7 of the NLRA. Mot. at 25. That argument fails for two reasons. First, by its terms, § 7 protects only employee "self-organization," not conduct of unions – the entity regulated by § 8(b)(4). 29 U.S.C. § 157; *see Lechmere, Inc. v. NLRB*, 502 U.S. 527, 537 (1992). Second, whatever the plain language of § 7, it does not protect unlawful pickets by employees, *see Dist. 30, United Mine Workers of Am. v. NLRB*, 819 F.2d 651, 656 (6th Cir. 1987); therefore, it could not possibly protect union threats to organize a secondary employer.

### 3. Evans has adequately pleaded violations of § 8(b)(4)(ii)(A).

Evans has alleged that Defendants violated § 8(b)(4)(ii)(A) by, individually and in concert, demanding a PLA as a condition for Evans "to go forward with [the Bahia redevelopment] project" and Defendants to put the pin back in the "grenade," or else face sham environmental and zoning challenges and other impeding actions. FAC ¶ 243. Defendants do not dispute that a PLA is a "cease doing business" agreement under § 8(e) of the NLRA. But they grossly misstate the law to suggest that threats or coercion can be used to secure such an agreement. Neither is permissible.

Section 8(b)(4)(ii)(A) prohibits union conduct to force an employer to enter into an agreement prohibited by § 8(e) of the NLRA, 29 U.S.C. § 158(e). A violation has

---

(9th Cir. 2013) (primary target of union's secondary boycott always has standing to sue under LMRA § 303 "because they are the direct objects of the unlawful activity"); *see also Charvet v. Int'l Longshoremen's Ass'n*, 736 F.2d 1572, 1576 (D.C. Cir. 1984); *Mead v. Retail Clerks Int'l Ass'n, Local Union No. 839*, 523 F.2d 1371, 1375 n.5 (9th Cir. 1975).

two elements: (1) threatening, coercing, and restraining any person is an unfair labor practice (2) if the object is to force that person to agree to a § 8(e) agreement. *See NLRB v. IBEW & Local Union No. 769*, 405 F.2d 159, 163 (9th Cir. 1968).

Section 8(e) prohibits "cease doing business agreements" between an employer and a union that are designed to affect labor relations with another employer.[9]  Although it provides a limited exception for employers primarily engaged in the construction industry, that exception does not apply to Evans because, as alleged, Evans is not an employer primarily engaged in the construction industry.  Moreover, "Congress did not afford construction unions an exemption from § 8(b)(4)[ ]." *Connell Constr. Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 631 (1975).  Accordingly, "to threaten, coerce, or restrain" to force an employer to agree to such an agreement is unlawful whatever the industry.  *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665 (1982).

Defendants attempt to sidestep this precedent by arguing that § 8(b)(4)(ii)(A) does not apply because § 8(e) "expressly exempts pre-hire agreements in the construction industry," and the Bahia redevelopment involves construction.  Mot. at 28.  Even if the construction industry exemption applies to Evans (it does not), § 8(b)(4)'s prohibitions would still apply.  *See Connell*, 421 U.S. at 633 (Congress did not intend "that strikes or picketing could be used to extract prehire agreements from unwilling employers"); *Woelke*, 456 U.S. at 665 ("even where… unions have negotiated secondary clauses that are sheltered by [§ 8(e)], they may not enforce them by picketing or other forms of concerted activity" (citing H.R. Conf. Rep. No. 1147, 86th Cong., 1st Sess., 39 (1959)).

Any attempt to narrow this rule would cut against Congress's stated intent.  One

---

[9] Section 8(e) of the NLRA states in pertinent part that "[i]t shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person[.]" 29 U.S.C. § 158(e).

of the aims of the Landrum Griffith Act was to limit "top-down" organizing campaigns, in which unions used economic weapons to force recognition from an employer regardless of the wishes of employees.  105 Cong. Rec. 6428-6429 (1959) (remarks of Sen. Goldwater); *id.* at 6648-6649 (remarks of Sen. McClellan); *id.* at 6664-6665 (remarks of Sen. Goldwater); *id.* at 14348 (memorandum of Rep. Griffin); 2 Leg. Hist. of LMRDA 1079, 1175-1176, 1191-1192, 1523.  As the Supreme Court recognized, Congress accomplished this goal by "tightening Section 8(b)(4), which prohibits the use of most secondary tactics in organizational campaigns."  *Connell*, 421 U.S. at 633.  The legislative history of that statute indicates that Congress did not intend for construction companies to be permitted to apply economic pressure to extract PLAs.  *See* H.R. Rep. No. 1147 n.5, at 42 (1959); 105 Cong. Rec. 10104 (1959) (memorandum of Sen. Goldwater); *id.* at 18128 (remarks by Rep. Barden); 2 Leg. Hist. of LMRDA 1289, 1715.  Unsurprisingly, the NLRB has long held this view.  *See Operating Engineers Local 542 (Noonan)*, 142 N.L.R.B. 1132 (1963), *enf'd*, 331 F.2d 99 (3d Cir. 1963).  The legion of authority thus conflicts with Defendants' contention that they can apply otherwise unlawful pressure to secure a PLA.

Defendants also seek to distract by making much the same argument as they did regarding the FAC's § 8(b)(4)(ii)(B) allegations.  In particular, Defendants contend that the facts as alleged are too "vague" to support a theory of a § 8(b)(4)(ii)(A) violation.  To the contrary, the facts alleged in the FAC plausibly support the legal theory that Defendants violated § 8(b)(4)(ii)(A).  As discussed above, § 8(b)(4) covers a broad range of conduct.

Specifically, the FAC alleges that Defendants engaged in sham lobbying, stating in no uncertain terms that they were using "greenmail," but would cover their tracks by requiring "small mitigation measures."  FAC ¶ 92.  Moreover, as alleged, Rolfe related to Evans that Defendants would target all of Evans' projects through environmental opposition that would resolve itself only if Evans signed a PLA.  FAC ¶ 108.  Following months of sham environmental opposition, Local 30 then contacted the Mayor's office

and demanded that he stop asking the City Council to docket the Bahia.  FAC ¶ 121.  In this backdrop, Defendants met with Evans and stated that unions are businesses with the objective to sign up members via a PLA.  FAC ¶ 122.  According to Defendants, with the City Council "all locked up," they had laid a "grenade with the pin on the table," but there was still time to put the pin back in place with the signing of a PLA.  FAC ¶ 122.  These and other facts support the plausible inference that Defendants threatened and attempted to coerce Evan Hotels into signing a § 8(e) agreement.

Defendants fare no better in arguing that they can avoid § 8(b)(4) liability because they never sought to become a party to a PLA with Evans, but would instead enter into such an agreement with a general contractor in the construction industry.  Mot. at 28.  While a "cease doing business agreement" with a general contractor—unlike one with Evans—may not violate § 8(e), threatening and coercing Evans to refrain from doing business with general contractors unwilling to sign a PLA constitutes a violation of § 8(b)(4)(ii)(B).  In other words, a message from a union to a third party (here, Evans) threatening its business unless it refrains from doing business with general contractors unwilling to sign a PLA (the primary employers) would be an unlawful secondary boycott.  *Int'l Longshoremen's Assn.*, 456 U.S. at 224.

Accordingly, however Defendants attempt to frame the facts as alleged, they cannot avoid liability under § 8(b)(4)(ii)(A).  Evans' allegations support a plausible theory of liability.

## B.   Evans' State Law Claims Are Not Preempted by § 303.

Evans alleges that (1), in the alternative, Defendants intentionally interfered with the SeaWorld agreement and (2) Defendants attempted to commit extortion to induce Evans to give up certain employee-related property.  FAC ¶¶ 281-95.  That is, to the extent that Defendants dispute that § 8(b)(4) applies to their conduct, Evans' claims are not preempted by § 303.  See, e.g., FAC ¶ 282.  Despite Defendants' assertions otherwise, § 303 does not preempt all claims involving the type of conduct at issue here.  See Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am., 768 F.3d 938, 956

(9th Cir. 2014) ("§ 303 does not so fully occupy the field such that any claim related to secondary boycotts must be brought under [it] or not at all.").

Defendants, however, rely on Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton, 377 U.S. 252 (1964), to argue that LMRA's preemptive scope extends beyond secondary action that is illegal under § 303 to any claim based on "secondary pressure." Mot. at 29-30. But the holding in Morton is not so broad. Instead, Morton stands for the proposition that a state law claim may be preempted if it is fundamentally a labor claim in the guise of an action for, as an example, tortious interference. 377 U.S. at 259-61; see also Retail Prop. Trust, 768 F.3d at 954 (discussing principles of preemption under Morton). Accordingly, under Morton, if the state law claims here are preempted, then Defendants essentially concede that the claims are fundamentally labor claims and § 303 applies. If Defendants dispute that the state law claims are fundamentally labor claims, then the claims are not preempted.

Even if Morton could be read broadly, Defendants previously argued that § 303 must be construed narrowly to prohibit only "picketing" activity and that any other secondary pressure that "threaten[s], coerce[s], or restrain[s]" is permissible—including threats of "negative publicity" and "greenmail." See Mot. at 23-24; see also FAC ¶ 110. Under Defendants' narrow construction, therefore, where "threaten, coerce, or restrain" is interpreted only as picketing and not as directly communicated threats of economic harm, then the conduct as alleged here must be outside of § 303. If that is the case, then the state law claims based on Defendants' communicated threats of economic harm must stand. Defendants cannot have it both ways. The alleged conduct either falls under § 303 and is preempted, or it is the proper subject of the claims alleged here.

Finally, Defendants argue that the intentional interference claim and the attempted extortion claim are "predicated solely on [their] actions toward Evans and SeaWorld, resulting in the termination of their contractual relations." Mot. at 29 (citing FAC ¶¶ 281, 289). But Defendants mischaracterize Evans' allegations. As to Evans' attempted extortion claim, Evans also alleges that the claim is based on Defendants' direct

communications to Evans.  FAC ¶ 289.  Direct communications are not secondary activity covered by § 303.  See 29 U.S.C. § 157.  Thus, even if claims based on Defendants' conduct towards Evans and SeaWorld could be preempted by § 303 (which they are not), the attempted extortion claim is not preempted to the extent it is based on allegations of Defendants' direct communications to Evans.

### C. Evans Has Alleged a Claim for Interference with Contractual Relationship Under California Law.

The FAC points to facts that are more than sufficient to state that Defendants intentionally interfered with the agreement between Evans and SeaWorld.  Defendants argue that Evans' contractual interference claim fails because Defendants did not have knowledge of the contract and did not engage in "intentional acts designed to disrupt or breach the contract between Evans and SeaWorld."  Trades Mot. at 29.  This argument mischaracterizes the law.

*First*, Evans sufficiently alleges that Defendants had knowledge of the Evans-SeaWorld agreement.  FAC ¶¶ 283-84.  Indeed, Defendants do not dispute that they had knowledge of this joint venture in 2015.  Trades Mot. at 29.  Yet—without citing any authority—they then conclude that this knowledge is somehow insufficient to establish knowledge of a contract entered into three years later.[10]  Even if this conclusion was logical, Defendants ignore that on February 23, 2018, one month *after* SeaWorld and Evans entered into the joint venture, Rick Bates, an officer of Defendant Local 30, submitted a Public Records Act request seeking information regarding the lease for the joint venture.  FAC ¶ 107.  Taken together, these facts support the plausible inference that Defendants had knowledge of the joint venture as of February 2018, (and intentionally engaged in acts designed to disrupt it).

*Second*, the FAC alleges that Defendants acted to "intentionally interfere[]" with

---

[10] Defendants reference *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990), but the cited page states only that an element of a contractual interference claims is that defendant has knowledge of the contract.

that contract.  FAC ¶ 285.  Defendants claim that Evans failed to allege that "*Defendants* engaged in acts designed to disrupt or breach the contract," or that "but for Defendants actions, the contract would have been performed."  Again, by failing to cite to any authority whatsoever, their argument completely misses the mark.  In an intentional interference claim, a jury can "infer culpable intent from conduct 'substantially certain' to interfere with the contract."  *Savage v. Pac. Gas & Elec. Co.*, 21 Cal. App. 4th 434, 449 (1993).  Evans has alleged such conduct here.  For example, the FAC alleges that Defendants told Rolfe to communicate to SeaWorld that Defendants would come after SeaWorld's reputation and public image if SeaWorld did not terminate its contract with Evans. *see* FAC ¶ 110.  At the very least, this supports a plausible inference that Defendants engaged in conduct "substantially certain" to cause SeaWorld to terminate the contract with Evans.  *Cf. Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1220 (9th Cir. 1980) ("Cases where intent is a primary issue generally are inappropriate for summary judgment unless all reasonable inferences that could be drawn from the evidence defeat the plaintiff's claims.").

　　　*Finally*, because Evans alleges that SeaWorld terminated its Joint Venture as a direct result of the threats communicated by Defendants, Defendants' argument that their actions are not the "but for" cause of the termination is meritless.  Indeed, courts find liability where Defendants' actions are a factor (and not necessarily the sole factor) in causing a breach.  *See, e.g.*, *Oakley, Inc. v. Nike, Inc.*, 988 F. Supp. 2d 1130, 1135 (C.D. Cal. 2013) ("[T]he third element [intentional acts] incorporates a causation requirement that these intentional acts were a substantial factor in causing the breach.") (citing *Bank of New York v. Fremont Gen. Corp.*, 523 F.3d 902, 909 (9th Cir. 2008)).

## D.　Defendants' Conduct Is Not Protected By *Noerr-Pennington*.

　　　Contrary to Defendants' arguments, the *Noerr-Pennington* doctrine does not immunize them from liability.  That doctrine protects only petitioning activity—communications directed at a branch of government, such as courts or legislatures—and conduct incidental to that activity.  *Cal. Motor*, 404 U.S. at 510; *City of Columbia v.*

*Omni Outdoor Advertising*, 499 U.S. 365, 279-80 (1990) (lobbying is petitioning activity); *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1183-84 (9th Cir. 2005) (complaint, answer, counterclaim and other pleadings are petitioning activity); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 935 (9th Cir. 2006) (incidental conduct must be "sufficiently related" to that petitioning activity to qualify for protection).  For example, *Noerr-Pennington* does not protect activity that is "sham"—i.e. not genuine or instituted solely to harass or to interfere with business relationships.  *See City of Columbia,* 499 U.S. at 380; *USS-POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council, AFL–CIO*, 31 F.3d 800, 811 (9th Cir. 1994).

Here, Evans has sufficiently alleged that Defendants' conduct included the use of non-traditional, unlawful tactics designed to exclude non-union hotel developers from the market.  Defendants argue that their conduct is protected by *Noerr-Pennington* because they were "petitioning" a legislative body (the City Council).  But Evans' claims are not, as alleged, based on petitioning activity.  Even if they are sufficiently related to petitioning activity, that activity is sham or illegal.

<ol>
<li>1. <u>Because Evans' claims are predicated on conduct that is neither petitioning activity nor incidental to petitioning activity, <em>Noerr-Pennington</em> does not bar Evans' claims.</u></li>
</ol>

The FAC alleges specific facts about the direct threats made by Browning, Lemmon, and Rolfe (communicating on Defendants' behalf) to Evans and SeaWorld.  Those statements simply are not petitioning activity.  *Sosa*, 437 F.3d at 933 ("only litigation activities which constitute 'communication[s] to the court' may be fairly described as 'petitions'") (quoting *Freeman*, 410 F.3d at 1184).  And, contrary to Defendants' argument, threats made to a third party (here SeaWorld) are not sufficiently related to petitioning activity to be protected incidental conduct.  *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, 164 F. Supp. 3d 1117, 1132 (D. Minn. 2016) (threats to plaintiff's customers that it would sue plaintiff for patent infringement if customers continued to work with plaintiff were "seemingly unrelated" to defendants' action against plaintiff directly); *180s, Inc. v. Gordini U.S.A., Inc.*, 602 F. Supp. 2d 635, 640-41

(D. Md. 2009) (pressuring plaintiff's customers not to do business with plaintiff is "separate and apart from" lawsuit against plaintiff and "are not the type of petitioning activity protected by the *Noerr-Pennington* doctrine").

Evans' claims also are predicated on Defendants' direct threats to Evans, such as Lemmon's "grenade" comments and the threat to "stop at nothing to prevent the Bahia from going forward." FAC ¶ 122. These allegations, taken together with allegations that Defendants had just carried out their threat to disrupt Evans' joint venture with SeaWorld, sufficiently plead direct threats separate and apart from any petitioning activity. *Cascades Computer Innovation LLC v. RPX Corp.*, 2013 WL 6247594, at *17 (N.D. Cal. Dec. 3, 2013) (court could not decide if demand for licensing fee was pre-suit settlement demand at motion to dismiss stage, because to do so would require inferences in the defendant's favor). Defendants claim that their threats are protected under *Noerr-Pennington* because they were lobbying the City Council about the Bahia at that time. Local 30 Mot. at 11-16. But the Bahia redevelopment is unrelated to Evans' joint venture with SeaWorld. Thus, the fact that Defendants may have been engaged in baseless, lobbying activity related to the Bahia does not convert Defendants' direct threats about SeaWorld into petitioning activity. Accordingly, *Noerr-Pennington* does not bar Evans' claims.

2.   Defendants' lobbying and litigation-related conduct is sham and not protected petitioning activity.

The *Noerr-Pennington* doctrine will not protect petitioning activity that is "ostensibly directed toward influencing governmental action" if it is a "mere sham." *Eastern R.R. Pres. Conf. v. Noerr Motor Freight*, 365 U.S. 127, 144 (1961). "A 'sham' situation involves a defendant whose activities are 'not genuinely aimed at procuring favorable government action' at all." *City of Columbia,* 499 U.S. at 380 (quoting *Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 500 n.4 (1988)). The Ninth Circuit recognizes two types of "sham" actions: (1) a sham, single action that must be objectively baseless and be brought for an improper subjective motive, such as "an

attempt to interfere directly with the business relationships of a competitor"; and (2) the use of serial actions for improper purpose, which may be sham even if some of the actions have minimal merit.  *USS-POSCO*, 31 F.3d at 810-11.  Evans has alleged that Defendants' conduct is sham under both standards.  As a result, their conduct is not protected petitioning activity or incidental to protected petitioning activity.

> a)    Evans has sufficiently pleaded that Defendants' conduct is sham and, thus, not protected by *Noerr-Pennington*.

> (1)    Defendants' meritless serial challenges to non-union developments are sham.

A serial sham action occurs when a defendant engages in serial and automatic petitioning "without regard to and regardless of the merits of said petitions."  *USS-POSCO*, 31 F.3d at 810-11 (allegations that defendant union engaged in a "pattern of automatic petitioning of governmental bodies" if proven, "would be sufficient to overcome the unions' *Noerr-Pennington* defense"); *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1254 (9th Cir. 1982) (allegations that "defendants protested rates automatically, without regard to merit or possible success before the [Interstate Commerce Commission (ICC)] fall within the sham exception as a matter of law"); *accord In re Outlaw Lab., LP Litig.*, 2019 WL 1205004, at *9 (N.D. Cal. Mar. 14, 2019) (sham alleged where counterdefendant allegedly "reflexively and repeatedly mail[ed] demand letters without regard to the individual merit thereof"). "[T]he question is not whether any one of them has merit—some may turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits. . . ."  *USS-POSCO*, 31 F.3d at 811 (question is whether actions were made "not out of a genuine interest in redressing grievances, but as part of a pattern . . . undertaken essentially for purposes of harassment").

Whether serial petitioning "is a genuine effort to influence government action, or a mere sham, is a question of fact." *Clipper Exxpress*, 690 F.2d at 1253.  Courts therefore "rarely award *Noerr-Pennington* immunity at the motion to dismiss stage, where the Court must accept as true the non-moving party's well-pleaded allegations."

1   *In re Outlaw*, 2019 WL 1205004, at *5 (quoting *Sonus Networks, Inc. v. Inventergy, Inc.*,

2   2015 WL 4539814, at *2 (N.D. Cal. July 27, 2015)); *see also Netflix, Inc. v. Blockbuster,*

3   *Inc.*, 2006 WL 2458717, at *7-8 (N.D. Cal. Aug. 22, 2006) (denying motion to dismiss

4   based on *Noerr-Pennington*).  Because Evans has pleaded sufficient facts to prove

5   Defendants' conduct meets the serial sham standard, the Court cannot dismiss the FAC.

6       *First*, Evans has sufficiently pleaded that, as part of Defendants' playbook,

7   Defendants have engaged in reflexive efforts to block non-union developments without

8   regard to the merit of their claims.  *See, e.g.,* FAC ¶¶ 92 (alleging that Lemmon admitted

9   Defendants' actions were, in his words, "greenmail"); 122 (alleging that Browning

10  bragged about creating challenges "out of 'thin air'" as she had with Cisterra and

11  Sunroad developments in the past).  In response to the FAC's numerous allegations

12  about Defendants' sham activity, Defendants rely on *Kottle v. Northwest Kidney Ctrs.*,

13  146 F.3d 1056 (9th Cir. 1998), for the proposition that the sham exception for serial

14  actions applies only to litigation, not to conduct before a legislative body like the City

15  Council.  Mot. at 12.  But this case is inapposite.  *Kottle* did not involve the lobbying of

16  a legislative body.  Nor did *Kottle* apply the sham standard applicable to serial conduct

17  because the defendant there had only filed two petitions.[11]  Thus, any statements in

18  *Kottle* about the scope or difficulty of applying the sham exception to legislative

19  lobbying are *dicta*.[12]

20

---

21      [11] Defendants argue that there are not challenges to establish a series, citing cases
22  that hold four or fewer actions are not a "series".  While Defendants claim that Evans
    alleges only five sham challenges (Mot. at 18), the FAC details eight non-union
23  developments – the Bahia, Convention Center, Cisterra, Town & Country, Sunroad,
    Seaport Village, Hotel Del Coronado, and San Diego Marriott Marquis & Marina (FAC
24  ¶¶ 51-73, 79-122) – and identifies other victims of Defendants' tactics (e.g., FAC ¶ 75
    (map of non-union developments targeted)).  That is more than double the number of
25  challenges in the cases cited by Defendants and is more than enough to establish a series
    of sham challenges.  *See, e.g., Otter Tail Power Co. v. U.S.*, 410 U.S. 366, 379-80
26  (1973) (remanding to determine if four lawsuits were series of sham litigation); *Catch
    Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1038 (C.D. Cal. 2007) (pattern of sham
27  litigation adequately alleged when plaintiff alleged "numerous cases similar to this one"
    and cited four specific cases as examples of the pattern).
        [12] Equally inapposite is *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090
28  (9th Cir. 2000), which did not consider the serial action standard for sham.

In contrast to *Kottle*, the FAC here alleges facts more than sufficient to show Defendants' long history of sham activity.  FAC ¶¶ 51-54 (alleging facts that, in the Convention Center dispute, Defendants asserted a lengthy list of environmental challenges in litigation and then abandoned nearly all of those issues in the settlement); FAC ¶¶ 59-60, 61-62, 70-71 (alleging numerous lawsuits in which Defendants dropped their environmental and zoning challenges once they received card check neutrality agreements and PLAs).[13]  These facts are consistent with Lemmon's statement that Defendants would include "small mitigation measures" to "cover [their] tracks" in any settlement.  FAC ¶ 92.  Further, the FAC alleges that Defendants use their power to prevent proposed developments from being docketed for votes by the City Council. FAC ¶¶ 5-6, 46, 120-21 (specifically detailing efforts by Defendants to prevent former City Council President Myrtle Cole and the City's Mayor from docketing the Bahia redevelopment).  Defendants' conduct is sham.

*Second*, Evans has sufficiently alleged that Defendants' lobbying efforts were not genuinely intended to block the Bahia redevelopment, but rather intended to secure a card check neutrality agreement and a PLA.  *City of Columbia*, 499 U.S. at 380 ("[A] 'sham' situation involves a defendant whose activities are 'not genuinely aimed at procuring favorable government action' at all").  This distinction between genuine and invalid petitioning activity was central to *Cal. Motor*.  The serial litigation exception applies to repeated, reflexive actions that were not genuine and designed "to harass and deter their competitors from having 'free and unlimited access' to the agencies and courts." 404 U.S. at 515.  This exception can therefore be applied to legislative petitioning.  Conduct is no less sham when a party blocks all efforts to obtain fair

---

[13] Defendants' assertion that *Or. Nat. Res. Council v. Mohla*, 944 F.2d 531 (9th Cir. 1991) prevents this Court from considering actions against other developments in deciding if the serial exception applies is unfounded.  *Mohla* merely holds that the plaintiff did not allege how the defendants' actions toward the plaintiff fit into its pattern of baseless actions against others.  *Id*. at 535.  No such problem exists here, where Evans has outlined Defendants' playbook, cited specific examples of how that playbook was applied to other developers, and described how Defendants are using that playbook against Evans.  FAC ¶¶ 41-47, 92, 122.

decisions by a legislative body than by courts or agencies.[14]  Defendants' contention that the sham exception does not apply to legislative petitioning is inconsistent with this authority.  And Defendants admit that if Evans accedes to Defendants' demands for a PLA and card check neutrality agreement, they will—as they have with other developers—drop their opposition and support the development.  FAC ¶¶ 54, 62, 66-67, 92, 122.  This raises the plausible inference that such behavior, as alleged, is not genuine and is therefore sham.

(2)   Defendants' challenges to the Bahia are objectively baseless.

An action is also sham if it is "'objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits'" and it "conceal[s] 'an attempt to interfere directly with the business relationships of a competitor.'"  *USS-POSCO*, 31 F.3d at 810 (quoting *Prof'l Real Estate Inv., Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993)).  The FAC adequately pleads sham challenges.

*First*, Evans alleges that Defendants brought "baseless lawsuits" and other "challenges" for the purpose of "delaying and frustrating" non-union developments.  *See, e.g.*, FAC ¶¶ 239-43.  Rather than address the sufficiency of those allegations, Defendants argue the merits of whether their actions were objectively baseless.  Mot. at 14.  Defendants' challenge centers on the Coastal Commission's purported requirement that Gleason Road be retained to provide public access to Bahia Point.  Mot. at 6.  For example, Defendants cite an October 3, 2018 memo from the City Planning Director as purportedly agreeing with Defendants that the MBMPU requires retention of Gleason Road on a graphic in the administrative record.[15]  Mot. at 6 (citing RJN, Exh. 11, at 1).

---

[14] Applying the serial sham standard to conduct like Defendants' poses no risk to genuine legislative petitioning.  As previously stated, the serial action standard requires a showing that the petitioning activity was "without any intent to induce favorable action" by the government body.  *Clipper Exxpress*, 690 F.2d at 1254 (finding sham exception applied to defendants' acts of automatically protesting ICC rate determinations "without regard to merit or possible success before the ICC").  Nobody seeking to genuinely lobby a legislative body will be subject to this standard.

[15] The other documents on which Defendants rely (RJN Exs. 4, 6, 8-10) to support this position are not judicially noticeable for the reasons described in the concurrently filed Objections to Request for Judicial Notice.  Accordingly, Defendants'

28

But the memo states that the graphic was in error and that the "articulated requirements adopted by the City Council and Coastal Commission . . . do not include the requirement to retain Gleason Road," and the Planning Department even included a corrected graphic that does not contain the "retain Gleason Road" language.  RJN, Exh. 11, at 1, 3.  Defendants similarly misstate the 1997 administrative record requiring the retention of Gleason Road, claiming that the Commission held that the elimination of the road would violate the Coastal Act and citing its finding that a Bahia redevelopment would have to preserve access to Bahia Point (citing RJN, Exh. 6 at 30, 34-35).  Mot. at 4-5.  But Defendants omit that, on the same pages, the Commission found those concerns would be satisfied with proposed mitigation measures that do not require retaining Gleason Road and concluded that these measures would keep an "adequate area for public use around the perimeter of the point." [16]  RJN, Exh. 6 at 34-35.[17]

Defendants' (incorrect) argument is beside the point as Evans sufficiently alleges that Defendants' conduct is objectively baseless.  Specifically, Evans alleges: that there is no requirement in the MBMPU that Gleason Road be retained (FAC ¶¶ 82); that Defendants knew that the administrative record contains no requirement to retain Gleason Road (*id.*); that Lemmon admitted that the walkway Evans proposes to build as part of the Bahia redevelopment would be better for access than Gleason Road (*id.*

merits-based argument is inappropriate for the purposes of a motion to dismiss and should be disregarded.

[16] Defendants also quote the Coastal Commission's statement that "the access needs of watercraft users include the need for transportation of equipment to the tip of the point[.]"  Mot. at 5 (quoting RJN, Exh. 6 at 35).  But that statement is not tied to any requirement that Gleason Road be retained and immediately follows the statement that the proposed measures – which do not require retaining Gleason Road – would satisfy the Coastal Commission's concerns. RJN, Exh. 6 at 34-35.

[17] The fact that Defendants cherry pick certain statements from these documents and ignore others demonstrates that they are asking the Court to credit their interpretation –  a determination which is not appropriate at the pleading stage. *Mediacom Southeast LLC v. BellSouth Telecomm., Inc.*, 672 F.3d 396, 400-01 (6th Cir. 2012) (crediting the defendant's interpretation of the facts in a document rather than the plaintiff's version unduly raises the pleading standard beyond the level of *Iqbal* and *Twombly*), *see also International Audiotext Network, Inc. v. American Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (any ambiguities in documents referred to in the Complaint must be resolved in the plaintiff's favor).

¶ 91); and that Lemmon admitted that neither he nor Browning could "speak to any of the purported environmental concerns" at issue (*id.* ¶ 122).  This is sufficient to show that Defendants' conduct is sham and therefore not immunized by *Noerr-Pennington*.

        b)     Defendants' threats to take future action against unknown SeaWorld projects are objectively baseless.

Defendants' argument that Noerr-Pennington protects their threats of future action against SeaWorld is equally without merit.  Mot. at 19-20.  They contend that "Evans provides no explanation for why any such petitioning would not be constitutionally protected."  Id. at 20.  The explanation is obvious.  The threats are sham because Defendants can have no objectively reasonable grounds for opposing SeaWorld developments before they are even proposed.  Such challenges are indistinguishable from the claimed petitioning activity taken "automatically, without regard to merit or possible success" that the Ninth Circuit held to "fall within the sham exception as a matter of law."  Clipper Exxpress, 690 F.2d at 1254.  Thus, Defendants' threats against SeaWorld also are not protected by Noerr-Pennington.

        c)     Bribery is not protected by *Noerr-Pennington*.

Finally, as discussed in the Building Trades opposition, Evans has sufficiently alleged that Defendants' conduct constitutes bribery under California law.  Building Trades Opp. at 20-22.  *Noerr-Pennington* does not protect bribery.  *Cal. Motor*, 404 U.S. at 512 ("bribery of a public purchasing agent may constitute a violation" of antitrust laws unprotected by *Noerr-Pennington*); *see also Clipper Exxpress*, 690 F.2d at 1255 n.23 ("We recognize that the fraud and bribery mentioned in *Trucking Unlimited* do not involve the petitioning activity that is the heart of the *Noerr-Pennington* doctrine.").  Defendants' conduct is not immunized under it and the motion should be denied.

## V.    CONCLUSION

For the foregoing reasons, Local 30's Motion to Dismiss should be denied.  To the extent the Court is inclined to grant any part of Local 30's Motion, Defendants respectfully request leave to amend.

1    Dated:  May 17, 2019           **AKIN GUMP STRAUSS HAUER & FELD LLP**

2                                     Lawrence D. Levien
                                     Susan Kay Leader

3                                     Jessica M. Weisel
                                     Rebecca A. Girolamo

4

5                       By:          *s/ Susan Kay Leader*
                                     Susan Kay Leader

6                                  Attorneys for Plaintiffs
                                  sleader@akingump.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO UNITE HERE LOCAL 30 AND BRIGETTE BROWNING'S MOTION TO DISMISS
AMENDED COMPLAINT

**CERTIFICATE OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is:  1999 Avenue of the Stars, Suite 600, Los Angeles, California 90067.  On May 17, 2019, I served the foregoing document(s) described as: **PLAINTIFFS' OPPOSITION TO UNITE HERE LOCAL 30 AND BRIGETTE BROWNING'S MOTION TO DISMISS AMENDED COMPLAINT** on the interested party(ies) below, using the following means:

**All parties identified for Notice of Electronic Filing
generated by the Court's CM/ECF system under the
referenced case caption and number**

☒ BY ELECTRONIC MAIL OR ELECTRONIC TRANSMISSION.  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent to the respective e-mail address(es) of the party(ies) as stated above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☒ (FEDERAL)  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on May 17, 2019, at Los Angeles, California.

Hadiss Y. Calderon
[Print Name of Person Executing Proof]          [Signature]