1
2
3
4
5
6
7

8          UNITED STATES DISTRICT COURT

9          SOUTHERN DISTRICT OF CALIFORNIA

10

11   EVANS HOTELS, LLC, a California          Case No.:  18-CV-2763 TWR (AHG)
     limited liability company; BH
12   PARTNERSHIP LP, a California limited     **ORDER (1) GRANTING IN PART
13   partnership; EHSW, LLC, a Delaware       THE LOCAL 30 DEFENDANTS'
     limited liability company,               MOTION TO DISMISS BASED ON
14                                            THE *NOERR-PENNINGTON*
15                          Plaintiff,        DOCTRINE, (2) GRANTING IN
                                              PART THE TRADES COUNCIL
16   v.                                       DEFENDANTS' MOTION TO
17                                            DISMISS FOR FAILURE TO STATE
     UNITE HERE! LOCAL 30; BRIGETTE           A CLAIM, AND (3) DENYING AS
18   BROWNING, an individual; SAN             MOOT THE TRADES COUNCIL
19   DIEGO COUNTY BUILDING and                DEFENDANTS' ANTI-SLAPP
     CONSTRUCTION TRADES                      MOTION**
20   COUNCIL, AFL-CIO; TOM LEMMON,
21   an individual; and DOES 1-10            (ECF Nos. 79, 80, 81)
22                          Defendants.
23

24         Presently before the Court are a Motion to Dismiss ("Local 30 Mot.," ECF No. 79)

25   filed by Defendants Unite Here! Local 30 ("Local 30") and its President, Brigette

26   Browning (together, the "Local 30 Defendants"), as well as a Special Motion to Strike

27   ("Anti-SLAPP Mot.," ECF No. 80) and Motion to Dismiss ("Trades Council Mot.," ECF

28   No. 81) filed by Defendants San Diego County Building and Construction Trades

                                      1

Council, AFL-CIO ("Trades Council") and its Business Manager, Tom Lemmon (together, the "Trades Council Defendants"). Defendants join in each others' Motions, (*see* ECF No. 79-1 ("Local 30 Mem.") at 1 n.1; ECF No. 81-1 ("Trades Council Mem.") at 1), which are fully briefed. (*See generally* ECF Nos. 82–87.) Also before the Court is a Notice of Supplemental Authority filed by Plaintiffs Evans Hotels, LLC; BH Partnership LP; and EHSW, LLC (ECF No. 90) and Defendants' Response (ECF No. 91.) The Parties waived oral argument unless requested by the Court, (*see generally* ECF Nos. 79–84), and the Court determines that these matters may be decided on the papers pursuant to Civil Local Rule 7.1(d)(1). Having carefully considered Plaintiffs' Second Amended Complaint ("SAC," ECF No. 76), the Parties' arguments, and the relevant law, the Court **GRANTS IN PART** the Local 30 Motion, **GRANTS IN PART** the Trades Council Motion, and **DENIES AS MOOT** the Anti-SLAPP Motion.

## BACKGROUND

### I.   Plaintiffs' Factual Allegations[1]

#### A.   *The Parties*

Plaintiffs operate three hotel properties in San Diego, including the Bahia Resort Hotel (the "Bahia") in Mission Bay Park.[2] (SAC ¶ 14.) The City of San Diego (the "City") owns Mission Bay Park, and the Bahia has operated under a long-term lease with the City since the 1950s. (*See id.* ¶ 11.) Consequently, any significant redevelopment of the Bahia would require a lease amendment from the City that is compliant with the 1997 Mission Bay Park Master Plan Update ("MBPMPU"). (*See id.*) The Bahia's employees are not unionized. (*See id.* ¶ 15.)

---

[1] For purposes of the Local 30 and Trades Council Motions, the facts alleged in Plaintiffs' Second Amended Complaint are accepted as true. *See, e.g.*, *Vasquez v. Los Angeles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007) (holding that, in ruling on a motion to dismiss, the Court must "accept all material allegations of fact as true").

[2] William (Bill) and Anne Evans founded Plaintiff Evans Hotels, LLC in 1953. (*See* SAC ¶ 14.) Plaintiff BH Partnership, LP owns the Bahia and is a party to the Bahia's lease with the City of San Diego. (*See id.* ¶ 16.) Members of the Evans Hotels family own and control both BH Partnership, LP and Plaintiff EHSW, LLC. (*See id.* ¶¶ 16–17.)

Defendant Local 30 is the local affiliate of the national UNITE HERE union and represents service workers in the San Diego area.  (*See id.* ¶ 18.)  Ms. Browning is Local 30's President, (*see id.* ¶ 19), and Local 30 identifies her as lobbyist in its quarterly disclosure reports.  (*See id.* ¶ 22.)

Defendant Trades Council consists of affiliated construction and trade unions in San Diego.  (*See id.* ¶ 21.)  Mr. Lemmon is its business manager.  (*See id.* ¶ 20.)  Trades Council has not filed lobbyist disclosure reports.  (*See id.* ¶ 22.)

### B.    *Defendants' "Playbook"*

According to Plaintiffs, Defendants' desire to increase their membership (and the dues generated by increased membership, (*see* SAC ¶ 39)) without going through the lengthy and cumbersome unionization process, (*see id.* ¶¶ 28–30), has led them to develop a "playbook" to achieve this goal by other means.  (*See id.* ¶¶ 1–10.)  The first "play" in Defendants' arsenal consists of public attacks, including lobbying and litigation, on non-union projects on sham environmental and land use grounds.[3]  (*See id.* ¶¶ 47–53.)  The second step involves threats to third parties in business with the targeted owners or developers of the non-union projects.  (*See id.* ¶¶ 54–63.)

Plaintiffs allege that Defendant Local 30's goal is to obtain a card check neutrality agreement, (*see id.* ¶ 30), through which an employer pledges to remain neutral to Local 30's organizing campaigns, not to communicate with its employees regarding the ramifications of unionization, and to recognize a union if Local 30 were to collect signed authorization cards from a majority of employees sought to be unionized.  (*See id.* ¶ 31.)  On the other hand, Defendant Trades Council's objective is to procure a project labor agreement ("PLA"), pursuant to which a developer agrees before beginning a project to work only with a unionized general contractor which, in turn, would subcontract work only to unionized entities or individuals.  (*See id.* ¶ 42.)  According to Plaintiffs,

---

[3] Plaintiffs define "land use" objections or challenges as objections or challenges based "non-environmental grounds, including, among others, that projects do not comport with general plans, contravene the Coastal Act, violate affordable housing and accommodation requirements, and fail to comply with historic preservation provisions."  (*See* SAC at 1 n.1.)

Defendants work together to ensure that both of their goals are accomplished, sometimes to the detriment of their own members.  (*See id.* ¶ 65.)

Plaintiffs identify ten projects between 2007 and the present in which Defendants have deployed their "playbook."  (*See generally id.* ¶¶ 66–163.)  Plaintiffs also allege that Defendant Local 30—then under different leadership—targeted two of Plaintiffs' hotels, including the Bahia, in 1996.  (*See id.* ¶ 170.)  At that time, Local 30 directly threatened at least three of Plaintiffs' clients, including the ACLU, with picketing while they stayed at Plaintiff's hotels.  (*See id.*)  According to Plaintiffs, Local 30 had targeted their hotels not out of concern for the wages, hours, or working conditions of Plaintiffs' employees, but rather because of Mr. Evans' purported anti-union actions during his time as a Director and as Chair of the San Diego Convention Center Corporation.  (*See id.*)

### C.   Defendants Deploy Their Playbook Against Plaintiffs

This action arises from Plaintiffs' efforts in 2018 to obtain an amendment to the Bahia lease agreement to renovate its existing facilities and add hundreds of additional rooms.  (*See* SAC ¶ 12; *see also id.* ¶ 171.)  Although Plaintiffs originally sought to redevelop the Bahia in the 1980s, the City asked them to put their plans on hold pending approval of the MBPMPU, which expressly contemplated an expanded footprint for the Bahia.  (*See id.* ¶ 11.)  Plaintiffs again sought a lease amendment for the Bahia on November 5, 2015.  (*See id.* ¶ 171.)  In late January 2018, Plaintiffs met with the Department of Real Estate Assets and the City Attorney to negotiate the proposed lease amendment.  (*See id.*)

#### 1.   The First Play

On February 28, 2018, Defendants implemented the first play in their playbook against Plaintiffs.  (*See* SAC ¶ 173.)  The Local 30 Defendants' attorney, Tony LoPresti, sent a letter to then-Mayor Kevin Faulconer and City Councilmembers "to express concern regarding the lack of transparency and access to information pertaining to environmental review of the proposed Lease Amendment for the Bahia Resort Hotel Renovation Project."  (*Id.*)  Mr. LoPresti sent a second letter on May 11, 2018,

contending that the proposed Bahia redevelopment was not compliant with the MBPMPU because it would eliminate Gleason Road.  (*See id.* ¶ 174.)  Defendants then created a website and Facebook page to disseminate this false claim.  (*See id.* ¶ 175.)  Defendants also met and/or communicated individually with a majority of the City Council to secure its opposition to the lease amendment.  (*See id.* ¶ 176.)

Plaintiffs first learned of Defendants' actions in February or March 2018.  (*See id.* ¶ 177.)  On February 16, 2018, Mr. Evans ran into an unnamed councilmember ("Councilmember I") and asked her about the Bahia redevelopment.  (*See id.*)  She responded by asking whether Mr. Evans had met with Ms. Browning.  (*See id.*)  When Mr. Evans responded that he had not, the Councilmember I informed him that Plaintiffs had to sign a card check neutrality agreement with Ms. Browning before she would support the project.  (*See id.*)  After learning about Mr. Evans' conversation, Plaintiffs' Executive Chairwoman, Grace Cherashore, scheduled a meeting with Councilmember I for February 23, 2018.  (*See id.* ¶ 178.)  Although Councilmember I expressed support for the project following Ms. Cherashore's presentation, (*see id.* ¶ 179), Councilmember I's staff called several weeks later to indicate that there was a "problem" with the Bahia proposal and that Councilmember I and other councilmembers could no longer support it.  (*See id.* ¶ 180.)  Plaintiffs believe that Councilmember I's change of heart was the result of Ms. Browning's threat to condition future funding and political support on opposition to the Bahia unless Plaintiffs signed a card check neutrality agreement, (*see id.*), and that Defendants had met with at least four other councilmembers.  (*See id.* ¶ 183.)

On June 30, 2018, Mr. Lemmon met with Mr. Evans, (*see id.* ¶ 184), about signing a card check neutrality agreement with the Local 30 Defendants.  (*See id.* ¶ 185.)  When Mr. Evans refused to do so voluntarily, Mr. Lemmon threatened him with litigation and informed him about the letters Mr. LoPresti had sent to the Mayor and City Council.  (*See id.*)  Mr. Lemmon closed by promising that the project would be "doomed" if Plaintiffs did not capitulate to Ms. Browning because "[they] know how to do it, [they] do it all the time."  (*Id.*)

In October 2018, Plaintiffs learned that the Bahia lease agreement was not placed on the agenda for a mid-October City Council Committee meeting, (*see id.* ¶ 188), even though only three matters had been calendared. (*See id.* ¶ 190.) That same month, a representative of Plaintiffs' spoke with a staffer of another councilmember ("Councilmember II"), who purportedly refused to calendar the lease agreement because of a close, personal friendship with Ms. Browning. (*See id.* ¶ 189.)

On October 19, 2018, Mr. Lemmon and Ms. Browning texted Plaintiffs' CEO, Robert Gleason. (*See id.* ¶ 192.) Mr. Lemmon told Ms. Browning to "send Robert [Gleason] [her] card check language in advance . . . . [because Mr. Lemmon has] got the feeling he's gonna need it." (*Id.* (first, second, and third alterations in original).) Mr. Lemmon added that he would "like to see all construction and future maintenance done by Union signatory contractors." (*Id.*)

Plaintiffs' problems persisted following City Council elections in November 2018. (*See id.* ¶ 215.) For example, the new City Council President indicated that she would not docket the Bahia lease amendment because the unions had given her "hundreds of thousands of dollars to win this thing" and Ms. Browning and Mr. Lemmon would be upset if the project were docketed before the new City Councilmembers took office. (*See id.*)

Plaintiffs therefore turned to then-Mayor Faulconer, (*see id.* ¶ 216), because the Mayor's office must make recommendations and prepare reports about pending projects. (*See id.* ¶ 49.) Plaintiffs allege, however, that the Mayor and Defendants had entered into a "secret agreement" in mid-2017 giving Defendants "veto power" over any non-union projects they opposed. (*See id.* ¶¶ 9, 79.) Plaintiffs further allege that Defendants had contacted the Mayor's office and exercised their veto power to demand that the Bahia project not be docketed. (*See id.* ¶ 216.)

On November 27, 2018, Ms. Browning, Mr. Lemmon, and Carol Kim, the Political Director for the Trades Council, met with Mr. Gleason and Mr. Evans. (*See id.* ¶ 217.) When asked why Plaintiffs should agree to the card check neutrality agreement and PLA,

18-CV-2763 TWR (AHG)

Ms. Browning responded, "[S]o that you can go forward with your project," adding that Defendants would "stop at nothing" to prevent the Bahia project from going forward. (*See id.*)  Ms. Browning and Mr. Lemmon indicated that they had the new City Council President's vote "all locked up."  (*See id.*)  Mr. Lemmon likened Defendants' conduct to a "grenade with the pin out on the table," adding that, although the pin had been taken out, there was still time to put it back in.  (*See id.*)

### 2.    *The Second Play*

In the midst of Defendants' successful delay of the Bahia vote using the first play in their playbook, Defendants "turned up the volume" by implementing the second play and "going after" Plaintiffs' business partner, Sea World LLC ("SeaWorld").  (*See* SAC ¶ 193.)   Plaintiffs and SeaWorld have had a "cooperative marketing relationship for decades," which includes Plaintiffs selling tickets for SeaWorld and offering branded room packages.  (*See id.* ¶ 194.)  On April 21, 2015, Plaintiffs and SeaWorld signed a letter of intent and, on November 4, 2015, a Preliminary Project Agreement regarding a potential SeaWorld hotel adjacent to SeaWorld's park.  (*See id.*)  Plaintiffs and SeaWorld issued a press release concerning the anticipated project on November 9, 2015, (*see id.*), but did not enter into a formal contract for the Joint Venture until January 22, 2018.  (*See id.* ¶ 195.)

SeaWorld requires approval from the California Coastal Commission to build new attractions.  (*See id.* ¶ 197.)  Consequently, SeaWorld worked with a consultant, Allison Rolfe, President of Collaborative Land Use Solutions and a former environmental activist, to facilitate its dealings with the California Coastal Commission and environmental groups.  (*See id.* ¶ 198.)  According to Plaintiffs, Ms. Rolfe is a "very close friend" of Ms. Browning and acts as an "intermediary" between Defendants and their targets, including Plaintiffs.  (*See id.* at ¶¶ 199–202.)  For example, at a March 22, 2018 lunch meeting, Ms. Rolfe relayed to Mr. Evans that Ms. Browning "had a real problem with [him]," (*id.* ¶ 202), and that, unless Plaintiffs entered into a deal with

/ / /

Ms. Browning, Defendants would target Plaintiffs' projects and SeaWorld, as their business partner. (*See id.*)

In June or July 2018, Defendants communicated to SeaWorld, through Ms. Rolfe, that it would face "severe" opposition from unions and their allies in opening new attractions if it did not sever ties with Plaintiffs. (*See id.* ¶ 204.) Specifically, Defendants threatened to interfere with SeaWorld's ability to obtain approval for its plans from the City Council and California Coastal Commission and to "drum up negative publicity." (*See id.*) In mid-July, SeaWorld's then-interim CEO called Mr. Evans, stating he understood that Plaintiffs had "a big problem" with Defendants and informing Mr. Evans that SeaWorld could not afford to be involved with anyone that would delay its ability to obtain approval of its plans. (*See id.* ¶¶ 206–07.) Although Plaintiffs and SeaWorld discussed the issue several times over the next month, (*see id.* ¶¶ 208–10), SeaWorld ultimately concluded that it could not risk its "core business" of opening new attractions. (*See id.* ¶¶ 205, 207–09, 211, 214.) Consequently, SeaWorld formally terminated the Joint Venture on September 19, 2018, (*see id.* ¶ 212), paying Plaintiffs approximately $2.8 million in termination fees. (*See id.* ¶¶ 205, 207.)

## II.   Procedural Background

Plaintiffs initiated this action on December 7, 2018, filing a complaint alleging nine causes of action for (1) unlawful secondary boycott in violation of Section 303 of Labor Management Relations Act ("LMRA"), 29 U.S.C. §§ 141–197; (2)–(3) attempted monopolization and conspiracy to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (4) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); (5)–(7) violation of RICO, 18 U.S.C. § 1962(d), by conspiring to violate 18 U.S.C. §§ 1962(a)–(c); (8) interference with prospective economic advantage; and (9) attempted extortion. (*See generally* ECF No. 1.) Except for the first cause of action, which was alleged only against Defendant Local 30, all causes of action were alleged against all Defendants. (*See generally id.* ¶¶ 91–184.)

/ / /

1    After Defendants filed motions to dismiss pursuant to Federal Rule of Civil
2    Procedure 12(b)(6) and special motions to strike under California's anti-Strategic Lawsuit
3    Against Public Participation ("anti-SLAPP") statute, Cal. Civ. Proc. Code § 425.16, (*see*
4    *generally* ECF Nos. 15–18), Plaintiffs filed their First Amended Complaint, (*see*
5    *generally* ECF No. 19), alleging essentially the same claims as in their original
6    Complaint aside from adding Defendant Trades Council to the first cause of action.
7    (*Compare* ECF No. 1, *with* ECF No. 19.)   After denying as moot the pending motions,
8    (*see* ECF No. 24), the Honorable Marilyn L. Huff recused, and this action was transferred
9    to the Honorable William Q. Hayes.  (*See* ECF No. 26.)

10    Defendants again filed motions to dismiss and special motions to strike Plaintiffs'
11   First Amended Complaint.  (*See generally* ECF Nos. 29–32.)  Judge Hayes heard oral
12   argument on October 2, 2019.  (*See* ECF No. 56.)  On January 7, 2020, Judge Hayes
13   issued a written dismissing without prejudice Plaintiffs' First Amended Complaint on the
14   grounds that Plaintiffs had failed to allege specific facts showing that Defendants'
15   conduct was not protected under the *Noerr-Pennington* doctrine.  (*See generally* ECF No.
16   60 ("Order").)  Plaintiffs moved for reconsideration on February 4, 2020, (*see generally*
17   ECF No. 61), and for leave to file a second amended complaint on February 6, 2020.
18   (*See generally* ECF No. 62.)  On April 20, 2020, Judge Hayes granted Plaintiffs leave to
19   file an amended complaint and denied as moot their motion for reconsideration.  (*See*
20   *generally* ECF No. 75.)

21    Plaintiffs filed their operative Second Amended Complaint on April 21, 2020.
22   (*See generally* ECF No. 76.)  In the Second Amended Complaint, Plaintiffs abandon their
23   claims for violation of RICO by conspiracy to violate 18 U.S.C. §§ 1962(a)–(b) and add a
24   new cause of action for unfair competition pursuant to California's Unfair Competition
25   Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*, against all Defendants.  (*See id.*)
26   Defendants filed the instant Motions on May 19, 2020.  (*See generally* ECF Nos.
27   79–81.)  On September 23, 2020, after the Motions were fully briefed (*see generally* ECF
28   Nos. 82–87), this action was transferred to the undersigned.  (*See generally* ECF No. 88.)

18-CV-2763 TWR (AHG)

## LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). "A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Id.* at 1242 (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

"If a complaint is dismissed for failure to state a claim, leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the

challenged pleading could not possibly cure the deficiency.'" *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)).  "A district court does not err in denying leave to amend where the amendment would be futile."  *Id.* (citing *Reddy v. Litton Indus.*, 912 F.2d 291, 296 (9th Cir. 1990), *cert. denied*, 502 U.S. 921 (1991)).

# ANALYSIS

As before, (*see* ECF No. 29-1), Defendants contend that dismissal of Plaintiffs' complaint is warranted because Defendants' alleged conduct is immunized by the *Noerr-Pennington* doctrine, (*see generally* Local 30 Mem. at 3–18), and because Plaintiffs fail adequately to plead any of their claims pursuant to Rule 12(b)(6).  (*See generally* Local 30 Mem. at 18–24; Trades Council Mem.)  With regard to Plaintiffs' state law claims, Defendants argue that those claims are preempted by Section 303 of the LMRA, (*see* Local 30 Mem. at 24–25); should be stricken under California's anti-SLAPP statute, (*see generally* ECF No. 80-1 ("Anti-SLAPP Mem.")); and should be dismissed for failure to state a claim.  (*See* Trades Council. Mem. at 23–25.)

## I.  *Noerr-Pennington*

Judge Hayes previously dismissed Plaintiffs First Amended Complaint in its entirety because Plaintiffs had failed to plead sufficient facts to demonstrate that Defendants' alleged petitioning conduct fell outside the protection of the *Noerr-Pennington* doctrine.  (*See* Order at 10–25.)  As Judge Hayes explained, "[t]he *Noerr-Pennington* doctrine requires that, to the extent possible, [courts] construe federal statutes so as to avoid burdens on activity arguably falling within the scope of the Petition Clause of the First Amendment."  (Order at 8 (second alteration in original) (quoting *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 942 (9th Cir. 2006)).)  But "[w]here petitioning activity is 'a mere sham to cover what actually is nothing more than an attempt to interfere directly with the business relationships of a competitor,' [*Noerr-Pennington*] immunity does not apply."  (*Id.* at 9 (quoting *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961)).)  "In determining whether the *Noerr-Pennington* doctrine immunizes a

defendant's conduct from liability, the court applies a three-step test." (*Id.* (citing *Sosa*, 437 F.3d at 930).)   "First, the court determines whether the plaintiff's lawsuit burdens the defendant's petitioning activities." (*Id.* at 9–10 (citing *Sosa*, 437 F.3d at 930, 932).) "Second, 'examin[ing] the precise petitioning activity at issue, [the court] determine[s] whether the burden on that activity implicate[s] the protection of the Petition Clause.'" (*Id.* at 10 (alterations in original) (quoting *Sosa*, 437 F.3d at 930).)   "Third, the court determines whether the laws the plaintiff is suing under may be construed to preclude the burden on petitioning activity." (*Id.* (citing *Sosa*, 437 F.3d at 930).)   "The plaintiff has the burden to state factual allegations that show the defendant's conduct falls outside the protection of *Noerr-Pennington*." (*Id.* (citing *Boone v. Redev. Agency of San Jose*, 841 F.2d 886, 894 (9th Cir. 1988); *Sosa*, 437 F.3d at 942).)

The Parties do not appear to challenge Judge Hayes' prior conclusions that Plaintiffs' lawsuit would burden Defendants' petitioning activities or that the laws under which Plaintiffs are suing may be construed to preclude liability based on petitioning conduct protected under *Noerr-Pennington*.[4]   (*See generally* Local 30 Mem.; ECF No. 82 ("Opp'n to Local 30 Mot."); ECF No. 86 ("Local 30 Reply").)   Rather, the bulk of the Parties' arguments—and of Plaintiffs' new allegations, (*see* ECF No. 62-3 (redline of

---

[4] Even if Plaintiffs do challenge Judge Hayes' findings regarding the first and third steps of the *Noerr-Pennington* analysis, the Court agrees with Judge Hayes' reasoning and conclusions and adopts them here in their entirety. (*See* Order at 10–11, 22–25.)   The Court notes that Plaintiffs do allege one new cause of action for unfair competition, (*see* SAC ¶¶ 375–77), but courts—including this one—have concluded that *Noerr-Pennington* applies to UCL claims. *See, e.g.*, *Aguilera v. Matco Tools Corp.*, No. No. 3:19-v-01576-AJB-AHG, 2020 WL 1188142, at *7 (S.D. Cal. Mar. 12, 2020) ("Plaintiffs are . . . precluded from asserting their UCL claim [based on legal proceedings] due to the *Noerr-Pennington* doctrine."); *Bridgewater, LLC v. Labarbera*, No. 15-cv-809-H-DHB, 2015 WL 11921049, at *4 (S.D. Cal. Sept. 14, 2015) ("The Noerr-Pennington Doctrine extends to forms of liability beyond antitrust, including unfair competition." (citing *Multimedia Patent Trust v. LG Elecs., Inc.*, No. 12-CV-2731-H (KSC), 2013 WL 12073800, at *3 (S.D. Cal. Aug. 1, 2013); *Hi-Top Steel Corp. v. Lehrer*, 24 Cal. App. 4th 570, 577–80 (1994))); *Multimedia Patent Trust*, 2013 WL 12073800, at *3 ("[T]he Noerr-Pennington doctrine applies to claims for violation of California's UCL" (citing *Monolithic Power Sys. v. O2 Micro Int'l Ltd.*, 2007 U.S. Dist. LEXIS 22556, at *18 (N.D. Cal. Mar. 14, 2007); *Meridian Project Sys. v. Hardin Constr. Co.*, 404 F. Supp. 2d 1214, 1220–21 (E.D. Cal. 2005))).   The Court therefore concludes that the UCL also may be read to preclude liability based on petitioning conduct that is protected under the *Noerr-Pennington* doctrine.

18-CV-2763 TWR (AHG)

Second Amended Complaint))—are devoted to the issue of whether Defendants' purported lobbying and litigation were "shams" and therefore exempted from *Noerr-Pennington* protection under the second step of the test.  (*See generally* SAC; Local 30 Mem.; Opp'n to Local 30 Mot.; Local 30 Reply.)  In analyzing this issue, the Court "first determine[s] whether the activities of [the defendant] are of the type that the *Noerr-Pennington* doctrine seeks to protect and then discuss[es] whether any exceptions to the *Noerr-Pennington* protections apply."  *Boone*, 841 F.2d at 894.  Plaintiffs contend that Defendants' alleged conduct is not entitled to *Noerr-Pennington* protection because it was: (1) unlawful,[5] (2) incidental and/or unrelated to petitioning activity, and (3) sham petitioning.  (*See* Opp'n to Local 30 Mot. at 3, 12.)

### A.   Conduct Incidental or Unrelated to Petitioning

To determine whether Defendants' conduct is entitled to *Noerr-Pennington* immunity, the Court must "first determine whether the activities of [Defendants] are of the type that the *Noerr-Pennington* doctrine seeks to protect."  *Boone*, 841 F.2d at 894. Plaintiffs argue that Defendants' alleged threats to Plaintiffs and SeaWorld fall outside the protection of the *Noerr-Pennington* doctrine because *Noerr-Pennington* does not immunize indirect petitioning in the labor context, (*see* Opp'n to Local 30 Mot. at 5–6), and because Defendants' alleged threats to Plaintiffs were about conduct unrelated to petitioning activity "because those threats could refer to both petitioning *and* non-petitioning activity." (*See id.* at 12–14; *see also, e.g.*, SAC ¶¶ 210, 217, 225–26.)

In support of their argument that *Noerr-Pennington* does not apply to indirect petitioning in the labor context, Plaintiffs rely on *United Nurses Associations of California v. National Labor Relations Board*, 871 F.3d 767 (9th Cir. 2017), (*see* Opp'n to Local 30 Mot. at 6–7), in which the Ninth Circuit held that an employer's service of

---

[5] Because "[c]ourts treat illegal acts, such as fraud and bribery, 'as analogous to the sham petitioning activity,'" (Order at 22 (quoting *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau*, 674 F.2d 1252, 1266 n.23 (9th Cir. 1982), *overruled in part on other grounds by Mayle v. Felix*, 545 U.S. 644 (2005))), the Court addresses Plaintiffs' arguments concerning the alleged illegality of Defendants' conduct together with Plaintiffs' sham arguments.  *See infra* Section I.B.

subpoenas seeking information protected by the NLRA was exempted from *Noerr-Pennington* protection because the employer had an "objective that is illegal under federal law." *United Nurses*, 871 F.3d at 787 (quoting *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 737 n.5 (1983)) (citing *Diamond Walnut Growers, Inc. v. NLRB*, 53 F.3d 1085, 1089 (9th Cir. 1995)).   Defendants respond that *United Nurses* "arose in a completely different setting: an *employer*'s subpoena that directly—and without mediation by a government decision maker—interfered with 'the First Amendment associational rights of employees embodied in' NLRA § 7, 29 U.S.C. § 157."  (Local 30 Reply at 8 (emphasis in original) (quoting *United Nurses*, 871 F.3d at 786–88) (citing ECF No. 69 at 12–16).)

Not only did the Ninth Circuit in *United Nurses* not hold that *Noerr-Pennington* immunity applies only to direct petitioning in the labor context, *see United Nurses*, 871 F.3d 787–88 & n.17, but *United Nurses*—and all of the cases on which it relied—was decided in a different context.  Specifically, *United Nurses*, the case on which it relied (*Venetian Casino Resort, LLC v. NLRB*, 484 F.3d 601 (D.D.C. 2007)), and the Supreme Court cases on which *Venetian Casino* relied (*BE & K Construction Co. v. NLRB*, 536 U.S. 516 (2002), and *Bill Johnson's*, 461 U.S. 731) all involved employer-initiated litigation, that was found to be an unfair labor practice, concerning union activity.  *See BE & K Constr.*, 536 U.S. at 520–24 (appeal of NLRB decision concerning employer-initiated litigation against unions); *Bill Johnson's*, 461 U.S. at 733–37 (appeal of NLRB decision concerning employer-initiated litigation against employees engaging in protected activities); *Venetian Casino*, 484 F.3d at 605–06 (appeal of NLRB decision concerning employer-initiated litigation against union); *United Nurses*, 871 F.3d at 772 (appeal of an employer-initiated NLRB decision regarding the employer's challenges to its employees' attempted unionization).  This distinction is meaningful because "[t]he employer's right of expression has to be balanced against 'the equal rights of the employees to associate freely,' giving special consideration to 'the economic dependence of the employees on their employers.'"  *See White v. Lee*, 227 F.3d 1214, 1236 (9th Cir.

2000) (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969)) (citing *NLRB v. Associated Gen. Contractors, Inc.,* 633 F.2d 766, 772 n. 9 (9th Cir.1980)).  Consequently, "employer speech that constitutes an unfair labor practice under the NLRA does not receive full First Amendment protection." *Id.* at 1236–37.  While the cases Plaintiffs cite implicate these strictures, here only Defendants' First Amendment rights are at issue. Plaintiffs fail to identify any authority that Defendants' rights are equally limited in this context.  *See White*, 227 F.3d at 1236 ("The First Amendment rights of employers 'in the context of [the] labor relations setting' are limited to an extent that would rarely, if ever, be tolerated in other contexts." (alteration in original) (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969))).

To the extent Plaintiffs contend that Defendants' conduct was unrelated to petitioning activity, (*see* Opp'n to Local 30 Mot. at 12–14), the Court disagrees.  With regard to Defendants' threats to Plaintiffs, Plaintiffs attempt to escape Judge Hayes' prior conclusion that "each alleged threat was made in the context of petitioning activity," (Order at 14), by alleging a new gloss on Defendants' communications, namely, Defendant Local 30's 1996 picketing of certain of Plaintiffs' hotels (including the Bahia) based on Mr. Evans' "purported anti-union actions."  (*See, e.g.*, SAC ¶ 170; *see also* Opp'n to Local 30 Mot. at 12–14.)   For example, Plaintiffs now allege that Mr. Lemmon's "grenade with the pin out" and "stop at nothing" comments "meant threats of pickets, corporate campaigns, and other unlawful means against Evans Hotels and its clients unless Evans Hotels conceded to the unions' demands."  (*See* SAC ¶ 217.) But, as Judge Hayes previously found, (*see* Order at 14), the Parties' discussion at the November 27, 2018 luncheon touched upon Defendants' "numerous environmental challenges to the Bahia," the vote before City Council, and Defendants' prior litigation. (*See* SAC ¶ 217.)   There are no allegations that Defendants mentioned, let alone threatened, picketing or any other conduct aside from their intended petitioning.  Given Plaintiffs' allegations, Plaintiffs fail to plead "facts tending to exclude the possibility that the [Defendants'] explanation is true."  *See Eclectic Props. E., LLC v. Marcus &*

*Millichap Co.*, 751 F.3d 990, 996–97 (9th Cir. 2014) (quoting *In re Cent. Aluminum Co. Secs. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013)).

As for Defendants' threats to SeaWorld, Judge Hayes previously concluded that he could "[]not infer that Defendants threatened any actionable conduct outside the protection of *Noerr-Pennington*" because "[t]he alleged statements were made along with 'threats' to lobby the City Council, petition the Coastal Commission, and drum up negative publicity." (*See* Order at 15.)   Plaintiffs therefore add that "SeaWorld reasonably understood [Defendants' threatened] opposition to include a corporate campaign to organize SeaWorld's labor force unless it cut ties with Evans Hotels" and that Defendants' "attacks would be unrelated to SeaWorld's future attractions, but would be on subjects like animal cruelty, an issue that has been the subject of past negative publicity campaigns against SeaWorld." (*See* SAC ¶ 204.)   According to Plaintiffs, these threats are not entitled to *Noerr-Pennington* protection because they "have zero connection to petitioning" and "are not related to an existing effort to influence government action." (Opp'n to Local 30 Mot. at 6.)   As above, *see supra* pages 15–16, Plaintiffs' new allegations concerning perceived threats of non-petitioning conduct fail because Plaintiffs do not allege that the threats were made in the context of discussions concerning anything other than Defendants' anticipated petitioning.   Plaintiffs also do not identify any authority requiring that threats to oppose a future project must relate to "an existing effort to influence government action." (*See generally* Opp'n to Local 30 Mot.) In any event, as Judge Hayes previously recognized, "[i]f liability may be imposed for making demands prior to directly petitioning a governmental body, parties would be deterred from attempting to resolve problems on their own before seeking government relief." (Order at 11 (citing *Sosa*, 437 F.3d at 932–33); *see also Sosa*, 437 F.3d at 933 ("Although the [pre-suit demand] letters were not themselves petitions, the Petitions Clause may nevertheless preclude burdening them so as to preserve the breathing space required for the effective exercise of the rights it protects."); *A.H.D.C. v. City of Fresno*, No. CIV F 97-5498 OWW SMS, 2001 WL 36276740, at *23 (E.D. Cal. Nov. 9, 2001)

(councilmember's comment that developer might "have some problems down the road if [the councilmember] did not get his way" regarding pending project "was a threat of a political nature").)  Finally, "[a] publicity campaign directed at the general public and seeking government action is covered by *Noerr-Pennington* immunity."  *See Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000) (citing *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499–500 (1988)).  Consequently, Plaintiffs fail to allege facts supporting a plausible inference that Defendants' alleged threats to Plaintiffs or SeaWorld related to non-petitioning conduct.

The Court therefore concludes that Plaintiffs fail to allege sufficient facts to support that Defendants' conduct was not petitioning activity or related to petitioning activity for purposes of *Noerr-Pennington*.

### B.  Sham Petitioning

Having determined that Defendants' conduct is of the type that *Noerr-Pennington* is intended to protect, the Court must next determine "whether any exceptions to the *Noerr-Pennington* protections apply."  *Boone*, 841 F.2d at 894.  Plaintiffs allege that Defendants' petitioning activities—both those related to litigation and those related to lobbying—were "shams" and, therefore, not entitled to *Noerr-Pennington* protection. (*See* SAC ¶¶ 228–45.)

#### 1.  Litigation

Plaintiffs allege that "Defendants have threatened future lawsuits" regarding the Bahia redevelopment that "constitute sham petitioning."  (*See* SAC ¶¶ 228, 239.)  In the context of litigation, the sham exception may apply in three situations: (1) "if the alleged . . . behavior consists of bringing a single sham lawsuit (or a small number of such suits), the . . . plaintiff must demonstrate that the lawsuit was ([a]) objectively baseless, and ([b]) a concealed attempt to interfere with the plaintiff's business relationships[;]" (2) "if the alleged . . . behavior is the filing of a series of lawsuits, 'the question is not whether any one of them has merit . . . [,] but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a

market rival[;]'" and (3) "in the context of a judicial proceeding, if the alleged . . . behavior consists of making intentional misrepresentations to the court, litigation can be deemed a sham if 'a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.'"  *See Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998).

Plaintiffs contend that Defendants' threatened litigation against the Bahia redevelopment is a sham under either the single or serial sham litigation exception.[6]  (*See* Opp'n to Local 30 Mot. at 16–24.)  In the context of a single sham lawsuit, Plaintiffs must plead that Defendants' threatened lawsuit was "objectively baseless."  *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993). This means Plaintiffs must allege that "no reasonable litigant could realistically expect success on the merits."  *See id.*  "Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation."  *Id.*

Plaintiffs fail to satisfy the first part of this test.  According to the Second Amended Complaint, Defendants sent two letters to the City Council and Mayor expressing concerns regarding the Bahia redevelopment. (*See* SAC ¶¶ 173–74.)  The first letter addressed a lack of "[a]ccess to information regarding environmental review of the Bahia Resort Hotel Lease Amendment," (*see id.* ¶ 173), and the second the proposed elimination of Gleason Road.  (*See id.* ¶ 174.)  In June 2018, while discussing these letters, "Mr. Lemmon made it clear to Mr. Evans that Local 30 and its allies, including Mr. Lemmon, intended to use CEQA and other environmental challenges to hold the Bahia redevelopment project hostage." (*See id.* ¶ 185.)  Although Plaintiffs urge that these threats were objectively baseless, (*see* Opp'n to Local 30 Mot. at 24), Plaintiffs fail to allege facts supporting that inference.  Defendants' past litigation practices are not

---

[6] That a lawsuit has not yet been filed does not preclude application of the sham exception because Petition Clause protection extends to prelitigation communications.  *See Sosa*, 437 F.3d at 935–39. Nonetheless, such prelitigation communications may not be entitled to protection under the *Noerr-Pennington* doctrine if they threaten litigation "so baseless that the threatened litigation would be a sham." *See id.* at 940.

18-CV-2763 TWR (AHG)

relevant to the single sham lawsuit analysis, and Plaintiffs argue that the environmental challenge is objectively baseless only because Mr. "Lemmon admitted that neither he nor [Ms.] Browning could 'speak to any of the purported environmental concerns' at issue." (*Id.* (quoting SAC ¶ 217).) But even if Mr. Lemmon and Ms. Browning could not "speak to any of the purported environmental concerns," (*see* SAC ¶ 217), that does not mean that their counsel could not—indeed, it appears that Mr. LoPresti addressed their environmental concerns at length in his February 28, 2018 letter. (*See id.* ¶ 173.) Because Plaintiffs fail to allege facts showing that Defendants' environmental concerns regarding the Bahia redevelopment were objectively baseless, Plaintiffs fail to show that threatened litigation was objectively baseless for purposes of the single sham exception.

Plaintiffs also allege that Defendants' conduct constitutes serial sham petitioning. (*See* Opp'n to Local 30 Mot. at 16–24.) For purposes of the serial sham litigation exception, prior petitions such as those alleged by Plaintiffs, (*see* SAC ¶¶ 67–168), "are relevant only to the extent that they demonstrate that [the petitioner] was improperly motivated in filing its lawsuit against [the defending party]." *See Ore. Nat. Res. Council v. Mohla*, 944 F.2d 531, 534 (9th Cir. 1991). To determine whether the serial sham exception applies, a court must determine "whether [the lawsuits] are brought pursuant to a policy of starting legal proceedings without regard to the merits and . . . essentially for purposes of harassment." *See USS-POSCO Indus. v. Contra Costa Cty. Building & Constr. Trades Council*, 31 F.3d 800, 811 (9th Cir. 1994).

Although Plaintiffs' Second Amended Complaint details Defendants' (and others') opposition to ten different developments over a ten-year period, only six involved litigation,[7] (*see* SAC ¶¶ 72–73, 89, 90–92, 115–16, 118–19, 123, 145–46, 151, 156):

---

[7] For the reasons discussed below, *see infra* Section I.B.2, Plaintiffs cannot include in the serial sham analysis Defendants' objections before the Port of San Diego, (*see* SAC ¶¶ 69, 95, 118, 126 n.4, 141, 150); the California Coastal Commission, (*see id.* ¶¶ 69, 98, 144, 154); the City of San Diego, (*see id.* ¶ 84); the Wetlands Advisory Board, (*see id.* ¶¶ 103–04); the Planning Commission, (*see id.* ¶¶ 103–04); Centre City Development Corporation (*see id.* ¶ 112); or local City Councils. (*See id.* ¶¶ 69, 87, 143, 152, 161, 163.)

18-CV-2763 TWR (AHG)

1.   Phase 3 of the San Diego Convention Center expansion:

a.   The Local 30 Defendants filed a petition for writ of mandate against the City alleging that the proposed plan to finance the project was illegal.  (*See id.* ¶ 72.)  The court dismissed the writ with prejudice, and the Local 30 Defendants voluntarily dismissed the appeal after reaching a settlement.  (*See id.* ¶¶ 72, 75–76.)  In an unrelated lawsuit, the Court of Appeal later concluded that the mechanism for funding the expansion was unconstitutional, (*see id.* ¶ 77);

b.   The Trades Council Defendants filed a separate CEQA lawsuit, which settled.  (*See id.* ¶¶ 73–76.)  The settlement addressed a few of the Trades Council Defendants' numerous environmental concerns, (*see id.* ¶ 75);

2.   The Cisterra Development:  A "surrogate" of Local 30 filed an unsuccessful petition for writ of mandate.  (*See id.* ¶ 89).  Although Local 30 appealed, (*see id.* ¶ 90), it voluntarily dismissed the appeal following resolution with Cisterra, (*see id.* ¶¶ 91–92);

3.   The Fat City Project:  Local 30 filed a petition for writ of mandate, (*see id.* ¶ 115), which it voluntarily dismissed following a settlement conference, (*see id.* ¶ 116);

4.   The Sunroad Project:  Local 30 filed a partially successful petition for writ of mandate, (*see id.* ¶¶ 118–19), and raised objections that were the basis for the Coastal Commission's successful appeal of a separate suit filed by the Port of San Diego, (*see id.* ¶¶ 121, 123);

5.   The Hotel Del Coronado:  Local 30 filed an unsuccessful lawsuit, (*see id.* ¶¶ 145–46); and

6.   The San Diego Marriott Marquis & Marina:  Local 30, as a member of The Coalition for Responsible Coastal Development, filed an unsuccessful petition for writ of mandate.  (*See id.* ¶¶ 151, 156.)

These allegations fail to support Plaintiffs' contention that Defendants file litigation "without regard to the merits."  Of the seven lawsuits Plaintiffs identify, five settled or were at least partially successful.  *See Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1008 (9th Cir. 2008) ("The fact that this ongoing litigation

settled suggests that the original suit was not objectively baseless."); *see also* SAC ¶¶ 72, 75–77 (appeal of an unsuccessful Local 30 petition was voluntarily dismissed upon settlement, although a Court of Appeal ruling in an unrelated case suggests the Local 30 petition (and appeal) had merit); *id.* ¶¶ 73–76 (Trades Council's CEQA petition was voluntarily dismissed after a settlement addressing at least some of the objections raised by the Trades Council); *id.* ¶¶ 89–92 (an appeal of unsuccessful Local 30 petition was voluntarily dismissed following settlement); *id.* ¶¶ 115–16 (same); *id.* ¶¶ 118–19 (partially successful Local 30 litigation); *id.* ¶¶ 145–46 (unsuccessful Local 30 petition); *id.* ¶¶ 151, 156 (same). "The fact that more than half of all the actions as to which we know the results turn out to have merit cannot be reconciled with the charge that the unions were filing lawsuits and other actions willy-nilly without regard to success." *See USS-POSCO*, 31 F.3d at 811. Plaintiffs therefore fail to allege that Defendants' threats of litigation were a sham under the serial exception.

Accordingly, Plaintiffs fail to allege facts showing that Defendants' threats of litigation against the Bahia redevelopment do not qualify for *Noerr-Pennington* protection under either the single or serial sham exceptions.

### 2. Lobbying

Plaintiffs also contend that Defendants' conduct before the City Council, California Coastal Commission, and other entities constitutes single or serial sham petitioning. (*See* Opp'n to Local 30 Mot. at 16–24.) The Ninth Circuit has recognized that "the scope of the sham exception depends on the type of governmental entity involved." *Kottle*, 146 F.3d at 1060 (citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972); *Boone*, 841 F.2d at 896); *see also id.* at 1061 ("[T]he scope of the sham exception to the *Noerr-Pennington* doctrine depends on the branch of government involved."). For example, the three enumerated circumstances for the litigation sham exception "do not make sense in the legislative realm," which "has a higher tolerance for outright lies." *Id.* at 1061 (citing *Cal. Motor Transp.*, 404 U.S. at 512–13); *see also id.* ("[I]t would seem quite pointless to ask whether the lobbying effort

was 'objectively baseless.'"); *id.* at 1062 ("Misrepresentations are a fact of life in politics." (citing *Cal. Motor Transp.*, 404 U.S. at 512)).  The inquiry is more complicated when it comes to executive entities, however, because of the vastly different types that exist.  *See id.* at 1061.  In some instances, the sham exception should be the same as for judicial bodies, but such an exception "would be far too broad" for entities more closely resembling legislative bodies.  *See id.*

Consequently, the Court must first determine whether the entities Plaintiffs allege Defendants lobbied, including the City Council and California Coastal Commission, are legislative or executive and, if executive, whether they more closely resemble judicial or legislative bodies.  The City Council is unquestionably a legislative body.  *See* City of San Diego City Charter, art. III, § 11 ("All legislative powers of the City shall be vested, subject to the terms of this Charter and of the Constitution of the State of California, in the Council, except such legislative powers as are reserved to the people by the Charter and the Constitution of the States.");[8] *see also Boone*, 841 F.2d 886 ("[E]ven though proceedings before the [redevelopment] agency may have some of the trappings normally associated with adjudicatory procedures, all final decisions are made by the [city] council, a distinctly legislative body.").  Consequently, the Court need not determine whether the City Council more closely resembles a judicial body or political entity.  *See Kottle*, 146 F.3d at 1061 (applying analysis only to executive entities); *cf.* Opp'n to Local 30 Mot. at 21–24 (advocating that the City Council's approval of a lease amendment is an adjudicative act).

Even assuming that the other entities mentioned in Plaintiffs' Second Amended Complaint are executive rather than legislative, Plaintiffs fail to allege facts supporting that their decisions are adjudicative rather than legislative in nature.  For example, to determine whether the California Coastal Commission more closely resembles a judicial body or political entity for purposes of the sham exception, the Court must evaluate to

---

[8] "The Court may take judicial notice of city charters."  *Rabkin v. Dean*, 856 F. Supp. 543, 546 (N.D. Cal. 1994).

several factors under the "totality of the circumstances," including whether the entity "conducts public hearings, accepts written and oral arguments, permits representation by counsel, . . . allows affected persons to question witnesses[,] . . . issue[s] written findings after [a] hearing[, and issues] decision[s that are] appealable." *See Kottle*, 146 F.3d at 1062. The scope of immunity in the legislative context therefore "depends on the degree of political discretion exercised by the government agency." *Id.* (quoting *Forro Precision, Inc. v. IBM*, 673 F.2d 1045, 1060 n.10 (9th Cir. 1982)) (citing *Boone*, 841 F.2d at 896). "[F]or purposes of the sham exception, executive entities are treated like judicial entities only to the extent that their actions are guided by enforceable standards subject to review" because "[o]nly when administrative officials must follow rules is it meaningful to ask whether a petition before an agency was 'objectively baseless[.]'" *See id.*

Aside from conclusorily alleging that the California Coastal Commission has issued "adjudicative decision[s]," (*see, e.g.*, SAC ¶ 98), Plaintiffs fail to allege any facts supporting the inference that the California Coastal Commission more resembles a judicial rather than legislative body for purposes of the sham exception. Although the Coastal Commission conducts public hearings and issues written decisions, there are no allegations regarding whether those hearings involve written or oral arguments, permit representation by counsel, or allow the questioning of witnesses. *See Kottle*, 146 F.3d at 1062. Most critically, there also are no allegations that the Commission is guided by enforceable standards. *See id.* The same is true of the other entities mentioned in Plaintiffs' Second Amended Complaint. (*See, e.g.*, SAC ¶¶ 69, 95, 118, 126 n.4, 141, 150 (Port of San Diego); *id.* ¶ 84 (the City); *id.* ¶¶ 103–04 (the Wetlands Advisory Board and the Planning Commission); *id.* ¶ 112 (Centre City Development Corporation).) Because Plaintiffs bear the burden of alleging that Defendants' conduct falls outside the protection of *Noerr-Pennington*, *see, e.g.*, *Sosa*, 437 F.3d at 942; *Boone*, 841 F.2d at 894, the Court therefore concludes that Plaintiffs fail to allege that any of the entities mentioned in their Second Amended Complaint more closely resemble judicial bodies for

/ / /

purposes of the sham exception.   Accordingly, the Court applies the "extraordinarily narrow" sham exception applicable to legislative entities.  *See Kottle*, 146 F.3d at 1061.

Having determined the correct standard to apply, the Court must determine whether Plaintiffs sufficiently allege that Defendants' lobbying efforts are a sham.  In the legislative context, the sham exception applies only when "persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *Omni Outdoor*, 499 U.S. at 380 (emphasis in original).   In other words, "[a] 'sham' situation involves a defendant whose activities are 'not genuinely aimed at procuring favorable government action' at all, . . . not one who genuinely seeks to achieve his governmental result, but does so *through improper means*."  *Id.* (emphasis in original) (internal quotation marks omitted) (citation omitted).  Where, as here, the plaintiffs allege that the defendants seek delay, "the purpose of delay[] . . . does not render lobbying activity a 'sham,' unless . . . the delay is sought to be achieved only by the lobbying process itself, and not by the governmental action that the lobbying seeks."  *See id.* at 381.

As an initial matter, Plaintiffs ask the Court to reconsider Judge Hayes' prior conclusion that the serial sham exception does not apply in the lobbying context.  (*See* Opp'n to Local l30 Mot. at 19–22 (citing Order at 16 (citing *Kottle*, 146 F.3d at 1061)).) But Plaintiffs do not cite—and the Court has not found—any authorities extending the serial sham exception outside the litigation context.   Further, as the Ninth Circuit cautioned, extending the serial sham exception to the legislative realm "would eviscerate the Petition Clause."  *See Kottle*, 146 F.3d at 1061.  Accordingly, the Court declines to adopt a serial sham lobbying exception or to consider Plaintiffs' allegations regarding Defendants' prior lobbying against other proposed developments.

As for Defendants' lobbying related to the Bahia redevelopment, Plaintiffs allege that Defendants objected to the project by sending letters to the City Council "express[ing] concern regarding the lack of transparency and access to information pertaining to environmental review of the proposed Lease Amendment," (*see* SAC

¶ 173), and "claiming that because the project purported to eliminate Gleason Road, it was not consistent with the 1997 MBMPU." (*See id.* ¶ 174.) According to Plaintiffs, these challenges were spurious and intended solely to delay approval of the Bahia redevelopment until Defendants could secure a PLA and card check neutrality agreement. (*See, e.g., id.* ¶¶ 175, 234–35, 239.) Despite the "exceptionally narrow" scope of the legislative sham exception and viewing these allegations in Defendants' favor, the Court concludes that Plaintiffs sufficiently allege that Defendants' objections to the City Council were "intended only to delay [Plaintiffs], not to influence governmental action." *See Clipper Exxpress*, 690 F.2d at 1253.

To the extent Plaintiffs' challenge Defendants' communications with individual Councilmembers, (*see, e.g.*, SAC ¶ 227), however, Plaintiffs fail to allege that Defendants' conduct falls within the sham exception. Plaintiffs allege that Defendants lobbied against the approval of the Bahia development by the City Council pending Plaintiffs' acquiescence to a PLA and card check neutrality agreement. (*See, e.g.*, SAC ¶¶ 58, 176–77, 180, 182–83.) Because Defendants allegedly sought—and obtained—the requested delay through the Councilmembers' conduct, Plaintiffs do not plead that Defendants did not genuinely seek the governmental action for which they lobbied. *See City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 381 (1991); *see also Boone*, 841 F.2d at 894 ("Successful petitioning of government often depends on the development of close relations between government officials and those who seek government benefits. Indeed, cultivating close ties with government officials is the essence of lobbying. Such conduct certainly falls within the ambit of the *Noerr-Pennington* doctrine.").

Plaintiffs also argue that Defendants' lobbying of the City Council and California Coastal Commission is a sham because it was done in violation of the Ralph M. Brown Act ("Brown Act"), Cal. Gov't Code §§ 54950 *et seq.*; San Diego's lobbying disclosure ordinance, San Diego Mun. Code §§ 27.4001 *et seq.*; and the prohibition on *ex parte* communications with the California Coastal Commission, Cal. Pub. Res. Code § 30324.

(*See* Opp'n to Local 30 Mot. at 14–15.)  The Court concludes that Plaintiffs fail to allege that Defendants' lobbying was unlawful.   Taking the provisions in turn, Plaintiffs concede that "only members of a legislative body can be prosecuted under the Brown Act." (*Id.* at 15.)  Nonetheless, Plaintiffs urge that "that does not mean communications in violation of the statute are protected by *Noerr-Pennington*." (*Id.*)  Plaintiffs, however, cite no authority that would permit the Court to conclude that *Defendants'* petitioning was unlawful based on a *Councilmember's* alleged violation of the Brown Act.  As for the lobbying disclosure ordinance, Plaintiffs concede that Local 30 filed the requisite disclosures for Ms. Browning, (*see* SAC ¶ 22), and fail to allege that the Trades Council Defendants engaged in any lobbying regarding the Bahia lease amendment.  (*See id.* ¶¶ 59–60, 63–63.)  Finally, Plaintiffs do not allege that Defendants engaged in *ex parte* communications with the California Coastal Commission regarding the Bahia project, or even that the Commission's approval was required.  (*See generally id.*)  In any event, Section 30324 prohibits *ex parte* communications with a California Coastal Commission member only if the Commission member fails to make the necessary disclosures.  *See* Cal. Pub. Res. Code § 30324(a) ("No commission member, nor any interested person, shall conduct an ex parte communication *unless the commission member fully discloses and makes public the ex parte communication . . . .*" (emphasis added)).  Such allegations are lacking here, (*see* SAC ¶¶ 97, 122, 132, 154, 156), and, as with the alleged Brown Act violations, Plaintiffs fail to identify any authority allowing the Court to find Defendants culpable for a politician's malfeasance.  Plaintiffs therefore fail to allege that the sham exception applies to Defendants' alleged lobbying efforts with the City Council or California Coastal Commission.

Finally, Plaintiffs allege that, in an effort to pressure Plaintiffs to sign a PLA and card check neutrality agreement, Defendants (through Ms. Rolfe) threatened SeaWorld that they would oppose SeaWorld's future attractions before the City Council and California Coastal Commission unless SeaWorld terminated its business relationship with Plaintiffs.  (*See, e.g.*, *id.* ¶¶ 204, 226.)  Although Defendants argue that the Court cannot

"presume that '*any* future Coastal Commission petition filed by Defendants against SeaWorld would be objectively baseless[,]'" (*see* Local 30 Mem. at 12 (emphasis in original) (quoting Order at 17)), it is difficult to imagine in what way Defendants could intend to influence governmental action or know that their objections would be meritorious without yet knowing the nature of SeaWorld's future attractions.  Because the threatened lobbying against SeaWorld is akin to "protests . . . filed automatically and without regard to merit," *see Clipper Exxpress*, 690 F.2d at 1254–55, the Court determines that Plaintiffs sufficiently plead that Defendants' threats against SeaWorld fall within the sham exception and therefore are not entitled to *Noerr-Pennington* protection.[9]

### C.    Conclusion

For the above reasons, the Court concludes that the majority of Defendants' alleged conduct is protected by the *Noerr-Pennington* doctrine, with the exception of Defendants' alleged environmental and land use challenges to the Bahia redevelopment and threats to SeaWorld regarding opposition to its future attractions.   The Court therefore **GRANTS IN PART** the Local 30 Motion consistent with the above analysis.

## II.    Failure to State a Claim

In their Second Amended Complaint, Plaintiffs allege eight causes of action: (1) unlawful secondary boycott in violation of Section 303 of the LMRA; (2)–(3) attempted monopolization and conspiracy to monopolize in violation of Section 2 of the Sherman Act; (4) violation of RICO, 18 U.S.C. § 1962(c); (5) violation of RICO, 18 U.S.C. § 1962(d), by conspiring to violate 18 U.S.C. § 1962(c); (6) interference with prospective economic advantage; (7) attempted extortion; and (8) violation of

---

[9] Plaintiffs also argue that Defendants' alleged threats to Plaintiffs and SeaWorld are unlawful "secondary boycotts" that are not entitled to *Noerr-Pennington* protection. (*See* Opp'n to Local 30 Mot. at 2–5.)   Specifically, Plaintiffs contend that Defendants' alleged threats against Plaintiffs violate Section 8(b)(4)(ii)(A) of the NLRA and that Defendants' alleged threats against SeaWorld violate Section 8(b)(4)(ii)(B) of the NLRA.  (*See id.*)   Because the alleged threats at issue are the same threats that the Court concludes are not entitled to *Noerr-Pennington* immunity, (*compare* SAC ¶¶ 255, 266, *with id.* ¶¶ 173–74, 204, 226), the Court declines to address Plaintiffs' NLRA-specific *Noerr-Pennington* arguments.

California's UCL.  (*See* SAC ¶¶ 246–377.)  Defendants ask the Court to dismiss each of Plaintiffs' claims with prejudice and without leave to amend for failing to state a claim under Rule 12(b)(6).  (*See* Local 30 Mot. at 26; Trades Council Mot. at 25.)

### A.   First Cause of Action: Unlawful Secondary Boycotts

Pursuant to Section 303 of the LMRA, "[i]t shall be unlawful . . . for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title."  29 U.S.C. **§** 187(a).  Plaintiffs allege violations of two provisions of Section 158(b)(4)(ii) ("Section 8") of the NLRA: (1) Section 8(b)(4)(ii)(A) based on Defendants' alleged threats against Plaintiffs, and (2) Section 8(b)(4)(ii)(B) based on Defendants' alleged threats against SeaWorld.[10]  Defendants urge dismissal of Plaintiffs' secondary boycott claims on several grounds.

---

[10] The relevant provisions of Section 8 of the NLRA provide:

**(b)      Unfair labor practices by labor organization**

It shall be an unfair labor practice for a labor organization or its agents—

. . .

       (4)

    . . .

            (ii)      to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

                    (A)      forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e); [and]

                    (B)      forcing or requiring any person . . . to cease doing business with any other person . . . : *Provided*, That noting contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

                  . . .

18-CV-2763 TWR (AHG)

First, citing *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building and Construction Trades Council*, 485 U.S. 568 (1988), Defendants contend that their conduct is protected by the First Amendment and therefore cannot form the basis for a claim under Section 8(b)(4)(ii).  (*See* Local 30 Mem. at 19–22.)   Because "baseless [petitioning] is not immunized by the First Amendment," *see Bill Johnson's*, 461 U.S. at 743, Plaintiffs must allege that Defendants threatened petitioning "lack[ed] a reasonable basis."  *See id.* at 744.   This inquiry dovetails with the second step of the *Noerr-Pennington* analysis.  Because the Court has concluded that Plaintiffs sufficiently allege that Defendants threatened "sham" lobbying, *see supra* Section I.B.2, the Court also concludes that Plaintiffs sufficiently allege that Defendants' conduct is not entitled to First Amendment protection in the context of the NLRA.

Second, Defendants argue that "litigants may not base Section 8(b)(4)(ii) claims on the mere fact that the union's conduct threatens to impose economic harm."  (*See* Local 30 Mem. at 22–23) (citing *DeBartolo*, 485 U.S. at 579).   As Plaintiffs note, however, "threats of economic harm are 'coercive threats' if they can reasonably be expected to threaten 'ruin or substantial loss'" to a party not involved in the labor dispute.  (*See* Opp'n to Local 30 Mot. at 9 (quoting *NLRB v. Retail Store Emp. Union, Local 1001 ("Safeco")*, 447 U.S. 607, 614 & n.9 (1980)).)   The Court concludes that Plaintiffs

> . . . *Provided further*, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product of products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, and the establishment of the employer engaged in such distribution[.]

29 U.S.C. §§ 158(b)(4)(ii)(A)–(B) (emphasis in original).

sufficiently allege that Defendants threatened both Plaintiffs and SeaWorld with substantial economic losses.  With regard to Plaintiffs, the Trades Council Defendants threatened to oppose the Bahia redevelopment unless Plaintiffs agreed to sign a PLA.  (*See* SAC ¶ 266.)  Plaintiffs contend that these threats would force them to incur "legal fees and other costs incurred because of, and in response to, Defendants' coercive threats," (*see id.* ¶ 270), and unquantified losses of the "Joint Venture with SeaWorld[,] . . . goodwill, . . . profits, and . . . property value." (*See id.* ¶ 271.)  At the pleading stage, these allegations suffice to demonstrate that Defendants threatened "substantial loss."

Plaintiffs allegations are even stronger as to SeaWorld.  Specifically, Plaintiffs allege that Defendants threatened that, "if [SeaWorld] continued its partnership with Evans Hotels, [it] would face severe opposition from the unions and union allies in connection with its plan to open new attractions every year" and that Defendants "would drum up negative publicity against SeaWorld designed to undermine SeaWorld's business by damaging its reputation and public image." (*See id.* ¶ 204.)  According to Plaintiffs, these threats "target[ed] SeaWorld's . . . core business plan to increase sales by opening up new attractions and harming its image." (*See id.* ¶ 205; *see also, e.g.*, *id.* ¶ 207 ("SeaWorld's stock price is dependent on developing new attractions."); *id.* ¶ 208 ("[A]ttractions are the 'lifeblood' of [SeaWorld]."); *id.* ¶ 209 ("SeaWorld's focus was on developing new attractions and . . . being able to open up new attractions on an annual basis was critically important to SeaWorld's success."); *id.* ¶ 211 ("SeaWorld had no choice but to 'protect its bread and butter' from union interference."); *id.* ¶ 212 ("[SeaWorld] could not move forward with the Joint Venture because it would jeopardize SeaWorld's underlying capital strategy of opening up new attractions at its theme park.").)  Given the alleged centrality of opening new attractions to SeaWorld's business, Plaintiffs adequately plead that Defendants' threats to oppose approval of those projects threatened a major portion of SeaWorld's business.  The Court therefore concludes that Plaintiffs sufficiently allege that Defendants' threats to both Plaintiffs and SeaWorld were "coercive" for purposes of Section 8(b)(4)(ii).

18-CV-2763 TWR (AHG)

Finally, Defendants argue that Plaintiffs cannot allege a violation of Section 8(b)(4)(ii)(A) for the Trades Council Defendants' threats to Plaintiffs because the alleged PLA does not violate Section 8(e) under the construction-industry proviso.[11]  (*See* Local 30 Mem. at 23–24.)   Plaintiffs respond that the construction-industry proviso does not apply because "Evans Hotels is not, nor does it intend to become, an employer in the construction industry, so it is not an employer covered by the exception."   (Opp'n to Local 30 Mot. at 10.)   Given Plaintiffs allegations that they are "not an employer primarily engaged in the construction industry," (*see, e.g.*, SAC ¶ 269), and that the Trades Council Defendants sought a PLA from Plaintiffs, (*see, e.g.*, *id.*), the Court concludes that Plaintiffs adequately allege that the Section 8(e) construction-industry proviso does not apply and that Plaintiffs state a claim against the Trades Council Defendants under Section 8(b)(4)(ii)(A).

Accordingly, the Court **DENIES IN PART** the Local 30 Motion as to Plaintiffs' first cause of action against Defendants under Sections 8(b)(4)(ii)(A) and (B).

## B.    *Second and Third Causes of Action: Sherman Act*

Plaintiffs bring claims for both attempted monopolization, (*see* SAC ¶¶ 272–92), and conspiracy to monopolize, (*see id.* ¶¶ 293–309), in violation of Section 2 of the Sherman Act.   Defendants advocate dismissal of both claims on the grounds that (1) the statutory labor exemption, 15 U.S.C. § 17, bars Plaintiffs' claims, (*see* Trades Council Mem. at 1–4); (2) the non-statutory labor exemption bars Plaintiffs' claims, (*see id.* at

---

[11] Section 8(e) provides, in relevant part:

> **(e)    Enforceability of contract or agreement to boycott any other employer; exception**
>
> It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer . . . agrees . . . to cease doing business with any other person . . . : *Provided*, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work . . . .

18-CV-2763 TWR (AHG)

5–6); and (3) Plaintiffs fail to plead certain elements of their antitrust claims.  (*See id.* at 6–7.)

### 1.    Statutory Labor Exemption

The Supreme Court has construed the "interlacing" Sherman, Clayton, and Norris-LaGuardia Acts to give unions a statutory exemption to the antitrust laws.[12]  *See USS-POSCO*, 31 F.3d at 805.  This exemption applies "[s]o long as a union acts in its self-interest and does not combine with non-labor groups[.]"  *See United States v. Hutcheson*, 312 U.S. 219, 232 (1941).  "This passage has been read as establishing a two-prong test for the statutory labor exemption: (1) did the union combine with a non-labor group? (2) Did the union act in its legitimate self-interest?"  *See USS-POSCO*, 31 F.3d at 805.  It is the plaintiff who bears the burden of pleading that the statutory labor exemption does not apply because it is an element of any claim that unions violated the antitrust laws.  *See id.* at 805 n.3.  The Parties contest its applicability here.  (*Compare* Trades Council Mem. at 1–4; *and* ECF No. 87 ("Trades Council Reply") at 1–2, *with* ECF No. 84 ("Opp'n to Trades Council Mot.") at 3–6.)

As for the first prong, Plaintiffs fail to allege that Defendants combined with a non-labor group.  The Ninth Circuit has defined a "non-labor group" for these purposes to mean that "the entity in question must operate in the same market as the plaintiff to a sufficient degree that it would be capable of committing an antitrust violation against the plaintiff, quite independent of the union's involvement."  *See USS-POSCO*, 31 F.3d at 806.  "[A] competitor of the plaintiff clearly falls within that definition," but "[o]ther entities, though more remote, may nevertheless stand in such a relationship to the plaintiff that they are deemed to be operative in the same market."  *See id.* at 806–07.

Here, Plaintiffs allege that Defendants have combined with non-labor groups, "including hotel developers and/or owners in the relevant market that sign PLAs and card

---

[12] The Sherman Antitrust Act of 1890 is codified at 15 U.S.C. §§ 1–7; the Clayton Antitrust Act of 1914 at 15 U.S.C. §§ 12–27, 29 U.S.C. §§ 52–53; and the Norris LaGuardia Act of 1932 at 29 U.S.C. §§ 101–115.

18-CV-2763 TWR (AHG)

check neutrality agreements as a condition of obtaining approval for their new developments and expansion plans . . . , as well as environmental groups like Citizens and Paddlers Against the Bahia Hotel Land Grab on Bahia Point and San Diegans for Responsible Planning." (*See* SAC ¶ 305.) Plaintiffs do not—and cannot—allege that the identified environmental groups "operat[]e in the same market" as them. *See USS-POSCO*, 31 F.3d at 806–07; *see also Adolph Coors Co. v. Wallace*, 115 L.R.R.M. (BNA) 3100, 3107 & n.14 (N.D. Cal. 1984) (concluding that, although the union "enlisted the support of various other non-labor groups" to participate in boycott, none of the non-labor groups were "alleged to be competitors or participants in any phase of the beer market").

Further, while Plaintiffs allege that Defendants have entered into card check neutrality agreements and PLAs with certain of Plaintiffs' competitors, these allegations fall short of an actionable combination. As the Ninth Circuit has explained, "[t]he mere combination by a union with 'non-labor groups' does not violate the Sherman Act" because "[t]o hold otherwise would invalidate collective bargaining." *See Bodine Prod., Inc. v. United Farm Workers Org. Comm.*, 494 F.2d 541, 558 (9th Cir. 1974). Consequently, "[w]hether the combination violates the antitrust laws turns on the purposes served thereby." *See id.* Here, Plaintiffs allege that Defendants "combine with non-labor groups (including but not limited to Protea [Waterfront Development] and Virgin Hotels [North America] regarding the Seaport Village development[ and] other developers who have agreed to Defendants' demands as a prerequisite to obtaining necessary approvals of their hotel developments) to initiate or threaten to initiate sham CEQA, environmental, and zoning land use opposition that will prevent or delay the development of non-union hotel properties." (*See* SAC ¶ 277.) But Plaintiffs' allegations concerning, for example, Protea and Virgin Hotels do not support that Defendants "combined" with them to eliminate Plaintiffs, and other non-union hotels, from the market. Rather, Plaintiffs allege that Ms. Browning and Mr. Lemmon contacted the six developers who submitted bids meeting the Port of San Diego's criteria to develop

a hotel in the Central Embarcadero area (the "Seaport Village project"), including Plaintiffs. (*See id.* ¶¶ 134–36.)  Protea was the first developer to agree to sign a card check neutrality agreement and PLA.  (*See id.* ¶¶ 136–37.)  At a public hearing, Protea announced that it would be entering into agreements with Defendants, (*see id.* ¶¶ 138–39), and the Port voted to proceed exclusively with Protea, (*see id.* ¶ 140), and later officially accepted Protea's bid.  (*See id.* ¶ 141.)  According to Plaintiffs, "[i]n combining with Protea, a direct competitor of Plaintiffs, Defendants blocked all developers, including Evans Hotels, from competing for the Seaport Village development," and "Protea ensured its success by agreeing to enter into labor agreements with Defendants."  (*See id.*)  But all developers—including Plaintiffs—were given the opportunity to enter into agreements with Defendants, and that Protea was motivated to secure its success on the Seaport Village project does not mean that Protea combined with Defendants to eliminate non-unionized hotels from the Relevant Market.  *Cf. Northshore Sheet Metal, Inc. v. Sheet Metal Workers Int'l Ass'n, Local 66*, No. 15-CV-1349 BJR, 2018 WL 4566049, at \*6 (W.D. Wash. Sept. 24, 2018) (concluding that statutory exemption did not apply where the complaint was "replete with plausible allegations that [the union] combined or attempted to combine with nonlabor entities in order to accomplish its alleged goal of eliminating [the plaintiff] from the relevant market").

As for the second prong, although Plaintiffs' allegations demonstrate that Defendants' acted in their own self-interest, *see, e.g.*, *USS-POSCO*, 31 F.3d at 809 ("That these activities were not undertaken to unionize this particular employer but in order to eliminate non-union shops altogether by taking an example of BE & K does not matter . . . .  Encouraging the use of unionized labor is an objective well within the legitimate interests of labor unions." (citing *Pennington*, 381 U.S. at 666; *Bodine*, 494 F.2d at 549)), the Court cannot determine that Defendants' alleged conduct regarding the Bahia redevelopment project is "per se exempted from the antitrust laws."  *See id.*  This is because Plaintiffs allege that Defendants pursued these legitimate ends through conduct

not "normally associated with labor disputes," including "automatically protesting against permits sought by [Plaintiffs.]"  *See id.*; *see also supra* Section I.B.2; SAC ¶¶ 281, 306 (alleging that Defendants engaged in conduct including "automatically protesting permits for development projects").   Consequently, the burden shifts to Defendants to demonstrate that "the non-traditional means were not only lawful, but necessary because the goals could not be achieved through traditional tactics."  *See USS-POSCO*, 31 F.3d at 809 (citing *H.A. Artists & Assocs., Inc. v. Actors' Equity Ass'n*, 451 U.S. 704, 722 (1981)).  Accepting Plaintiffs' allegations as true, as the Court must at the pleading stage, Defendants cannot meet this burden as to the allegations concerning the Bahia redevelopment project.  As for the Seaport Village project, however, Plaintiffs fail to include allegations that Defendants engaged in similar conduct.  (*See* SAC ¶ 135 (alleging only that the Local 30 Defendants called and "threatened" Plaintiffs' developer, stating that their bid "'would not have a snowball's chance in hell' if they didn't cut a deal").).  Plaintiffs therefore fail to meet their burden as to the Seaport Village project.

Because the Ninth Circuit has construed the two-pronged test in the disjunctive, *see USS-POSCO*, 31 F.3d at 810; *see also id.* at 808 ("We read [*H.A. Artists*] as a clear holding that a union may violate the antitrust laws—in other words, that it may lose the benefit of the labor exemption—even when it does not combine with a non-labor group."), the Court concludes that Plaintiffs adequately allege that Defendants' conduct falls outside of the statutory labor exemption with regard to the Bahia redevelopment project but not the Seaport Village project.

### 2.   *Non-Statutory Labor Exemption*

Defendants argue that, even if the statutory labor exemption does not apply, the non-statutory labor exemption bars Plaintiffs' claims.  (*See* Trades Council Mot. at 5–6.) The non-statutory exemption "recognizes that, to give effect to federal labor laws and policies and to allow meaningful collective bargaining to take place, some restraints on competition imposed through the bargaining process must be shielded from antitrust sanctions."  *Int'l Longshore & Warehouse Union v. ICTSI Ore., Inc.*, 863 F.3d 1178,

1189 (9th Cir. 2017) (quoting *Brown v. Pro Football, Inc.*, 518 U.S. 231, 237 (1996)) (citing *Pennington*, 381 U.S. at 711 (Goldberg, J., concurring in part and dissenting in part)).   To determine whether the non-statutory exemption applies, courts apply the *Mackey* test, under which "[a]n alleged agreement restraining trade is shielded from antitrust liability only if the following three . . . [elements] are satisfied: '(1) the restraint primarily affects the parties to the agreement and no one else[;] (2) the agreement concerns wages, hours, or conditions of employment that are mandatory subjects of collective bargaining[;] and (3) the agreement is produced from bona fide, arm's-length collective bargaining.'"   *See id.*; *see also Mackey v. Nat'l Football League*, 543 F.2d 606, 614 (8th Cir. 1976).   While the *Mackey* test is couched in terms of union-employer agreements, the scope of the non-statutory labor exemption is not so limited.[13]   *See Brown*, 518 U.S. at 243.

The Court concludes that Plaintiffs' allegations satisfy the first and second elements of the *Mackey* test.   First, Plaintiffs allege that "the restraints Defendants seek to impose do not 'primarily affect' the parties to agreements between Defendants and developers (as no such collective bargaining relationship exists between Evans Hotels and Defendants)."   (*See* SAC ¶¶ 282, 307.)   But any agreements entered into by Defendants and other developers do "primarily affect" those parties and not Plaintiffs. To the extent Plaintiffs allege that the agreements sought by Defendants with respect to the Bahia would not "primarily affect" them, Plaintiffs have failed to allege facts supporting that inference.   A card check neutrality agreement between Plaintiffs and the Local 30 Defendants or a PLA between Plaintiffs and the Trades Council Defendants would "primarily affect" those groups, as would a PLA between a general contractor and

---

[13] The *Mackey* test focuses on employer-union agreements because "[t]he Supreme Court has never delineated the precise boundaries of the [non-statutory labor] exemption, and what guidance it has given as to its application has come mostly in cases in which agreements between an employer and a labor union were alleged to have injured or eliminated a competitor in the employer's business or product market."   *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1125 (9th Cir. 2011) (alteration in original) (quoting *Clarett v. Nat'l Football League*, 369 F.3d 124, 131 (2d Cir. 2004)).

the Trades Council Defendants. *See, e.g.*, *Sun-Land Nurseries, Inc. v. S. Cal. Dist. Council of Laborers*, 793 F.2d 1110, 1117–18 (9th Cir. 1986) (concluding that nonstatutory labor exemption applied to subcontracting limitation clauses even though "an agreement restricting subcontracting has anticompetitive effects"); *see also Cal. Dump Truck Owners Ass'n, Inc. v. Associated Gen. Contractors of Am., San Diego Chapter, Inc.*, 562 F.2d 607, 613 (9th Cir. 1977) ("The [agreement] may have an effect upon the appellants, but it is an indirect effect.").

Second, Plaintiffs allege that "Defendants have admitted they are not concerned with bettering working conditions of Evans Hotels' employees." (*See* SAC ¶¶ 282, 307.) But Plaintiffs elsewhere allege that "Defendants' action in forcing San Diego hotels to 'go union' has the effect of imposing certain wage scales and work rules on the construction and operation of all full-service hotels in the San Diego waterfront." (*See id.* ¶ 221(a).) These two allegations are not irreconcilable and, ultimately, demonstrate that Defendants' conduct "concerns wages, hours or conditions of employment," even if the working conditions at the Bahia currently are satisfactory.

Finally, for the reasons discussed above, *see supra* Sections I.B.2, II.B.1, the Court finds that Plaintiffs' Second Amended Complaint adequately alleges that Defendants did not engage in "bona fide, arm's-length" bargaining. Plaintiffs allege that "any agreement that would result [from Defendants' conduct] is not the product of bona fide arm's length collective bargaining, but rather the product of developers capitulating to Defendants' non-traditional and unlawful tactics." (*See* SAC ¶¶ 282, 307 (citing *Int'l Longshore*, 863 F.3d 1178).) Defendants invoke *Bodine*, in which the Ninth Circuit concluded that the non-statutory labor exemption applied despite the fact that the plaintiff alleged that "the means employed by the defendants to obtain the agreements . . . consisted of threats of financial ruin, coercion, intimidation, and other activities." 494 F.2d at 559–60. Although *Bodine* remains good law, it predates the Ninth Circuit's adoption of the *Mackey* test in 1987. *See Cont'l Maritime of San Francisco, Inc. v. Pac. Coast Metal Trades Dist. Council, Metal Trades Dep't, AFL-CIO*, 817 F.2d 1391, 1393 (9th Cir.

1987).  Given Plaintiffs' allegations that Defendants have pressured Plaintiffs through threats of specious lobbying, the Court concludes that Plaintiffs sufficiently plead that Defendants did not engage in "bona fide, arm's-length" bargaining.  Consequently, the Court concludes that Plaintiffs sufficiently allege that the non-statutory labor exemption does not apply to Defendants' alleged conduct.

### 3.    Failure to Plead Required Elements

Defendants also contend that Plaintiffs fail to plead required elements of their antitrust claims, specifically antitrust standing and an adequate market share.  (*See* Trades Council Mem. at 6–7.)

### a.    Standing

"[I]n addition to having Article III standing, a Sherman Act plaintiff must plausibly allege 'antitrust standing.'"  *In re German Auto. Mft.'s Antitrust Litig.*, 497 F. Supp. 3.d 745, 760 (N.D. Cal. 2020).  "[T]he Supreme Court . . . [has] identified certain factors for determining whether a plaintiff who has borne an injury has antitrust standing," including "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages."  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054–55 (9th Cir. 1999) (citing *Amarel v. Connell*, 103 F.3d 1494, 1507 (9th Cir. 1996)).  Although "a court need not find in favor of the plaintiff on each factor," *id.* at 1055 (citing *Amarel*, 102 F.3d at 1507), and "[n]o single factor is decisive," *id.* (alteration in original) (quoting *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 146 (9th Cir. 1989) (en banc), "[a] showing of antitrust injury is necessary . . . to establish standing." *Id.* (first alteration in original) (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986)).

Defendants contend that Plaintiffs have failed to allege the requisite antitrust injury. (*See* Trades Council Mem. at 6–7.)  The Ninth Circuit has "identif[ied] four requirements for antitrust injury: (1) unlawful conduct, (2) causing an injury to the

plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt.*, 190 F.3d at 1055. Defendants focus on the last requirement, arguing that Plaintiffs fail (1) to allege that they compete in the same market as Defendants, (*see* Trades Council Mem. at 6); or (2) sufficiently to allege consumer injury. (*See id.* at 6–7.)

As for Defendants' first argument, for an injury to be of the type that antitrust laws were intended to prevent, "the 'injured party [must] be a participant in the same market as the alleged malefactors.'" *Am. Ad Mgmt.*, 190 F.3d at 1057 (quoting *Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985)). To determine whether the injured party and malefactor "participate in the same market, the focus is upon the reasonable interchangeability of use or the cross-elasticity of demand between the services provided by" both. *See Bhan*, 772 F.2d at 1470–71. Here, Plaintiffs allege that Local 30 is a "labor union," (*see* SAC ¶ 18), that Trades Council "consists of affiliated construction and trade unions," (*see id.* ¶ 21), and that both participate in the "hospitality labor market." (*See, e.g., id.* ¶¶ 1, 221(b), 222.) On the other hand, Plaintiffs define the "Relevant Market" as the operation of "full-service, waterfront hotels in San Diego," which "not only includes the operation of such hotels, but also the use of contractors in the construction of hospitality properties in San Diego along the coastline of and in downtown San Diego." (*See id.* ¶ 273.) Although Plaintiffs allege that "Defendants and the non-labor groups with which they combine [will] monopolize the Relevant Market," (*see id.* ¶ 283), Plaintiffs fail to—and cannot—allege that Defendants are participants in the Relevant Market or that Plaintiffs and Defendants offer services that are "reasonabl[y] interchangeab[le]." *See Bhan*, 772 F.2d at 1070–71. Simply stated, a consumer seeking to rent a hotel room on the San Diego coast could not procure such a service from Defendants, and hospitality or construction workers seeking to unionize would not seek Plaintiffs' assistance.

Regarding Defendants' second argument, "[t]he antitrust laws were enacted for 'the protection of *competition*, not *competitors*.'" *See McGlinchy v. Shell Chem. Co.*, 845

F.2d 802, 811–12 (9th Cir. 1988) (emphasis in original) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 290, 320 (1962)).  Consequently, "to allege a plausible antitrust injury, a private plaintiff must allege facts that, assumed to be true, show that the plaintiff's injuries are caused by an anticompetitive aspect of the defendant's conduct that also injures competition and consumers."  *PLS.com, LLC v. Nat'l Ass'n of Realtors*, No. 2:20-cv-04790-JWH-RAOx, --- F. Supp. 3d ---, 2021 WL 369545, at *7 (C.D. Cal. 2021) (on appeal) (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334–35, 342–44 (1990); *Rebel Oil Co. v. Atl. Richfield*, 51 F.3d 1421, 1445 (9th Cir. 1995); *Cargill*, 479 U.S. at 109–110; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

Here, Plaintiffs allege that "Defendants' anti-competitive activities have . . . caused . . . reduced competition and reduced supply due to Defendants' unlawful practice of preventing the development of non-union hotels; blocked entry and reduced desirability of entry into the Relevant Market by non-union hotels and non-union hotel developers; . . . a loss of revenue to the City of San Diego in rental income; and increased prices to consumers in the Relevant Market due to the lack of meaningful market competition." (*See* SAC ¶¶ 291, 309.)  Conclusory allegations such as these, however, fail to establish a plausible injury to competition for purposes of antitrust standing.  *See, e.g.*, *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 305 F. Supp. 3d 1065, 1074 (N.D. Cal. 2018); *Power Analytics Corp. v. Operation Tech., Inc.*, No. SA CV16-01955 JAK (FFMx), 2017 WL 11486807, at *20–22 (C.D. Cal. Dec. 7, 2017); *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, No. 17cv205-MMA (MDD), 2017 WL 6059145, at *5 (S.D. Cal. Dec. 6, 2017); *S. Cal. Inst. of Law v. TCS Educ. Sys.*, No. CV 10-8026 PSG (AJWx), 2011 WL 1296602, at *10 (C.D. Ca. Apr. 5, 2011); *Carsten v. United Parcel Serv., Inc.*, No. CIV.S-95-862 WBSJFM, 1996 WL 335421, at *2 (E.D. Cal. Mar. 26, 1996).

/ / /

/ / /

Because Plaintiffs fail adequately to allege antitrust injury, Plaintiffs fail to establish antitrust standing.  *See, e.g.*, *Glen Holly Ent'mt, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003); *Bhan*, 772 F.2d at 1469–71.

### b.   Market Share

"[M]arket share is . . . the starting point for assessing market power," *see Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 925 (9th Cir. 1980), a necessary element for Plaintiffs' antitrust claims.  *See id.* at 925–27.  Because "market shares on the order of 60 percent to 70 percent have supported findings of monopoly power," *id.* at 924–25 (citing *Greyhound Comp. Corp. v. Int'l Bus. Machines Corp.*, 559 F.2d 488 (9th Cir. 1977); *Pac. Coast Agric. Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196 (9th Cir. 1975)), Plaintiffs allege that "Defendants in combination possess at a minimum a 60% share and up to a 70% share of the Relevant Market."  (*See* SAC ¶ 275.) Defendants, however, argue that "Plaintiffs cannot base monopolization claims on the theory that unionized hotels or developers—which *compete against each other*—can somehow monopolize the market as a group."  (Trades Council Mem. at 7 (emphasis in original) (citing *Terminalift LLC v. Int'l Longshore & Warehouse Union Local 29*, No. 11-CV-1999W(WVG), 2013 WL 2154793, at *4 (S.D. Cal. May 17, 2013).)  Plaintiffs respond that "Defendants—*who work together and do not compete with each other*—possess 60–70% of the relevant market."  (Opp'n to Trades Council Mot. at 8 (emphasis in original) (citing SAC ¶ 296).)  Defendants counter that they "operate in the *labor* market, while Plaintiffs' antitrust claims rest on allegations of the attempted monopolization of the *hotel construction and operation* market."  (Trades Council Reply at 3 (emphasis in original).)

The Court concludes that Plaintiffs have failed to allege that Defendants possess a sufficiently substantial market share.  According to Plaintiffs, the "Relevant Market" is the operation of "full-service, waterfront hotels in San Diego," as well as "the use of contractors in the construction of hospitality properties in San Diego along the coastline of and in downtown San Diego."  (*See* SAC ¶ 273.)  As the Court concluded above, *see*

*supra* Section II.B.3.a, Plaintiffs' allegations do not establish that Defendants participate in the Relevant Market because Plaintiffs do not allege that Defendants operate hotels or retain contractors for the construction of hospitality properties.   (*See generally id.*) Rather, Plaintiffs allege that Defendants participate in the "hospitality labor market." (*See id.* ¶¶ 1, 221(b), 222.)  Consequently, to the extent Plaintiffs allege that Defendants "possess at a minimum a 60% share and up to a 70% share of the Relevant Market," (*see id.* ¶ 275), that allegation in contradicted by the allegations in the Second Amended Complaint.  (*See, e.g.*, *id.* ¶ 222 (alleging that Defendants' conduct "ensure[s] that they maintain control over the relevant hospitality labor market").)

To the extent Defendants allege that the hotels entering into PLAs and/or card check neutrality agreements with Defendants enjoy a 60 to 70 percent market share, Defendants are correct that Plaintiffs cannot state a claim.  As Plaintiffs themselves allege, they compete with other hotel operators in the Relevant Market, (*see id.* ¶ 273), including, for example, unionized operators such as Virgin Hotels. (*See, e.g.*, *id.* ¶ 280.) The Relevant Market, therefore, is an oligopoly, which "is not *per se* illegal under Sherman Act § 2."   *Rebel Oil*, 51 F.3d at 1437 n.6.  Rather, "[t]o pose a threat of monopolization, one firm *alone* must have the power to control market output and exclude competition," *id.* at 1443, because "[a]n oligopolist lacks this unilateral power." *Id.*; *see also id.* ("We recognize that [this] gap in the Sherman Act allows oligopolies to slip past its prohibitions, . . . but filling that gap is the concern of Congress, not the judiciary." (citation omitted)); *Terminalift*, 2013 WL 2154793, at *3–4 ("The very phrase 'shared monopoly' is paradoxical[.]" (quoting *Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 926 F. Supp. 2d 36, 46 (D.D.C. 2013))).  Because Plaintiffs fail to plead such facts, the Court concludes that they fail to allege the requisite market power.

### c.   Conclusion

Although Plaintiffs successfully allege that neither the statutory nor the non-statutory labor exemptions apply to Defendants' conduct, Plaintiffs fail to allege antitrust standing or that Defendants possess a sufficiently substantial market share.  Accordingly,

the Court **GRANTS** the Trades Council Motion and **DISMISSES WITHOUT PREJUDICE** Plaintiffs' second and third causes of action under Section 2 of the Sherman Act.

### C.    Fourth and Fifth Causes of Action: RICO

To allege a civil RICO claim, Plaintiffs must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to [Plaintiffs'] business or property." *United Bd. of Carpenters & Joiners of Am. v. Bldg. & Const. Trades Dep't, AFL-CIO*, 770 F.3d 834, 838 (9th Cir. 2014).  Defendants challenge the sufficiency of Plaintiffs' Second Amended Complaint as to each element, as well as Plaintiffs' standing.  (*See generally* Trades Council Mot. at 7–23.)  Because the Court concludes that Plaintiffs fail adequately to allege standing, the Court **DISMISSES** Plaintiffs' RICO causes of action without reaching the individual elements of Plaintiffs' RICO claims.

To recover under RICO, a plaintiff must be able to show that he or she was "injured in his business or property by reason of" the predicate offense.  *See* 18 U.S.C. § 1964(c); *see also Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010) (plurality opinion).  Consequently, "[t]o allege civil RICO standing . . . , a plaintiff must show: (1) that his alleged harm qualifies as injury to his business or property; and (2) that his harm was caused by reason of the RICO violation." *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co.*, 943 F.3d 1243, 1248 (9th Cir. 2019) (internal quotation marks omitted) (quoting *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008)).  The second element of this test requires the plaintiff to plead that "a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'" *Hemi*, 559 U.S. at 9 (quoting *Holmes v. Secs. Inv. Protection Corp.*, 503 U.S. 258, 268 (1992)).  The Supreme Court explicitly has rejected proximate cause based on foreseeability.  *See id.* at 12.  Instead, "[p]roximate cause for RICO purposes . . . requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* at 9 (quoting *Holmes*, 503 U.S. at 268).  "A link that is

'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Id.* (alteration in original) (quoting *Holmes*, 503 U.S. at 271, 274).

Broadly speaking, Plaintiffs allege that they have sustained lost profits and attorneys' fees as a result of Defendants' predicate acts. (*See* SAC ¶ 334.)  Defendants contend that these injuries are not compensable injuries for purposes of RICO and/or that the link between their alleged conduct and these injuries is not sufficiently direct to establish standing under RICO. (*See* Trades Council Mem. at 19–23.)

### 1.  *Lost Profits from the Joint Venture with SeaWorld*

Plaintiffs first claim to have "lost profits in excess of $100 million in connection with the opportunity to build a SeaWorld branded hotel." (*See* SAC ¶ 334.)  Defendants argue that "Plaintiffs' financial loss was directly caused by *SeaWorld's* decision to terminate its Joint Venture, and that Defendants' alleged threats were not the proximate cause of Plaintiffs' alleged injury." (*See* Trades Council Mem. at 20 (emphasis in original).)  Plaintiffs urge that "Defendants' actions caused SeaWorld to terminate the joint venture" and that this case "is nothing like *Pillsbury*[*, Madison & Sutro v. Lerner*, 31 F.3d 924 (9th Cir. 1994)] or *Hemi*." (*See* Opp'n to Trades Council Mot. at 22; *see also id.* at 20–22.)

Plaintiffs' attempts to distinguish *Pillsbury* and *Hemi* are unavailing.  In *Hemi*, for example, the City of New York filed a RICO action against an out-of-state, online vendor of cigarettes for failing to submit customer information to the State of New York so that the City could collect cigarette taxes.  *See* 559 U.S. at 4.  Although the district court dismissed the RICO claim without addressing the City's standing, the Second Circuit reversed and concluded that the City's loss of tax revenue "came about 'by reason of' the predicate mail and wire frauds."  *Id.* at 7–8.  The Supreme Court reversed, concluding that "[t]he City's injuries . . . were not caused directly by the alleged fraud."  *Id.* at 17–18.  The Court reasoned that foreseeability was not enough, *see id.* at 12, and that "the conduct directly responsible for the City's harm was the customers' failure to pay their taxes," whereas "the conduct constituting the alleged fraud was [the vendor]'s failure to

file [necessary tax-related] reports." *See id.* at 11.   Accordingly, "the conduct directly causing the harm was distinct from the conduct giving rise to the fraud." *See id.* (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006)).   Further, "[t]he State . . . is better situated than the City to seek recovery from [the vendor]" and "has an incentive to sue" because it imposed its own tax on cigarettes that was "nearly double what the City charges." *See id.* at 11–12.

Similarly, the Ninth Circuit in *Pillsbury* concluded that dismissal was proper based on the plaintiff's "failure to meet the proximate cause requirement imposed for civil RICO actions." *See* 31 F.3d at 926–27 (citing *Holmes*, 503 U.S. 258; *Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1311–12 (9th Cir. 1992), *abrogated by Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc)).   In *Pillsbury*, the plaintiff sublet about fifty percent of a building's office space from the master tenant of the property. *Id.* at 927. The plaintiff alleged a scheme by former owners to inflate the value of the property—and the rents that could be charged—as part of a money-laundering and fraud enterprise. *See id.* at 926–27.   Unable to reach an agreement, the master tenant and new owner arbitrated the revised rent under the lease. *See id.* at 927.   After the plaintiff was informed of its new rent under the arbitrated sublease, it filed a RICO action, which the district court dismissed for failure to allege proximate cause. *See id.*   The Ninth Circuit affirmed, *see id.* at 931, concluding that, "in this case, the direct harm runs to . . . the master tenant." *See id.* at 928–29.   The plaintiff, on the other hand, "is not directly injured by the alleged sham sales of the building and the arbitration," but rather by the master tenant's "attempt to pass on a portion of the rent increase." *See id.* at 929.   "[T]he failure to adequately demonstrate that [a concrete financial] loss resulted *directly* from the wrongful conduct of the defendants means [the plaintiff's] loss is too remote to be actionable under RICO." *Id.* (emphasis in original) (citing *Holmes*, 506 U.S. at 267–76; *Imagineering*, 976 F.2d at 1311–12).   Further, as in *Holmes*, the directly injured master tenant had an incentive to sue the defendants itself. *Id.* at 930–31.

/ / /

As in *Hemi* and *Pillsbury*, Plaintiffs' expected losses stemming from the SeaWorld Joint Venture did not result directly from Defendants' alleged conduct.   Rather, Defendants threatened *SeaWorld* with opposition to its future attractions and a negative publicity campaign.  (*See, e.g.*, SAC ¶ 204.)  After months of deliberation and weighing its options, (*see, e.g.*, *id.* ¶¶ 206–12), SeaWorld decided to dissolve the Joint Venture and pay Plaintiffs over $2.8 million in termination fees.   (*See, e.g.*, *id.* ¶¶ 205, 212.) Accordingly, as in *Hemi* and *Pillsbury*, the conduct giving rise to the harm—SeaWorld's termination of the Joint Venture—was distinct from the predicate offense—the allegedly extortionate threats.  Also as in *Hemi* and *Pillsbury*, SeaWorld has an incentive to sue Defendants not only for its lost profits, but also for the termination fees it paid to Plaintiffs.   Accordingly, the Court concludes that Plaintiffs fail to allege proximate causation as to their claimed damages from the termination of the Joint Venture with SeaWorld.

## 2.   *Losses from Delayed Approval of the Bahia Redevelopment*

Plaintiffs also claim to have been injured in the form of "lost profits due to the delay in operating the redeveloped Bahia."  (*See* SAC ¶ 334.)  Defendants urge that any losses incurred from delays in operating the redeveloped Bahia are "far too speculative to establish RICO standing" because "there has never been any *guarantee* that the Bahia redevelopment would be approved, much less within a *specific timeframe*."  (*See* Trades Council Mem. at 21–22 (emphasis in original) (citing *Anza*, 547 U.S. at 459–60; *Canyon Cty.*, 519 F.3d at 983).)  Further, proximate cause is lacking because "*Defendants* are not responsible for approving or denying the Bahia redevelopment, so any 'delay' could only have been caused by *third parties* (the City Council) and could have been due to any number of factors, including an intervening election that changed the composition of the City Council."  (*See id.* at 22 (emphasis in original) (citing *Anza*, 547 U.S. at 459; *Hemi*, 559 U.S. at 11).)  Plaintiffs respond that its "injuries were 'a foreseeable and natural consequence of [Defendants'] scheme.'"  (*See* Opp'n to Trades Council Mot. at 23 / / /

1  (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008)) (citing
2  *Painters & Allied Trades*, 943 F.3d at 1257).)

3          The Court begins by addressing the sufficiency of Plaintiffs' allegations.
4  Generally speaking, Plaintiffs allege that Defendants opposed the lease amendment at the
5  City Council to delay its approval, (*see, e.g.*, SAC ¶¶ 50, 173–76, 235, 239, 241, 314),
6  and that Defendants met illegally with (or even bribed) a majority of Councilmembers in
7  violation of the Brown Act to secure the City Council's opposition.  (*See, e.g., id.*
8  ¶¶ 57–58, 314.)   Plaintiffs, however, fail sufficiently to allege either a delay or that any
9  delay was caused—let alone directly—by Defendants' alleged conduct.  (*See* Trades
10 Council Mem. at 21–22.)  Aside from conclusorily alleging that the docketing of the
11 Bahia redevelopment was "delayed," Plaintiffs allege no facts supporting that allegation.
12 For example, while Plaintiffs allege that, "[t]ypically, once the Planning Commission
13 recommends that the City Council approve a project, it would be docketed for a hearing
14 before the City Council within 30 days," (*see* SAC ¶ 105), Plaintiffs fail to allege that the
15 Planning Commission made such a recommendation regarding the approval of the Bahia
16 redevelopment.  (*See generally id.*)  Indeed, as Defendants' note, (*see* Trades Council
17 Mem. at 21–22), Plaintiffs requested City Council approval of the Bahia lease
18 amendment beginning in November 2015, (*see* SAC ¶ 171), over two years before
19 Defendants began opposing the project in February 2018.  (*See id.* ¶ 173.)  Because
20 Plaintiffs fail to include allegations regarding the anticipated procedure and timeline for
21 the City Council to docket and vote on projects such as the Bahia redevelopment, the
22 Court need not accept Plaintiffs' conclusory allegations that approval of the Bahia
23 redevelopment was delayed.  *See In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th
24 Cir. 2008) ("The court need not . . . accept as true allegations . . . that are merely
25 conclusory." (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.
26 2001), *amended on other grounds*, 275 F.3d 1187 (9th Cir. 2001))).

27         Plaintiffs' allegations also fail to support the inference that Defendants illegally
28 secured the opposition of a majority of Councilmembers.  (*See* Trades Council Mem. at

47

15–17.)  For example, Plaintiffs allege that Councilmember I's withdrawal of support for the Bahia redevelopment after meeting with Ms. Brown "provide grounds to reasonably infer that the Councilperson made a quid pro quo agreement with the Defendants." (*See* SAC ¶ 329, 354.)    Plaintiffs' allegations, however, reveal that Councilmember I originally opposed the Bahia redevelopment, (*see id.* ¶ 177); was persuaded to support the project following a private meeting with Plaintiffs' Executive Chairwoman, (*see id.* ¶¶ 178–79); and again withdrew her support following a private lunch with Ms. Browning.    (*See id.* ¶¶ 180–83.)    The inference that Defendants bribed Councilmember I simply because she changed her mind after meeting with them is speculative, and Plaintiffs therefore "have not nudged their claims across the line from conceivable to plausible."  *See Twombly*, 550 U.S. at 570; *see also, e.g.*, *Cobb v. JPMorgan Chase Bank, N.A.*, No. 13-cv-01955-JSW, 2013 WL 6201414, at *13 (N.D. Cal. Nov. 27, 2013) (concluding that the plaintiff failed to plead plausible predicate act of bribery based on his "conclusory and speculative" "allegation that [a commissioner] was 'entirely compromised pursuant to bribery . . . by virtue of her continuance decisions'").

Plaintiffs further allege that "City Councilmember I's actions also are consistent with Mr. Lemmon's repeated claim that he 'own[s] five City Councilmembers,' and also with Defendants' relationship with City Councilmember II." (*See id.* ¶ 329, 354.)  But Plaintiffs allege that Mr. Lemmon's claim that he "own[s] five City Councilmembers" was based on (allegedly illegal) lobbying, (*see id.* ¶ 62 ("The only plausible way that Lemmon could 'own[] five city councilmembers' is by communicating opposition to projects through private meetings and communications in advance of a vote." (alteration in original))), and that Councilmember II's staff relayed that "Ms. Browning and Councilmember II are 'best friends' and that Ms. Browning had been 'very good' to Councilmember II, and has helped Councilmember II out on many occasions." (*See id.* ¶ 189.)  Plaintiffs' allegations concerning Defendants' lobbying and Ms. Browning's personal friendship with a single Councilmember do give rise to a plausible inference that Defendants illegally secured the vote of four additional Councilmembers.  In light of

these pleading deficiencies, the Court concludes that Plaintiffs fail to allege RICO standing for any damages incurred as a result of the purported delayed approval of the Bahia redevelopment.

Even if Plaintiffs had plausibly alleged that Defendants were responsible for the City Council's delayed approval of the Bahia redevelopment, however, it is not clear whether Plaintiffs can allege that Defendants' conduct was a sufficiently direct cause of Plaintiffs' alleged injury for purposes of proximate causation.  Ultimately, it was the City Council that failed to docket the Bahia redevelopment, thereby giving rise to Plaintiffs' claimed lost profits.  (*See, e.g.*, SAC ¶¶ 324, 328.)  The Parties dispute whether the actions of the Councilmembers defeat proximate causation here.  (*Compare* Trades Council Mem. at 22; *and* Trades Council Reply at 9, *with* Opp'n to Trades Council Mot. at 22–23.)  Given Plaintiffs' alleged facts, the law on this point is unclear and inadequately addressed by either side.  On the one hand, as Plaintiffs obliquely recognize, (*see* Opp'n to Trades Council Mot. at 22–23), some authorities from the Supreme Court and Ninth Circuit appear to support that where, as here, an integral intermediary did not suffer a financial injury as a result of the defendant's alleged predicate acts, the plaintiff's injury may still be sufficiently direct for purposes of RICO proximate causation.  *See, e.g.*, *Bridge*, 553 U.S. at 657–58; *Painters & Allied Trades*, 943 F.3d at 1257.[14]  On the other hand, as argued by Defendants, (*see* Trades Council Mem. at 21–22), the proximate causation inquiry is further complicated in this case by the presence of additional factors, such as the economy, consumer preferences, etc., that further attenuate the directness of Plaintiffs' alleged injury.  *See, e.g.*, *Anza*, 547 U.S. at 459–60; *Club One Casino, Inc. v. Perry*, 837 Fed. App'x 459, 461–62 (9th Cir. 2020); *Phan v. Best Foods Int'l Inc.*, No. C

---

[14] Although Plaintiffs rely on *Painters and Allied Trades*, (*see* Opp'n to Trades Council Mot. at 23), the Ninth Circuit expressly limited its decision to civil RICO actions brought by patients and health insurance companies against pharmaceutical companies, *see* 943 F.3d at 1246, 1252–53, 1257–59, and was influenced by the policy concern that "drug manufacturers would be insulated from liability . . . , as they could continuously hide behind prescribing physicians and pharmacy benefit managers."  *See id.* at 1257–58.  Accordingly, *Painters and Allied Trades*, unlike *Bridge*, is not controlling here.

14-0888 RS, 2014 WL 1677526, at *6 (N.D. Cal. Apr. 28, 2014); *Dalidio Family Tr. v. San Luis Obispo Downtown Ass'n*, No. CV-07-6446 CAS (CWx), 2008 WL 11335134, at *10 (C.D. Cal. Mar. 25, 2008); *Sheperd v. Am. Honda Motor Co.*, 822 F. Supp. 625, 630–31 (N.D. Cal. 1993).  Should Plaintiffs choose to amend their complaint and should Defendants again move to dismiss, the Parties must address the intersection of these proximate causation issues.

### 3.    *"Legal Fees and Other Costs"*

Finally, Plaintiffs allege that they "suffered . . . legal fees and other costs incurred because of, and in response to, Defendants' extortionate conduct, including the costs associated with responding to Defendants' baseless objections to the Bahia redevelopment."  (*See* SAC ¶ 334.)  Defendants contend that "the Ninth Circuit has specifically declined to recognize legal fees as RICO injuries," (*see* Trades Council Mem. at 22–23 (citing *Thomas v. Baca*, 308 Fed. App'x 87, 88 (9th Cir. 2009); *Ogden v. Wells Fargo Bank, N.A.*, No. CV 14-3579 DMG (SH), 2015 WL 13413390, at *2 (C.D. Cal. Feb. 20, 2015))), and, in any event, that any fees and costs Plaintiffs incurred "were caused by Plaintiffs' *own decision* to spend money *affirmatively lobbying* the City Council." (*See id.* at 23 (emphasis in original) (citing *Herzer v. Redstone*, No. 17-CV-7545 PSG (KSx), 2018 WL 5094933, at *6 (C.D. Cal. July 10, 2018); *Holloway v. Clackamas River Water*, No. 3:13-cv-01787-AC, 2014 WL 6998069, at *9 (D. Or. Sept. 9, 2014), *report and recommendation adopted*, 2014 WL 6998084 (D. Or. Dec. 9, 2014)).)  Plaintiffs counter that standing may be premised on the "necessary legal fees to respond to Defendants' frivolous objections to the Bahia redevelopment."  (*See* Opp'n to Trades Council Mot. at 23 (citing *In re Outlaw Lab., LP Litig.*, No. 18-cv-840-GPC-BGS, 2020 WL 1953584, at *13 (S.D. Cal. Apr. 23, 2020); *Lauter v. Anoufrieva*, 642 F. Supp. 2d 1060, 1085 n.33 (C.D. Cal. 2009); *Burger v. Kuimelis*, 325 F. Supp. 2d 1026, 1035–36 (N.D. Cal. 2004)).

The only Ninth Circuit decision to address this issue concluded that "[n]one of plaintiffs' alleged injuries satisfies the RICO standing requirement" because "[t]his court

has not recognized the incurment of legal fees as an injury cognizable under RICO, and we decline to do so here." *See Thomas*, 308 Fed. App'x at 88.  Although unpublished and therefore not precedential, *see* 9th Cir. R. 36-3(a), the Court finds the Ninth Circuit's only guidance on the issue persuasive.  Plaintiffs' cases, on the other hand, apply out-of-Circuit authorities in determining that attorneys' fees are compensable under RICO.  *See, e.g.*, *In re Outlaw*, 2020 WL 1953584, at *9 (relying on decisions from the Second and Eighth Circuits); *Lauter*, 642 F. Supp. 2d at 1084–85 & n. 33 (relying on *Burger* and decisions from the Seventh and Eighth Circuits); *Burger*, 325 F. Supp. 2d at 1035 (relying on decision from the Second and Eighth Circuits).  The Court therefore concludes that Plaintiffs' attorneys' fees are not a compensable injury.  *See, e.g.*, *City of Almaty v. Khrapunov*, 956 F.3d 1129, 1132–33 (9th Cir. 2020) (concluding that money expended to trace funds stolen through money laundering scheme was not compensable under RICO because "there is no state law indicating that voluntary expenditures to track down stolen property constitutes a separate injury to property").

Even if Plaintiffs' attorneys' fees were compensable under RICO, however, the Court would conclude that Plaintiffs fail to plead proximate causation.  *See id.* at 1133 (concluding that the plaintiff "fail[ed] to satisfy the proximate cause inquiry" because the "[p]laintiff has not shown that it was forced to spend its money" in response to the defendants' money laundering).  Further, Plaintiffs' cases are distinguishable.  *See In re Outlaw*, 2020 WL 1953584, at *9–10 (concluding that the counterclaimants' attorneys' fees were proximately caused by the alleged RICO scheme because "the collection of settlements was central to the Enterprise's scheme" and, consequently, the alleged predicate acts caused the counterclaimants to incur attorneys' fees); *Lauter*, 642 F. Supp. 2d at 1084–85 & n.33 (concluding—without addressing *Holmes*—that, at the pleading stage, the plaintiff adequately alleged proximate causation for attorneys' fees incurred in response to a prosecution initiated by the defendants' false reports, but cautioning that the presumption that the prosecutor's decision to file the criminal complaint constitutes an intervening event would apply at summary judgment); *Burger*, 325 F. Supp. 2d at 1036

(concluding that the plaintiff failed adequately to plead damages but concluding that dismissal should be with leave to amend because the counterclaimant's "injuries . . . were solely the result of counterdefendants' actions").  Consequently, Plaintiffs fail to allege that they were forced to incur attorneys' fees as a direct result of Defendants' lobbying activity.

### 4.    Conclusion

Accordingly, the Court concludes that Plaintiffs fail sufficiently to allege proximate causation and, accordingly, RICO standing, as to any of their claimed injuries. The Court therefore **GRANTS** the Trades Council Motion and **DISMISSES WITHOUT PREJUDICE** Plaintiffs' fourth and fifth causes of action under RICO.

### D.    State Law Causes of Action

Defendants urge that Plaintiffs' state law claims must be dismissed as preempted by Section 303 of the LMRA, (*see* Local 30 Mem. at 24–25), or for failure to state a claim pursuant to Rule 12(b)(6), (*see* Trades Council Mem. at 23–25), or that the claims should be stricken under California's anti-SLAPP statute.  (*See generally* Anti-SLAPP Mem.)  The Court addresses each argument in turn.

### 1.    Preemption

The Court concludes that dismissal of Plaintiffs' state law claims is warranted because they are preempted by Section 303 of the LMRA.  (*See* Local 30 Mem. at 24–25.)  The Supreme Court has recognized that "state law has been displaced by § 303 in private damage actions based on peaceful union secondary activities." *Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton*, 377 U.S. 252, 261 (1964). Preemption is likely when the plaintiffs bring "economic causes of action," *see Real Prop. Tr. v. United Broth. of Carpenters & Joiners of Am.*, 768 F.3d 938, 959–60 (9th Cir. 2014), that are "fundamentally, a labor case in the guise of" state law causes of action, *see id.* at 960, and do not allege union violence. *See id.* at 955–56, 958–59, 961; *see also Morton*, 377 U.S. at 257.  Applying *Morton*, the Ninth Circuit has found that "interference with prospective economic advantage and contractual rights claims are

preempted by section 303 of the LMRA." *San Antonio Comm. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1235 (9th Cir. 1997) (citing *Morton*, 377 U.S. 252, 260–61).

Here, Plaintiffs do not allege that Defendants engaged in any violence, (*see generally* SAC), and Plaintiffs seek economic damages in the form of "lost profits . . . [and] legal fees and other costs." (*See id.* ¶¶ 366, 374, 377.)  Further, despite Plaintiffs' attempt to plead their state laws claims "in the alternative to [their] First Claim for Relief for Secondary Boycott," (*see id.* ¶ 360), the state law claims are based on the same threats that formed the basis for Plaintiffs' first cause of action under Section 303 of the LMRA. (*Compare, e.g., id.* ¶¶ 254–56, 266, 269, *with id.* ¶¶ 363, 371–72, 377.)  Because Plaintiffs' state law claims repackage the underlying labor dispute between them and Defendants and do not contain allegations of violence, they are preempted by Section 303 of the LMRA.  The Court therefore **GRANTS** the Local 30 Motion and **DISMISSES WITHOUT PREJUDICE** Plaintiffs' state law causes of action as preempted.

### 3. Failure to State a Claim

Even if the state law causes of action were not preempted under Section 303, Defendants contend that Plaintiffs fail to state a claim as to any of those claims under Rule 12(b)(6). (*See* Trades Council Mem. at 23–25.)  The Court agrees.

#### a. Sixth Cause of Action: Interference with Contract

To state a claim for intentional interference with a contract, Plaintiffs must allege: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas & Elec. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).  Defendants contend that Plaintiffs fail to allege the second, third, and fifth elements. (*See* Trades Council Mem. at 23–24.)

The Court agrees that Plaintiffs fail to allege Defendants' knowledge of the contract between Plaintiffs and SeaWorld.  Although Plaintiffs allege that "Defendants

knew of the Joint Venture between Evans Hotels and SeaWorld," (SAC ¶ 362), the underlying factual allegations do not support Defendants' knowledge of a legally enforceable *contract* regarding the Joint Venture.   Rather, Plaintiffs allege that they signed a letter of intent with SeaWorld on April 21, 2015, and a Preliminary Project Agreement on November 4, 2015.  (*See id.* ¶ 194.)   Although Plaintiffs and SeaWorld "issued a press release . . . announcing their intention to develop the hotel next to the theme park" on November 9, 2015, (*see id.*), they did not sign the Limited Liability Company Agreement concerning the Joint Venture until January 22, 2018.   (*See id.* ¶ 195.)   Plaintiffs further allege that, "on February 23, 2018, Rick Bates, a Local 30 Research Analyst, submitted a Public Records Act request to the City of San Diego seeking information 'regarding the SeaWorld Hotel or any lease amendment related to the SeaWorld Hotel.'"   (*See id.* ¶ 201.)   While Plaintiffs sufficiently allege Defendants' knowledge of Plaintiffs' and SeaWorld's intention to build a hotel, they fail to allege that Defendants knew of a contractual relationship between them, as is necessary to state a claim for contractual interference.

Defendants counter that it is "absurd" to "believe that parties would agree to develop a 300-room hotel and announce it publicly to the media without a contract." (Opp'n to Trades Council Mot. at 24.)   But the announcement of an "intention" to build a hotel in 2015, (*see* SAC ¶ 194), does not equate to knowledge of an enforceable contract to build a hotel "[a]fter years of further negotiation and collaboration" in 2018.   (*See id.* ¶ 195; Trades Council Reply at 10; *see also Jenni Rivera Enters., LLC v. Latin World Entm't Holdings, Inc.*, 36 Cal. App. 5th 766, 783 (2019) ("Comment i to Restatement . . . Second of Torts, section 766, . . . states:  To be subject to liability [for inducing a breach of contract], the actor must have knowledge of the contract with which he is interfering and of the fact he is interfering with the performance of the contract." (second and third alterations in original) (quoting *Littler v. Amber Hotel Co.*, 202 Cal. App. 4th 280, 302 (2011)) (citing *I-CA Enters., Inc. v. Palram Ams., Inc.*, 235 Cal. App. 4th 257, 290

/ / /

(2015)).)   The Court therefore concludes that Plaintiffs fail to state a claim for interference with contractual relations.

b.   Seventh Cause of Action: Attempted Extortion

Plaintiffs' seventh cause of action for attempted extortion is alleged under California Penal Code § 524.  (*See* SAC ¶ 368.)  Defendants contend that this is a criminal statute that provides no private cause of action, (*see* Trades Council Mot. at 24 (citing *Xie v. Oakland Unified Sch. Dist.*, No. C 12-02950 CRB, 2012 WL 5869707, at *5–6 (N.D. Cal. Nov. 19, 2012); *Thomas v. Denny's Rest.*, No. 1:15-cv-01113-DAD-SKO, 2015 WL 9583029, at *2 & n.4 (E.D. Cal. Dec. 31, 2015))), and that Plaintiffs fail to state a claim.

The Court agrees that there is no private cause of action under Section 524. Plaintiffs cite to cases interpreting separate provisions of the California Penal Code, Sections 518 and 523,[15] as giving rise to a private cause of action.  (*See* Opp'n to Trades Council Mot. at 24–25 (citing *Calicraft Distribs., LLC v. Castro*, No. CV 15-01041 BRO (AJW), 2015 WL 1789014, at *3 n.3 (C.D. Cal. Apr. 17, 2015); *Monex Deposit Co. v. Gilliam*, 666 F. Supp. 2d 1135, 1137 (C.D. Cal. 2009)).)  The California Court of Appeal has recognized that a plaintiff may bring a civil action, "[h]owever denominated (e.g., extortion, menace, duress) . . . for the recovery of money obtained by . . . wrongful threat" so long as the plaintiff has "actually paid the money demanded from defendants." *See Fuhrman v. Cal. Satellite Sys.*, 179 Cal. App. 3d 408, 425–28 (1986), *disapproved of on other grounds by Silberg v. Anderson*, 50 Cal. 3d 205 (1990).  Accordingly, in addition to claims under Section 518 in which the plaintiff has paid money to defendants, federal courts have allowed private causes of action under Section 523 because the enumerated actions are "punishable . . . as if such property or other consideration were actually obtained by means of" the alleged conduct.  *See Monex*, 666 F. Supp. 2d at

---

[15] Section 518 defines extortion generally, *see* Cal. Pen. Code § 518(a), and Section 523 discusses extortion in the specific context of "threatening letters" and "ransomware."  *See* Cal. Pen. Code §§ 523(a), (b)(1).

18-CV-2763 TWR (AHG)

1136–37. But the reasoning of these authorities does not apply to Plaintiffs' seventh cause of action: Plaintiffs do not allege that they paid any money to Defendants, and Section 524—unlike Section 523—does not apply even when the Defendants fail to obtain the consideration they sought. Accordingly, the Court concludes that there exists to private cause of action under Section 524.

The Court also concludes that Plaintiffs fail to state a claim under Section 524, which defines attempted extortion as an "attempt[], by means of threat, such as is specified in Section 519 of this code, to extort property or other consideration from another." Cal. Pen. Code § 524. "The elements of attempted extortion are '(1) a specific intent to commit extortion and (2) a direct ineffectual act done towards its commission." *People v. Umana*, 138 Cal. App. 4th 625, 638–39 (2006) (quoting *People v. Sales*, 116 Cal. App. 4th 741, 749 (2004)). "Extortion is the obtaining of property from another, with his consent, . . . induced by wrongful use of force or fear." *Id.* (quoting Cal. Pen. Code § 518). "Fear, such as will constitute extortion, may be induced by a threat . . . [t]o do an unlawful injury to the person or property of the individual threatened or of a third person." Cal. Pen. Code § 519(1). Defendants contend that Plaintiffs fail to allege (1) an unlawful injury, (2) that Defendants sought to obtain property from Plaintiffs, or (3) Defendants' specific intent. (*See* Trades Council Mem. at 25.)

Plaintiffs allege that Defendants sought to obtain the following "property" from them through a PLA and card check neutrality agreement:

> (i) money in the form of per capita payments, union dues, union fees, and other payments, such as contributions to union pension and health plans; (ii) developers' rights to have a vote for unionization carried out by secret ballot; (iii) the right to determine and pay specific wages, benefits, and union dues deducted from employee compensation; (iv) proprietary personnel information (i.e., employee contact lists) without having to obtain signed authorization cards from 30% of the employee unit and successfully petition the NLRB for an election; and (v) free access and use of the employer's premises for soliciting employees and holding captive audience speeches on working time.

(*See* SAC ¶ 369.)  But "these . . . theories are all based on wholesale speculation as to the (hypothetical) terms of a (hypothetical) card check agreement or PLA."  (*See* Trades Council Mem. at 12.)  As Plaintiffs acknowledge elsewhere in their Second Amended Complaint, Defendants sought Plaintiffs' "capitulat[ion] to Defendants' demands for a PLA and card check neutrality agreement."  (*See, e.g.*, SAC ¶¶ 372–73.)  The relevant question, therefore, is whether the PLA and card check neutrality agreements Defendants sought qualify as "property" under California's extortion statutes.

For purposes of the California Penal Code, "property" is defined to "include[] both real and personal property."  Cal. Pen. Code § 7(10).  In turn, "'personal property' include[s] money, goods, chattels, things in action, and evidence of debt."  Cal. Pen. Code § 7(12).  California courts have determined that "property" implies "the exclusive right to use or possess a thing or the exclusive ownership of a thing."  *See, e.g.*, *People v. Kozlowski*, 96 Cal. App. 4th 853, 866 (2002) (citing *People v. Kwok*, 63 Cal. App. 4th 1236, 1250–51 (1998); *People v. Sadowski*, 155 Cal. App. 3d 332, 335 (1984); Cal. Civ. Code § 654).  "The term is all-encompassing, including every intangible benefit and prerogative susceptible of possession or disposition."  *See id.* (citing *Kwok*, 63 Cal. App. 4th at 1251).  Despite the broad definition of "property," the Court concludes that Plaintiffs fail sufficiently to allege that the agreements Defendants sought—particularly given the speculation concerning their terms—qualify.  *See, e.g.*, *Prime Healthcare Servs, Inc. v. Servs. Emps. Int'l Union*, 147 F. Supp. 3d 1094, 1107 (S.D. Cal. 2015) (concluding that allegations that defendants attempting to procure labor contracts from employer would obtain "money that would be paid under the alleged unlawful agreements or paid if [the employer]'s employees choose [the union] to represent them" were "insufficient to show extortion"); *Magic Laundry Servs., Inc. v. Workers United Serv. Emp.'s Int'l Union*, No. CV-12-9654-MWF (AJWx), 2013 WL 1409530, at *7–8 (Apr. 8, 2013) (concluding that the plaintiff did "not sufficiently allege that [the union d]efendants obtained or attempted to obtain a property right" because the plaintiff "at

/ / /

most alleges that it faced a choice (whether or not to unionize its workforce) and that [the union d]efendants exerted coercive pressure to force its hand in that decision").

Further, although Plaintiffs generally allege that "Defendants intended by their actions to commit extortion," (*see* SAC ¶ 369), the Second Amended Complaint as a whole alleges that Defendants' threats were made to obtain PLAs and card check neutrality agreements.  (*See, e.g.*, *id.* ¶¶ 56, 129, 226, 260, 340 (alleging that Defendants engaged in extortionate acts "with the purpose of obtaining involuntary PLAs and card check neutrality agreements").)  Plaintiffs also allege that Defendants had a "specific intent" to "destroy competition."   (*See, e.g.*, *id.* ¶¶ 276–77, 283–85, 300–01.) Consequently, Plaintiffs' conclusory allegations, which are contradicted by other allegations in the Second Amended Complaint, do not suffice to establish Defendants' intent to commit extortion.  *See, e.g.*, *Himes v. Gastelo*, No. 2:18-cv-00327-PSG (MAA), 2020 WL 2089162, at *9 (C.D. Cal. Mar. 9, 2020) (dismissing First Amendment access-to-court claim where allegations of intent were conclusory and "contradict[ed] other allegations in the" complaint); *Pac. Asian Enters., Inc. v. Siemens Energy & Automation, Inc.*, No. SA CV 08-106 AHS (ANx), 2009 WL 10698207, at *2 (C.D. Cal. July 1, 2009) (dismissing fraud claim where "[p]laintiff's conclusory allegations of defendant's intent are insufficient and contradicted by allegations demonstrating that defendants intended to perform"); *Wuxi Multimedia, Ltd. v. Koninklijke Philips Elecs., N.V.*, No. 04cv1136 DMS (BLM), 2006 WL 6667002, at *9 (S.D. Cal. Jan. 5, 2006) (dismissing Sherman Act claim where allegations of specific intent to monopolize failed to "raise a reasonable inference of specific intent" and were contradicted by other allegations); *Stewart v. Wachowski*, No. CV 03-2873 MMM, 2004 WL 2980783, at *6 (C.D. Cal. Sept. 28, 2004) (dismissing RICO claims where the plaintiff's allegations regarding specific intent were conclusory).

Because there is no private cause of action under California's attempted extortion statute and because Plaintiffs fail to allege necessary elements, including that Defendants sought to obtain property from Plaintiffs and had a specific intent to extort, the Court concludes that Plaintiffs fail to state a claim for attempted extortion.

c.      Eighth Cause of Action: Unlawful Business Practice

Finally, Plaintiffs allege a cause of action for unlawful business practices premised on Defendants' alleged violation of Section 524.  Because Plaintiffs have failed to state a claim for the underlying offense, *see supra* Section II.D.3.b, Plaintiffs cannot state a claim under the UCL's unlawful prong.[16]  *See, e.g.*, *Vargas v. JP Morgan Chase Bank, N.A.*, 30 F. Supp. 3d 945, 952–53 (C.D. Cal. 2014) (citing *Herrejon v. Ocwen Loan Serv'g, LLC*, 980 F. Supp. 2d 1186, 1186 (E.D. Cal. 2013); *Krantz v. BT Visual Images, LLC*, 89 Cal. App. 4th 164, 178 (2001)).

d.      Conclusion

For these reasons, the Court concludes that Plaintiffs fail to state a claim for any of their state law causes of action under Rule 12(b)(6).  The Court therefore **GRANTS** the Trades Council Motion and **DISMISSES WITHOUT PREJUDICE** Plaintiffs' sixth through eighth causes of action.

4.      *Anti-SLAPP*

Finally, Defendants urge that "this Court should resolve Defendants' anti-SLAPP motions even if—as it should—the Court grants Defendants' motions to dismiss." (*See* Anti-SLAPP Mem. at 16.)  Specifically, Defendants contend that "[a]nti-SLAPP motions are *not* mooted by dismissal under Rule 12(b)(6), because the Court still must resolve the defendant's entitlement to attorneys' fees under California Code of Civil Procedure §425.16(c)(1).  (*Id.* (citing *Resolute Forest Prod., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1024 (N.D. Cal. 2017); *Robinson v. Alameda Cty.*, 875 F. Supp. 2d 1029, 1040,

/ / /

---

[16] To be clear, dismissal of Plaintiff's eighth cause of action for unlawful business practices is based solely on Plaintiffs' failure to plead the requisite elements under Section 524.  Although the Court also dismissed Plaintiffs' seventh cause of action under Section 524 because there is no private cause of action under that statute, "[i]t does not matter [for purposes of Plaintiffs' eighth cause of action] whether the underlying statute also provides for a private cause of action; section 17200 can form the basis for a private cause of action even if the predicate statute does not."  *See Chabner v. United Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000) (citing *Stop Youth Addition, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 562 (1998), *superseded by statute on other grounds as recognized in Arias v. Super. Ct.*, 46 Cal. 4th 969, 977–78 (2009)).

1  1046 (N.D. Cal. 2012); *Bhambra v. True*, No. C 09-4685 CRB2010 WL 1758895, *2

2  (N.D. Cal., Apr. 30, 2010)).)

3       The Court concludes that fees are not warranted here.  In contrast to Defendants'

4  cases, *see Resolute Forest Prod.*, 302 F. Supp. 3d at 1026 (separately addressing anti-

5  SLAPP motion on the merits); *Robinson*, 875 F. Supp. 2d at 1050 (dismissing defamation

6  claim with prejudice); *Bhambra*, 2010 WL 1758895, at *2 (granting attorneys' fees on

7  anti-SLAPP motion where "this Court has already dismissed [the plaintiff's] complaint

8  with prejudice), the Court has dismissed Plaintiffs' claims without prejudice and without

9  addressing the Anti-SLAPP Motion on the merits.  *See generally supra*.  Consequently,

10  Defendants are not "prevailing parties" for purposes of Section 425.16(c)(1)—or entitled

11  to attorneys' fees—at this time.  *See, e.g.*, *Garcia v. Allstate Ins.*, No. 1:12-cv-00609-

12  AWI-SKO, 2012 WL 4210113, at *14 (E.D. Cal. Sept. 18) ("Since Defendants' anti-

13  SLAPP motion is being considered in federal court, and since the Ninth Circuit requires

14  that Plaintiffs be given an opportunity to amend their complaint . . . , granting of

15  Defendant's motion is considered a 'technical' victory that does not warrant an award of

16  attorney's fees to Defendant as the prevailing party.") (citing *Verizon Del., Inc. v. Covad

17  Commc'ns Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004); *Brown v. Elecs. Acts, Inc.*, 722 F.

18  Supp. 2d 1148, 1156–57 (C.D. Cal. 2010)), *report and recommendation adopted*, 2012

19  WL 4982145 (E.D. Cal. Oct. 17, 2012); *Martin v. Inland Empire Utilities Agency*, 198

20  Cal. App. 4th 611, 633 (2011) ("[B]ecause the court's order granting defendants' anti-

21  SLAPP motion with leave to amend was the functional equivalent of a denial, defendants

22  were not 'prevailing parties' entitled to attorney fees").

23       Because the Court has dismissed Plaintiffs' claims without prejudice, the Court

24  **DENIES AS MOOT** Defendants' Anti-SLAPP Motion and **DENIES WITHOUT**

25  **PREJUDICE** Defendants' request for attorneys' fees.

26                                      **CONCLUSION**

27       In light of the foregoing, the Court (1) **GRANTS IN PART** the Local 30 Motion

28  (ECF No. 79), (2) **GRANTS IN PART** the Trades Council Motion (ECF No. 81), and

(3) **DENIES AS MOOT** the Anti-SLAPP Motion and **DENIES WITHOUT PREJUDICE** Defendants' request for attorneys' fees (ECF No. 80).  Specifically, the Court **DISMISSES WITHOUT PREJUDICE** all claims in Plaintiffs' Second Amended Complaint (ECF No. 76) except Plaintiffs' first cause of action for secondary boycott.

Although Plaintiffs have already had three attempts to plead their claims against Defendants, (*see* ECF Nos. 1, 19, 76), this is the first Order to address the sufficiency of Plaintiffs' individual causes of action on the merits.  (*Cf.* ECF No. 60 (addressing only *Noerr-Pennington*).)  The Court therefore concludes that Plaintiffs should be afforded one final opportunity to amend their complaint.  Accordingly, Plaintiffs **MAY FILE** an amended complaint addressing the above-identified deficiencies <u>within fourteen (14) days of the electronic docketing of this Order</u>.  *Should Plaintiffs elect not to file an amended complaint, this action will proceed as to Plaintiffs' sole surviving cause of action.*

**IT IS SO ORDERED.**

Dated:  August 26, 2021

Honorable Todd W. Robinson
United States District Court

18-CV-2763 TWR (AHG)