1  Richard G. McCracken, SBN 62058
2  Paul L. More, SBN 228589
   McCRACKEN, STEMERMAN & HOLSBERRY, LLP
3  595 Market Street, Suite 800
4  San Francisco, CA 94105
   Tel:    415-597-7200
5  Fax:    415-597-7201
6  Email:  rmccracken@msh.law
7          pmore@msh.law

8  *Attorneys for Defendants UNITE HERE Local 30 and Brigette Browning*

9  Stacey Monica Leyton, SBN 203827
   ALTSHULER BERZON LLP
10 177 Post Street, Suite 300
11 San Francisco, CA 94108
   Tel:    415-421-7151
12 Fax:    415-362-8064
13 Email:  sleyton@altshulerberzon.com

14 *Attorneys for Defendants Tom Lemmon and San Diego Building and*
15 *Construction Trades Council*

16 Steven Todd Coopersmith, SBN 18464
   Danielle L. Macedo, SBN 328873
17 THE COOPERSMITH LAW FIRM
18 555 W Beech St., Suite 230
   San Diego, CA 92101
19 Tel:    619-238-7360
20 Fax:    619-785-3357
   Email:  stc@stevecoopersmithlaw.com
21         dlm@stevecoopersmithlaw.com

22 *Attorneys for Defendant Tom Lemmon*

23 ///
24 ///
25 ///
26 ///
27 ///
28

---

MEMORANDUM OF POINTS AND AUTHORITIES          CASE NO. 18-cv-02763-TWR-AHG

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EVANS HOTELS, LLC, a California limited liability company; BH PARTNERSHIP LP, a California limited partnership; EHSW, LLC, a Delaware limited liability company, | CASE NO. 18-cv-02763-TWR-AHG |
| Plaintiffs, | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR RECONSIDERATION OF ORDER GRANTING IN PART, DENYING IN PART, MOTIONS TO DISMISS** |
| v. | |
| UNITE HERE LOCAL 30; BRIGETTE BROWNING, an individual; SAN DIEGO COUNTY BUILDING and CONSTRUCTION TRADES COUNCIL, AFL-CIO; TOM LEMMON, an individual; and DOES 1-10, | The Honorable Todd W. Robinson |
| | Date:  January 12, 2022 |
| | Time: 1:30 p.m. |
| | Courtroom: 3A |
| Defendants. | |
| | **NO ORAL ARGUMENT UNLESS REQUESTED BY COURT** |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND .....................................................................................................3

LEGAL STANDARD..............................................................................................6

ARGUMENT ..........................................................................................................6

I.    The Court Should Reconsider Its Conclusion that Local 30 Counsel's
     Letters to the City and Defendants' Alleged "Threats" to Oppose
     SeaWorld Attractions Are Not Protected by the Petition Clause...................6

     A.    Local 30's letters cannot be both objectively reasonable and a sham. .6

     B.    The Order improperly places the burden on Defendants
           to prove that their future petitioning would be "meritorious." ...........13

II.   The Court Should Reconsider Its Conclusion that Speech
     and Petitioning Can Violate Section 8(b)(4)(ii)(B) if
     They Threaten "Substantial Loss."................................................................17

III.  The Court Should Reconsider Its Conclusion that the
     SAC Pleads a Violation of Section 8(b)(4)(ii)(A).........................................21

IV.   The Court Should Reconsider Its Treatment of
     the Sherman Act's Non-Statutory Exemption................................................23

CONCLUSION .......................................................................................................25

MEMORANDUM OF POINTS AND AUTHORITIES          CASE NO. 18-cv-02763-TWR-AHG

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page(s)**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
  486 U.S. 492 (1988).............................................................................................11

*Allstate Ins. Co. v. Herron*,
  634 F.3d 1101 (9th Cir. 2011) ............................................................................6

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).......................................................................................3, 22

*Bldg. & Constr. Trades Council of Metro. Dist. v. Assoc. Builders &*
  *Contractors of Mass./R.I., Inc.*,
  507 U.S. 218 (1993)............................................................................................21

*Bodine Produce, Inc. v. United Farm Workers Org. Comm.*,
  494 F.2d 541 (9th Cir. 1974) ..............................................................................23

*Boone v. Redevelopment Agency of City of San Jose*, 841 F.2d 886, 894
  (9th Cir. 1988)......................................................................................................16

*Brown & Root, Inc. v. La. State AFL-CIO*,
  10 F.3d 316 (5th Cir. 1994) ..........................................................................15, 17

*Brown v. Pro Football, Inc.*,
  518 U.S. 231 (1996).............................................................................................24

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
  404 U.S. 508 (1972).............................................................................................16

*In re Century Aluminum Co. Sec. Litig.*,
  729 F.3d 1104 (9th Cir. 2013) ............................................................................22

*City of Columbia v. Omni Outdoor Advertising, Inc.*,
  499 U.S. 365 (1991)................................................................................ 10, 12, 15

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
  690 F.2d 1982 (9th Cir. 1982) .................................................................. 8, 9, 13, 16

i

*Cont'l Maritime of S.F., Inc. v. Pac. Coast Metal Trades Dist. Council,*
*Metal Trades Dep't, AFL-CIO,*
817 F.2d 1391 (9th Cir. 1987) ............................................................ 23, 24

*DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
485 U.S. 568 (1988).................................................................. *passim*

*Franchise Realty Interstate Corp. v. San Francisco Loc. Joint Exec. Bd. of*
*Culinary Workers,* 542 F.2d 1076 (9th Cir. 1976) .................................16

*George v. Nat'l Ass'n of Letter Carriers,*
185 F.3d 380 (5th Cir. 1999) .................................................. 17, 19, 20

*Har v. Massanari,*
266 F.3d 1155 (9th Cir. 2001) ...........................................................23

*ILWU v. ICTSI Or., Inc.,*
863 F.3d 1178 (9th Cir. 2017) ...........................................................24

*Kohn v. Sw. Reg'l Council of Carpenters,*
289 F. Supp. 2d 1155 (C.D. Cal. 2003) ...............................................20

*Kottle v. Nw. Kidney Ctrs.,*
146 F.3d 1056 (9th Cir. 1998) ......................................... 1, 11, 12, 15 16

*Mackey v. NFL,*
543 F.2d 606 (8th Cir. 1976) ......................................................23, 24

*Manistee Town Ctr. v. City of Glendale,*
227 F.3d 1090 (9th Cir. 2000) .............................................................9

*McDowell v. Calderon,*
197 F.3d 1253 (9th Cir.1999) .............................................................6

*NLRB v. Fruit & Vegetable Packers & Warehousemen,*
377 U.S. 58 (1964)....................................................... 2, 18, 19

*NLRB v. Ironworkers Local 433,*
850 F.2d 551 (9th Cir. 1988) ...........................................................22

*NLRB v. Retail Store Emps. Union, Local 1001,*
447 U.S. 607 (1980)...................................................... *passim*

ii

*Overstreet v. Carpenters, Local 1506*,
    409 F.3d 1199 (9th Cir. 2005) ..........................................................17, 20

*Overstreet v. Carpenters, Local 1506*,
    No. CIV.03-0773 J(JFS), 2003 WL 23845186 (S.D. Cal. May 7, 2003)...............20

*Plumbers & Pipefitters Local 32 v. NLRB*,
    912 F.2d 1108 (9th Cir. 1990) ..........................................................3, 22

*Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993)............................................................ *passim*

*Sheet Metal Workers' Int'l Assoc., Local 15 v. NLRB*,
    491 F.3d 429 (D.C. Cir. 2007)................................................................17

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ................................................ 11, 14, 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..........................................................................7, 8

*U.S. Futures Exch., LLC v. Bd. of Trade of the City of Chi., Inc.*,
    953 F.3d 955 (7th Cir. 2020) ................................................................11

*United Mine Workers of America v. Pennington*,
    381 U.S. 657 (1965)..........................................................................24

*United States v. Walker*,
    601 F.2d 1051 (9th Cir. 1979) ...............................................................6

*USS-POSCO Indus. v. Contra Costa Cty. Building & Constr. Trades
    Council*,
    31 F.3d 800 (9th Cir. 1994) ..........................................................8, 16

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ..............................................................11

**Statutes**

National Labor Relations Act,

    29 U.S.C. §157..............................................................................14

    29 U.S.C. §158(b)(4)(ii) ................................................................ *passim*

iii

29 U.S.C. §158(b)(4)(ii)(A) ............................................................... *passim*

29 U.S.C. §158(b)(4)(ii)(B) ............................................................... *passim*

29 U.S.C. §158(e) ...................................................................................21

Labor Management Relations Act,

29 U.S.C. §187.................................................................................5, 17

**Other Authorities**

I Phillip E. Areeda & Herbert Hovenkamp, FUNDAMENTALS OF
   ANTITRUST LAW (2017) ............................................................... 12

Stuart N. Senator & Gregory M. Sergi, *Noerr-Pennington: Safeguarding
   the First Amendment Right to Petition the Government*, 23
   Competition: J. Antitrust & Unfair Competition L. 83 (2014)..............................12

MEMORANDUM OF POINTS AND AUTHORITIES          CASE NO. 18-cv-02763-TWR-AHG

# INTRODUCTION

Defendants respectfully request that the Court reconsider five aspects of its Order on Defendants' Motions to Dismiss (Doc. 93) to correct manifest errors.

First, the Court should reconsider its conclusion that Plaintiffs have adequately alleged that two letters sent by UNITE HERE Local 30's counsel to the City are not protected by the Petition Clause. Doc. 93, at 24-25, 26-27. The Court properly concluded that these letters to the Mayor and City Council were not "objectively baseless," but then held them unprotected because they were allegedly "intended to delay approval of the Bahia redevelopment until Defendants could secure a PLA and card check neutrality agreement." Doc. 93, at 19, 25. That conclusion is incompatible with Supreme Court precedent, which "establish[es] that the legality of objectively reasonable petitioning 'directed toward obtaining governmental action' is '*not at all affected*'" by any unlawful or non-genuine motivation that the petitioner may have had. *Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 59 (1993) (internal citations omitted) (emphasis added) ("*PRE*"). In reaching a contrary conclusion, the Court relied on authority that predates and has been superseded by *PRE*.

Second, the Court should reconsider its conclusion—which contravenes Judge Hayes' earlier order—that Plaintiffs sufficiently alleged that Defendants' threats of future lobbying and "negative publicity" against SeaWorld were not constitutionally protected.[1] The Court recognized that Plaintiffs bear the burden of demonstrating that the allegedly threatened petitioning is a "sham." Doc. 93, at 23. But the Order then relieved Plaintiffs of this burden and shifted it onto Defendants to demonstrate "that their objections would be meritorious." Doc. 93, at 27. Requiring Defendants to demonstrate that future political lobbying would be "meritorious" is incompatible with

---

[1] While lobbying is protected by the Petition Clause, as discussed below, Defendants' alleged threats of "negative publicity" are also independently protected by the First Amendment's Speech Clause.

the Ninth Circuit's *Noerr-Pennington* standard for lobbying.  *See Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1061 (9th Cir. 1998).

Third, the Court should reconsider its adoption of Plaintiffs' contention that "threats of economic harm" satisfy NLRA Section 8(b)(4)'s "coercion" requirement if they threaten "substantial loss" to a party not involved in the labor dispute.  Doc. 93, at 29.  The Supreme Court has expressly rejected the idea that threats of imposing economic harm through otherwise non-coercive activity such as negative publicity or petitioning can be coercion under Section 8(b)(4).  *See DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 579 (1988) ("Our decision in *Tree Fruits* . . . makes untenable the notion that *any* kind of handbilling, picketing, or other appeals to a secondary employer to cease doing business with the [primary] employer . . . is 'coercion' within the meaning of § 8(b)(4)(ii)(B) if it has some economic impact on the neutral."); *NLRB v. Fruit & Vegetable Packers & Warehousemen*, 377 U.S. 58, 72 (1964) ("*Tree Fruits*") ("We disagree . . . that the test of 'to threaten, coerce, or restrain' . . . is whether [the secondary disputant] suffered or was likely to suffer economic loss.").  The case on which Plaintiffs relied, *NLRB v. Retail Store Emps. Union, Local 1001*, 447 U.S. 607, 614 (1980) ("*Safeco*"), involved *picketing*—and that act, not mere economic impact, established coercion.

Fourth, the Court should reconsider its conclusion that Plaintiffs adequately alleged a violation of NLRA § 8(b)(4)(ii)(A), and that "the Section 8(e) construction industry provision does not apply."  Doc. 93, at 31.  The Order bases this conclusion on the SAC's "allegations that [Plaintiffs] are 'not an employer primarily engaged in the construction industry,' and that the Building Trades Defendants sought a PLA [Project Labor Agreement] from Plaintiffs."  Doc. 93, at 31.  But the SAC makes no allegation that Defendants demanded a PLA *with Evans Hotels*.  The SAC's *only* factual allegation regarding a PLA request was that the Council President texted, "Robert I'd like to see all construction and future maintenance be done by Union signatory contractors."  SAC, Doc. 76, at 192.  Given that Plaintiffs *admit* that PLAs

occur when a project's developer (in this case Evans Hotels) require general contractors (which are construction industry employers) to enter them, SAC ¶42, "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see also Plumbers & Pipefitters Local 32 v. NLRB*, 912 F.2d 1108, 1110 (9th Cir. 1990) (courts may not presume unlawful conduct under NLRA Section 8(b)(4)(ii) when lawful conduct is possible).[2]

Finally, the Court should reconsider its conclusion that Plaintiffs' allegations establish the inapplicability of the Sherman Act's non-statutory labor exemption.

## BACKGROUND

Following extensive briefing and oral argument, the Court's January 7, 2020 Order dismissed the First Amended Complaint under the *Noerr-Pennington* doctrine. Doc. 60.  The Court concluded that Plaintiffs' lawsuit threatened to burden Defendants' right to petition, that Plaintiffs' allegations did not concern conduct that was incidental to petitioning, and that Plaintiffs could not invoke the "serial-litigation" line of cases in the context of legislative lobbying (and that they had not alleged facts supporting liability under that doctrine in any case).  Doc. 60, at 10-15, 15-17.

The Court then held that Plaintiffs' allegations concerning two letters that Local 30's attorney sent to the Mayor and City Councilmembers, which expressed concern for the "lack of transparency and access to information" on the proposed Bahia Lease Amendment and argued that the proposed elimination of Gleason Road as part of the project would violate a key planning document and California law, did not establish "sham" petitioning.  Doc. 60, at 19.  The Court recognized these letters as a form of legislative lobbying and held that "even if Defendants' interpretation of the MBPMPU

---

[2]  The complaint alleges: "Under a PLA, the developer agrees before beginning a project that it will work only with a unionized general contractor and that it will require that general contractor to subcontract work exclusively to unionized persons or entities . . . ."  SAC, Doc. 76, ¶42.

was incorrect or false, the 'extraordinarily narrow' lobbying sham exception would still not apply."  Doc. 60, at 20 & n.3.[3]

Similarly, the January 2020 Order held that Plaintiffs had not pled facts that could meet their burden of proving that Defendants' alleged future petitioning against SeaWorld's attractions would be a sham under the applicable legislative lobbying standard:

> Even if the Court examines Defendants' alleged threat to "interfere with SeaWorld's ability to get approval for a master plan amendment at . . . the Coastal Commission . . . ," (ECF No. 19 ¶ 110), under the "objectively baseless" standard for single petitions, as Plaintiffs request, Plaintiffs fail to state facts from which the Court can infer Defendants' threat was a sham. Plaintiffs request the Court conclude that any future Coastal Commission petition filed by Defendants against Sea World would be objectively baseless, without stating "specific allegations" that show the petitions would be meritless.

Doc. 60, at 17.  The Court concluded that it could not infer that a "future negative publicity campaign" against SeaWorld would be unprotected.  Doc. 60, at 21.

Plaintiffs filed a Second Amended Complaint.  Doc. 76.  In its August 26, 2021 Order, this Court stated that "the bulk . . . of Plaintiffs' new allegations . . . are devoted to the issue of whether Defendants' purported lobbying and litigation were 'shams' and therefore exempted from *Noerr-Pennington* protection."  Doc. 93, at 12-13.  However, the SAC contains almost no new factual allegations related to showing that Local 30's counsel's letters to the City constituted "sham" petitioning.[4]  And the SAC contains *no new factual allegations at all* supporting an inference that Defendants' alleged future petitioning of SeaWorld would be baseless or a sham.  *See* Doc. 62-3, ¶¶193-214; *cf.*

---

[3] The MBPMPU is the Mission Bay Park Master Plan Update.  SAC, Doc. 76, ¶11.

[4] The SAC adds only the allegation that two "advisory" committees—a Park and Recreation Board and a Mission Bay Park Committee—agreed with Plaintiffs' position on whether the MBPMPU required retention of Gleason Road.  Doc. 62-3, ¶175.

Doc. 60, at 18 ("Plaintiffs have not met their burden to state facts that show Defendants' alleged threat against Sea World to petition the Coastal Commission in the future falls within the sham exception to the *Noerr-Pennington* doctrine.").  To the contrary, the SAC adds allegations *supporting* the protected nature of what Defendants allegedly threatened.  *See* Doc. 62-3, ¶204 (alleging that Defendants' future "negative publicity" would involve "subjects like animal cruelty").[5]

Plaintiffs' other amendments sought to avoid Judge Hayes' Order by alleging that Defendants' petitioning on the Bahia Lease "subvert[ed] the integrity of the government process" by violating California's Brown Act and lobbying ordinances and by invoking an alleged secret "veto agreement" with the Mayor.  Doc. 62-3, ¶¶49, 57, 59-63, 79, 176, 183, 191, 193.  Plaintiffs also alleged that rather than threatening future petitioning, as Plaintiffs had previously insisted, Defendants were in fact threatening to unlawfully picket and engage in "corporate campaigns" against Defendants and Sea World.  Doc. 62-3, ¶¶170, 185, 202, 204, 210, 216, 217.[6]

Because the Court had already dismissed the First Amended Complaint on *Noerr-Pennington* grounds in a comprehensive decision, Defendant Local 30's motion to dismiss the SAC focused primarily on the SAC's new allegations.  *See generally*

---

[5] Plaintiffs added other allegations that "on information and belief, SeaWorld reasonably understood this opposition to include a corporate campaign to organize SeaWorld's labor force unless it cut its ties with Evans Hotels," that this corporate campaign would include "rallies, demonstrations, boycotts, walkouts, pickets, media, and websites attacking SeaWorld's brand," that unionization would adversely affect SeaWorld's business, and that SeaWorld knew of Local 30's alleged 1996 conflict with Evans Hotels involving threats to picket.  Doc. 62-3, ¶¶204, 206, 210, 255-56.

[6] Plaintiffs also added various new allegations concerning Defendants' past petitioning, related to their "serial" litigation theory, Doc. 62-3, ¶¶64-168; legal argument on whether various proceedings were lobbying or quasi-judicial adjudication, *id.* ¶¶172, 233; and legal argument concerning the *Noerr-Pennington* doctrine, *id.* ¶¶223-32, 240, 242, 244-45, and federal labor law, *id.* ¶¶249, 260.  Plaintiffs also made various amendments to the SAC in an effort to address Defendants' arguments on the merits of their LMRA §303, antitrust, RICO, and state-law claims.  *See generally id.* ¶¶ 272-377.

---

MEMORANDUM OF POINTS AND AUTHORITIES          CASE NO. 18-cv-02763-TWR-AHG

Doc. 79.  The Court issued its August 2021 Order without the benefit of oral argument.
As discussed below, the Order departs in significant ways, and without explanation,
from the Court's previous legal conclusions and from settled law.

## LEGAL STANDARD

This motion is timely under Rule 59(e).  F.R.C.P. 59(e); *see also* L.R. 7.1(i).
"Since specific grounds for a motion to amend or alter are not listed in the rule, the
district court enjoys considerable discretion in granting or denying the motion."
*McDowell v. Calderon*, 197 F.3d 1253, 1255 n.1 (9th Cir.1999) (en banc) (per curiam)
(citation omitted).  Reconsideration is appropriate when "necessary to correct manifest
errors of law or fact upon which the judgment rests" and when "necessary to prevent
manifest injustice."  *Allstate Ins. Co*. v. *Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011);
*McDowell*, 197 F.3d at 1255 n.1.  Motions for reconsideration are an efficient
mechanism for a judge to correct an otherwise erroneous judgement without
implicating the appellate process.  *See, e.g.*, *United States v. Walker*, 601 F.2d 1051,
1058 (9th Cir. 1979) ("Frequently a trial judge has had to rule on difficult questions
under time pressures and without thorough briefing by the parties.  A motion for
reconsideration may, in some instances, avoid the necessity of appeal.").

## ARGUMENT

**I.    The Court Should Reconsider Its Conclusion that Local 30 Counsel's Letters to the City and Defendants' Alleged "Threats" to Oppose SeaWorld Attractions Are Not Protected by the Petition Clause.**

### A.    Local 30's letters cannot be both objectively reasonable and a sham.

The Court's conclusion that Local 30's letters were objectively reasonable
cannot be reconciled with its holding that "sham petitioning" was sufficiently alleged.
The Supreme Court has made clear that a subjective motivation to delay may not, by
itself, render objectively reasonable petitioning unprotected under the Petition Clause.
The Court's Order misreads Ninth Circuit case law in a manner that would impose
unprecedented and illogical liability for lobbying activity.

The Court initially concluded that Local 30 counsel Tony LoPresti's February 28, 2018 and May 11, 2018 letters to the City Council and Mayor were not objectively baseless.  Doc. 93, at 18-19 ("Plaintiffs fail to allege facts showing that Defendants' environmental concerns regarding the Bahia redevelopment were objectively baseless. . . .").  The Court recognized that these letters "addressed [Defendants'] environmental concerns at length."  *Id.* at 19.

This conclusion was correct.  Mr. LoPresti's February 28 letter complained about the City's response to a public-records request for technical documents underlying a previous Environmental Impact Report ("EIR") on the MBPMPU.  It argued that Evans Hotels' proposed project included elements not previously analyzed in the MBPMPU EIR, and "urge[d] the Mayor and Council to take all necessary steps to ensure that Local 30 and other interested stakeholders are provided access to technical studies . . . to determine whether environmental impacts specific to the Project were . . . addressed in the MBMPU EIR."  The letter stated that "the Mayor and Council should take every possible measure to provide the public with full notice and opportunity to comment on the Project prior to the City Council's consideration of it."  Similarly, Mr. LoPresti's May 11, 2018 letter described in detail Local 30's objections to Evans Hotels' proposed expansion of its resort, outlining Local 30's position that the MBPMPU does not permit Evans Hotels' proposed elimination of Gleason Road (the sole public vehicular access road to the peninsula) and that the California Constitution and the Coastal Act independently prohibit its elimination.[7]  Letters to public officials seeking transparency and an opportunity for public comment, and documenting the

---

[7] Defendants submitted copies of Mr. LoPresti's February 28, 2018 and May 11, 2018 letters with their requests for judicial notice in support of their April 15, 2019 Motion to Dismiss.  *See* Doc. 29-6, Exhs. 9-10.  The letters may be considered in support of a motion to dismiss because the letters are referred to in the SAC.  *See* Doc. 76, ¶¶ 173-174; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Plaintiffs did not object to judicial notice of these documents, but Judge Hayes determined that consideration of the letters was unnecessary given his conclusion that the letters were not sham petitioning.  Doc. 60, at 20 n.2.

constituent's legal position, cannot be considered "objectively baseless."

Despite concluding that that Local 30's letters were objectively reasonable, the Order held that Plaintiffs sufficiently alleged that they were "sham lobbying," based on Plaintiffs' conclusory allegations that Defendants do not subjectively care whether they are successful in their efforts to lobby the government and that their true intent is to delay.  Doc. 93, at 24-25 (citing SAC, Doc. 76, ¶¶175, 234-35, 239).[8]  This holding was manifest error—under Supreme Court authority, objectively reasonable lobbying cannot be a "sham" merely because the lobbyist has a "non-genuine" reason for engaging in it, such as delay.

The sole authority on which the Order relies for the proposition that Local 30's objectively reasonable lobbying positions in the February and May 2018 letters were sufficiently alleged to be a "sham" is *Clipper Exxpress v. Rocky Mountain Motor Tariff*

---

[8] *See* SAC ¶235 (alleging that Defendants "do not seek to genuinely influence government action" and "have no interest in the environmental challenges they assert or ensuring compliance with land use laws and regulations"); *id.* (averring generally that true motive of *all* of Defendants' petitioning is "to delay and obstruct projects"); *id.* ¶¶236-38 (alleging that Defendants' past CEQA and land-use petitioning is evidence that they subjectively intended to use Mr. LoPresti's letters to delay); *id.* ¶239 ("Should the Bahia redevelopment project receive approval from the City Council (which Defendants have assured Plaintiffs it will not), Defendants have threatened future lawsuits with arguments created out of 'thin air.'"); *id.* ¶320 (alleging that Local 30's President referred to "the affordable accommodation challenge she pulled out of 'thin air' to oppose the Sunroad Harbor Island Hotel development").

Elsewhere, the Court rejected Plaintiffs' argument that these past instances of litigation had been "brought pursuant to a policy of starting legal proceedings without regard to the merits and . . . essentially for purposes of harassment" or that Defendants were "filing lawsuits and other actions willy-nilly without regard to success."  Doc. 93, at 19, 21 (quoting *USS-POSCO Indus. v. Contra Costa Cty. Building & Constr. Trades Council*, 31 F.3d 800, 811 (9th Cir. 1994)).  The Court recognized that the legal arguments that Plaintiffs allege Defendants pulled out of "thin air" were, in fact, successful in Local 30's writ petition against the Sunroad Project and were the basis "for the Coastal Commission's successful appeal of a separate suit filed by the Port of San Diego."  Doc. 93, at 20.

*Bureau, Inc.*, 690 F.2d 1982, 1253 (9th Cir. 1982).  That case does not support this conclusion even on its own terms, and the Supreme Court has rejected Plaintiffs' proposed reading of it, which the Order adopts.

*Clipper Exxpress* involved the defendants' repeated, unsuccessful protests against a competitor's proposals to *reduce* its tariffs, which automatically suspended the proposed tariffs while the Interstate Commerce Commission investigated.  *Id.* at 1246.  The defendants "would automatically protest any forwarder tariff, regardless of the rate's legality or competitive justification," to obtain an automatic suspension of the tariff and harm the competitor.  *Id*. at 1246, 1253.[9]  The court concluded that such "*[b]aseless protests*, instituted without regard to merit, are 'nothing more than an attempt to interfere directly with the business relationships of a competitor.'"  *Id*. at 1254 (emphasis added) (citation omitted).

*Clipper Exxpress* does not apply to this case.  First, *Clipper Exxpress* involved *serial* regulatory challenges, whereas this Court rejected the notion that Defendant's past petitioning had been "instituted without regard to merit"; indeed, the Court recognized that Defendants have been successful in most of their past petitioning.  Doc. 93, at 20 ("These allegations fail to support Plaintiffs' contention that Defendants file litigation 'without regard to the merits.'").  Second, this Court correctly recognized that Local 30's letters to the Mayor and City Council set forth objectively reasonable legal positions and so were not "baseless protests." *Id.* at 18-19.  The Ninth Circuit has rejected the argument that *Clipper Exxpress* applies in circumstances similar to this case.  *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1095 (9th Cir. 2000) (rejecting claim that defendants engaged in sham lobbying against a municipal lease and finding *Clipper Exxpress* was "easily distinguished" because the defendants' protests there were "baseless, and prosecuted without regard to their merit").

---

[9] The defendants, in fact, admitted for the purposes of the motion that "the object behind each of the protests was . . . simply trying to eliminate or destroy competition." *Clipper Exxpress*, 690 F.2d at 1250.

MEMORANDUM OF POINTS AND AUTHORITIES          CASE NO. 18-cv-02763-TWR-AHG

Reading *Clipper Exxpress* to allow a subjective motivation to delay to render otherwise reasonable petitioning a sham would make it incompatible with Supreme Court precedent.  In *PRE*, the Supreme Court made clear that to be a sham, petitioning must *always* be shown to be objectively baseless, and that a subjectively non-genuine intent—such as a purported intent to delay—is *never* sufficient by itself to render petitioning a sham.  508 U.S. 49, 58 (1993) ("Since *California Motor Transport*, we have consistently assumed that the sham exception contains an indispensable objective component.").  The Court explained that it has "repeatedly reaffirmed that evidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham."  *Id*. at 59 ("Our decisions therefore establish that the legality of objectively reasonable petitioning 'directed toward obtaining governmental action' is 'not at all affected by any anticompetitive purpose [the actor] may have had.'") (citations omitted); *id.* ("Our most recent applications of *Noerr* immunity further demonstrate that neither *Noerr* immunity nor its sham exception turns on subjective intent alone.").

While *PRE* addressed the "sham" test in the context of litigation, it made clear that objective baselessness was required to show that *any form* of petitioning is a sham.  The Supreme Court noted it applied the same rule in *City of Columbia v. Omni Outdoor Advertising, Inc*., 499 U.S. 365 (1991), a case involving allegations that the defendant's lobbying to modify a city's zoning code was a sham because the defendant's true purpose was to cause delay.  As the *PRE* court recognized—in language that demonstrates the Order's error—allegations of a subjective purpose to delay cannot render objectively reasonable lobbying a sham:

> In *Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365 (1991), we similarly held that challenges to allegedly sham petitioning activity must be resolved according to objective criteria.  We dispelled the notion that an antitrust plaintiff could prove a sham merely by showing that its competitor's "purposes were to delay [the plaintiff's] entry into the market and even to deny it a meaningful access to the appropriate . . .

administrative and legislative fora." *Id.* at 381 (internal quotation marks omitted).  We reasoned that such inimical intent "may render the manner of lobbying improper or even unlawful, but does not necessarily render it a 'sham.'"

*PRE*, 508 U.S. at 59–60 (citations omitted); *see also U.S. Futures Exch., LLC v. Bd. of Trade of the City of Chi., Inc.*, 953 F.3d 955, 966 (7th Cir. 2020) (rejecting theory that lobbying was sham because its purpose was delay: "*Noerr-Pennington* therefore immunizes Defendants' petitioning, even if that conduct delayed the Commission's approval of USFE's application and created market uncertainty that harmed USFE.").[10]

The Ninth Circuit has subsequently characterized the requirement that petitioning be shown to be objectively baseless as necessary to provide "breathing space" to the exercise of Petition Clause rights.  *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934 (9th Cir. 2006).  Holding otherwise would "undermine, if not vitiate, *Noerr*.  And despite whatever 'superficial certainty' it might provide, a subjective standard would utterly fail to supply 'real "intelligible guidance."'" *PRE*, 508 U.S. at 60 (quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 507, n.10 (1988)); *id.* at 58 (explaining that the right of the people to petition for desired outcomes "cannot properly be made to depend upon their intent in doing so") (citation omitted).  This case is a perfect example.  The Order threatens damages liability (or, at least, a drawn-out lawsuit) against legitimate, objectively reasonable (and entirely commonplace) communications to public officials, based on the nebulous question of whether Local 30 (or its President, or its members) "genuinely" care about access to Bahia Point or the other environmental concerns laid out in the letters.  *See White v. Lee*, 227 F.3d

---

[10] Of course, in the context of legislative lobbying, showing that the lobbying is "objectively baseless" is virtually impossible, because "the sham exception is extraordinarily narrow" and "[m]isrepresentations are a fact of life in politics." *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1061–62 (9th Cir. 1998) (citations omitted).  But that does not mean a court may forego *any* objective analysis and focus only on the subjective genuineness of the lobbying.

MEMORANDUM OF POINTS AND AUTHORITIES          CASE NO. 18-cv-02763-TWR-AHG

1214, 1233 (9th Cir. 2000) ("[W]hen an action involves 'the right to petition governmental bodies under *Noerr-Pennington*,' it is necessary to apply a 'heightened level of protection . . . to avoid "a chilling effect on the exercise of this fundamental First Amendment right."'") (internal citations omitted).

The Order's approach to the *Noerr-Pennington* doctrine creates other legal anomalies. Under the Order's approach, lobbying is subject to a *stricter* sham-petitioning standard than is litigation or adjudicative petitioning, which is the opposite of Ninth Circuit law. Under the Order's reasoning, if Mr. LoPresti had not lobbied the City on Local 30's behalf but instead filed a lawsuit raising the same challenges, Local 30's actions would have been unquestionably protected, because the challenges are objectively reasonable. *Cf. Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1060–61 (9th Cir. 1998).

The Order's conclusion that Mr. LoPresti's objectively reasonable letters were not constitutionally protected because they were allegedly motivated by a desire to delay the project also cannot be squared with the Order's correct conclusion that Defendants' *direct* lobbying of Councilmembers to delay the project *is* protected. Doc. 93, at 25. Under this reasoning, if Mr. LoPresti had expressly requested that the City delay consideration of the project while it evaluated the legal claims he put forth—as the City has in fact done—the letters would have met the standard required by the Order.

The Order appears to be the first instance in which a federal court has concluded that a defendant's lobbying of legislative officials was a sham after *City of Columbia* and *PRE*. *See Kottle*, 146 F.3d at 1061; Stuart N. Senator & Gregory M. Sergi, *Noerr-Pennington: Safeguarding the First Amendment Right to Petition the Government*, 23 Competition: J. Antitrust & Unfair Competition L. 83, 88 (2014) ("While the Ninth Circuit stated that 'the sham exception is extraordinary narrow' in the context of legislative petitioning, no circuit court appears to have expressly applied such an exception or explained what exactly it would be.") (footnote omitted); I PHILLIP E.

AREEDA & HERBERT HOVENKAMP, FUNDAMENTALS OF ANTITRUST LAW § 2.03[F] (2017) (noting that in the context of legislative petitioning, "it is virtually impossible to identify the sham").

The Court should not become the first to do so.  Because the Order's treatment of Local 30's February and May 2018 letters is incompatible with Supreme Court and Ninth Circuit precedent, the Court should reconsider it.

**B.    The Order improperly places the burden on Defendants to prove that their future petitioning would be "meritorious."**

The Court also committed manifest error in concluding that allegations that a defendant threatened future petitioning shifts the burden to the defendant to show that the petitioning would be meritorious in order to claim *Noerr-Pennington* protection. This ruling was contrary to the conclusions of Judge Hayes in the January 7, 2020 order dismissing the First Amended Complaint, and to authority placing the burden of proving "sham" petitioning on plaintiffs and describing the standard under which lobbying activity can constitute a "sham."

The Court's January 7, 2020 Order held that Plaintiffs' "request [that] the Court conclude that any future Coastal Commission petition filed by Defendants against Sea World would be objectively baseless, without stating 'specific allegations' that show the petitions would be meritless," failed to state a claim.  Doc. 60, at 17.  Plaintiffs did not thereafter add any new "specific allegations" showing that future petitions would be objectively baseless.  Instead, the new allegations merely alleged that SeaWorld understood Defendants' purported threats to involve picketing, "corporate campaigns" and unionization of its workforce.  *See supra*, at 5.

Despite the absence of any material changes to the complaint, the August 26, 2021 Order comes to the opposite conclusion.  The Order says "it is difficult to imagine in what way Defendants could intend to influence governmental action or know that their objections would be meritorious without yet knowing the nature of SeaWorld's future attractions."  Doc. 93, at 27.  Again relying on *Clipper Exxpress*,

690 F.2d at 1254–55, the Court concludes that the SAC adequately alleged "sham lobbying" "[b]ecause the threatened lobbying against SeaWorld is akin to 'protests . . . filed automatically and without regard to merit.'" Doc. 93, at 27.

However, the SAC does not allege that Defendants (directly or through Rolfe) threatened to engage in "baseless lobbying" against future attractions. Plaintiffs allege that "[t]hrough Ms. Rolfe, Defendants communicated to SeaWorld that if SeaWorld continued its partnership with Evans Hotels, SeaWorld would face *severe opposition* from the unions and union allies in connection with its plan to open new attractions every year." Doc. 76, ¶204 (emphasis added). Plaintiffs posit many examples of what they *believe* this "severe opposition" would entail, including First Amendment-protected "negative publicity campaigns" about SeaWorld's record on animal cruelty, "corporate campaigns" designed to unionize SeaWorld's employees (a right guaranteed under the National Labor Relations Act, 29 U.S.C. §157), and other forms of protest such as "rallies" and "demonstrations, as well as petitioning, which Plaintiffs call "greenmail." Doc. 93, ¶¶204, 256.

Yet despite Plaintiffs' allegations that they had numerous conversations with SeaWorld officials, Doc. 93, ¶¶206-08, 210, 218, Plaintiffs do not (and so apparently cannot) allege that SeaWorld informed them of any specific threat to lobby (or litigate) against future attractions.

The Order concludes from these allegations about how Plaintiffs *believe* SeaWorld to have *understood* communications that Defendants allegedly relayed *indirectly* through Rolfe that Defendants were threatening to lobby against future attractions in a manner that "would [not] be meritorious." Doc. 93, at 27. This was manifest error for three reasons.

First, as the Court recognized in its January 2020 Order (and as the Court also recognized elsewhere in its August 2021 Order), it is *Plaintiffs' burden* to allege facts plausibly supporting the conclusion that Defendants' threatened lobbying would fail to meet the "exceptionally narrow" standard for finding legislative lobbying to be a sham.

Doc. 93, at 23; *see also Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 942 (9th Cir. 2006).  If there is ambiguity about whether the future petitioning would be a "sham" or protected, then Plaintiffs' allegations cannot meet this burden.  *Sosa*, 437 F.3d at 942 ("[I]n light of the burden RICO liability would impose on DIRECTV's right to petition the courts, [the court] decline[s] to construe mail and wire fraud statutes so broadly as to reach . . . arguably ambiguous statements . . . absent a showing that the statement meets the standard for the sham exception.").[11]  Threats to oppose an antagonist's interests in the future—including by wielding political power in the democratic arena through lobbying—are commonplace; and such "lobbying is the *sine qua non* of democracy." *Kottle*, 146 F.3d at 1061–62 (citation omitted).  Yet the Order would permit allegations of ambiguous statements about the future exercise of core petitioning rights to serve as a basis for RICO, anti-trust, and other liability.

Second, the Order also errs by applying a standard under which Defendants' future lobbying is a sham unless it is "meritorious."  Doc. 93, at 27.[12]  But Defendants invoking the *Noerr-Pennington* doctrine *never* have to demonstrate that legislative lobbying is "meritorious."  That concept derives from the standard for objective baselessness that applies to litigation, not lobbying.  *See PRE*, 508 U.S. 49, 50 ("Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation.").  *Noerr-Pennington* protects *lobbying* even if it is founded on

---

[11] Nor can ambiguous threats to "oppose" or "target" or "cause problems" constitute "coercion" under NLRA Section 8(b)(4)(ii).  *See Brown & Root, Inc. v. La. State AFL-CIO*, 10 F.3d 316, 322 (5th Cir. 1994) (rejecting claim that threat of future lobbying could violate Section 8(b)(4)(ii): "It is well-established that general predictions of problems or trouble are not alone sufficient to establish threats or coercion within the meaning of section 8(b)(4)(ii).").

[12] The SAC is replete with evidence supporting the conclusion that any future petitioning that Defendants engaged in with regard to SeaWorld's attractions would have been "meritorious."  This includes the fact that past SeaWorld attractions had been the subject of meritorious Coastal Act challenges, SAC, Doc. 76, ¶197, and that the majority of Defendants' past petitioning had *not* been "filed without regard for merit and for the purpose of harassment," Doc. 93, at 19.

---

15

misrepresentations and intentional deception (and so is "non-meritorious").  *City of Columbia*, 499 U.S. 365, 383–84 (1991) ("In *Noerr* itself, where the private party 'deliberately deceived the public and public officials' in its successful lobbying campaign, we said that 'deception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned.'") (citation omitted); *see also Kottle*, 146 F.3d at 1061; *Franchise Realty Interstate Corp. v. San Francisco Loc. Joint Exec. Bd. of Culinary Workers*, 542 F.2d 1076, 1079 (9th Cir. 1976) ("[T]he relatively precise legal standards in light of which certain arguments may be characterized as 'frivolous' are simply absent from the rough and tumble of the political arena; almost any position, including the self-interested plea of one competitor that another should be denied a permit, may be urged before such a political body."); *Boone v. Redevelopment Agency of City of San Jose*, 841 F.2d 886, 894 (9th Cir. 1988) ("While we do not condone misrepresentations, we trust that the council and agency, acting in the political sphere, can 'accommodate false statements and reveal their falsity.'") (citation omitted).

Finally, the Order states that the alleged "threatened lobbying against SeaWorld is akin to 'protests . . . filed automatically and without regard to merit.'"  Doc. 93, at 27 (citing *Clipper Exxpress*, 690 F.2d at 1254-55).  But there is no *Noerr-Pennington* doctrine of serial *lobbying* "without regard to merit."  As the Ninth Circuit and the Supreme Court have made clear (and as this Court recognized elsewhere in its Order), this concept applies *only* to the *serial litigation* branch of *Noerr-Pennington* doctrine, not to legislative lobbying.  *See, e.g.*, *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972) (holding that a sham may be established through "a pattern of baseless, repetitive claims . . . which leads the factfinder to conclude that the *administrative and judicial* processes have been abused" (emphasis added)); *PRE*, 508 U.S. at 72-73; *USS-POSCO*, 31 F.3d 800, 811 (9th Cir. 1994) ("*California Motor Transport* deals with the case where the defendant is accused of bringing a whole series of *legal proceedings*.  *Litigation* is invariably costly, distracting and time-consuming; having to defend a whole series of such proceedings can inflict a crushing

burden on a business.") (emphasis added); *Kottle*, 146 F.3d at 1061 ("[S]ubjecting [a] defendant to antitrust liability because it engaged in numerous unsuccessful attempts to lobby a state legislature . . . would eviscerate the Petition Clause.").

For these reasons, the Order's conclusion that the SAC alleges sufficient facts to plausibly demonstrate that Defendants threatened "sham lobbying" was manifest error.

## II.   The Court Should Reconsider Its Conclusion that Speech and Petitioning Can Violate Section 8(b)(4)(ii) if They Threaten "Substantial Loss."

The Court should reconsider its holding that Plaintiffs' allegations that Defendants' petitioning activity will cause "substantial economic loss" state a claim under Labor Management Relations Act ("LMRA") Section 303, 29 U.S.C. §187, based on alleged violations of NLRA §8(b)(4)(ii)(B) (with regard to alleged coercion of SeaWorld) and §8(b)(4)(ii)(A) (with regard to alleged coercion of Plaintiffs). Doc. 93, at 29-30. That holding is inconsistent with governing authority, which rejects the notion that constitutionally protected or otherwise non-coercive conduct becomes "coercion" within the meaning of Section 8(b)(4)(ii) if it threatens an employer with enough economic harm.

The Order concludes that "Plaintiffs sufficiently allege that Defendants threatened both Plaintiffs and SeaWorld with substantial economic losses" and that such "threats of economic harm are 'coercive threats.'" Doc. 93, at 29-30. In doing so, the Order refers to Defendants' alleged "conduct" toward Plaintiffs and SeaWorld, without clarifying what "conduct" it is referring to. Doc. 93, at 29. The SAC alleges that Defendants created a website opposing the Bahia redevelopment and threatened a "negative publicity campaign" about animal rights against SeaWorld, as well as "rallies," "demonstrations," "boycotts" and "websites." SAC, Doc. 76, ¶¶186, 204, 256. These forms of protest are protected under the First Amendment's *speech clause* and are precisely the types of union activities that *DeBartolo*, 85 U.S. 568 (1988), distinguished from picketing and held are beyond Section 8(b)(4)(ii)'s prohibition. *See, e.g.*, *Overstreet v. Carpenters, Local 1506*, 409 F.3d 1199, 1212 (9th Cir. 2005)

(protest banners could not be held "coercive" under Section 8(b)(4)(ii)); *Sheet Metal Workers' Int'l Assoc., Local 15 v. NLRB*, 491 F.3d 429, 433-34, 439 (D.C. Cir. 2007) (street-theater protest involving a funeral procession in front of a hospital using a non-union contractor not "coercion"); *George v. Nat'l Ass'n of Letter Carriers*, 185 F.3d 380, 385-89 (5th Cir. 1999) (letter-writing campaign urging a boycott could not be "coercion"); *Brown & Root, Inc.*, 10 F.3d 316, at 326 (5th Cir. 1994) ("Lobbying, like handbilling, is activity protected by the First Amendment.").

The Order's conclusion that an LMRA §303 plaintiff can demonstrate coercion by pointing to "substantial economic losses" misconstrues the Supreme Court's holding in *Safeco*, 447 U.S. 607, 614 (1980), and is incompatible with the Supreme Court's holding in *DeBartolo*, 485 U.S. 568.

The Order adopts Plaintiffs' characterization of *Safeco* as holding that a "threat of economic harm" in the form of "ruin or substantial loss" is coercive under §8(b)(4)(ii). Doc. 93, at 29 (quoting Opp'n to Local 30 Mot., at 9). But that is not what *Safeco* held. In the course of distinguishing the picketing at issue in that case from the picketing of a single product at a secondary grocery store upheld in *Tree Fruits*, 377 U.S. 58, 72 (1964), *Safeco* held the following:

> As long as *secondary picketing* only discourages consumption of a struck product, incidental injury to the neutral is a natural consequence of an effective primary boycott. . . . But the Union's secondary appeal against the central product sold by the title companies in this case is "reasonably calculated to induce customers not to patronize the neutral parties at all.". . . The resulting injury to their businesses is distinctly different from the injury that the Court considered in *Tree Fruits*. *Product picketing* that reasonably can be expected to threaten neutral parties with ruin or substantial loss simply does not square with the language or the purpose of § 8(b)(4)(ii)(B).

447 U.S. at 614–15 (emphasis added, citations omitted). Thus, the Supreme Court did *not* hold that *any* conduct is "coercive" when it threatens a significant degree of

---

economic harm.  Rather, the Court pointed to the threat of "ruin or substantial loss" to distinguish the secondary *picketing* at hand—unions having a labor dispute with an insurance company picketing at secondary insurance agencies that relied nearly exclusively on that company's insurance products—from the product picketing upheld in *Tree Fruits*, which targeted just one of the many products that the neutral employer sold.

In *DeBartolo*, the Supreme Court foreclosed the notion that "threats of economic harm" are inherently "coercive" under Section 8(b)(4)(ii)(B) even if the conduct at issue is not picketing and would not otherwise qualify as coercion.  There, the Supreme Court overturned a National Labor Relations Board ruling that union handbilling calling for a total boycott of a secondary mall owner that employed non-union contractors was coercive.  The Board had reasoned that the handbilling was "'an attempt to inflict economic harm on the secondary employers by causing them to lose business,' and 'such appeals constitute "economic retaliation" and are therefore a form of coercion.'"  *DeBartolo*, 485 U.S. at 573 (citation omitted).  But the Court rejected the notion that "economic retaliation" or "economic harm" caused by otherwise lawful conduct could be equated with "coercion": "Our decision in *Tree Fruits*, however, makes untenable the notion that *any* kind of handbilling, picketing, or other appeals to a secondary employer to cease doing business with the employer involved in the labor dispute is 'coercion' within the meaning of § 8(b)(4)(ii)(B) if it has some economic impact on the neutral."  *Id*. at 579 (emphasis added).  *DeBartolo* made clear that *Safeco's* finding of coercion rested on the fact that *picketing*, not peaceful protest or handbilling, was involved, holding that "picketing is qualitatively 'different from other modes of communication.'"  *Id*. at 579-80 (citation omitted).

The Fifth Circuit has explained why *Safeco* does not stand for the principle Plaintiffs urged (and the Order accepts):

> The possibility of economic ramifications, however, does not transform otherwise lawful conduct into "threats, coercion, or restraint" under the

statute.  While the Court did evaluate the economic realities of the boycott in *Safeco*, that consideration was limited to the inquiry of whether the *picketing* was in fact the "isolated evil" which the statute proscribed.  The Court did not, as George's argument implies, examine Safeco's economic predicament without first finding (at least potentially) prohibited conduct.

*George v. Nat'l Ass'n of Letter Carriers*, 185 F.3d 380, 389 (5th Cir. 1999) (emphasis in original); *see id*. at 390 ("[I]t was only the absence of picketing or patrolling which distinguished *DeBartolo II* from *Safeco*.  In *DeBartolo II*, the union was requesting a total boycott of the mall and its shops, but nothing in the Court's opinion indicates whether or not this posed a significant risk of serious economic harm to the mall or the shops there and the opinion does not evaluate or consider that risk.").  If the Order's characterization of *Safeco* were correct, then

> any form of publicity, such as the proposed letter-writing or even an aggressive advertising campaign, would constitute "coercion, threats, or restraint" if it effectively persuaded consumers not to patronize a secondary employer.  There is no evidence that Congress intended such a result, and, more importantly, *DeBartolo II* forecloses the possibility of this interpretation of section 8(b)(4)(ii).

*Id*. at 389.

Following *DeBartolo*, no federal court of which Defendants are aware has interpreted *Safeco* in the matter Plaintiffs proposed.  Courts regularly reject the notion that otherwise protected or non-coercive conduct is rendered coercive under Section 8(b)(4)(ii) because of its economic impact.  *See, e.g.*, *Kohn v. Sw. Reg'l Council of Carpenters*, 289 F. Supp. 2d 1155, 1167 (C.D. Cal. 2003) ("[T]he Supreme Court has made it clear that 'economic coercion' in this sense does not rise to a statutory violation, and that some sort of intimidation is required before speech-related activities will transgress the prohibitions of § 8(b)(4)(ii)(B).."); *Overstreet v. Carpenters, Local 1506*, No. CIV.03-0773 J(JFS), 2003 WL 23845186, at *5 (S.D. Cal. May 7, 2003), *aff'd*, 409 F.3d 1199 (9th Cir. 2005) ("[E]conomic impact on the secondaries is

insufficient to elevate Respondent's peaceful boycott activities to the level of coercion.").  This Court should reconsider instead of being the first to conclude otherwise.

### III.    The Court Should Reconsider Its Conclusion that the SAC Pleads a Violation of Section 8(b)(4)(ii)(A).

The Court should also reconsider its conclusion that Plaintiffs "adequately allege that the Section 8(e) construction industry proviso does not apply" because they allege "that they are 'not an employee primarily engaged in the construction industry,' and that the Trades Council Defendants *sought a PLA from Plaintiffs*."  Doc. 93, at 31 (emphasis added).  The SAC's specific factual allegations do not make it plausible that Defendants made the nonsensical demand that *Evans Hotels itself* sign an (unlawful and unenforceable) PLA; rather, they are equally (if not far more) susceptible to the interpretation that Defendants wanted Evans Hotels to direct its general contractor (who *would* be covered by the proviso) to sign such an agreement, making the demand lawful and the resultant PLA enforceable.  This is an additional reason why the SAC's LMRA Section 303 cause of action based on Section 8(b)(4)(ii)(A) should have been dismissed.

Section 8(b)(4)(ii)(A) prohibits "coercion" that has the object of forcing an employer to "enter into any agreement which is prohibited by subsection (e)."  29 U.S.C. § 158(b)(4)(ii)(A).  PLAs are not "agreements prohibited by Section 8(e)" because they are agreements between unions and construction industry employers "relating to the contracting or subcontracting of work to be done at the site of the construction . . . of a building, structure, or other work" and therefore fall within the construction industry proviso.  29 U.S.C. § 158(e).  In fact, the entire purpose of the construction industry proviso was to protect PLAs and other forms of pre-hire agreements in the construction industry.  *Bldg. & Constr. Trades Council of Metro. Dist. v. Assoc. Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 231 (1993) (explaining Congress enacted Section 8(e)'s proviso to "authoriz[e] certain kinds of

---

21

project labor agreements in the construction industry").

The SAC explains how PLAs work: "Under a PLA, the developer [here, Evans Hotels] agrees before beginning a project that it will work only with a unionized general contractor and that it will require that general contractor to subcontract work exclusively to unionized persons or entities."  SAC ¶42.  If this is what Defendants sought—that Evans direct the general contractor of the Bahia development to enter a PLA—then the agreement (and the objective or obtaining it) would be covered by the construction industry proviso and therefore lawful.  The only way that a PLA on the Bahia project would contravene Section 8(e), and thus potentially support a Section 8(b)(4)(ii)(A) claim, would be if Evans Hotels *itself* entered into the PLA.  But there is no allegation that *plausibly* supports this interpretation of the Building Trades Defendants' request.

The SAC's only relevant factual allegation is that the Building Trades President texted Plaintiffs' representative, stating: "Robert I'd like to see all construction and future maintenance be done by Union signatory contractors."  SAC, Doc. 76, at 192.  Even if this statement were susceptible of the interpretation that Defendants were demanding a PLA with Evans Hotels itself, that would be insufficient under Ninth Circuit case law.  "When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (citation omitted).  "Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true . . . in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*." *Id.* (citations omitted).  Plaintiffs plead no facts excluding the explanation that Defendants sought a lawful and enforceable PLA covered by the construction industry proviso. The Court's conclusion otherwise was error.

This conclusion is further bolstered by the Ninth Circuit rule that when

interpreting Section 8(b)(4)(ii), courts may not presume that threats of conduct that could be carried out lawfully will in fact be carried out in a manner that violates the Section. *NLRB v. Ironworkers Local 433*, 850 F.2d 551, 557 (9th Cir. 1988) (rejecting argument that picketing threat that could be carried out lawfully meant that union would engage in unlawful secondary picketing, citing "the general legal principle that people should be presumed to be acting lawfully until proven otherwise"); *Plumbers & Pipefitters Local 32 v. NLRB*, 912 F.2d 1108, 1110 (9th Cir. 1990) ("[The NLRB] could not presume that a union's threat to picket the job was a threat to picket contrary to the law, when picketing at the job could be done in a lawful manner [because] such a presumption is without foundation in the Act, relevant case law or any general legal principles.").  The Order conflicts with this governing authority by accepting as sufficient allegations that presume that any eventual PLA covering the Bahia project would be designed and executed in a manner that violates Section 8(e) and Section 8(b)(4)(ii)(A), even though a perfectly lawful path was available.

## IV.  The Court Should Reconsider Its Treatment of the Sherman Act's Non-Statutory Exemption.

Because Plaintiffs were given leave to replead their antitrust claims, the Court should also reconsider its conclusion that Plaintiffs have alleged facts sufficient to preclude dismissal of those claims on the basis of the non-statutory labor exemption, both to avoid any conflict with governing Ninth Circuit precedent and to properly reflect the rationale for the third factor set forth in *Mackey v. NFL*, 543 F.2d 606, 614 (8th Cir. 1976).

The Order holds that the third *Mackey* factor is not satisfied because Plaintiffs allege "that Defendants have pressured Plaintiffs through threats," which, in the Court's view, do not amount to "bona fide, arm's-length" bargaining.  Doc. 93, at 38. However, the Order acknowledges that *Bodine Produce, Inc. v. United Farm Workers Org. Comm.*, 494 F.2d 541, 558-60 (9th Cir. 1974), applied the non-statutory exemption to agreements allegedly procured through "threats of financial ruin,

coercion, intimidation, and other activities," and "remains good law."  Doc. 93, at 37.

That *Bodine* "predates the Ninth Circuit's adoption of the *Mackey* test in 1987," *id.*

(citing *Cont'l Maritime of S.F., Inc. v. Pac. Coast Metal Trades Dist. Council, Metal Trades Dep't, AFL-CIO*, 817 F.2d 1391, 1393 (9th Cir. 1987)), does not change the analysis.  To the contrary, an earlier precedential decision is binding on all subsequent Ninth Circuit panels.  *See Har v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001) ("[T]he first panel to consider an issue sets the law [for] future panels of the court of appeals.").  *Continental Maritime* thus could not have overruled *Bodine*.

Nor did it purport to do so.  *Continental Maritime* did not involve an agreement purportedly procured through "threats," so it did not consider the relevance of such conduct to the non-statutory labor exemption—the issue decided in *Bodine*.  More fundamentally, the purpose of asking whether an agreement resulted from "bona fide, arm's length bargaining is to deny immunity to *collusive* agreements that serve employers' economic interests or those *unilaterally imposed* by employers (as in *Mackey* itself, 543 F.2d at 615-16).  *Continental Maritime*, 817 F.2d at 1393 (noting that "labor-management agreement designed to drive [the employers'] competitors out of business" was not entitled to non-statutory labor exemption immunity) (citing *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965)).[13]  Plaintiffs' allegations that Defendants used "threats" to procure agreements preclude any conclusion that those agreements were unilaterally imposed or the result of collusion.[14]

Thus, the Court should revise its decision to hold that the third *Mackey* factor

---

[13] *Mackey*'s conclusion that agreements imposed unilaterally by employers do not qualify for nonstatutory antitrust immunity likely did not survive *Brown v. Pro Football, Inc.*, 518 U.S. 231 (1996).  But the Ninth Circuit has explained that this "makes it *easier* to argue [an] agreement is arm's-length," so the Court need not reach this issue.  *ILWU v. ICTSI Or., Inc.*, 863 F.3d 1178, 1195 n.13 (9th Cir. 2017) (emphasis added).

[14] Indeed, almost all agreements between employers and labor unions are the result of implied or express threats to strike, which are typical sources of union leverage.

also supports non-statutory immunity.[15]

## CONCLUSION

For the foregoing reasons, the Court should reconsider its August 26, 2021 Order on Defendants motions to dismiss.

Dated: September 23, 2021        Respectfully submitted,

Richard G. McCracken, SBN 62058
Paul L. More, SBN 228589
McCRACKEN, STEMERMAN & HOLSBERRY, LLP
595 Market Street, Suite 800
San Francisco, CA 94105
Tel:  415-597-7200        Fax:  415-597-7201
Email: rmccracken@msh.law / pmore@msh.law
*Attorneys for Defendants UNITE HERE Local 30 and Brigette Browning*

Stacey Monica Leyton, SBN 203827
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel:  415-421-7151        Fax:  415-362-8064
Email:sleyton@altshulerberzon.com
*Attorneys for Defendants Tom Lemmon and San Diego Building and Construction Trades Council*

///
///
///

---

[15] While Defendants do not seek reconsideration on this point, the Court may also want to clarify the Order's discussion of the first two elements of the *Mackey* test, to eliminate any ambiguity.  At one point the Order expressly states that the first two *Mackey* factors support immunity: "any agreements entered into by Defendants and by other developers do 'primarily affect' those parties and not Plaintiffs," and "Defendants' conduct 'concerns wages, hours or conditions of employment.'"  Doc. 93, at 36-37.  But the earlier statement "that *Plaintiffs' allegations satisfy* the first and second elements of the *Mackey* test," *id.* at 36 (emphasis added), might be read to suggest that Plaintiffs' allegations suffice to *preclude* immunity.

MEMORANDUM OF POINTS AND AUTHORITIES        CASE NO. 18-cv-02763-TWR-AHG

Steven Todd Coopersmith, SBN 18464
Danielle L. Macedo, SBN 328873
THE COOPERSMITH LAW FIRM
555 W Beech St., Suite 230
San Diego, CA 92101
Tel:  619-238-7360        Fax:  619-785-3357
Email:stc@stevecoopersmithlaw.com
dlm@stevecoopersmithlaw.com
*Attorneys for Defendant Tom Lemmon*

MEMORANDUM OF POINTS AND AUTHORITIES          CASE NO. 18-cv-02763-TWR-AHG

1

<u>**CERTIFICATE OF SERVICE**</u>

2
3
4

I am employed in the city and county of San Francisco, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is: 595 Market Street, Suite 800, San Francisco, California 94105.

5

On September 23, 2021, I served a copy of the foregoing document

6
7

**DEFENDANTS' MOTION FOR RECONSIDERATION OF ORDER GRANTING IN PART, DENYING IN PART, MOTIONS TO DISMISS**

8

on the interested party(s) in this action, as follows:

9
10

***By ECF System - Court's Notice of Electronic Filing:***

11
12
13
14
15
16

Susan K. Leader
AKIN GUMP STRAUSS HAUER & FELD
1999 Avenue of the Stars
Suite 600
Los Angeles, CA 90067
Telephone: 310-229-1000
Fax: 310-229-1001
Email: sleader@akingump.com

William M. Low
Edwin M. Boniske
Geoffrey M. Thorne
Jacob T. Spaid
HIGGS FLETCHER & MACK LLP
401 West "A" Street, Suite 2600
San Diego, California 92101-7913
Telephone: 619-236-1551
Fax: 619-696-1410
Email: wlow@higgslaw.com
        boniske@higgslaw.com
        thorneg@higgslaw.com
        spaidj@higgslaw.com

17
18
19
20
21
22
23
24
25
26

Lawrence David Levien
AKIN GUMP STRAUSS HAUER & FELD
2001 K Street, N.W.
Washington, DC 20006-1037
Telephone: 202-887-4054
Fax: 202-887-4288
Email: llevien@akingump.com

Stephanie Peri Priel
BAKER MCKENZIE
10250 Constellation Boulevard
Suite 1850
Los Angeles, CA 90067
Telephone: 310-201-4728
Fax: 310-201-4721
Email: spriel@akingump.com

27

*Attorneys for Plaintiffs*

*Attorneys for Plaintiffs*

28

1

1  I declare under penalty of perjury under the laws of the State of California that
2  the foregoing is true and correct.

3  Executed on this 23rd day of September, 2021, at San Francisco, California.

Katherine Pierre

2