William M. Low, Bar No. 106669
wlow@higgslaw.com
Edwin M. Boniske, Bar No. 265701
boniske@higgslaw.com
Geoffrey M. Thorne, Bar No. 284740
thorneg@higgslaw.com
Jacob T. Spaid, Bar No. 298832
spaidj@higgslaw.com
HIGGS FLETCHER & MACK LLP
401 West "A" Street, Suite 2600
San Diego, California  92101-7913
Telephone: 619.236.1551
Facsimile:  619.696.1410

Attorneys for Plaintiffs
EVANS HOTELS, LLC; BH PARTNERSHIP LP; and EHSW, LLC

(*Counsel continued on next page*)

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EVANS HOTELS, LLC, a California limited liability company; BH PARTNERSHIP LP, a California limited partnership; EHSW, LLC, a Delaware limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> UNITE HERE! LOCAL 30; BRIGETTE BROWNING, an individual; SAN DIEGO COUNTY BUILDING and CONSTRUCTION TRADES COUNCIL, AFL–CIO; and TOM LEMMON, an individual, <br><br> Defendants. | Case No. 3:18-cv-02763-LL-AHG <br><br> **THIRD AMENDED COMPLAINT FOR:** <br><br> 1. **UNLAWFUL SECONDARY BOYCOTT** <br> 2. **ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT** <br> 3. **CONSPIRACY TO MONOPOLIZE IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT** <br><br> **DEMAND FOR JURY TRIAL** |

THIRD AMENDED COMPLAINT

Lawrence D. Levien (*Pro Hac Vice*)
LLevien@littler.com
LITTLER MENDELSON, P.C.
815 Connecticut Avenue, NW, Suite 400
Washington, DC 20006
Telephone: 202.842.3400
Facsimile: 202.842.0011

Daniel J. Mogin, Bar No. 95624
dmogin@moginrubin.com
Jennifer M. Oliver, Bar No. 311196
joliver@moginrubin.com
Timothy Z. LaComb, Bar No. 314244
tlacomb@moginrubin.com
MOGINRUBIN LLP
600 West Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 687-6611
Fax: (619) 687-6610

Attorneys for Plaintiffs
EVANS HOTELS, LLC; BH PARTNERSHIP LP; and EHSW, LLC

THIRD AMENDED COMPLAINT

10794295.1

Plaintiffs Evans Hotels, LLC; BH Partnership, LP; and EHSW, LLC (collectively "Evans Hotels" or "Plaintiffs") allege as follows:

## SUMMARY OF THE ACTION

1.      This is a case about unions and union leaders that, in their quest for increased dues and power in the Relevant Market, have abandoned traditional (and legal) statutory systems of labor democracy in favor of a pattern of abusive and unlawful secondary boycotts, sham "environmental" and land use challenges,[1] false statements, extortion, bribery, threats, and intimidation.  Defendants UNITE HERE! Local 30 ("Local 30"), the San Diego County Building and Construction Trades Council, AFL-CIO ("Building Trades"), and their respective leaders, Brigette Browning and Tom Lemmon (collectively "Defendants"), have combined, agreed and conspired with each other and a rotating cast of "concerned citizens" and others in an attempt to dominate, monopolize, control, and unreasonably restrain trade in the market for luxury destination resorts in the cities of San Diego and Coronado (the "Relevant Market").

2.      Defendants openly flaunt to owners, developers, and the remaining City of San Diego ("City") officials not under their thumb that it's a "new day" in San Diego and that business owners and developers "better figure out who runs this town."  Of course, Defendants are not (nor have they ever been) elected officials.  Rather, they exercise their control over the City by communicating in serial fashion, behind the scenes with elected city officials, to secure their opposition to non-union projects (in violation of the Ralph M. Brown Act, Cal. Gov. Code § 54950, *et seq*.) in exchange for campaign funding and other "support." These meetings are held in secret because the City Attorney has advised City Council members that conditioning support for a project on the developer's agreement to unionize is unlawful.  Accordingly, Defendants' off-the-

---

[1] As discussed further, Defendants raise numerous objections to project approvals on non-environmental grounds, including, among others, that projects do not comport with general plans, contravene the Coastal Act, violate affordable housing and accommodation requirements, and fail to comply with historic preservation provisions. Evans Hotels refers generally to these non-environmental categories as "land use" objections or challenges.

record meetings to ensure opposition to non-union projects induce City Council members to violate the Brown Act and federal labor laws, rendering these "lobbying" efforts unlawful, and therefore, not legitimate petitioning activity.

3.      Attempting to secure a majority vote for or against a project before it is even docketed for a public hearing is not legitimate petitioning activity.  In some instances, when Defendants are unable to secure a majority of votes in opposition before the project is docketed, they exercise their control over the Mayor's office and the City Council President to delay and block the project from being docketed for a hearing.  As part of a secret agreement to obtain union support for approval of his plans to expand the San Diego Convention Center, Mayor Kevin Faulconer expressly agreed to give Defendants "veto power" over any non-union projects they oppose.  This agreement has been carried out by slow rolling, and in some cases, blocking the docketing of non-union projects.  This has the effect of denying non-union owners and developers meaningful access to those governing bodies.

4.      The serial, reflexive oppositions that Defendants advance to the City Council and other governmental entities or agencies involved in the approval process for a project, including the Planning Commission, Development Services Department, Port of San Diego, and Coastal Commission, as well as in the courts, are also not legitimate petitioning activity.  Defendants pursue these actions without regard for the merits of their claims, often using the same, boilerplate sham attacks, to the point that Defendants readily admit that they create legal challenges out of "thin air" and then abandon their claims and actively support the same project once they secure the unrelated labor agreements they seek.  Although Defendants repeatedly allege that proposed projects violate the California Environmental Quality Act ("CEQA"), fail to conform with the general plans, or should be rejected for other non-environmental reasons, Defendants drop these objections once they secure labor agreements, and the final, approved projects rarely, if ever, include provisions addressing the CEQA or land use related objections Defendants asserted.

10794295.1

5.      Unfortunately for the residents and taxpayers of the City, Defendants have used their power and control to hold development and progress in San Diego hostage and deny taxpayers more than a billion dollars in increased revenue.  Defendants have engaged in this illegal behavior not to protect hotel or construction workers, but to advance their own economic and political interests, and to restrict the development of competing non-union hotels and other projects in the prime tourism regions of San Diego.

6.      For more than ten years, and with ever-increasing frequency, Defendants have refined their "playbook": hold any non-union owner and developer hostage by impeding, delaying, or shutting down projects through unlawful meetings and agreements with City officials, greenmail, and secondary boycott activities.  Defendants have thwarted, delayed and, in many cases, shut down development of non-union projects (and impeded the creation of tens of thousands of new jobs) at the expense of the City of San Diego and its residents.  As detailed below, Defendants have carried out this playbook against at least ten separate non-union developers that Evans Hotels has identified so far.  Such significant restraints on the Relevant Market used to support union campaigns and implemented without regard to wages and working conditions of the target's employees are not protected by either the statutory or non-statutory labor exemption to antitrust claims.  *See Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 623 (1975).

7.      Defendants' playbook is, *inter alia*, a pattern of anticompetitive, exclusionary conduct, designed with one objective: to use unlawful measures to unionize all labor in the construction and operation of large-scale hospitality properties in greater San Diego.

a.   For Local 30 and Ms. Browning, this objective is not achieved by free and fair elections in accordance with statutory systems of labor democracy but rather by forcing card check neutrality agreements on non-union properties. In fact, Local 30 has not even attempted a collective bargaining election by

the NLRB in more than 15 years because, as Ms. Browning recognized, Local 30 "wouldn't get an agreement."

    b. For the Building Trades and Mr. Lemmon, this playbook means ensuring that hospitality developers agree to a Project Labor Agreement ("PLA") or use only unionized labor on an upcoming construction project.

Mr. Lemmon said to a developer of a two billion dollar project, he does not care if the project he is killing would provide thousands of jobs to his members, and he does not care if the project is great for San Diego. He "owns five city council members," and although he acknowledges that Defendants' unlawful actions will cost his members jobs today, he and Defendants will pay that price unless the developer agrees to his demands (including a card check neutrality agreement for Local 30, a union that does not represent his members).

8. Ms. Browning and Mr. Lemmon both have bragged about their collective control over the City Council and their ability to kill good projects for City residents before they even get docketed. They do so by covertly communicating, in serial fashion, with City Councilmembers to secure their agreement to approve the project only if a PLA and card check neutrality agreement are in place (in violation of the Brown Act) or, when that fails, prevent the project from getting placed on the City Council's docket for a public hearing and determination.

9. As a result of these tactics, projects are held in limbo—sometimes for years—until the developer is forced to either agree to unionize or abandon the project entirely.

10. The latest target of Defendants' unlawful activity is the redevelopment of the Bahia Resort Hotel. The Bahia Resort Hotel is on Mission Bay Park, land leased from the City. It was the first commercial lessee on Mission Bay and has operated under long term leases from the City since the 1950s. The City receives substantial rent from the Bahia Resort Hotel based upon a percentage of the revenue generated by the

4

THIRD AMENDED COMPLAINT

property.  Any increase in revenue to the Bahia Resort Hotel increases the rent owed to the City.  In the late 1980s, the family owners of Evans Hotels submitted a redevelopment plan for the Bahia Resort Hotel.  The City asked them to put the redevelopment plan on hold, so the City could finish updating its comprehensive land-use plan for the entirety of Mission Bay Park (the Mission Bay Park Master Plan Update, "MBMPU").  In 1994, after years of public input, over one hundred public meetings, and approval by the California Coastal Commission, the MBMPU was adopted by the City.  The approved land use plan expressly contemplated the new and expanded footprint for the Bahia Hotel.  Because the land is leased from the City, a lease amendment from the City is required as part of any significant redevelopment.

11. Evans Hotels is now seeking an amendment to the Bahia lease agreement in order to redevelop the Bahia in accordance with the MBMPU.  The redevelopment contemplates not just renovating the existing space, but adding hundreds of additional rooms.  Defendants have not engaged in lawful union election procedures or negotiations with Evans Hotels regarding the use of organized labor in either the development of the Bahia or its staffing.  Instead, Defendants presented sham environmental and land use challenges to the lease amendment, communicated behind the scenes with a majority of the City Council members and demanded their opposition to the redevelopment unless and until Evans Hotels agreed to the labor demands, made threats to Evans Hotels and its business partner SeaWorld, made false statements to the public concerning the project, and told Plaintiffs point blank that if they did not agree to a PLA and card check neutrality agreement they would use their extensive control over the City Council to kill the project.

12. Defendants' conduct not only violates Section 8(b)(4) of the National Labor Relations Act ("NLRA") and Section 303 of the Labor Management Relations Act ("LMRA"), but in the aggregate demonstrates a pattern of anticompetitive, coercive, and unlawful conduct that is designed to (and has) stifled development,

10794295.1

competition, and commerce in the Relevant Market in violation of Section 2 of the Sherman Act.

## THE PARTIES

13.     Evans Hotels was founded by San Diego natives William and Anne Evans in 1953.  It operates three hotel properties in and around San Diego: the Bahia Resort Hotel (the first commercial lessee on Mission Bay); the Catamaran Resort Hotel and Spa (on the northwest corner of Mission Bay); and The Lodge at Torrey Pines (an AAA Five Diamond resort located near Torrey Pines State Reserve and Torrey Pines Golf Course).

14.     Plaintiff Evans Hotels, LLC is a California limited liability company located at 998 West Mission Bay Drive in San Diego  ("Evans Hotels").  It is an employer within the meaning of the NLRA, 29 U.S.C. § 152(2).  Evans Hotels is committed to its employees.  It employs over 1,180 individuals, many of whom have been with the company and its predecessors for more than a decade.  Indeed, 8% of Evans Hotels' employees have over 20 years of service, and the average tenure of all employees with over one year of service is 11 years.  Annually, Evans Hotels pays over $39 million to its employees and over $9.5 million in employee benefits.  Along with competitive health insurance and a matching 401(k) program, Evans Hotels offers all of its employees interest-free loans and hosts 35 free on-site health and wellness activities throughout the year.  Evans Hotels is committed to training its employees and promoting based on merit.  45% of Evans Hotels'' managers have received advanced training in leadership development.  Evans Hotels is not engaged primarily in the building and construction industry, nor does it employ employees engaged in the building and construction industry or control labor relations at any construction sites. Evans Hotels'' employees have never sought to be recognized by Local 30.  Nor has Evans Hotels ever been engaged in a collective bargaining relationship with either Local 30 or the Building Trades.

10794295.1

15.     The Bahia Resort Hotel ("Bahia"), which opened in 1953, is located in the heart of Mission Bay on the Bahia Peninsula.  The Bahia is a full-service hotel, offering extensive visitor-serving amenities, on-site restaurants and bars, a fitness center, and resort activities.  Plaintiff BH Partnership, LP is a California limited partnership located at 998 West Mission Bay Drive in San Diego.  BH Partnership, LP owns the Bahia and is a party to the Bahia lease with the City.  Members of the Evans Hotels family own and control BH Partnership, LP.

16.     Plaintiff EHSW, LLC is a Delaware limited liability company located at 998 West Mission Bay Drive in San Diego.  Members of the Evans Hotels family own and control EHSW, LLC.

17.     Plaintiffs are informed and believe, and thereon allege, that Defendant Local 30 is an unincorporated association and a labor union.  Local 30 is the local affiliate of the national UNITE HERE! union (formed when the Union of Needletrades, Industrial and Textiles Employees combined with the Hotel Employees & Restaurant Employees International).  Local 30 represents service workers in the San Diego region. Local 30 maintains offices at 2436 Market Street (in San Diego) and at 5256 Mission Road (in San Diego County).  Local 30 is a labor organization within the meaning of Section 152(4)-(5) of the NLRA, 29 U.S.C. § 152(4)-(5).

18.     Plaintiffs are informed and believe, and thereon allege, that Defendant Brigette Browning is the president of Local 30 and works in San Diego.   On information and belief, Ms. Browning will receive increased salary and/or benefits if the number of union members increases.

19.     Plaintiffs are informed and believe, and thereon allege, that Defendant Tom Lemmon was the business manager of Defendant Building Trades during the relevant time period and lives and works in San Diego County.  On information and belief, Mr. Lemmon received increased salary and/or benefits when the number of union members increased.  In October 2021, Mr. Lemmon retired from his position as business manager of Defendant Building Trades.  As reported by the Voice of San Diego,

THIRD AMENDED COMPLAINT

Defendant Building Trades forgave between $100,000 and $200,000, and potentially more, in payments to which Mr. Lemmon was not entitled.  This agreement, on its face, restricts Mr. Lemmon's ability to testify truthfully in this matter because the provision of continued defense and indemnity for this particular action by Defendant Building Trades is "contingent upon [Mr. Lemmon] not admitting to any liability attributable to any acts or other conduct of [Mr. Lemmon] while engaged in the scope of his duties while acting as an agent of [Defendant Building Trades]."[2]

20.     Plaintiffs are informed and believe, and thereon allege, that Defendant Building Trades consists of affiliated construction and trade unions in San Diego County.  The Building Trades maintains an office at 3737 Camino del Rio South, Suite 202 in San Diego.  The Building Trades is a labor organization within the meaning of Section 152(4)-(5) of the NLRA, 29 U.S.C. § 152(4)-(5).

21.     Local 30 regularly files quarterly lobbyist disclosure reports identifying Ms. Browning as a lobbyist under San Diego's Lobbying Ordinance, San Diego Municipal Code § 27.4001, *et seq.*  It does not appear that the Building Trades or Tom Lemmon have filed any lobbyist disclosure forms with the City in the past 10 years.  On information and belief, the Building Trades meets the definition of an "organization lobbyist" under Municipal Code § 27.4002 and is subject to the Lobbying Ordinance, including the requirement that it file quarterly disclosure reports disclosing its contacts with the City.  Failure to lawfully register renders the lobbying activity unlawful.

22.     The acts alleged to have been done by Defendants were authorized, ordered, or performed by their respective directors, officers, managers, agents, employees, or representatives in the course of their employment and while actively engaged in the management of Defendants' affairs.

---

[2] An unsigned version of this agreement was published in the Voice of San Diego. See Notice of Retirement and Agreement of Mutual Release, *available* at https://www.voiceofsandiego.org/wp-content/uploads/2021/10/LemmonResignationAgreement.pdf at p. 2-3, 4.

23.     Each Defendant, through its subsidiaries, divisions, affiliates and agents, operated as a single unified entity with each acting as the agent or joint-venturer of or for the others with respect to the acts, violations, and common course of conduct alleged herein and under the authority and apparent authority of parent entities, principals and controlling parties.

24.     Various other persons not named as Defendants have participated as co-conspirators or joint venturers with Defendants and have made contracts, performed acts, and made statements in furtherance of Defendants' unlawful acts and conspiracy. The Defendants are jointly and severally liable for the acts of such persons or entities and Plaintiffs are informed and believe, and on that basis allege, that each such entity is responsible in some manner for the occurrences herein alleged, or was acting in concert with, and with the permission, approval, and authorization of, the specifically named Defendants. Plaintiffs will seek leave of the Court to amend this pleading to set forth the true names and capacities of such parties when the same are ascertained.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over the subject matter of Plaintiffs' Second Amended Complaint under 28 U.S.C. § 1331 and § 1337, because the Second Amended Complaint arises under federal statutes: the NLRA, 29 U.S.C.A. § 158; the LMRA, 29 U.S. Code § 187; the Sherman Act, 15 U.S.C. § 2; and the Clayton Act, 15 U.S.C. §§ 15, 26.

26.     The conduct alleged in this Third Amended Complaint occurred in interstate commerce and has substantially and directly affected and will continue to substantially and directly affect interstate commerce.

27.     The Court has personal jurisdiction over the Defendants and venue is proper in the Southern District of California because: (1) the Defendants reside and/or conduct business in the State of California and at least one of the Defendants resides and/or conducts business in this District; and (2) substantial parts of the events or omissions giving rise to the claims alleged herein occurred in this District.

THIRD AMENDED COMPLAINT

10794295.1

# DEFENDANTS' UNLAWFUL CONDUCT

**Defendants' Goal: Increase Union Dues By Securing a Card Check Neutrality Agreement for Local 30 and a PLA for the Building Trades**

Card Check Neutrality Agreements

28.     Plaintiffs are not parties to any collective bargaining agreement with Defendants, including PLAs. Nor have Defendants attempted traditional, lawful, statutory unionization of Evans Hotels' properties during the time relevant to this lawsuit or since its filing.

29.     With respect to unionizing employees, the differences between traditional, lawful labor organization and Defendants' playbook cannot be overstated.  Traditional, statutory NLRA rules focus on *employees*' wants and demands.

30.     The unionization process generally begins with the union collecting signed authorization cards from employees seeking to be represented in collective bargaining from 30% of the company's employees.  The union then must petition the National Labor Relations Board ("NLRB"), which will determine whether the union made a timely and sufficient showing of employee interest and sought to represent an appropriate bargaining unit.  If, following an investigation, discovery, and a hearing during which witness testimony is taken, the NLRB finds it appropriate to schedule an election, a Board-regulated campaign period will follow.  During this campaign, both the employer and the union can speak freely and openly with the employees regarding the costs and benefits of unionization.  Only *after* an election is scheduled is the employer required to disclose to the union contact information for employees in the bargaining unit.  Significantly, the union does not have the right to access and use the hotel owner's facilities during this "campaign" period.  Once the campaign period is complete, the NLRB conducts a secret ballot election and the hotel owner has the right to object to the election procedure.  Following additional discovery and a hearing, the Board will determine whether to void the election and schedule a new one.  The Board will not certify the union as the exclusive representative of the employees until after the

union receives informed votes from a majority of the employees in what the Board determines to be a fair election process.

31.    Unionization of employees through the process set forth in the NLRA is far from guaranteed.  *Many* employees do not wish to pay the initiation fees and membership dues associated with union representation.  To avoid these issues, Defendants have developed an unlawful playbook that allows them to bypass this legal structure that Congress and the NLRB created for employees to express their desires regarding union representation.  Instead of unionizing properties by securing employees' voluntary and informed consent, Defendants instead accomplish the same objective by unlawfully extorting hotel owners into signing Defendant Local 30's form card check neutrality agreement (hereinafter referred to as "card check neutrality agreement").

32.    A card check neutrality agreement does not include any of the safeguards built into the NLRA to ensure that the decision to unionize is made by the employees and is both voluntary and informed.  Instead, a hotel owner pledges to remain "neutral" in Local 30's organizing campaigns conducted in the employer's nonunion facilities and to not communicate with its employees regarding the ramifications of unionization.  The employer further agrees that if Local 30 collects signed authorization cards from a majority of employees sought to be unionized, the employer will recognize the union, foregoing its legal right to a Board-conducted secret ballot election.  Local 30 has additional rights under the agreement after the union is "recognized."  For instance, the card check neutrality agreement requires the owner to furnish Local 30 on a monthly basis with a complete list of employees, including their job classifications, departments, personal phone numbers, home addresses, and email addresses.  The agreement further gives Local 30 the right to "engage in organizing efforts" on the premises.  As part of that solicitation, the agreement permits Local 30 to hold "captive audience meetings," in which the employer must require employees to attend union-sponsored speeches on the property during work hours.  Finally, the employer waives its right to bargain the terms and conditions of employment to impasse, instead agreeing to submit disputed terms

and conditions to arbitration. This is called an "interest arbitration."  The interest arbitrator alone then determines the terms and conditions of employment, including wages, benefits, and union dues, for the members.  The agreement requires the interest arbitrator to examine the terms and conditions of employment in effect in the market by looking at comparable unionized hotels within a specific radius of the employer's hotel. In exchange for compliance with its agreement, Local 30 agrees not to strike, picket, or boycott the hotel.

33.    Therefore, by its very nature, a card check neutrality agreement dramatically restricts the employer's First Amendment rights, as it infringes upon an employer's free speech right to communicate its views to its employees.  Regardless of how the employer feels, what relevant information the employer holds, or how long the employee has worked for the employer in a non-unionized environment, the employer is absolutely prohibited from speaking with its employees about the ramifications of joining the union other than to say it "welcomes the union."  The result of this sham employer "welcome" is that the employees are forced to choose for or against unionization without hearing from the employer regarding the costs and consequences of joining a union.  The employer is not even permitted to advise its employees that a card check neutrality agreement is in place.

34.    There are costs and consequences of unionization that employees may want to consider in making an informed decision.  With a card check neutrality agreement in place, Evans Hotels would be prohibited from speaking to its employees regarding the negative consequences of unionization.  Thus, Evans Hotels' employees would not be able to consider, for instance, that employee contributions to the Evans Hotels' 401(k) plan vest immediately and employer contributions vest in 25% increments over the course of five years.  If an employee decides to leave Evans Hotels at any time, that employee keeps his or her vested account balance and may leave it in the Evans Hotels' 401(k) plan, directly roll it over into another qualified plan, or withdraw the account balance (subject to taxes and penalties for early distribution), regardless of where he or

she decides to work, or what he or she decides to do.  By contrast, the union's pension plan benefits are generally not portable and are contingent on the employee working the required number of years at a union hotel that contributes to the pension plan.  If that same employee leaves a contributing union hotel without a full five years of vesting service to work at a non-union property, the employee loses all his or her accrued benefits—even though those benefits were earned through contributions that came out of the employee's wage and benefits package.

35.     Other practical consequences of unionization that employees are not presented with during the card check process include union security agreements and union dues deduction authorization.  Union security agreements require each employee to either become a member of Local 30 or pay an upfront fee to Local 30 to cover Local 30's collective bargaining costs.  If the employee fails to either agree to join Local 30 or pay the upfront fee, the employer has no choice but to terminate the employee.  Once employees join the union, Local 30 requires employers to deduct union dues from the employees' compensation and remit the monies directly to Local 30.  On information and belief, all union collective bargaining agreements governing workers at San Diego area hotels include union security agreements and union dues deduction authorization.

36.     Because of the importance of ensuring that employees are well-informed about unionization, the Supreme Court has held that "an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union. . . ."  *N.L.R.B. v. Gissel Packing Co*., 395 U.S. 575, 617 (1969).  This right also is enshrined in Section 8(c) of the NLRA, which protects expressions of views by employers and unions that "contain[] no threat of reprisal or force or promise of benefit."  29 U.S.C. § 158(c).  Consequently, while hotel employers may voluntarily agree to sign card check neutrality agreements, actions designed to extort such agreements violate the First Amendment and Section 8(c).

37.     The protection for this type of employer speech in Section 8(c) is important because, in the highly regulated area of labor relations, employers and unions do not

have unfettered First Amendment rights.  As the Supreme Court and lower courts, including the Ninth Circuit, have recognized, employers and unions may be sanctioned and enjoined for engaging in unfair labor practices, even if the violations are based on speech that would otherwise be protected under the First Amendment.  In particular, an act that violates Section 8(b)(4)'s prohibition on secondary boycotts "carries no unconstitutional abridgment of free speech." *Int'l Bhd. of Elec. Workers v. N.L.R.B. (IBEW)*, 341 U.S. 694, 705 (1951).

38.    For obvious reasons, Defendants prefer a process where they retain exclusive control over the information presented to employees and where the employer is forced to stay silent as to the consequences of unionization.  Defendants do not want to invest the time, effort, and money to allow employees to make an informed choice and face the risk of recovering nothing in the way of union initiation fees and monthly dues.  Rather than seeking employees' support, they pursue hotel owners' and developers' surrender.  Defendants employ unlawful means to circumvent lawful organizing tactics and employees' rights to information, voting, and consent by seeking involuntary card check neutrality agreements.

39.    As Ms. Browning has recognized, if she were forced to try to organize hotel workers the traditional way, she "wouldn't get an agreement."  Indeed, that is why historically many of the hotels in San Diego were non-union.  Ms. Browning knows that with a card check neutrality agreement, there is no vote by the employees as to whether to join the union, much less a secret ballot.  Instead, the union simply collects cards from the employees.  It is very rare that a "card check vote" under this process results in a "no" for unionization.  While there is a question as to whether employees benefit from unionization, there is no question as to the direct and immediate financial benefit to Defendants Browning and Local 30 in the form of increased union dues, initiation fees, and employer payments into union pension and health plans.

40.    In fact, Local 30 receives a substantial portion of its income in the form of dues from its members.  On average, a member pays the union $750 a year in dues.

Local 30 also imposes a one-time "initiation fee"—ranging from $60-$124—for each new member.  Thus, an increase in dues-paying members immediately results in initiation fees to Local 30 and increases the number of members paying annual dues going forward.  On information and belief, those union dues and fees both fund the Defendants' playbook, and benefit Defendant Ms. Browning personally in both salary and stature.[3]  Local 30 received 81.4% of its $4,462,751 income from dues and dues related fees alone.

41.     Not surprisingly, employers are generally not inclined to agree to a card check neutrality agreement—a process that denies them their First Amendment right to oppose unionization and communicate with their employees.  There are some exceptions.  Some employers agree to card check neutrality agreements to ensure labor peace, i.e., no disruption to business or handbilling by employees.  Others agree because they want to attract business from labor unions or union-connected businesses or who already have an established relationship with a union representing another part of their workforce voluntarily.  But those employers are in the minority.  As a result, Defendants are willing to use unlawful means to force hotel owners to agree to a card check neutrality agreement against their will.

Project Labor Agreements

42.     The NLRA prohibits prehire agreements, in which a union and an employer agree to use only union labor.  Prehire agreements are expressly forbidden, because they deprive employees of their choice of whether to be represented by a union.  29 U.S.C. § 158(e).

43.     Congress carved out a limited exception to the prohibition against prehire agreements for PLAs between unions and employers in the construction industry. Because construction projects are often short-term, it is difficult for employees to organize and obtain recognition.  Under a PLA, the developer agrees before beginning a

---

[3] Brigette Browning was paid a total of $103,599 from her vice president role at UNITE HERE, and president role at UNITE HERE Local 30 in 2018.

project that it will work only with a unionized general contractor and that it will require that general contractor to subcontract work exclusively to unionized persons or entities regardless of cost, skill, experience or other factors such as the size of the company bidding the work and/or whether it is a minority owned business.  Although it is not uncommon for developers to contract out work to unionized labor without a PLA in place, it is impossible to contract work to any of the thousands of non-unionized workers once a PLA is in place.   Thus, by its nature, a PLA is designed to eliminate competition from non-union workers and preclude developers from being able to enter into contracts free of restriction.

44.   As the Supreme Court has recognized, Congress intended that such prehire agreements must "be arrived at voluntarily" and "no element of coercion" could be employed to force employers to agree to them.  *N.L.R.B. v. Local Union 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, AFL-CIO*, 434 U.S. 335, 347 n.10 (1978).

45.   Due to its restrictive nature, a PLA dramatically increases the costs of construction on real estate development projects.  A PLA reduces the number of qualified bidders on a construction project to a small portion of the work force, which in turn weakens a developer's bargaining power.  Moreover, in most cases the employees working the project are required to join an underfunded union-run multi-employer pension plan.  Employers of union-represented employees who join these union-run multi-employer plans incur the financial liability for the underfunding.  That liability alone can exceed the value of the project and remain a burden on the employer long after construction is completed.  Once the developer agrees to a PLA, it loses the right to contract with persons or entities based on skill, cost, or other intangibles such as a diversified workforce.  Instead, all work, no matter how competitive or uncompetitive the bid may be, must be directed to unionized labor.  It is for this reason that in many cases, the short-term and long-term costs associated with a PLA can make a once viable project financially unfeasible.  It also is why most developers do not voluntarily agree to

16

THIRD AMENDED COMPLAINT

PLAs.  The few developers who voluntarily agree to PLAs usually do so only when nonunionized workers are unavailable or unable to meet the staffing needs of a particular construction site.  Other developers may voluntarily agree to PLAs if they want to avoid conflicts with unions or have long-established collective bargaining relationships with labor unions that already supply most of their workforce to construction sites.

46.    Because Defendants cannot in many cases present a business case as to why Plaintiffs should accede to their demands for a card check neutrality agreement or a PLA, they have resorted to unlawful means to force Plaintiffs and other hotel owners and developers to sign their rights away involuntarily.  If Defendants had faith in their ability to reach their goals through traditional means of organizing labor—i.e., picketing, boycotting, lobbying, and/or negotiating for a voluntary labor agreement—they would not need to resort to unlawful acts, including communicating behind the scenes with public officials to deny owners and developers the benefit of a public hearing on the real source of opposition (i.e., the labor concessions), and applying secondary pressure.

47.    This repeated "playbook" of anticompetitive, exclusionary conduct harms not only the owners and developers of the projects, but also the residents of San Diego.  New projects and redevelopment efforts translate into more jobs, increased tourism (which translates into higher transient occupancy tax revenue) and healthy competition.  Likewise, having union and non-union properties (as determined by legal and fair union voting practices) allows for competition in the hospitality and construction industries and choices for workers.

**Part 1 of Defendants' Playbook:  Publicly Attack the Non-Union Project on Sham Environmental Grounds and Land Use Issues**

48.    For each target, Defendants delay, oppose, and, if necessary, eliminate the project by painting it as environmentally harmful.  Initially, they send letters to public officials to express purported concern that a new development plan does not align with

THIRD AMENDED COMPLAINT

governing environmental regulations and non-environmental requirements.  They also request documents from governmental agencies, namely all environmental materials applicable to the development.  Next, they combine forces with environmental groups to draw public attention to the purported environmental issues, feigned environmental concerns, and sham land use issues by creating websites dedicated solely to opposing the project and/or posting on social media.

49.    Defendants automatically and aggressively initiate this sham opposition—which they have openly referred to as "greenmail"—with every non-union project presented to the City Council, the Coastal Commission, or the Port of San Diego, regardless of size, merit, or consequence to City residents.

50.    Defendants subvert the integrity of the governmental process through serially meeting with members of government bodies off the record, triggering conversations, the exchange of facts preliminary to any decision, and reminders about past election support provided by Defendants for the members as well as promises of future support, resulting in secret promises by the members to oppose non-union projects that Defendants have targeted (in violation of the Brown Act).  Until Defendants secure a commitment from a majority of City Council members to oppose a project until it agrees to unionize, Defendants exercise their control over the Mayor's office and City Council members to delay or block the project in question from being docketed for a public hearing.  Because the Mayor's office must make recommendations and prepare reports about pending projects, the Mayor can direct that those tasks be delayed until Defendants have obtained assurances from a majority of the City Council to oppose the project.  This denies non-union owners and developers meaningful access to the City Council, Coastal Commission, and the courts, which can consider challenges only on review of the actions of other government bodies.

51.    Publicly, Defendants pursue frivolous and unrelated challenges to the development at every level.  They start with the local planning committees, including the Port of San Diego, the Planning Commission, City Council, and the Coastal

Commission.  If they fail to secure enough votes in opposition from these bodies, they initiate litigation either directly or indirectly under state statutes such as CEQA and local land use requirements.  Before Defendants can file a lawsuit under these provisions, they must first oppose a project at the City Council, the Port of San Diego, or other governmental agency that votes to approve it.

52.   Whatever means they use, Defendants' opposition is taken automatically and reflexively to non-union projects, without regard for the merits of the contentions they raise.  Indeed, once Defendants receive what they want – card check neutrality agreements and PLAs – not only are the environmental and land use claims abandoned, but Defendants switch gears entirely and actively support the very same projects they previously opposed.

53.   This sham opposition, greenmail, and abuse of the government process results in a huge expenditure of resources not just for owners/developers, who are required to respond to hundreds or thousands of pages of drummed up environmental comments and prepare environmental assessments that would not otherwise be required, but also for the residents of San Diego and the judicial system that is forced to expend precious resources on these proceedings.

54.   These actions also delay development for years, causing owners/developers to lose financial backing, to incur costs associated with holding undeveloped land for an extended time, and to incur escalating construction costs.  Through unlawful government meetings, abuse of the City Council, manipulation of the docketing and approval process, sham environmental and land use opposition, and baseless lawsuits, Defendants thwart and delay developments, resulting in less development, less competition, less commerce, fewer jobs, lower City transient occupant tax ("TOT") revenue, and lost City rent revenue.

10794295.1

**Part 2 of Defendants' Playbook: Threaten Third Parties in Business with the Targeted Owner/Developers and Public Officials**

55.     While pursuing the frivolous environmental and land use challenges, Defendants use additional unlawful tactics, such as threatening third parties who have a business relationship with the owner or developer and/or threatening elected public officials who they meet with in serial fashion off the record in an attempt to secure the votes necessary to preclude the project from moving forward before it even gets docketed for a public hearing.

56.     In terms of the former, Defendants target neutral third parties who do business with the non-union owner/developer and use the threat of disruption to that third party/non-union developer's business relationship as leverage to force the developer to accede to Defendants' demands.  Again, whatever means Defendants use, their real objective is to pressure that third party to either discontinue its relationship with the owner/developer that Defendants want to organize or continue to be subject to threats, intimidation, and opposition from Defendants.

57.     In terms of the latter, Defendants have explicitly told owners and current sitting Councilmembers that it is "a new day" in San Diego and that Defendants (not City Council) "run this town."  Defendants have seized control over the City Council and other elected public officials by offering union money and support as a quid pro quo for voting against or delaying a particular project, regardless of whether it is in the best interest of the residents of San Diego.  Both Mr. Lemmon and Ms. Browning brag about their "ownership" and control over the City Council and have used their ability to unilaterally block projects from being docketed for a vote and/or approved by the City Council to extort agreement for card check neutrality agreements and PLAs.

58.     Defendants' acts of surreptitiously lining up City Council votes before a public hearing violates California law.  The Brown Act prohibits a majority of a legislative body from meeting privately, including using "a series of communications of any kind, directly or through intermediaries to discuss, deliberate, or take action on any

10794295.1

item that is within the subject matter jurisdiction of the legislative body."  Cal. Gov. Code § 54952.2.  The City Council is a legislative body within the meaning of the Brown Act.  Taking action means "a collective decision made by a majority of the members of a legislative body, a collective commitment or promise by a majority of the members of a legislative body to make a positive or a negative decision, or an actual vote by a majority of the members of a legislative body when sitting as a body or entity, upon a motion, proposal, resolution, order or ordinance."  Cal. Gov. Code § 54952.6.

59.     On information and belief, Defendants and/or their agents communicate with a majority of the City Council behind closed doors through phone conversations, text messages, and in-person meetings long before the public hearing takes place to ensure the members will block a project from going forward unless and until there is a labor agreement in place.  Defendants serve as intermediaries between City Council members to communicate how they intend to vote on the project.  As a result, the "public hearing" is nothing more than a pre-scripted proceeding in which the owner/developer and public have no real ability to influence the outcome.  Indeed, Defendants' control over these proceedings is so blatant that City Councilmembers often read information from scripts prepared for them by Defendants in advance of the hearing.

60.     These meetings are held in secret for two reasons. First, the City Attorney has advised councilmembers that conditioning support for a project on the developer's agreement to unionize is unlawful. Second, such meetings violate the Brown Act and federal labor laws. And even where councilmembers (opposed to Defendants) have violated the Brown Act in connection with these meetings, Defendants induced the Brown Act violation meaning the actions remain illegitimate petitioning activity that falls outside the protections of *Noerr-Pennington*.

61.     To prevent this abuse from occurring, the City of San Diego enacted a lobbying ordinance decades ago that requires lobbyists to file regular disclosure forms. San Diego Mun. Code § 27.4001, *et seq*. (the "Lobbying Ordinance").  Lobbying is

defined as "direct communication with a City Official for the purpose of influencing a municipal decision on behalf of any other person."  San Diego Mun. Code § §27.4002. "Lobbying activities means the following and similar activities that are related to an attempt to influence a municipal decision: (a) lobbying; (b) monitoring municipal decisions; (c) preparing testimony and presentations; (d) engaging in research, investigation, and fact-gathering; (e) attending hearings; (f) communicating with clients; (g) waiting to meet with City Officials; and (h) communications with City employees who are not City Officials."  *Id*.

62.     The Lobbying Ordinance requires every "lobbying firm" and "organization lobbyist" to register with the City.  An "organization lobbyist" includes "any business or organization, including any non-profit entity, that provides compensation to one or more employees for the purpose of lobbying on behalf of the business or organization and who have a total of 10 or more separate contacts with one or more City Officials for that purpose within 60 consecutive calendar days."

63.     Local 30 meets the definition of "organization lobbyist" and has registered with the City and routinely files quarterly disclosure reports that identify, among others, Defendant Browning as its agent.

64.     Based on Defendant Lemmon's statements that the Building Trades "owns five city council members," Plaintiffs are informed and believe that the Building Trades also meet the definition of "organization lobbyist."  The only plausible way that Lemmon could "own[] five city councilmembers" is by communicating opposition to projects through private meetings and communications in advance of a vote.

65.     A search of the City's database of registered lobbyists and disclosure forms does not turn up any forms submitted by the Building Trades or any forms that identify Defendant Lemmon.  Plaintiffs, thus, are informed and believe that Defendants Building Trades and Lemmon meet with City officials and employees in violation of the Lobbying Ordinance, including for purposes of blocking non-union projects, such as the Bahia Resort Hotel redevelopment, from going forward.

**The Playbook in Action**

66.     Defendants' playbook of *inter* alia, anticompetitive, exclusionary conduct is common knowledge among owners, developers, local government in San Diego, and state government officials.  Defendants have followed this playbook of unlawfully interfering with and obstructing non-union projects to attain control of any new or redeveloped large-scale hotels in the prime tourism areas in San Diego including Mission Bay and San Diego Bay as well as in Downtown and Mission Valley. Defendants target each non-union project not simply to unionize each individual project, but to send broader messages to hotel developers and owners in San Diego: Local 30 and the Building Trades—led by Ms. Browning and Mr. Lemmon—are the gatekeepers for any large-scale hospitality development in the prime tourism areas of the City.   And the message they send is clear:  no new large-scale development in the hospitality industry can move forward without agreeing to a PLA with the Building Trades and a card check neutrality agreement with Local 30.

67.     Defendants' alliance maximizes their power and control over City officials. Ironically, this power and control is oftentimes used to the detriment of their respective members.  For instance, Mr. Lemmon has threatened developers that he will block their projects from going forward *even with a signed PLA in place* unless and until the developer also agrees to execute a card check neutrality agreement.  On one occasion, Mr. Lemmon revoked his express agreement to support a project that had a PLA in place for the stated reason that he would have to "go with Brigette" and block the project from consideration by the City Council, unless and until the developer also agreed to card check neutrality agreement.   Mr. Lemmon's decision to renege on his agreement, and more than likely cost the members of the Building Trades thousands of jobs, speaks volumes as to the fact that the conduct at issue is about market control and domination, and not lawful organization.

68.     Over the last ten years, Defendants have used this playbook to cause development of non-union projects in the market to grind to a halt, at times for years,

10794295.1

and/or to cease entirely.  Some of the more recent victims of Defendants' misconduct include: the Bahia (delay of more than four years), the SeaWorld project (terminated), the Lane Field development in North Embarcadero (including the InterContinental and SpringHill Suites & Residence Inn) (delay of over one year); the Hotel Del Coronado (delay of approximately eighteen months); the Ritz-Carlton/Cisterra development at 7th and Market in Downtown (delay of over three years despite developer signing a PLA with the Building Trades); the Town and Country Hotel and Convention Center in Mission Valley (delay of one and a half years before entering into card check neutrality agreement); the Sunroad Hotel project located on Harbor Island (delay of over five years before card check neutrality agreement signed, and hotel project still not constructed); the Convention Center (delay of four years).  City Council members, including prior President Myrtle Cole, admitted that they cannot vote for a non-union project regardless of the merits.  And in circumstances where Defendants are unable to unlawfully lock down opposition before the meeting, they rely on their agreement with the Mayor and his office to delay a project from being docketed for public hearing until they have secured the necessary votes from the City Council.

**The Playbook Illustrated: San Diego Convention Center Expansion, Phase 3**

69.     A publicized example of Defendants' playbook in action can be seen in Phase 3 of the San Diego Convention Center Expansion.  In 2009, the City of San Diego began planning an expansion of its downtown Convention Center.  Because the City owns the Convention Center and its expansion involved a matter of significant public interest, many of the details of the unions' actions were reported in local media. Thus, although that development did not directly involve a hotel, Defendants' actions during the Convention Center expansion follow the same playbook that has been directed at Plaintiffs and other owners/developers.

70.     When the City began planning the Convention Center expansion, Local 30 already had a contract with the Convention Center.  However, it was up for negotiation and Defendants wanted to make sure there was a PLA in place for the expansion effort.

71.     Defendants lobbied against the project.  Mr. Lemmon and an agent for Local 30 spoke out against the Convention Center expansion at City Council, Port of San Diego, and Coastal Commission meetings.  As reflected in lobbyist disclosure statements filed by Local 30, Ms. Browning lobbied individual members of the City Council outside of official meetings to pressure them to oppose the expansion.

72.     Through a purported environmental group "San Diego Coalition for A Better Convention Center," Defendants submitted a 62-page letter to the Port of San Diego claiming that the expansion violated CEQA.  The environmental group consisted of a single named resident, Defendants Local 30 and the Building Trades, and "their local union affiliates and union members and their families who live, recreate and/or work in the City of San Diego and San Diego County."

73.     Defendants' attorney identified a laundry list of defects in the Convention Center Environmental Impact Report ("EIR").  Defendants claimed that the EIR, among other things, did not sufficiently analyze soil and groundwater contamination, the effect of the project on traffic, and significant impacts on air quality, water quality, biological resources, geology, greenhouse gas emissions, and rising sea levels.

74.     After the project was approved by those government bodies, Local 30 filed a petition for writ of mandate against the City of San Diego, alleging that the financing plan proposed for the project was illegal.  *Browning, Gonzales, and Unite Here Local 30 v. City of San Diego*, Case No. 37-2012-00094831-CU-MC-CTL.  The named plaintiffs included Ms. Browning and Sergio Gonzales, a member of Local 30's Executive Board. That action was dismissed after the trial court sustained a demurrer to the petition without leave to amend.  Local 30 appealed the ruling, *Browning et al. v. The San Diego City Council*, Case No. D062216, but dismissed it before briefing.

75.     Defendant Building Trades, through several of its affiliate unions, Sheet Metal Workers Local 206, Ironworkers Local 229, Electrical Workers Local 569, and United Association of Plumbers & Steamfitters Local 230, also filed a lawsuit about the Convention Center project.  *Coalition for Responsible Convention Center Planning;*

*Lutnick; Brown; Michaelson; IBEW; UAPS; Sheet Metal Workers Local 206; and Ironworkers Local 229 v. City of San Diego*, Case No. 37-2012-00100333-CU-TT-CTL. They alleged that the approval violated CEQA.

76.     In or around the fall of September 2012, the City's mayor, Jerry Sanders, brokered a compromise with Defendants and San Diego & Imperial Counties Labor Council.  Under this compromise, the cases were dismissed with prejudice in exchange for, among other things, the Building Trades receiving a PLA for the Convention Center expansion.

77.     The City then entered into three settlement agreements with Defendants: two to resolve the pending lawsuits and a third to foreclose a CEQA challenge by UNITE HERE!, the Building Trades, and their sham environmental group.  Notably, despite the dozens of purported defects in the City's EIR identified by Defendants, the settlement only provided for three cosmetic remedial actions during the construction phase.  The City agreed to assess "vibration caused by pile-driving activities," follow existing regulations governing "dewatering" of the construction site, and create a plan to manage solid waste during construction.  Significantly, none of these issues is raised in the first 41 pages of the letter submitted by Defendants' lawyer outlining their purported objections to the project.

78.     As part of the settlement agreements, Defendants agreed to "dismiss all litigation related to formation of the Convention Center . . . and refrain from filing future lawsuits."  Further, the "Parties agree[d] to work together to promote the Project."  Ms. Browning and Mr. Lemmon were both signatories to the settlement agreements.

79.     Although the Convention Center expansion was approved, in 2014, progress was halted  as a result of a separate lawsuit in which Defendants played no part.  In that lawsuit, the Court of Appeal held that the mechanism for funding the expansion was unconstitutional, requiring that the City create a new plan.

80.     In 2017, the City began seeking approval for a new plan to expand the Convention Center.  The City's current mayor, Kevin Faulconer, had made Convention

THIRD AMENDED COMPLAINT

10794295.1

Center expansion a centerpiece of his campaign and desperately sought to move the expansion forward.

81.    In mid-2017, Mayor Faulconer met with Mr. Lemmon as well as Democratic City Councilmember David Alvarez to discuss the Convention Center expansion.  In exchange for Mr. Lemmon's promise of union support for the Convention Center expansion, Mayor Faulconer agreed to provide Defendants with unrestricted "veto power" over any development that Mr. Lemmon opposed.  On information and belief, Mayor Faulconer followed through on his commitment and ensured that no project was docketed for a City Council hearing until Mr. Lemmon approved.  In effect, this agreement between Defendants and the Mayor's office gave Defendants veto power over any non-union development.

82.    The Convention Center expansion has not yet been approved.  However, as reflected in 2018-2019 lobbyist disclosure forms, Local 30 and Ms. Browning are now actively lobbying in support of the Convention Center expansion.  On information and belief, Mr. Lemmon has spoken before the City Council in favor of, and has lobbied in support of, the Convention Center expansion.  *See, e.g.*, Carol Kim, Deacon Jim Vargas, & Jaymie Bradford, *Commentary: Yes on Measure C - expanding convention center helps San Diego in three big ways*, SAN DIEGO UNION-TRIBUNE, Jan. 15, 2020, *available at* https://www.sandiegouniontribune.com/opinion/commentary/story/2020-01-15/a-yes-vote-on-measure-c-would-help-build-a-better-san-diego-utak (last visited February 5, 2020).

**The Playbook Directed at Hotels and Other Large Developments in Greater San Diego**

83.    As the facts about the Convention Center illustrate, Defendants' playbook involves opposing projects on numerous, yet dubious grounds; filing voluminous objections to projects (also on dubious grounds); and pursuing sham lawsuits that are immediately abandoned once Defendants obtain PLAs and card check neutrality agreements.

84.     This playbook has been pursued repeatedly by Defendants seeking to force hotel developers to agree to PLAs and card check-neutrality agreements.  In repeating the playbook, Defendants count on the fact that hotel developers and owners will surrender after seeing what others have lost once Defendants stamped a red "X" on their back.  A few examples of Defendants' real-life hotel targets follow:

**The Cisterra Development**

85.     In 2013, Cisterra Development ("Cisterra"), a real estate development company based in San Diego, responded to a Request for Qualifications and Proposals issued by Civic San Diego to develop a project at 7th and Market.  At the time, Civic San Diego was a non-profit development agency to which the City delegated approval authority for projects in Downtown San Diego. Cisterra's proposal combined residential, hotel, office, and public parking uses and included a 40,000 square-foot Whole Foods Market as well as a 160-room Ritz-Carlton hotel and 58 Ritz-Carlton branded condominium units.

86.     In May 2015, a selection committee consisting of Civic San Diego staff, City of San Diego staff, and a Civic San Diego Board member selected Cisterra and its proposed 7th and Market project.  Cisterra and the City thereupon began negotiating an Exclusive Negotiation Agreement ("ENA"), and later, a Development and Disposition Agreement to develop the project.  Entering such agreements are administrative or adjudicative acts by the City or the agent to which it has delegated authority to negotiate on its behalf.

87.     Over the next several months, Defendants targeted the 7th and Market project, forcing negotiation delays between the City and Cisterra.  Although Cisterra had agreed with Defendant Building Trades to sign a PLA and use union labor for construction, it did not have authority or control to commit the owner of the housing/hotel complex (Marriott) to agree to a card check neutrality agreement.  Thus, Defendants Local 30 and Ms. Browning—with the support of Mr. Lemmon—targeted Cisterra, the third party "secondary employer" to exert pressure on the primary target

10794295.1

and hotel owner, Marriott, to agree to sign a card check neutrality agreement for its employees. Specifically, Defendants exerted their control over the City Council and directed them not to approve the ENA with Cisterra unless the ENA included a provision requiring any employer operating on the 7th and Market site to recognize the union as the exclusive bargaining representative for its employees and not to approve unionization.  This was unsuccessful because the San Diego City Attorney determined that the City is federally preempted by the NLRA from imposing a card check neutrality provision as a condition of approving a project. The ENA was thus approved, and Defendants turned to a sham environmental attack.

88.    In July 2016, Local 30's counsel submitted a letter to Civic San Diego, which had to approve the project.  The letter alleged a host of purported defects in the project, including:

- the abbreviated CEQA Consistency Evaluation for the 7th and Market project relies on an outdated Final Environmental Impact Report ("FEIR") for Downtown San Diego and baseline data is faulty and stale;

- improper piecemealing of the land use entitlements from the Disposition and Development Agreement;

- inadequate and sloppy study of whether Greenhouse Gas ("GHG") emissions for the project were consistent with the City's Climate Action Plan ("CAP");

- the almost completely ignored presence of hazardous materials on site;

- inadequate review of land use inconsistency and long-term cumulative impacts;

- outdated and afterthought air quality mitigation for all of the 7th and Market project's car trips;

29

THIRD AMENDED COMPLAINT

- sloppy study of traffic impacts including omission of key intersections and all freeway impacts;

- deferred review of historic resource impacts on the Clermont Hotel and cultural resources;

- a patently defective noise study;

- faulty and old CEQA statement of overriding considerations that did not consider job quality; and

- the inability of Civic San Diego to make the required findings under governing Civic San Diego rules and the SDMC.

89.    Despite the opposition from Local 30, in October 2016, Civic San Diego approved the development permits, and the City Council in its discretion approved the Disposition and Development Agreement.  The votes did not involve legislation and were adjudicative in nature.

90.    Sergio Gonzalez (a Local 30 Executive Board member) appealed the approvals to the City Planning Commission.  The appeal was denied.  Gonzalez then appealed the approvals to the City Council, asserting the same objections that the Planning Commission already rejected.  That appeal was denied.

91.    Defendants did not stop there.  Using a surrogate, San Diegans for Responsible Planning, and Sergio Gonzalez as plaintiffs, Defendants filed a Petition for Writ of Mandate in the San Diego Superior Court, *Gonzalez v. City of San Diego*, No. 37-2016-00042702-CU-TT-CTL.  The court denied the petition in its entirety, finding that: (1) the plaintiffs could not bring a claim for declaratory relief; (2) the Planning Commission properly determined that the project was within the scope of existing EIRs and no further environmental documentation was required; (3) the City properly delegated its authority to Civic San Diego to issue development permits; and (4) the conclusions reached by Civic San Diego and the City were supported by substantial evidence.

92.     Still undeterred, Defendants appealed the judgment.  *Gonzalez v. City of San Diego*, No. D073358.

93.     While the appeal was pending, Cisterra and Local 30 entered into a confidential agreement.  On information and belief, the agreement included provisions for a side-agreement for a card check neutrality agreement between Marriott (owner of the Ritz-Carlton branded hotel planned for the development) and Local 30 but did not include any significant revisions to the 7th and Market project.  Neither the development permits issued by Civic San Diego nor the Development Disposition Agreement approved by the City changed.

94.     Once the agreements were executed, Defendants dismissed their appeal.  Although the appeal was purportedly taken by San Diegans for Responsible Planning and Sergio Gonzalez, no one from Cisterra ever met with anyone from San Diegans for Responsible Planning or Sergio Gonzalez.

95.     Although Cisterra's comparable projects typically take three years to complete from planning through construction, the delays caused by Defendants resulted in a loss of financing for the project, and it still has not been constructed.  Moreover, the delays by Defendants caused anchor tenant Whole Foods Market to terminate its agreement to lease space in the Cisterra project.

**Lane Field Development**

96.     In 2007, Lane Field San Diego Developers LLC proposed a project to develop two hotels totaling 800 rooms, approximately 80,000 square feet of retail space, restaurants, and public plazas, and 1,330 underground parking spaces.  The project would be developed in the North Embarcadero area at Broadway and Harbor Drive.

97.     Local 30 opposed the project.  In January 2008, the Port of San Diego approved a coastal development permit ("CDP") for the project in an adjudicative decision that did not require amending the Port Master Plan.  Local 30 appealed this approval to the Coastal Commission.  Local 30's attorney submitted a letter alleging numerous problems with the project:

10794295.1

- The project does not comply with the Port Master Plan and was therefore not eligible for a coastal development permit;
- Undisclosed contamination of soil and groundwater at the project site carries the potential to harm water quality and marine life in the San Diego Bay;
- Such contamination threatens the health and welfare of the people, especially on-site workers who may come in contact with it;
- The project is prohibitively expensive to the vast majority of the public, making it inconsistent with the Port Master Plan;
- The project does not comply with the setback and building orientation requirements of the Port Master Plan;
- The project's retail uses are not defined and not expressly limited to water-dependent and/or visitor-serving uses, as required by the public trust doctrine;
- People who live or work near the hotels will breathe more polluted air, lose productive time sitting in traffic jams, and suffer adverse health and safety impacts caused by the project;
- The project will pollute San Diego Bay, exposing people who regularly fish in the Bay;
- Degraded water quality and compromised integrity of marine life affects Union members' ability to enjoy the natural resources of the Bay;
- The project's emissions are a substantial adverse air quality impact;
- The project will have a substantial adverse impact on climate change;
- The project will have a substantial adverse impact on traffic and vehicle miles traveled;

10794295.1

- The project will have a substantial adverse impact on public services, such as fire protection services; and
- The project will have a substantial adverse impact on the ever-dwindling water supply scenario in San Diego.

98. While this appeal was pending, the Port of San Diego approved an amendment to the previously issued coastal development permit. Local 30 appealed this decision as well. In another letter to the Coastal Commission, Local 30's attorney claimed the following:

- The Amended CDP does not address Local 30's concerns;
- The Multimodal Transit Opportunity Promotion Plan (proposed "Bayfront Shuttle System") is vague and unenforceable as mitigation for impacts to public access;
- No evidence in the record that the shuttle program will be effective in reducing traffic or addressing the loss of parking;
- The Amended CDP and traffic plan fail to mitigate impacts to public access from a parking shortfall during construction as well as during operation;
- The Amended CDP fails to mitigate the Project's inconsistencies with the non-exclusionary public access polices of the Port Master Plan and Coastal Act;
- The Amended CDP fails to mitigate substantial adverse impacts from potential disturbance of contaminated soil and groundwater; and
- The Amended CDP fails to correct violations of the Port Master Plan's visual and minimum setback requirements.

99. Just days before the Coastal Commission hearing, Ms. Browning made an improper *ex parte* communication to a Coastal Commissioner, asking for the November 13 hearing to be delayed until December when many more Local 30 members could be present.

100.   The Coastal Commission, in an adjudicative decision, rejected Defendants' appeal and approved the amendment to the previously issued coastal development permits, but the delay caused by Local 30's actions resulted in the developer being unable to secure financing.  The project stalled but was revived in a slightly modified form in 2012, which required revisions to the previously issued permits.

101.   According to media reports, between the 2009 approval of the project and when the revived project was resubmitted to the Coastal Commission, the developer agreed to a PLA for construction and a card check neutrality agreement for the hotel.

102.   At a February 2013 Coastal Commission hearing, Defendants openly supported approval of the amendments to Lane Field Development's permits.  In a letter dated February 1, 2013, Ms. Browning wrote to the Coastal Commission on behalf of the 4,000 members of Local 30 to express their support for the same Lane Field project that they had spent years opposing.  Ms. Browning wrote that Local 30's "communication and working relationship with the Lane Field development team has been a model of how business and labor working together can advance projects that benefit [the] entire community" and that the Lane Field Project was the "best project" Local 30 had seen in the last ten years.  Ms. Browning went on to state that Local 30 had "long supported Lane Field moving forward."

**Town and Country Development**

103.   Atlas Hotels, the owner of the Town and Country Hotel and Convention Center site in the Mission Valley area of San Diego, formed a Joint Venture with financial backers in 2015 to consolidate and renovate the hotel and convention center, create a new compact multi-family residential neighborhood, restore San Diego River open space habitat, and establish recreational areas.

104.   Defendants opposed the project at all levels.  In October 2016, Local 30's attorneys sent a 117-page letter to City of San Diego Development Services on behalf of Local 30 and Executive Board member Sergio Gonzalez.  The letter claimed that Local 30 and its members "are concerned about the environmental impacts that massive

projects like Town and Country can cause, the serious impacts to natural biological resources, and the strain they place on public infrastructure, utilities, and services."  The letter also claimed that the Draft Environmental Impact Report ("DEIR") did not adequately consider impacts from the project on "land use, traffic and circulation, biological resources, air quality, hydrology, noise, greenhouse gases, public utilities, cumulative impacts, alternatives and the required statement of overriding considerations."  Among the 182 issues identified in the letter, Defendants argued:

- "The DEIR improperly classified the existing wetlands as 'low biological quality' thus artificially and impermissibly reducing the Project's impacts to the wetlands and inflating the benefit of the proposed restoration and enhancement activities."

- "The DEIR's baseline relies upon insufficient and incomplete surveys of special-status animal species" which is a "critical component of the environmental baseline for any project."

- "The DEIR's baseline relies upon insufficient and incomplete surveys of special-status plant species"

- "The DEIR impermissibly treats the illegal 122-space parking lot northeast of [the Project] as part of the environmental baseline" and the illegally constructed parking lot "caused significant impacts to the adjacent wetlands."

- "The DEIR's traffic model overestimates the baseline traffic from the existing hotel, which makes the Project's traffic impacts appear less significant."

- "The GHG baseline is artificially overestimated, making the Project's new GHG emissions seem insignificant."

- "The DEIR's Project description is incomplete and inconsistent" because (a) it does not identify the size or number of bedrooms in the 840 planned dwelling units, (b) it is flawed as to residential

population assumptions, (c) it provides varying descriptions of the wetland areas to be restored and enhanced, (d) it incorrectly identifies the San Diego River as part of the restoration and enhancement area, (e) it fails to analyze the Royal Palm Towers as part of the Project, (f) it does not adequately describe the storm water management area and drainage channel, and (g) it does not adequately describe employment at the Project.

- "The DEIR does not adequately analyze and mitigate impacts associated with inconsistencies between the Project and applicable land use plans" [and discusses 41 examples].

- "The DEIR transportation/circulation analysis is flawed" because (a) the "transportation models use flawed methodology to understate Project impacts" and (b) the "parking analysis fails to account for circulation impacts and parking deficits."

- "The DEIR fails to adequately analyze and mitigate impacts to biological resources" because (a) it "does not adequately analyze and mitigate impacts from proposed restoration and enhancement activities on special-status species," (b) it "does not adequately analyze and mitigate risk of avian collisions," (c) it "fails to adequately address Project impacts" to the least Bell's vireo endangered species, and (d) it "does not adequately analyze and mitigate impacts from 'edge effects'" on biological resources.

- "The DEIR's air quality analysis is flawed" because (a) "the Project's construction air quality impacts are understated," (b) "the Project's demolition air quality impacts are understated," (c) the "air quality analysis fails to account for overlapping operational and construction emissions which will have significant impacts," and (d) "additional, feasible air quality mitigation is required."

36

THIRD AMENDED COMPLAINT

- "The DEIR fails to adequately analyze impacts associated with hydrology" because (a) it "does not analyze the impacts of proposed amendments to the Atlas Specific Plan" and (b) the "discussion of development in the Floodway and Floodplan is vague and contradictory."

- "The DEIR's construction noise analysis and mitigation does not use proper methodology and lacks enforceable performance standards."

- "The DEIR's GHG analysis contains significant errors and omissions, and additional GHG mitigation is needed" because (a) "the GHG analysis underestimates the Project's GHG significance," (b) "the GHG analysis fails to comply with the City's Climate Action Plan and fails to ensure that mitigation measures will be enforced," and (c) "additional GHG mitigation is warranted."

- "The DEIR's analysis of water demand is flawed" because (a) the "analysis of water demand is based on population estimates that the DEIR contradicts," the "analysis of water demand is based on unsubstantiated assumptions about per capita consumption," and (c) it "fails to include key documents underlying the analysis."

- "The DEIR fails to identify and analyze all cumulative impacts."

- "The DEIR does not include an adequate analysis of Project alternatives."

- "A valid statement of overriding considerations is needed, and it must include all feasible mitigation and analysis of job quality."

105.   Defendants also presented written objections to the Wetlands Advisory Board and the Planning Commission, noting "serious flaws" with the project.  Despite these myriad objections, in June 2017, the Planning Commission recommended that the City Council certify the EIR and approve the project.

10794295.1

106.   The actions by the Wetlands Advisory Board and the Planning Commission were adjudicative in nature as they considered whether the project complied with CEQA, whether the proposed use of land was consistent with existing plans, and whether permits should be issued.

107.   Typically, once the Planning Commission recommends that the City Council approve a project, it would be docketed for a hearing before the City Council within 30 days.  However, Defendants used their influence over the City Council and their unlawful agreement with Mayor Faulconer to delay docketing until they could line up City Council opposition to the project.

108.   Local 30 also publicly voiced its continued opposition to the project in a 22-page letter sent to the City Council and Mayor Faulconer, and urged the City Council members to vote against approval of the final EIR, claiming that the environmental analysis fell short of what was required and describing the project as an "overwhelming net negative[.]"  In addition to incorporating and attaching its prior 117-page letter to the City Planning Commission, Local 30 also argued:

- "Although the DEIR found that bridge replacement, restoration activities, edge effects, and other aspects of the Project will have significant impacts on biological resources, the FEIR reverses those findings without explanation."

- "Although the FEIR completely abandons the flawed [GHG] analysis in the DEIR in favor of an analysis based on the City's Climate Action Plan, the City failed to circulate the new analysis for public comment."

- "The FEIR fails to analyze the complete elimination of the Flood Management Program from the Atlas Specific Plan."

- "The FEIR fails to identify or discuss an evacuation plan in the event of catastrophic flooding in Mission Valley, even though storm events

10794295.1

in the recent past have necessitated hundreds of documented emergency rescues."

- "The FEIR inflates the baseline for its traffic analysis by assuming 100% occupancy at the current hotel while admitting that there is not 100% occupancy at the hotel."

- "The FEIR fails to analyze the total air quality emissions during the overlap of Phase I operations and Phase II construction."

- "The FEIR omits analysis of the air quality impacts from demolishing 416 parking spaces that would result in a 73% increase in haul trips during demolition."

- "The FEIR's biological resources analysis relies on a plainly deficient 3.5 hour preliminary survey of a 55.9-acre site conducted when several species are not detectable."

- "The FEIR states that it assumes the presence of special-status species, but conducts several analysis that explicitly recognize that their presence was not assumed."

- "The FEIR fails to analyze the impacts of its inconsistencies with the General Plan and other plans, including the Project's significant and unmitigated impacts on traffic and its lack of affordable housing."

109.   After a three-month docketing delay, the project was finally placed on the September 2017 docket.  However, in the face of the continued opposition, the developer was forced repeatedly to pull the project from consideration by the City Council between September 2017 and February 2018.

110.   Finally, Atlas Hotels acquiesced.  Before the March 20, 2018 City Council meeting, Atlas Hotels accepted a card-check neutrality agreement with Local 30.  Not surprisingly, at that City Council hearing, Ms. Browning immediately dropped all of Defendants' opposition to the project and voiced her wholehearted support.  She claimed, "Since last fall, we have worked with the developer Lowe to address the loss of

THIRD AMENDED COMPLAINT

hotel rooms with respect to the proposed project, environmental concerns, as well as the lack of onsite affordable housing on the proposed site." Ms. Browning continued, "I am pleased to say our discussions have resulted in addressing our previous concerns and ensures the preservation of hotel worker jobs moving forward."[4] The City Council then certified the EIR and approved the proposed mitigation and project permits as originally presented to the City Council.

111.   On information and belief, if any modifications were made to the Town and Country plans to address the 182 environmental and land use issues Defendants identified when they opposed the project, they were not significant enough to require revision to the EIR, mitigation, or revision to the development plan.

**Fat City Project**

112.   In 2012, developers GLJ West Acquisitions, LLC and GLJ Builders West LP proposed to build a two-tower, six-story hotel with 364 rooms at Pacific Highway and Hawthorn Street, the former location of the Fat City Restaurant.

113.   Defendants opposed the project at the Centre City Development Corporation ("CCDC"), the predecessor to Civic San Diego. At the time, CCDC had authority to approve projects and grant development permits. Local 30 and Sergio Gonzalez (Executive Board member) submitted written opposition to the project.

114.   Despite this opposition, CCDC made the adjudicative decision to approve the project and grant a Centre City Development Permit and Coastal Development Permit for the project. Afterwards Ms. Browning told the media that the ruling was based on "favors" and "insider deals." She announced that Local 30 will "appeal the decision and use every legal tool [it has] to make sure that hotel workers' rights are not trampled."

---

[4] Local 30 opposed the project for failing to provide "a single affordable housing unit." Yet, on information and belief, despite Ms. Browning's public reference to working with the developer on affordable housing, the developer only committed to a card check neutrality agreement and a PLA and did not commit to building affordable housing within the 40 acre project.

115.   Soon thereafter, Local 30 followed up on its commitment to use "legal tools" to ensure hotel workers' rights and appealed the ruling to the Planning Commission.  Local 30 claimed that CCDC's approval of the project without any environmental review violated CEQA and that CCDC's findings of no significant environmental impacts were unsupported.  Local 30's objections included the following:

- The proposed project was not contemplated or adequately analyzed under the FEIR for Downtown San Diego and a separate EIR should have been prepared rather than relying on the Secondary Study.

- The CCDC is required to conduct subsequent environmental review of the project, including traffic impacts, air quality impacts, and GHG impacts.

- The project is inconsistent with the goals, policies, and objectives of the City of Villages Strategy and the Economic Prosperity Element of the General Plan.

116.   The Planning Commission denied Local 30's appeal.

117.   Local 30 then filed a Petition for Writ of Mandate on Dec. 5, 2012 against the City, the Planning Commission, and CCDC. *Unite Here Local 30 v. City of San Diego*, 37-2012-00086972-CU-TT-CTL.  The Petition alleged:

- The City violated CEQA by relying on the 2006 Program Environmental Impact Report ("PEIR") to approve the project when the project is outside the scope of the program reviewed in the 2006 FEIR;

- Substantial changes and new information related to the project require the City to prepare an EIR to disclose and analyze new or substantially more severe significant impacts and feasible mitigation measures not analyzed in the 2006 PEIR;

- The project's severe significant traffic impacts that were not analyzed or mitigated in the 2006 PEIR and now must be disclosed, analyzed, and mitigated in the subsequent EIR;

- The project's significant air quality impacts were not analyzed or mitigated in the 2006 PEIR and now must be disclosed, analyzed, and mitigated in the subsequent EIR;

- The project's significant greenhouse gas impacts were not analyzed or mitigated in the 2006 PEIR and now must be disclosed, analyzed, and mitigated in the subsequent EIR;

- The City prejudicially abused its discretion and failed to proceed in a manner required by law and without substantial evidence when it failed to prepare a project-specific statement of overriding considerations supported by substantial evidence in the record.

118.   Four months after it was filed, on March 20, 2013, Local 30 dismissed the lawsuit with prejudice.  At that time, no motion or answer had been filed by the Defendants.  However, the docket reflects that a settlement conference took place in or around March 15, 2013.  On information and belief, agreements were made with Defendants for a card check neutrality agreement and a PLA, which led to the dismissal. Construction on the Fat City project moved forward with the Centre City Development Permit and Coastal Development Permit as previously approved by CCDC.

**Sunroad Project**

119.   In 2011, Sunroad Enterprises ("Sunroad") began in earnest the process of developing a restaurant (the "Restaurant Project") as well as multiple hotels (the "Hotel Project").  The Restaurant Project would be developed in the vicinity of the old Reuben E. Lee floating barge, and the Hotel Project would be developed near the restaurant, both at the end of Harbor Island.  Because Sunroad is non-union, Local 30 pushed to block these projects.

10794295.1

120.   Local 30 tried to block the Port of San Diego's approval of the EIR for the Hotel Project, an adjudicative decision.  Yet, the Port of San Diego approved the EIR for the project, and thereafter, Local 30 filed a CEQA lawsuit, *Local 30 v Port District*, 37-2012-00094537-CU-TT-CTL, arguing the Hotel Project EIR should have included analysis of the Restaurant Project because the projects are interrelated.  Local 30 also challenged the conclusions in the EIR regarding earthquake-related impacts and hazardous materials impacts.

121.   On April 18, 2012, the trial court ruled that sufficient evidence in the record supported the conclusion that the two projects could be evaluated independently, and substantial evidence supported the Port of San Diego's conclusion regarding earthquake related impacts and hazardous materials impacts.  However, the Court found that the Hotel Project should have been analyzed differently, because the project included multiple hotels.

122.   Sunroad returned to the Port of San Diego to consider whether to approve an amendment to the Port Master Plan that would divide the existing Plan's allotment of a single, 500-room, high quality hotel to three lower-profile hotels.  Local 30 continued to oppose the project.  However, the Port of San Diego approved the amendment to the Port Master Plan, which then went to the Coastal Commission for certification.

123.   Before the Coastal Commission, Local 30 advanced a new argument against the Hotel Project, arguing that the failure for the plan to provide low-cost overnight accommodations is inconsistent with the public access and recreation policies of the Coastal Act.  Notably, the then-existing Port Master Plan, which included an allotment for a single, 500-room, high quality hotel, was previously certified by the Coastal Commission and had no requirement for inclusion of any low-cost overnight accommodations.

124.   To secure the Coastal Commission's rejection of the project, Ms. Browning and Mr. Lemmon had improper *ex parte* communications with Coastal Commissioners – in the days before the Sunroad Hotel Project was to be heard.  On information and belief

THIRD AMENDED COMPLAINT

Ms. Browning and Mr. Lemmon met with Port Commissioner Mark Vargas and demanded that he and his fellow Coastal Commissioners vote against the project unless and until Sunroad agreed to a card check neutrality agreement. The Coastal Commission did just that – it rejected the amendment to the Port Master Plan at an August 13, 2015 hearing.

125.   Litigation ensued between the Port of San Diego and the Coastal Commission over whether the Coastal Commission had the authority to require low-cost accommodations, *San Diego Unified Port District v California Coastal Commission*, No. 37-2015-00034288-CU-WM. The Superior Court ruled in favor of the Port of San Diego, but the Court of Appeal reversed.

126.   Following reversal, the matter returned to the Port of San Diego in 2018. After years of refusing to accede to Defendants' demands, Sunroad acquiesced and signed a card check neutrality agreement. Local 30 immediately dropped its opposition to the Hotel Project and publicly reversed its position, supporting the project at multiple Port of San Diego hearings.

127.   In September 2018, representatives of Local 30 and Building Trades argued in support of an extension of Sunroad's exclusive negotiating agreement for a hotel development.

128.   On February 12, 2019, Ms. Browning, Mr. Lemmon, and Murtaza Baxamusa of Building Trades Family Housing Corporation spoke in support of Sunroad's project at the Port of San Diego. The Port Commissioners suggested that Sunroad revise the project from three hotels to a single, 500-room hotel, because the Port Master Plan already provided for that.[5] At the hearing, Mr. Baxamusa said: "We've gone through multiple iterations of this project. At last we're seeing something that we can all be proud of that is a signature building on our waterfront. The gateway to San

---

[5] Approval of the hotel under the existing Port Master Plan would be an adjudicative decision.

Diego."  Pointing to the numerous union workers present at the hearing, Mr. Lemmon said: "We all know we're going to work on this project.  We're excited about it."

129.   On October 8, 2019, Sunroad presented its revised plan to build a single, 450-room, dual-branded hotel to the Port of San Diego.  Mr. Lemmon and Ryan Karlsgodt of Local 30 spoke in support of the revamped project.  Mr. Lemmon made clear that his support stemmed from the fact that the hotel's operations "will create opportunities for middle class jobs" for Local 30 while the construction would benefit the San Diego Building Trades.

130.   The Port of San Diego approved the plans and directed Sunroad to proceed with the CEQA environmental review process before returning to the Port of San Diego for final consideration.  The Port of San Diego indicated that the Coastal Commission will not have to approve the project because it falls within the scope of the existing Port Master Plan and does not require amendment.  Despite Local 30's prior objections, it continued to fully support the project even though the approved plans contained no provisions for low-cost accommodations.

131.   Concurrent with its (prior) opposition to the Hotel Project, Local 30 also opposed the Port of San Diego's approval of the Restaurant Project.  Again, Local 30's opposition was not based on the Restaurant Project itself, but was intended to exert pressure on Sunroad to agree to a card check neutrality agreement and PLA for the Hotel Project.

132.   The Port of San Diego approved the Restaurant Project and issued a categorical exclusion determination that the project did not need a coastal development permit.  Local 30 appealed this determination to the Coastal Commission and submitted a letter "on behalf of its members and their families" arguing that:

- The restaurant project is inconsistent with the Port Master Plan;
- The restaurant project is inconsistent with the public access and recreation policies of the Coastal Act;

10794295.1

- The restaurant project requires a Port Master Plan amendment and coastal development permit; and
- The restaurant project will impede public access, block views, adversely impact natural resources, increase pollutants in the Bay, and pose risk from geological hazards.

133. Local 30's attorney submitted a further letter about geological issues, claiming that the Restaurant Project "is located in an area of active earthquake fault strands, most of which have not been accurately located." Local 30 argued that the Restaurant Project would not be "aesthetically pleasing" and would be a "hazard to the health and welfare of the people of California."

134. As with the Hotel Project, Local 30 had improper *ex parte* communications with Coastal Commissioners prior to the appeal hearing in an attempt to secure their agreement to oppose the project.

135. In this case, however, the Coastal Commission's expert concluded that Local 30 did not raise a substantial issue with regard to its geological and fault concerns, and the Restaurant Project was approved.

**Seaport Village**

136. In October 2015, the Port of San Diego directed staff to move forward on a plan to develop the Central Embarcadero, an area of land situated between downtown San Diego and the San Diego Bayfront. In May 2016, eleven developers submitted proposals for the project, six of which met the Port of San Diego's criteria for consideration. Oliver McMillan, in partnership with Evans Hotels, submitted one of the six bids that met the Port of San Diego's criteria for the project. Under the proposal, Evans Hotels would own and operate a hotel on the property.

137. In the spring of 2016, Defendant Browning began calling and threatening officers of Oliver McMillan. Initially, Ms. Browning demanded an in-person meeting. When Oliver McMillan noted it was too early in the process to come to an agreement on union issues, her tone turned threatening and she stated that Oliver McMillan's proposal

46

"would not have a snowball's chance in hell" if they didn't cut a deal with her.  Oliver McMillan refused to cave to Ms. Browning's threats.

138.   On information and belief, in or around the same period, Mr. Lemmon and Ms. Browning contacted other developers who submitted the other five bids.  One of the other developers agreed to meet with Ms. Browning.  Ms. Browning told the developer that if he agreed to a card check neutrality agreement, she would provide her support.  The developer agreed to enter a card check neutrality agreement, as he understood that he needed labor's support to compete against the remaining five, well-regarded developers.  Shortly after he agreed, Ms. Browning later said that the deal was off because Mr. Lemmon, on behalf of Defendants, had secured an agreement from another developer.

139.   Protea Waterfront Development, also known as Gafcon Inc. or 1HWHY1 (collectively, "Protea"), was the developer that first reached an agreement with Mr. Lemmon.  Specifically, Protea agreed to Mr. Lemmon and Ms. Browning's demands and represented that it would enter a card check neutrality agreement with Local 30 and a PLA with the Building Trades.  Under the Protea proposal, the hotel on the property would be operated by Virgin Hotels North America.

140.   On July 13, 2016, the Port held a public hearing to discuss the proposals under an agenda item titled "PRESENTATION AND UPDATE ON THE RESPONSES TO THE WORLD-CLASS WATERFRONT DEVELOPMENT OPPORTUNITY (CENTRAL EMBARCADERO) REQUEST FOR PROPOSALS AND DIRECTION TO STAFF REGARDING FURTHER ANALYSIS AND PROCESSING OF THE PROPOSALS."

141.   A representative of Protea told the Port of San Diego at the hearing that it would enter into agreements with the unions.  Ms. Browning also spoke at the hearing and commented that she was "really excited to hear [Protea]'s proposal when they talked about how they're going to have agreements with [Local 30] and with the Construction Trades."  On information and belief, Protea was the only developer that agreed to sign labor agreements with both Defendants.

10794295.1

142.   Despite the understanding of all bidders that any action would be limited to narrowing the field to further analyze two or three proposals, the Board voted to continue discussions about Seaport Village *exclusively* with Protea.[6]   On information and belief, the Port of San Diego's decision to abandon the bid evaluation process and negotiate exclusively with the one developer that agreed to sign an agreement with both Defendants did not comply with standard competitive bidding processes in government contracting.

143.   In November 2016, in an adjudicative decision, the Port of San Diego officially accepted the bid from Protea.   In combining with Protea, a direct competitor of Plaintiffs, Defendants blocked all developers, including Evans Hotels, from competing for the Seaport Village development.   Protea ensured its success by agreeing to enter into labor agreements with Defendants.

**The Hotel Del Coronado**

144.   Hotel Del Coronado is a national historic landmark that opened in 1888. Between 2003 and 2008, KSL Resorts sought and received permits to revise the Hotel Del Coronado's Master Plan to allow for physical improvements to the property.   KSL Resorts had a contract with Local 30 to use union labor at the hotel, but that contract was set to expire in 2009.   Local 30 also wanted the Hotel to provide health care benefits only through Ms. Browning's health care organization.   In an attempt to get KSL resorts to agree to her demands, Local 30 opposed Hotel Del Coronado's expansion plans.

145.   In 2008, the Coronado City Planning Commission approved the permits and the revisions to Hotel Del Coronado's Master Plan.   The Planning Commission did not require a new EIR, and instead relied on an addendum to a previously certified EIR.

---

[6] Commissioners voted 6-1 to proceed exclusively with Protea. Contemporaneous news articles say "San Diego port commissions, skipping its usual drawn-out development process …" decided to proceed exclusively with Protea. And "San Diego port commissioners shocked the development communities when they swiftly narrowed a field of bidders to redevelop Seaport Village and its surrounding acreage."

THIRD AMENDED COMPLAINT

Thereafter, in an adjudicative decision, the Coronado City Council issued two appealable coastal development permits for the approved Hotel Del Coronado Master Plan.  Local 30 appealed the decision and submitted written objections and testified orally at three hearings held by the City Council.  Among their arguments, Local 30 argued that a full-blown, new EIR should be conducted to analyze the environmental impacts from the Project.  Their appeal was denied.

146.   Local 30 also appealed approval of the coastal development permits to the Coastal Commission and again argued that a full-blown, new EIR should be conducted to analyze the environmental impacts from the project.  Local 30 identified severe impacts from a newly identified earthquake fault under the project site, water quality and biological resource impacts from a project proposal to divert additional storm water runoff to San Diego Bay, air quality and public health impacts, and climate change impacts from greenhouse gas emissions.

147.   At the same time, Local 30 filed a lawsuit in the San Diego Superior Court, *Unite Here Local 30 v City of Coronado*, No. 37-2008-00095595-CU-TT-CTL, arguing that the project's EIR violates CEQA and asserting violations of the Alquist-Priolo Earthquake Fault Zoning Act and California Public Records Act.  Specifically, Local 30 alleged that its members will breathe more polluted air, face risks from seismic hazards, be subject to increased traffic, recreate in polluted waters, and suffer adverse health, safety and environmental impacts caused by the project.

148.   On December 4, 2009, the court rejected Local 30's claims and denied the petition in its entirety, finding that the City did not violate CEQA, the Alquist-Priolo Act, or the Public Records Act, and that there was substantial evidence to support the City's decision to approve the project.

149.   Not surprisingly, once the hotel came to an agreement with Local 30 regarding the union contract renewal, Local 30 abandoned the appeal pending before the Coastal Commission regarding the coastal development permits and did not voice any further opposition to the Hotel's expansion.

10794295.1

**San Diego Marriott Marquis & Marina**

150.    The San Diego Marriott Marquis & Marina (the "Marriott Marquis") is a hotel located at 333 West Harbor Drive in Downtown San Diego.  In 2011, the Marriott Marquis proposed a redevelopment project that would result in reconstruction of its existing facilities, as well as construction of a public access way and a 25,000-square-foot public promenade.

151.    Consistent with its playbook, Defendants opposed the project before the Port of San Diego, City Council, and the Coastal Commission.

152.    Local 30 representatives Ms. Browning, Rick Bates, and Thomas Enslow spoke in opposition to the project at a hearing of the Port Commissioners in December 2011 citing purported inadequacies in the project EIR.  Despite this opposition, the Port of San Diego certified the project EIR and approved an amendment to the Port Master Plan.

153.    Local 30 then teamed up with The Coalition for Responsible Coastal Development (Local 30 is a member) and sued the Port of San Diego on January 13, 2012, *Coalition for Responsible Coastal Development v San Diego Unified Port District* No. 37-2012-00090739-CU-WM-CTL.  Through their petition for writ of mandate, Petitioners sought to set aside certification of the EIR, arguing that it is legally defective and was certified by the Port in violation of CEQA laws.  Petitioners also argued that the Port's approval of the amendment to the Port Master Plan was wrongful because the Port failed to adequately disclose, evaluate, and mitigate the project's traffic, parking, soil contamination, wastewater and water supply impacts, and relied upon assumptions and findings that were not support by any substantial evidence.

154.    While their petition for writ of mandate was pending, Local 30 asserted additional opposition to the project by challenging the water main easement vacated by the City.  In a July 2012 letter to the City Council, through the Coalition for Responsible Coastal Development, Local 30 challenged the Development Services Department's determination that abandoning the public use of a water main easement was exempt

THIRD AMENDED COMPLAINT

from environmental review under CEQA.  In its opposition, Local 30 – with support from Mr. Lemmon and the Building Trades – advanced the following arguments:

- The CEQA evaluation of the easement vacation project improperly segments environmental review of the proposed abandonment of the easement from environmental review of the applicant's intended next steps of replacing the vacated water easement with a new water easement and physically relocating water main pipes from the old easement to the new easement;

- The CEQA evaluation of the easement vacation project also improperly segments environmental review of the proposed abandonment (and relocation) of the easement from environmental review of the larger, related and interdependent Marriott project; and

- The categorical exemption for minor alterations in land use limitations does not apply because the project is located on a listed hazardous waste site and there is substantial evidence that the existence of contaminated soil on the site creates a reasonable possibility that disturbance of these soils during the removal and relocation of that water mains may result in significant impacts on water quality and human health and safety.

155.   It is not clear whether the City ever responded to this letter.

156.   Certification of the approved amendment to the Port Master Plan was set to be heard by the Coastal Commission on November 15, 2012. Defendants opposed certification via letters from their counsel to the Coastal Commission as well as improper *ex parte* communications to Coastal Commissioners.

157.   In their written opposition, Local 30 urged the Coastal Commission to take "the final opportunity to reverse decades of bad planning and to provide the public a small but clear window in the wall of development that currently obstructs the South Embarcadero waterfront."  Their additional objections included:

10794295.1

- the project has substantial visual and access impacts to the marina area and walkway and fails to protect, restore, and enhance coastal views;

- project plans fail to adequately disclose and evaluate the potential risk to coastal resources and human health from the proposed excavation of soils know to be contaminated with diesel fuel and arsenic;

- the Port Master Plan amendment is inconsistent with the Coastal Act because it fails to protect lower cost visitor and recreational facilities;

- the plan fails to protect water quality, the coastal environment, and human health; and

- the plan fails to address the project's increased guest capacity will have on parking demand.

158.   On November 1, 2012, Superior Court Judge Dato denied the petition for writ of mandate in its entirety, and Judgment was entered in favor of the Port of San Diego.  Yet, as late as November 9, 2012, Coastal Commissioners continued to receive opposition from Local 30 via improper *ex parte* communications urging the Coastal Commission to deny certification of the amendment.

159.   On or about November 12, 2012, as part of the resolution of the then-existing challenges to the Convention Center expansion, the Defendants reached an agreement that Mayor Sanders would meet with senior officials of the Marriott and support Defendants' demand for a card check neutrality agreement.

160.   After the Mayor's November 12, 2012 agreement to meet with Marriott, the Marriott Marquis project was approved by the Coastal Commission at its November 15, 2012 hearing with no opposition from Defendants.

10794295.1

**Legacy International Center**

161.    The Legacy International Center is a religious tourism and conference center in Mission Valley with a 127-room hotel proposed to be developed by Morris Cerullo World Evangelism.  In June 2017, the City Planning Commission unanimously voted to approve that project, and the project was scheduled for a September 2017 hearing before City Council.

162.    Two days before the hearing, the developer received a call from a City Councilmember's Chief of Staff indicating that the vote on the project was likely to be split.  The Chief of Staff explained that union members were expected to appear at the hearing to oppose a different project, Town and Country, and would likely oppose the Legacy International Center on the basis that it is non-union.

163.    At the hearing, the developer's representative was told that City Council President Myrtle Cole could not vote in favor of the project because the unions were present.  As predicted, the union members present at the hearing to oppose the Town and Country project voiced opposition to the Legacy International Center.  This led to a split vote, so the issue was tabled for a later hearing.

164.    At Defendants' request, the developer met a week later with Ms. Browning and Mr. Lemmon, who both said the developer would need to agree to their efforts to unionize the project to get the votes required for City Council approval.  The developer explained that the Legacy International Center is a 501(c)(3) non-profit religious entity and would employ only ordained ministers, so it could hire Local 30 members only if they agreed to accept Jesus Christ.  The developer also explained that denial of the project would violate religious freedom laws and subject the City to liability.  On information and belief, the City Attorney agreed with the developer and so advised the City Council.

165.    When Ms. Browning learned that she could not unionize the workers, Defendants immediately agreed to drop their opposition.  The project was then approved by the City Council 7-2 at the next meeting where it was addressed.

**San Diego State University Mission Valley (SDSU West)**

166.   In August 2020, the Board of Trustees of the California State University ("CSU") and the City of San Diego ("the City") entered into a binding Real Property Purchase and Sale Agreement for the development of SDSU Mission Valley ("PSA"). The Parties completed the sale of the former stadium site on August 13, 2000.  The master plan for SDSU Mission Valley includes entitlement for parks, recreation, campus uses, 95,000 square feet of community-serving retail space, 4,600 residences and approximately 400 hotel rooms "to support campus visitors and Stadium-related events, provide additional conference facilities, and serve as an incubator for graduate and undergraduate students in SDSU's hospitality and tourism management program." SDSU Mission Valley Campus Master Plan EIR at ES-3.

167.   The PSA requires the City to cooperate with CSU for the separate purchase of a 2.041 acre parcel of City land and associated application to vacate an existing right of way on the land.  CSU would use the land (part of San Diego Mission Road) to provide a private driveway to the Kinder Morgan Mission Valley Energy Terminal (a private fuel storage facility) as well as access to the San Diego Mission Road Bridge, necessary for the full development of the SDSU Mission Valley Campus.  CSU will provide alternative public access through SDSU Mission Valley.

168.   In August 2021, CSU's completed right of way vacation application, with agreed upon purchase and sale agreement, was approved by City Staff, and the item was placed on the September 2021 Land Use Housing Committee agenda.  Shortly before the meeting, the item was pulled from the agenda.  Nearly five months later, as of February 2022, approval of the completed application has not been docketed.

169.   Even though Defendants have secured an agreement that Local 30 would represent the hotel workers and a portion of the stadium workers and that the construction project would use as much union labor as practical, Defendants have stalled the project unless they secure a PLA for all construction work and Local 30 representation of all Stadium workers.   Ms. Browning and Carol Kim, current business

manager of the San Diego County Building & Trades Council, held a press conference on January 26, 2022, noting their opposition to the project because SDSU President Adele de la Torre "told us the hotel would have union standards.  There would be a right to organize from the union. . . . SDSU was unwilling to provide project labor agreements for ancillary construction around the property."  Browning wants all jobs to go to union employees, not just the new stadium but all kitchen and related work.  Jack McGrory, City Manager and now trustee on the CSU Board, says he wants a portion of the jobs to remain open to students trying to work their way through school.  He went on to say "all we need is the $240,000 acquisition of 2.1 acres of land.  They're holding up a $4 billion project."[7]

**Increasing Costs For Developers Through Delays In Project Approval Is Admittedly Central to Their Playbook.**

170.   Defendants' playbook stems from the highest level of management within the union, as the General President of Local 30's then parent union, UNITE HERE!, publicly asserted that: "[T]o be successful [in unionizing target companies], I believe you have to be relentless . . . We're not businessmen, and at the end of the day they are. **If we're willing to cost them enough, they'll give in**."  (Bruce Raynor's presentation at the annual meeting of the American Political Science Association, Atlanta, Georgia, September 3, 1999) (emphasis added).

171.   As the foregoing examples demonstrate, Defendants' reflexive and automatic environmental and land use objections to a project are a sham.  Despite such repeated objections to projects, those objections have almost always been rejected by the government bodies to which they are directed with the authority to approve the developments.  Defendants' efforts result only in delays to a project, and substantively

---

[7] Available at https://www.voiceofsandiego.org/ newsletters/politics-report/politics-report-vicious-dispute-between-sdsu-and-labor-goes-public/?utm_source= Voice+of+San+Diego+Master+List&utm_campaign=2c6465283d-Morning_Report&utm_medium =email&utm_term=0_c2357fd0a3-2c6465283d-81862833&goal=0_c2357fd0a3-2c6465283d-81862833.

THIRD AMENDED COMPLAINT

10794295.1

their objections result in very few, if any, modifications to the developments.  Moreover, Defendants' CEQA and land use lawsuits have been similarly unsuccessful.  Defendants have either lost their sham lawsuits or they are immediately abandoned once Defendants obtain PLAs and card check neutrality agreements.

172.   Many of Defendants' other lobbying efforts are likewise a sham and used as a weapon to delay projects and significantly increase costs for developers.  Indeed, "inflicting such high costs on [a plaintiff developer] that it was forced to abandon the project" or "delaying the project long enough" that it is no longer viable constitutes antitrust injury even when the parties at issue are not competitors. *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 174 (3d Cir. 2015).

173.   In addition to the projects discussed above, Defendants have targeted other developments.  As shown in the graphic below, Defendants have targeted virtually all significant, non-union projects on the coastline or on City-owned land over the course of the last fifteen years.

THIRD AMENDED COMPLAINT

10794295.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Defendants' Targets



| | |
|---|---|
| A.  Bahia Hotel | G.  Marriott Marquis & Marina |
| B.  Town & Country | H.  Cisterra Development |
| C.  Sunroad Project | I.  Convention Center Expansion |
| D.  Fat City Hotel Project | J.  Hotel Del Coronado |
| E.  Lane Field Hotel Development | K.  Seaport Village |
| F.  AC Hotel Project | L.  Morris Cerullo Legacy Center |

THIRD AMENDED COMPLAINT

10794295.1

174.   As they did with each of the projects described above, Defendants are now using the same illegal playbook with the Bahia Resort Hotel redevelopment project. Defendants seek not only to unionize the Bahia Hotel and force a PLA, but also to make an example out of Evans Hotels.  The message to all other non-union developers and owners is clear: see how much you will spend and lose if you resist Defendants' demands.

175.   As described above, the illegal playbook has evolved to prevent projects from being docketed for a public vote in circumstances where the unions are not able to secure adequate votes in opposition in advance of the hearing and want to avoid having to challenge the City Council's approval through CEQA.

**Local 30 Targets Evans Hotels in the 1990s**

176.   This situation is not the first time Local 30 has targeted Evans Hotels or the Bahia.

177.   In 1996, Local 30, then under the helm of Ms. Browning's stepfather, Jef Eatchel, and Ms. Browning's mother, Nancy Browning, targeted the Bahia and the Catamaran, another Evans family-owned hotel.  Specifically, Local 30 called and wrote letters to at least three of Evans Hotels' clients, including the ACLU, and threatened that if they did not cancel their reservation at Evans Hotels, Local 30 would disrupt their trip by picketing those clients while they stayed at the hotel.  This was not an idle threat. During picketing outside one of the hotels, Local 30 specifically identified a client of Evans Hotels that had an upcoming conference at that hotel.   Local 30's targeting of Evans Hotels did not stem from concern over the wages, hours or working conditions of Evans Hotels' employees.  In fact, when asked by a client of Evans Hotels why it was targeting them, Local 30's agent responded that it was due to purported anti-union actions that Bill Evans had taken in his role as a Director, including as Chair, of the San Diego Convention Center Corporation.  As a result of Local 30's unlawful secondary threats and conduct, at least two of Evans Hotels' clients canceled their scheduled conferences.  It was only after Evans Hotels filed a lawsuit against Local 30 that Local

30 agreed to stop unlawfully targeting Evans Hotels.  In fact, Local 30 agreed to cease any attempt to unionize the Bahia (or any other Evans Hotels-owned property) for a period of five years.  While twenty years have now passed and the reins of Local 30 have been handed over from Jef Eatchel and Nancy Browning to daughter Brigette Browning, Local 30 continues to resort to the same unlawful conduct in an effort to impede competition and commerce.[8]

**Local 30 and the Building Trades Target the Bahia Redevelopment Project in 2018**

178.   On November 5, 2015, BH Partnership requested City Council approval of the lease amendment for the Bahia.  After working with the Development Services Department on associated environmental documents, BH Partnership met with the Department of Real Estate Assets and the City Attorney to negotiate the lease amendment at the end of January 2018.

179.   Like many of the approvals of the projects by other developers who faced Defendants' opposition, the City Council's vote on a lease amendment is an adjudicative or administrative decision.  *San Bruno Comm. for Econ. Justice v. City of San Bruno*, 15 Cal.App.5th 524, 534-35 (2017) (city's sale of property was adjudicative act); *Worthington v. City Council of Rohnert Park*, 130 Cal.App.4th 1132, 1142-43 (2005) (city's contract with Indian tribe was administrative task); *Martin v. Smith*, 184 Cal.App.2d 571, 577 (1960) (city council's decision to approve sublease was administrative action).  It does not involve amending the existing MBMPU or changes to zoning laws, as two advisory boards, the Coastal Commission staff, and the City's own staff have concluded.

180.   As expected, Defendants responded by implementing Part 1 of their playbook.  On February 28, 2018, Tony LoPresti of the Altshuler Berzon firm (not coincidentally the same attorney who represented Local 30 in the Town and Country dispute referenced above and the same attorney representing Local 30 in this case) sent

---

[8] Nancy Browning earns an annual salary of $94,409 from Local 30 for work as a contract administrator in 2018.

10794295.1

a letter on behalf of Local 30 to San Diego Mayor Kevin Faulconer and City Council members.  Its re line read: "Access to information regarding environmental review of the Bahia Resort Hotel Lease Amendment."  Mr. LoPresti stated that he wrote on behalf of his client, Local 30, "to express concern regarding the lack of transparency and access to information pertaining to environmental review of the proposed Lease Amendment for the Bahia Resort Hotel Renovation Project . . . ."  Mr. LoPresti asserted that the Bahia redevelopment was being processed "to preclude public comment on environmental review under [CEQA]" because the project was being analyzed under an addendum to the EIR previously approved for the MBMPU, which is not subject to public comment.

181.   On May 11, 2018, Mr. LoPresti sent another letter to Mayor Faulconer and the City Council, this time claiming that because the project purported to eliminate Gleason Road, it was not consistent with the 1997 MBMPU, and therefore, would require Evans Hotels to amend the MBMPU in order to move forward.

182.   Defendants knew or had reason to know that the retention of Gleason Road was not a part of the MBMPU.  Although the words "Retain Gleason Road" mysteriously appear (in a different font) on an unapproved, amended graphic that was prepared after the approvals for the Bahia redevelopment were articulated, this requirement is nowhere to be found in the administrative record.  In fact, in December 2014, Coastal Commission staff confirmed that the Coastal Commission's actions in 1997 did not require the retention of Gleason Road.  On October 3, 2018, the Planning Department of the City of San Diego issued a formal memo stating that the City conducted a thorough examination of the administrative record and concluded again that the retention of Gleason Road is not part of the MBMPU.  Therefore, the Bahia's proposed lease amendment does not require an amendment to that plan.  Two advisory boards, the Mission Bay Park Committee and the Park and Recreation Board, also found that the Bahia's proposed development plan was consistent with the master plan which did not require retention of Gleason Road, and therefore did not require an amendment.

10794295.1

Notwithstanding this, Defendants continue to falsely assert that the MBMPU forbids the elimination of Gleason Road.  Specifically, Defendants created and sponsored a website, "nomissionbaylandgrab.org," and a related Facebook page to disseminate the false message that the Bahia redevelopment violates the MBMPU.  Users on Facebook have shared a link to the website over 450 times.

183.   Defendants also met and/or communicated individually in serial fashion with City Councilmembers to secure votes against the proposed Bahia lease amendment unless Evans Hotels agreed to meet with Ms. Browning and get her support.  Plaintiffs allege on information and belief that Defendants' meetings and communications with a majority of the City Councilmembers in advance of the Bahia being docketed for a public hearing violated the Brown Act.

184.   Plaintiffs first learned of Defendants' action in February/March 2018.  On February 16, 2018, Bill Evans attended a party on Shelter Island.  While Mr. Evans was standing in line to get a drink, he asked a City Councilmember (hereinafter "Councilmember I") about the Bahia redevelopment.  Instead of discussing the merits of the project, she immediately asked Mr. Evans if he had spoken to Ms. Browning.  Caught off guard, Mr. Evans responded that he had not as the hotel is not organized.  Councilmember I then told Mr. Evans that he had to sign a card check neutrality agreement with Ms. Browning because "without it, [Councilmember I] would never support the project."  When Mr. Evans told Councilmember I that the project would bring in hundreds of millions of dollars for the City, Councilmember I stopped him mid-sentence and told him that any hotel on public land must be union irrespective of how much revenue it would bring to the City.

185.   Shortly thereafter, Mr. Evans related his discussion with Councilmember I to his sister Grace Cherashore, the Executive Chairwoman of Evans Hotels (hereinafter "Ms. Cherashore").  In response, Ms. Cherashore scheduled a meeting at Councilmember I's office on February 23, 2018 at 10:00 a.m.  At this meeting, Ms. Cherashore presented materials regarding the project and Evans Hotels generally.

Ms. Cherashore specifically addressed why Evans Hotels did not want to unionize, including the fact that it would hinder Evans Hotels' ability to have a direct relationship with its employees and promote based on merit.  Ms. Cherashore talked about different employee programs, including the interest free loans it offers to employees, its high quality health insurance, and matching 401(k) program.  The fact that Evans Hotels' employees commute right past unionized hotel properties with job postings on the way to work, such as the Hilton or the Hyatt, speaks to the fact that many workers prefer a non-unionized work environment.  Ms. Cherashore also noted that each of Evans Hotels' properties are listed in the top 40 of Trip Advisor ratings, while competing union properties are all ranked significantly lower.  Evans Hotels has scores of employees who have been with the business for more than a decade.  For these reasons, Ms. Cherashore stated that although Evans Hotels was committed to the City and prepared to invest hundreds of millions of dollars in the Bahia redevelopment, it would do so only if it could continue to operate in a non-unionized environment.  Ms. Cherashore concluded by pointing out that the City would benefit to the tune of almost *half a billion dollars* in increased rent revenue over the course of the lease.

186.   In response, Councilmember I indicated personal support for the proposal and strategized as to who else Ms. Cherashore should speak with to assure that the project get the necessary approvals from the City (including, for example, the labor union representing City workers).  Councilmember I stated that a lunch meeting was already scheduled with Ms. Browning and that Councilmember I would speak to her and attempt to gain her support for the project.

187.   Weeks later, Mr. Evans received a call from one of Councilmember I's staff.  The staff member indicated that there was now a "problem" with the Bahia proposal and that Councilmember I (and others on City Council) can "no longer support it."  When Mr. Evans pressed as to what had caused the Councilmember I to change stance, the staff member indicated that Councilmember I had met with Ms. Browning and that Ms. Browning had pressured Councilmember I to agree to oppose the project,

THIRD AMENDED COMPLAINT

regardless of what this would mean in terms of lost revenue for the City.  On information and belief, Ms. Browning "pressured" Councilmember I by conditioning future funding and political support for Councilmember I's campaign for Mayor on a quid pro quo agreement to oppose the Bahia unless Evans Hotels agreed to sign a card check neutrality agreement.  Mr. Evans expressed his disappointment that the City's change in stance ignored the merits of the project and the benefits to the City.  Mr. Evans asked that Councilmember I communicate the change in position directly to Ms. Cherashore.

188.   Conditioning City Council support for a development on the developer's acceptance of a card check neutrality agreement, which deprives employers of the right to demand a secret ballot election and communicate freely with their employees, is preempted by the NLRA.  The San Diego City Attorney expressly advised the City Council of this fact in the 2015 Memorandum in response to efforts by Defendants to force City Councilmembers into conditioning support for Cisterra on negotiations for a card check neutrality agreement. The same legal analysis prohibits the City of San Diego from requiring Developers to execute a PLA for construction work on such development projects.

189.   On information and belief, when Ms. Browning covertly pressured Councilmember I to agree to support the project only if Evans Hotels agreed to a deal with Local 30 and the Building Trades, Defendants knew that conditioning City approval of a project on a card check neutrality agreement and/or a PLA was unlawful and contrary to the City Attorney's analysis.

190.   On March 23, 2018, Councilmember I spoke with Ms. Cherashore at a luncheon they both attended at the Bahia Hotel.  Councilmember I pulled Ms. Cherashore aside so they could speak privately.  Councilmember I indicated that the lunch meeting with Ms. Browning took place and that unless Evans Hotels agreed to a card check neutrality agreement at the Bahia, Councilmember I would have to oppose the project.  When Ms. Cherashore reiterated the benefits of being a non-union property

and how the proposed redevelopment would benefit the City , Councilmember I responded that "not all card check neutrality agreements are the same." Councilmember I insisted that Evans Hotels would need to sign some form of a card check neutrality agreement in order for Councilmember I to be able to support the project.  Councilmember I made it clear that this position was based solely on the discussion Councilmember I had with Ms. Browning and that Councilmember I's personal view that the project would benefit City residents had not changed.  On information and belief, Defendants have contacted at least five of the City's nine Councilmembers and have conveyed that other Councilmembers have agreed to oppose the Bahia redevelopment.  These serial discussions have resulted in an unlawful agreement in violation of the Brown Act by a majority of the City Council to oppose the project on grounds unrelated to the sham public opposition.

191.   When Evans Hotels refused to acquiesce, Ms. Browning sent her cohort, Tom Lemmon, to meet with Mr. Evans and personally deliver a message.  On the morning of June 30, 2018, Mr. Lemmon texted Mr. Evans to meet him at the Catamaran Hotel for a drink.  After making small talk, Mr. Lemmon raised the Bahia redevelopment, initially stating that he thought the redevelopment would result in a lack of access on Bahia Point.  After discussing this point with Mr. Evans, Mr. Lemmon agreed that the new walkway proposed as part of the redevelopment would be better for bike and pedestrian access than the current road (Gleason), which is designed for cars and does not allow safe passage for bicyclists or pedestrians.

192.   Mr. Lemmon then abruptly shifted gears to the reason for the meeting and stated firmly that Evans Hotels needed to sign a card check neutrality agreement with Ms. Browning and Local 30.  Initially, Mr. Lemmon focused on the benefit to Evans Hotels of unionizing—claiming that it would result in union money and guests flowing to Evans Hotels' properties.  When Mr. Evans made it clear that Evans Hotels would not voluntarily sign a card check neutrality agreement, the discussion quickly shifted to greenmail and other union tactics.  Mr. Evans told Mr. Lemmon that Ms. Browning and

Local 30 had already hired lawyers to threaten the redevelopment.  He noted that those attorneys had already sent letters to the Mayor and City Council.  Mr. Lemmon appeared excited by the reference to the letters and told Mr. Evans that those were "my lawyers" and that "they always win."  He admitted to Mr. Evans that the unions were engaging in "greenmail," but said the union would cover its tracks if Evans Hotels agreed to the neutrality agreement by requiring a couple of "small mitigation measures." Mr. Lemmon made it clear to Mr. Evans that Local 30 and its allies, including Mr. Lemmon, intended to use CEQA and other environmental challenges to hold the Bahia redevelopment project hostage.  Although Mr. Lemmon is not associated with Local 30, he did not hide the fact that Ms. Browning was behind the meeting and openly exchanged numerous text messages with Ms. Browning during the course of, and as part of, the discussion.  Mr. Lemmon concluded the meeting by threatening Mr. Evans that if he did not give in to Ms. Browning, his project would be doomed as the union would hold it up by any and all means—stating "we know how to do it, we do it all the time." Mr. Evans was all too familiar with the means used by Local 30, which, in the past, included contacting at least three Evans Hotels' clients with contracts to hold meetings at the Bahia and Catamaran, and unlawfully threatening to picket those clients and disrupt their meetings unless and until they canceled their contracts.

193.   The threats were not idle.  Soon thereafter, on September 11, 2018, Local 30 posted links on its Facebook pages to a website that it funded and created.  This website, called "No Mission Bay Land Grab at Bahia Point by UNITE HERE Local 30," contains false and misleading information regarding the Bahia Project and whether it violates a purported requirement to retain Gleason Road.

194.   On September 19, 2018, Evans Hotels' CEO, Robert Gleason, ran into Mr. Lemmon in the lobby of City Hall.  Mr. Lemmon asked Mr. Gleason if he had seen all the social media about the Bahia project, to which Mr. Gleason responded that he had. Mr. Lemmon then asked Mr. Gleason if he was interested in sitting down to talk about

10794295.1

it, and advised that, "just so you know, we're going to turn up the volume."  By "we," Mr. Lemmon meant the Defendants.

195.   In early October 2018, the City Real Estate Assets Department was trying to schedule a hearing on the Bahia lease amendment with a City Council Committee. Mr. Gleason learned that the Bahia lease amendment would not be placed on the agenda for the Committee meeting in mid-October because there were supposedly too many items on the agenda.

196.   On October 9, 2018, a representative from Evans Hotels spoke with a staff member representing a different San Diego City Councilmember (hereinafter "Councilmember II") on scheduling the Committee hearing.  The staff member noted that Councilmember II would not calendar the Bahia lease amendment on the requested date because Ms. Browning and Councilmember II are "best friends" and that Ms. Browning had been "very good" to Councilmember II, and has helped Councilmember II out on many occasions.

197.   Not surprisingly, far from being "too busy," there were only three agenda items heard at one of the requested Committee hearing dates, and the other Committee hearing date was taken completely off calendar for lack of agenda items.

198.   On information and belief, Defendants coerced City Councilmembers during these unlawful meetings to prevent the project from being docketed until Defendants had secured a collective commitment by a majority of Councilmembers to oppose the project.  Moreover, in accordance with Defendants' agreement with Mayor Faulconer, Mr. Lemmon secured the Mayor's assistance in delaying the Bahia from being docketed for a hearing because it did not have Defendants sign off.

199.   Sensing weakness, on October 19, 2018, Mr. Lemmon initiated a text message communication with Ms. Browning and Mr. Gleason, in which he said, "**Bahia** We should all huddle up."  Mr. Lemmon then told Ms. Browning to "send Robert [Gleason] [her] card check language in advance . . . . I got the feeling he's gonna need it."  After Ms. Browning responded, "Yep," Mr. Lemmon then added, "Robert I'd like to

THIRD AMENDED COMPLAINT

10794295.1

see all construction and future maintenance be done by Union signatory contractors." By this, Mr. Lemmon was referring to having Plaintiffs sign a PLA governing the Bahia.

**Defendants Threaten SeaWorld, Evans Hotels' Business Partner**

200.   While successfully carrying out Part 1 of their playbook and delaying a vote on the Bahia lease amendment, Defendants further turned up the volume by implementing Part 2.  At the same time that Defendants were drumming up environmental opposition, covertly meeting with members of the City Council to secure agreement to oppose unless Evans Hotels agreed to unionize the project, *i.e.*, agreed to the card check neutrality agreement and PLAs with Defendants, and/or to delay docketing of the public hearing, and posting false messages on its website, they also turned up the heat by going after Evans Hotels' business partners, specifically Sea World LLC ("SeaWorld").

201.   Evans Hotels' relationship with SeaWorld is long-standing.  Evans Hotels and SeaWorld have had a cooperative marketing relationship for decades and Evans Hotels sells SeaWorld tickets and branded room packages.  On April 21, 2015, Evans Hotels entered into a business venture with SeaWorld when the parties signed a Letter of Intent to explore hotel development opportunities on the property of SeaWorld's San Diego Park.  Later that year, on November 4, 2015, SeaWorld and Evans Hotels entered into a Preliminary Project Agreement to develop an upscale, full service SeaWorld themed and branded hotel of approximately three hundred rooms adjacent to the theme park.  Evans Hotels' business agreement with SeaWorld was a matter of public knowledge as the parties issued a press release on November 9, 2015 announcing their intention to develop the hotel next to the theme park.  In the ensuing days, the L.A. Times, Fox News, and the San Diego Tribune wrote articles about the expected success of the Joint Venture.

202.   After years of further negotiation and collaboration, on January 22, 2018, the parties executed a Joint Venture to develop, own, and operate a hotel project

(hereinafter "SeaWorld hotel") leased by SeaWorld.  The Joint Venture was formalized in a written Limited Liability Company Agreement.

203.   Defendants knew about the Joint Venture and the significance of this opportunity for Evans Hotels' business.  SeaWorld is one of the top tourist attractions in San Diego and the Joint Venture contemplated Evans Hotels' hotel to be the first hotel in the country branded with SeaWorld's name.

204.   Defendants also knew that it was important to SeaWorld to build new attractions in the San Diego Park.  These new attractions require Coastal Commission approval.[9]  SeaWorld had already encountered problems with the Coastal Commission in 2016 when the Commission had conditioned approval of SeaWorld's $100 million proposed expansion of the orca tank and habitat (referred to as "Blue World") on SeaWorld's agreement to discontinue its orca breeding program.  Although SeaWorld initially sued the Coastal Commission on the ground that it had no legal basis to take the action it did, ultimately SeaWorld absorbed the loss and focused its energy on

---

[9] Local Coastal Programs (LCPs) are planning tools created by local governments to guide development in the coastal zone, in partnership with the Coastal Commission. LCPs contain the ground rules for future development and the protection of coastal resources. LCPs are prepared by local government, but must conform with the goals and policies of California's Coastal Act.  Once a local government (*e.g.*, a city council) adopts a LCP, the LCP is submitted to the Coastal Commission for review for consistency with Coastal Act requirements.

After an LCP has been finally approved, the Commission's coastal permitting authority over most new development is transferred to the local government, which applies the requirements of the LCP in reviewing and approving new developments. The Commission retains permanent coastal permit jurisdiction over development proposed on tidelands, submerged lands, and public trust lands, and the Commission also acts on appeals from certain local government coastal permit decisions.  The Commission reviews and approves any amendments to previously certified LCPs.  The Mission Bay Park Master Plan Update and the Sea World Master Plan are both certified LCPs.

To ensure compliance with the LCP and the Coastal Act, developments in the coastal area need a Coastal Development Permit.  Once the Commission certifies a LCP, local governments review and grant most coastal development permits.  The Coastal Commission retains continuing permit jurisdiction over certain specified lands (such as tidelands and public trust lands), and it has appellate authority over specified categories of development.

Based on their location and scale, the new attractions planned by SeaWorld and the Hotel developments described herein generally require a multiple step process that includes both City Council approval and Coastal Commission approval.

THIRD AMENDED COMPLAINT

developing new attractions for its parks.  SeaWorld was not back before the Coastal Commission until summer 2017 when it sought approval of a new ride for its San Diego theme park called the "Electric Eel."

205.   In this timeframe, SeaWorld was working with a consultant, Allison Rolfe, President of Collaborative Land Use Solutions and former environmental activist, to facilitate its dealings with the California Coastal Commission and other environmental groups.  Although SeaWorld did not agree to a PLA, Mr. Lemmon did not oppose the Electric Eel ride because of the large number of new union jobs that would be created in constructing it.  SeaWorld was also able to get approval of a new roller coaster for construction and release in 2019.  The unions' support, however, was limited and was ultimately designed to send a message to SeaWorld that if it wanted to avoid unionization and move forward with its business and develop new attractions, it would need Defendants' continued support.

206.   Not coincidentally, at all relevant times, Allison Rolfe has been a very close friend of Ms. Browning, and she has relied on this relationship to achieve success in her role as a consultant.  As she states on her website, Ms. Rolfe relies on her relationships to "pioneer[] profitable solutions for high-profile development projects that would otherwise have faced intractable opposition."  In other words, Ms. Rolfe manufactures solutions by acting as the intermediary between Defendants and the owners and developers whom they target.  Accordingly, on information and belief, Mr. Lemmon and/or Ms. Browning, communicated their messages to Evans Hotels in part through Ms. Rolfe, and Ms. Rolfe communicated messages to Evans Hotels from Defendants.

207.   At the same time that Ms. Rolfe was working on securing Coastal Commission approvals for the upcoming SeaWorld attractions, Ms. Rolfe was also meeting and conversing with Mr. Evans regarding the Bahia and SeaWorld.  Ms. Rolfe's first discussion with Mr. Evans was a telephone call in which she related her success stories in negotiating with Defendants, specifically Local 30.  Ms. Rolfe related that she was close friends with Lorena Gonzalez (a state assemblyperson and head of the San

Diego & Imperial Counties Labor Council) and that she worked with her to broker a deal between Pacifica, Ms. Rolfe's client, and the Port of San Diego whereby the Port of San Diego would trade property with Pacifica for the site of its new hotel.  As part of this deal, Ms. Rolfe confirmed that she secured a promise from Ms. Browning not to engage in greenmail in exchange for Pacifica's commitment to sign a card check neutrality agreement for the project.  Ms. Rolfe assured Mr. Evans that if he were willing to agree to a card check neutrality agreement for the Bahia, she could get the same kind of result.  Mr. Evans listened to Ms. Rolfe's story but said that unlike Pacifica, Bahia had been in operation for over 60 years and Evans Hotels was not willing to sign away its rights just to avoid the threat of greenmail and union opposition.

208.   Ms. Rolfe met Mr. Evans for lunch on or around March 22, 2018 to discuss the Bahia proposal again, but with a new focus on SeaWorld and a potential quid pro quo relating to the SeaWorld hotel.  Ms. Rolfe's communications made clear that she had spoken to Ms. Browning and Local 30 and they were after the Bahia redevelopment.  Ms. Rolfe told Mr. Evans that Mr. LoPresti had sent a letter to the City Council on behalf of Local 30 opposing the Bahia.  Because Mr. LoPresti's letter was dated February 28, 2018 and no one at the City Council had yet shared this letter with Evans Hotels, Mr. Evans was unaware of its existence until he met with Ms. Rolfe.  Ms. Rolfe was not working on the Bahia redevelopment, so no one from the City had reason to share the letter.  Thus, the only way Ms. Rolfe could have known about this letter authored by Defendant Local 30's counsel is from Defendants.  On information and belief, Defendants shared the letter with Ms. Rolfe and authorized her to serve as the intermediary between Defendants and Evans Hotels.  Indeed, only a few weeks earlier, on February 23, 2018, Rick Bates, a Local 30 Research Analyst, submitted a Public Records Act request to the City of San Diego seeking information "regarding the SeaWorld Hotel or any lease amendment related to the SeaWorld Hotel."

209.   In this lunch meeting, Ms. Rolfe also made clear that she had spoken with Ms. Browning when she relayed to Mr. Evans that Ms. Browning has "a real problem

with you."  Ms. Rolfe related that unless Mr. Evans did a deal with Ms. Browning, Defendants would target all of Evans Hotels' projects and SeaWorld as Evans Hotels' business partner.  By contrast, if Evans Hotels agreed to a deal with Ms. Browning for the Bahia—which necessarily includes entering a PLA with the Building Trades—the environmental opposition would resolve itself at the Bahia and Defendants would not target SeaWorld or its employees.  Although Mr. Evans offered to pay Ms. Rolfe for her time, she appeared uncomfortable and refused.  These statements were made against the backdrop of the historical conflict between Local 30 and Evans Hotels during which Local 30 contacted Evans Hotels' clients and threatened to picket those customers during their scheduled conferences at Evans Hotels, unless they cut ties.

210.   Ms. Rolfe spoke regularly with Mr. Evans during the Spring of 2018 and relayed the same message again and again:  If you want to be able to move forward with SeaWorld, you need to do a deal with Defendants for the Bahia.  On information and belief, Ms. Rolfe was sent by Defendants to communicate the message to Evans Hotels that unless it agreed to a card check neutrality agreement at the Bahia, the unions would continue its attack on the Bahia and come after SeaWorld as Evans Hotels' business partner.

211.   In or around June or July 2018, when Evans Hotels refused to acquiesce to Defendants' threats and demands, they turned their focus instead on SeaWorld, Evans Hotels' business partner.  Through Ms. Rolfe, Defendants communicated to SeaWorld that if SeaWorld continued its partnership with Evans Hotels, SeaWorld would face severe opposition from the unions and union allies in connection with its plan to open new attractions every year.  Defendants not only would interfere with SeaWorld's ability to get approval for a master plan amendment at the City Council and the Coastal Commission (the usual greenmail), but also would drum up negative publicity against SeaWorld designed to undermine SeaWorld's business by damaging its reputation and public image.  These attacks would be unrelated to SeaWorld's future attractions, but would be on subjects like animal cruelty, an issue that has been the subject of past

negative publicity campaigns against SeaWorld.  Defendants did not actually intend to oppose SeaWorld's future attractions.  They merely wanted the threat of future opposition to pressure SeaWorld to cease doing business with Evans Hotels.  In addition, on information and belief, SeaWorld reasonably understood this opposition to include a corporate campaign to organize SeaWorld's labor force unless it cut ties with Evans Hotels.  The message to SeaWorld was clear:  either terminate your deal with Evans Hotels or face years of delay in getting future attractions approved and immeasurable damage to your image, reputation, and business in San Diego.

212.   As expected, when faced with the prospect of the unions targeting SeaWorld's reputation and core business plan to increase sales by opening up new attractions and harming its image, SeaWorld had no choice but to agree to abandon its Joint Venture with Evans Hotels, resulting in an obligation to pay out more than $2.8 million in termination fees.

213.   In mid-July 2018, Bill Evans received a phone call from John Reilly, the interim CEO of SeaWorld, regarding the Joint Venture.  Mr. Reilly stated on the call that he understood there was "a big problem" with the union relating to the Bahia.  On information and belief, Mr. Reilly received this message from Defendants through Ms. Rolfe and/or another agent of SeaWorld, as the union's opposition to the Bahia project was not yet public knowledge.  Mr. Reilly then told Mr. Evans that SeaWorld could not afford to be involved with anyone or any projects that could delay SeaWorld's ability to get its master plan approved and/or otherwise adversely impact its business.  This is supported by SeaWorld's 2018 annual Form 10-K filing which identifies unionization as a significant threat to its profitability:

**Unionization activities or labor disputes may disrupt our operations and affect our profitability**.

Although none of our employees are currently covered under collective bargaining agreements, we cannot guarantee that our employees will not elect to be represented by labor unions in the future. If some or all of our employees were to become unionized and collective bargaining agreement terms were significantly different from our current compensation arrangements, it could adversely affect our business, financial condition or

results of operations. In addition, a labor dispute involving some or all of our employees may disrupt our operations and reduce our revenues, and resolution of disputes may increase our costs.

214.   Mr. Reilly said that while SeaWorld still liked conceptually the idea of a SeaWorld hotel and believed that it would bring millions of dollars in increased revenue, SeaWorld's stock price is dependent on developing new attractions and that SeaWorld could not afford to become a target of the union.  SeaWorld was faced with two options: it could either keep the hotel and inevitably spend years fighting the union and its asserted pressure tactics, or else drop the hotel, move forward with the planned opening of key attractions for the park, and avoid union organizing.  SeaWorld had no choice but to end its venture with Evans Hotels.

215.   Evans Hotels' CEO, Robert Gleason, had a subsequent phone call with Mr. Reilly on the same subject on or around July 26, 2018.  On this call, Mr. Reilly reiterated SeaWorld's concern regarding the union and asked that the parties arrange for an in-person meeting in San Diego to discuss.  Without going into much detail, Mr. Reilly reiterated that while there was still "interest" conceptually in doing a SeaWorld hotel, he said that attractions are the "lifeblood" of the organization and that would have to take priority.  Mr. Reilly expressed concern that doing a hotel with Evans Hotels would make SeaWorld a target to union opposition generally and reiterated that SeaWorld could not afford any "wrinkle" in its plans.

216.   On or around August 10, 2018, the parties convened at SeaWorld's office in San Diego.  Mr. Reilly again reiterated that SeaWorld's focus was on developing new attractions and that being able to open up new attractions on an annual basis was critically important to SeaWorld's success.  Although SeaWorld had been able to get its new Electric Eel ride approved by the Coastal Commission for 2018, there were other attractions in the pipeline pending approval, which needed an amendment to the SeaWorld Master Plan.  While SeaWorld still saw the value in a branded hotel, it told Evans Hotels that it could not move forward with the hotel plans at the expense of its core business of opening new attractions at its parks.

217.   SeaWorld pointedly asked about the status of the Bahia and whether Evans Hotels had agreed to meet with Ms. Browning or anyone else at Local 30.  When Mr. Evans responded that Evans Hotels had not agreed to meet with Ms. Browning, Corrine Brindley, SeaWorld's Vice President of State Affairs, said that SeaWorld's concern is that if Evans Hotels did not do a deal with Ms. Browning for the Bahia, Defendants would come after SeaWorld and its proposed new attractions with "pitchforks in air."  SeaWorld was acutely aware of Local 30's history of blocking projects and using unlawful means to disrupt its opponents' businesses, including Local 30's previous conflict with Evans Hotels during which Local 30 had threatened to picket Evans Hotels' clients and disrupt their business meetings at Evans Hotels' hotels unless they terminated their contracts with Evans Hotels.  Notably, Allison Rolfe reports directly to Ms. Brindley.  When Mr. Evans responded that the greenmail is part of the Defendants' playbook, Ms. Brindley responded that SeaWorld also had other more pressing concerns relating to Defendants' stated ability to attack its reputation and image.

218.   Mr. Reilly acknowledged that SeaWorld's decision effectively threw Evans Hotels under the bus but said, again, that SeaWorld had no choice but to "protect its bread and butter" from union interference.

219.   On September 19, 2018, Tony Taylor, the General Counsel of SeaWorld, called Robert Gleason and formally terminated the Joint Venture with Evans Hotels.  He stated that while SeaWorld valued its relationship with Evans Hotels, SeaWorld's leadership had decided that they could not move forward with the Joint Venture because it would jeopardize SeaWorld's underlying capital strategy of opening up new attractions at its theme park.  He then stated that SeaWorld would move forward without Evans Hotels in the Master Plan Amendment so that it could formally get the entitlement process moving forward on new attractions.  Mr. Taylor reiterated that while it was a difficult decision to make given the amount of time, energy, and money invested

10794295.1

by the parties in the SeaWorld hotel, SeaWorld had no choice but to protect its core business.

220.   On November 7, 2018, SeaWorld issued an SEC filing formally announcing its decision to abandon the SeaWorld hotel.  Although SeaWorld did not share in the press release the real reason why it was that it had decided at significant cost to abandon a hotel destined to bring thousands of jobs and hundreds of millions of dollars in anticipated revenue to SeaWorld San Diego and rent revenue to the City of San Diego, the message was clear.  In fact, the following day Mayor Faulconer pulled Mr. Evans aside and asked why it was that SeaWorld abandoned the project after years of investment and collaboration with Evans Hotels. When Mr. Evans declined to respond, the Mayor leaned in and said, "It was the Union, right?"

221.   On November 15, 2018, a SeaWorld executive confirmed to David Cherashore, Executive Board Member of Evans Hotels, that the reason why the SeaWorld Board of Directors terminated the Joint Venture with Evans Hotels was because the unions threatened to target SeaWorld, including its plans to open up new attractions on an annual basis, if it continued in its Joint Venture with Evans Hotels.  On information and belief, this threat was communicated by Defendants to Allison Rolfe or another agent of SeaWorld.

**Defendants Continue To Interfere with the Bahia Project After 2018 Election**

222.   In November 2018, following the City of San Diego election, Evans Hotels was still trying to get the Bahia lease amendment set for hearing.  Councilmember II refused to schedule the Bahia lease amendment for a hearing at the Committee level.  When Evans Hotels requested that then City Council President Myrtle Cole directly docket the Bahia lease amendment at City Council, Ms. Cole refused.  When Mr. Evans called Ms. Cole to ask why the Bahia would not be docketed, Ms. Cole admitted that the unions had given her "hundreds of thousands of dollars to win this thing" and that they (Ms. Browning and Mr. Lemmon) would be upset if the Bahia was to get docketed before the new City Councilmembers took office.

223.   After hearing that the City Council President would not docket the project because of her relationship with Defendants, Evans Hotels turned to Mayor Faulconer for help.  On information and belief, under the agreement between the Mayor and Defendants regarding the Convention Center expansion, on November 26, 2018, Defendants contacted the Mayor's office and demanded that he not request City Council to docket the Bahia for December 3, 2018. The Mayor agreed, and the Bahia lease was not docketed.

224.   Then and only then, after surrender by Evans Hotels was all but certain, Ms. Browning, Mr. Lemmon, and Carol Kim (then Political Director and Now Business Manager for the Building Trades) met with Mr. Gleason and Mr. Evans at the Patio Restaurant in Mission Hills on November 27, 2018 at 4:00 p.m.  After exchanging brief pleasantries, Mr. Gleason raised the issue of the numerous environmental challenges to the Bahia and Evans Hotels' belief that the opposition all stemmed from Defendants' desire to forcibly unionize the Bahia.  Although Mr. Lemmon was careful not to discredit the environmental opposition, he acknowledged that neither he nor Ms. Browning could speak to any of the purported environmental concerns.  Instead, he rationalized their opposition by stating that the union is a business and its objective is to sign up members via a signed PLA and card check neutrality agreement.  When Mr. Evans posed the question as to why they should agree to do this, Ms. Browning responded bluntly "so that you can go forward with your project" and be able to pursue other opportunities in San Diego.  They stated that they had the vote of the presumptive incoming City Council President "all locked up" and future City Councils would be even worse.  In case the message was not clear enough, Mr. Lemmon likened the unions' conduct to a "grenade with the pin out on the table," placing his mobile phone on the table across from Mr. Gleason and Mr. Evans and gesturing to it as though it were a grenade. Mr. Lemmon threatened that although the "pin" had been taken out of the grenade, there was still time to put it back in.  Mr. Evans and Mr. Gleason were well acquainted with what happens when Defendants caused a "grenade" to explode, given

that both had lived through the historical conflict with Local 30 and had only, two weeks earlier, confirmed that Defendants were responsible for the destruction of the SeaWorld Joint Venture.  That meant threats of pickets, corporate campaigns, and other unlawful means against Evans Hotels and its clients unless Evans Hotels conceded to the unions' demands.  If that were not enough, Ms. Browning made clear that the alternative for Evans Hotels would not be pretty.  Citing her sham environmental suit with the Cisterra 7th & Market (see further at paragraphs 85-95) project and the affordable accommodation challenge she pulled out of "thin air" to oppose the Sunroad Harbor Island Hotel project (see further at paragraphs 119-135), Ms. Browning assured Evans Hotels that they would "stop at nothing" to prevent the Bahia from going forward. When Mr. Evans asked why they were targeting Evans Hotels, as they were good employers, Mr. Lemmon appeared surprised and said this has nothing to do with Evans Hotels being "bad people" or a "bad employer."  To the contrary, both he and Ms. Browning reiterated that it is a "new era" for the unions.  Mr. Lemmon summed it up by saying "we have a business just like you have a business" and that their focus was on increasing the number of members because that translates into increased dues. Ms. Browning added that the plan is to have 10,000 members within a year's time and ultimately to use their control over the City Council[10] and the California Coastal Commission to unionize "each and every hotel in San Diego."  Ms. Kim stated that using union labor is "no longer a market liability," but rather the expectation.  In other words, non-union hotel owners/developers in the market would need to sign up or be forced out of the Mission Bay, San Diego Bay, Mission Valley, and Downtown markets.

225.   Evans Hotels also understands that Defendants' claimed concern about retaining Gleason Road is a smokescreen.  Defendants have no actual desire to retain

---

[10] Ms. Browning has repeatedly mentioned that she is "best friends" with Councilmember II, and that her husband, who is Councilmember II's political campaign consultant, was responsible for getting Councilmember II elected to office. Ms. Browning even referred to Councilmember II as the Council President, even though at that time the election for that position had not yet occurred.

THIRD AMENDED COMPLAINT

Gleason Road.  In fact, as Mr. Lemmon conceded in his meeting with Mr. Evans, Evans Hotels' plans for the Bahia redevelopment provide greater access to the public than Gleason Road currently provides.

226.   Further, Evans Hotels understands that altering its plans to comply with Defendants' demand to retain Gleason Road will accomplish nothing.  As they did with the Sunroad Harbor Island Hotel project, if they lose the basis for their current objection, Defendants will simply create a new objection out of the "thin air."  On information and belief, Defendants have utilized this tactic against other developers that have made changes to their projects to address Defendants' CEQA and land use objections.  Ultimately, nothing less than agreeing to a card check neutrality agreement and PLA will end Defendants' objections – which they will readily abandon in favor of the labor concessions.  And if Evans Hotels agrees to those agreements, Defendants will switch their position on the Bahia redevelopment to support its approval regardless of whether it includes retaining Gleason Road.

227.   Defendants have taken all of these surreptitious actions knowing full well that that their ultimate objective—Evans Hotels' *forced* execution of a card check neutrality agreement—is an unlawful act that neither the City Council nor any other state or local governmental entity may impose upon an employer, and it has been declared improper by the Supreme Court of the United States.  Indeed, the San Diego City Attorney, in his 2015 Memorandum to the San Diego City Council, specifically advised the Council and the public of this federal prohibition.

228.   Defendants have taken the steps described herein in an attempt to allow Local 30 and the Building Trades to control and monopolize the prime tourist regions of San Diego, including in proximity to Mission Bay and San Diego Bay and to eliminate competition and development from non-union hotels.  Defendants' actions in opposing any hospitality development project by a full-service hotel in these areas whose labor is not represented by Local 30 and/or whose construction project is not subject to a PLA has the effect of forcing all existing hotels undergoing renovation and/or expanding their

footprint (which all hotels must do regularly to continue to attract guests) to "go union" and forcing all newcomers to the San Diego hotel market to either use union labor, both in the construction and operation of the properties, or to build elsewhere.  This is harmful to competition in the San Diego hospitality market in multiple ways.

229.   Defendants will not stop their abusive and unlawful behavior with respect to the Bahia redevelopment until they receive a signed card check neutrality agreement and a PLA.  And they will not stop this behavior in the City of San Diego going forward.  Their illegal actions, violating the Sherman Act and NLRA, ensure that they maintain control over the Relevant Market.

## DEFENDANTS AGREED AND CONSPIRED TO MONOPOLIZE THE RELEVANT MARKET

230.   Defendants have agreed and conspired to monopolize the Relevant Market. Through their combination, conspiracy, and agreement, unlawful tactics, and use of power in the Relevant Market, Defendants have repeatedly prevented construction of non-union hotels and worked together to force developers to unionize or sign PLAs. For example, Defendants have used their playbook to delay or entirely stop development of at least ten hotels in or around San Diego. Unless and until developers agreed to card check neutrality and/or a PLA, Defendants did not allow these developments to proceed.  This has had the effect of artificially limiting the supply of hotels, favoring incumbents, blocking new entrants and capacity and ensuring only Defendants and the hotels that accede to their demands can gain market position in the Relevant Market.

231.   As demonstrated by their opposition to the SDSU project, including its hotel component, Defendants continue to combine, agree, and conspire to stall large development projects in San Diego. In her press conference concerning Defendants' opposition to SDSU West, Ms. Browning made clear she opposed the project, at least in part, because "SDSU was unwilling to provide project labor agreements for ancillary construction around the property." She was referring to SDSU's refusal to sign PLAs

10794295.1

with the Building Trades – an organization of which she is not an officer or representative.  As of April 2021, Ms. Browning heads the San Diego & Imperial Counties Labor Council.

232.   As demonstrated by their explicit coordination, Defendants have combined, agreed, and conspired to implement their playbook against Plaintiffs in an attempt to force Plaintiffs to unionize and to further monopolize the Relevant Market.  For example, in June 2018, Ms. Browning sent Mr. Lemmon to deliver the following messages to Plaintiffs: (i) sign a card check neutrality agreement *with Local 30*; (ii) if not, *both* Local 30 and the Building Trades would engage in greenmail against Plaintiffs; (iii) Local 30 already hired lawyers to threaten the Bahia development; (iv) Local 30's lawyers already sent letters to the Mayor and City Council opposing the development; and (v) the lawyers used by Local 30 were Mr. Lemmon's/the Building Trade's lawyers. Mr. Lemmon explained Ms. Browning was responsible for initiating his meeting with Plaintiffs and that he exchanged numerous text messages with Ms. Browning during the meeting.  The meeting concluded with Mr. Lemmon telling Mr. Evans that if he did not give Ms. Browning what she wanted, then the Bahia development would be doomed. Notably, these demands by Mr. Lemmon did not benefit members of his organization.

233.   Likewise, in October 2018, Mr. Lemmon initiated a text message communication with Ms. Browning and Mr. Gleason, in which he said: "Bahia We should all huddle up." Mr. Lemmon then told Ms. Browning to "send Robert [Gleason] [her] card check language . . . I got the feeling he's gonna need it." Again, the members of the Building Trades, who Mr. Lemmon represents, do not benefit from Plaintiffs agreeing to card check neutrality with Local 30.

234.   Similarly, in November 2018, Ms. Browning, Mr. Lemmon, and Mr. Gleason held an in-person meeting at which Defendants made clear they collectively controlled the new City Council and, therefore, Plaintiffs would require Defendants' support for the Bahia project in order to move forward.

THIRD AMENDED COMPLAINT

10794295.1

235.   Defendants also agreed and conspired to monopolize the Relevant Market when engaging in the unlawful secondary boycott of SeaWorld. As explained above, Ms. Browning and Mr. Lemmon, through Ms. Rolfe, threatened representatives of SeaWorld that Defendants would target SeaWorld if Plaintiffs did not agree to a card check neutrality agreement and a PLA for the Bahia. Once Plaintiffs refused, Defendants, either directly to a SeaWorld agent or through Ms. Rolfe, told SeaWorld that if it continued its partnership with Plaintiffs, then it would face severe opposition from Defendants and their allies every time it attempted to open a new attraction. Defendants' threats and attacks were intended to interfere with SeaWorld's close business relationship with Plaintiffs and cause SeaWorld to terminate the joint venture. Defendants' threats proved successful – SeaWorld terminated its joint venture due to Defendants' secondary boycott despite believing it would generate millions of dollars in additional revenue.

## THE RELEVANT MARKET

**The Relevant Product Market**

236.   The Relevant Market is the market for luxury destination resorts in the Cities of San Diego and Coronado. "Luxury" includes internationally recognized premium brands (*e.g.*, Four Seasons, and Ritz-Carlton) and strong independent properties (*e.g.*, the Catamaran and the Bahia) with extensive amenity and/or food and beverage offerings. "Destination resorts" refers to larger and full-service properties that appeal to leisure travelers, typically located in resort markets, and considered a destination in and of themselves.

237.   The Relevant Market is a distinct product market. Industry experts recognize that hotels compete in markets based on quality (*e.g.*, luxury), amenities (*e.g.*, destination resort), and location (*e.g.*, San Diego and Coronado). Likewise, when

10794295.1

providing consulting on the SeaWorld hotel, CBRE Group[11] identified a competitive set for the proposed hotel consisting almost exclusively of hotels in the Relevant Market.

238.   Defendants recognize this as a distinct product market because they often target hotels in this market when targeting standalone hotel projects (opposed to large construction projects that include a hotel component like SDSU West). This is because Defendants' foreclosure campaigns involve sizeable costs (including cash, opportunity costs, and reputational risks), meaning Defendants must direct these campaigns at large, impactful developments for them to make economic sense. In the hotel industry in San Diego, these types of developments are very likely to be luxury destination resorts.

239.   The Relevant Market includes all reasonable substitutes. Hotels are differentiated products based on quality and location. Hotels in the Relevant Market charge substantial premiums compared to lower quality hotels and/or hotels in less desirable locations. Consumers are willing to pay these premiums because they value the properties. Stated differently, consumers who prioritize price or are indifferent to quality and/or location do not choose to stay at hotels in the Relevant Market because there are many lower-cost options. Therefore, a consumer in the Relevant Market faced with a small but significant and non-transitory increase in price (a "SSNIP") would not switch to a lower quality room or non-destination hotel. For example, a consumer faced with a SSNIP at the Bahia would not switch to the Residence Inn in Escondido.

240.   Defendants and Plaintiffs participate in the Relevant Market and meaningfully affect commerce in the Relevant Market. In fact, the Relevant Market would not exist or be able to function day-to-day without the contributions of Plaintiffs (luxury hotel operators/developers) and Defendants (luxury hotel service workers and building trades). Plaintiffs and Defendants are, in fact, inextricably intertwined participants in the Relevant Market.  *See Blue Shield of Virginia v. McCready*,  457 US 465, 491 (1982)

---

[11] CBRE Group is a leading commercial real estate services and investment firm.

THIRD AMENDED COMPLAINT

241.   As discussed above, Defendants further participate in the Relevant Market by functioning as gatekeeper for entry and/or expansion of hotels in the Relevant Market. Through their control of City Council, their agreement with the Mayor's office, and other coercive tactics associated with their playbook, Defendants dictate which construction or redevelopment projects go forward in the Relevant Market.  And although their goal of increasing union dues is not unlawful, the methods Defendants chose "are not immune from antitrust sanctions simply because the goal is legal." *Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 625 (1975).

**Geographic Market**

242.   The relevant geographic market is the Cities of San Diego and Coronado. Coronado is a resort city located just across San Diego Bay from the City of San Diego and connected by the San Diego-Coronado Bridge. Given their close and significant bayfront proximity, the luxury destination resorts in Coronado (like the Hotel Del Coronado) serve as competitors to those in San Diego.  Defendants target projects in this geographic market because their playbook is significantly more effective here given their control of the City Council and the Mayor's office, as well as their ability to influence Port of San Diego and Coastal Commission approvals.  The Relevant Market is also a distinct destination for tourists that offers unique attractions that renders it distinguishable from surrounding cities offering different attractions.

**Substantial Power in the Relevant Market**

243.   Defendants have substantial market power in the Relevant Market. Through implementation of their exclusionary and anticompetitive playbook, Defendants control more than 75% of the Relevant Market. Over the past fifteen years, Defendants have foreclosed competition from more than 75% of proposed construction or redevelopment projects in the Relevant Market from going forward until developers or owners agree to card check neutrality and/or a PLA. Some of these projects remain delayed to this day. This likely underestimates Defendants' control over the Relevant

Market because it does not include projects that were privately targeted by Defendants and terminated as a result.

244.   Through their ability to dictate which projects proceed, Defendants can exclude competitors and/or competition. Defendants could not do so without possessing significant power in the Relevant Market. As the Political Director for the Building Trades explained to Mr. Gleason during a November 2018 meeting, using union labor is "no longer a market liability," but rather the expectation in San Diego, meaning non-union hotel owners/developers in the Relevant Market either need to unionize or face foreclosure.

245.   The effects of Defendants' substantial power in the Relevant Market are clear, as Defendants have significantly increased unionization in the Relevant Market. Before adopting and implementing their anticompetitive, exclusionary playbook, few hotels in the Relevant Market were unionized.  Now, as shown above, Defendants force nearly all developers entering the market or operators expanding in the market to unionize. Notably, Defendants do not (because they cannot) use traditional labor democracy systems to achieve unionization. In fact, Local 30 has not held a single election directed by the NLRB in the Relevant Market in at least 15 years.

246.   Defendants' power in the Relevant Market is durable. Defendants' ability to dictate entry and expansion in the Relevant Market is a significant and often insurmountable barrier to entry. As demonstrated herein, Defendants can use their substantial power in the Relevant Market to halt nearly all unwanted entries and expansions. This barrier stifles competition and reinforces Defendants' power in the Relevant Market.

247.   Defendants' power in the Relevant Market will continue to grow.  It is highly likely that new construction projects or significant redevelopments will inevitably occur in the Relevant Market. And each time they do, Defendants will employ their exclusionary playbook to foreclose market entry and delay the projects

10794295.1

until the developers/owners unionize or terminate the project. This, in effect, ensures Defendants' control of the market will continue to increase over time.

## INJURY TO COMPETITION

248.   Through their playbook, Defendants have directly and substantially injured competition in the Relevant Market. Defendants have repeatedly prevented or significantly delayed entry or expansion of non-union hotels or otherwise harmed competition in the Relevant Market, including: (i) Plaintiffs' redevelopment of the Bahia Hotel (delay of nearly four years and still not constructed); (ii) Plaintiffs' joint venture with SeaWorld (terminated due to Defendants' unlawful secondary boycott of SeaWorld); (iii) the Hotel Del Coronado expansion project (delay of approximately eighteen months and loss of roughly half the proposed number of hotel rooms); (iv) the InterContinental project, which is associated with the Lane Field project (delay of over one year); and (v) the Seaport Village project (elimination of competitive bidding process).  This has caused the loss of hundreds or thousands of additional hotel rooms in the Relevant Market.  And this list represents only the projects Plaintiffs believe to have been terminated or delayed due to Defendants' unlawful conduct in the Relevant Market. Many other non-union projects, of which Plaintiffs are not aware, were likely scrapped early in the process due to private targeting by Defendants or the prospect of being targeted by Defendants.

249.   By causing developers to terminate or substantially delay hotel projects, Defendants have significantly reduced the number of competitors and hotel rooms in the Relevant Market. This not only harms competition *per se*, but also: (i) benefits incumbent and unionized hotels to the detriment of competitors and potential entrants; (ii) eliminates a source of downward pressure on pricing and upward pressure on quality, service, and innovation that stems from competition, resulting in higher prices and lower quality rooms and services for end consumers; (iii) forces operators to incur substantial costs associated with holding undeveloped land; (iv) reduces the breadth of choices available to end consumers; (v) excludes tens of thousands of jobs that would

10794295.1

exist but-for Defendants' tactics and, contrary to Defendants' economic self-interest the pool of potential union members. Additionally, the playbook has reduced rent and tax revenue by more than a billion dollars for the City of San Diego, nearly $500 million of which would have come from increased rent following redevelopment of the Bahia.

250. By forcing hotels to unionize or expend significant resources to fight against Defendants' playbook, Defendants significantly increase operating, construction, and/or legal costs for hotel operators. These costs are passed to (and harm) end consumers in the form of higher prices and lower quality rooms and services. The prospect of facing such costs also makes entry significantly less attractive for non-union developers and has likely kept several from entering the Relevant Market. Unionization also causes rigidity in the manner hotels can deploy labor, which leads to lower quality service for end consumers. Indeed, each Evans Hotel property is in the top 40 of Trip Advisor's ratings, while competing union properties are all ranked significantly lower.

251. Defendants' actions further harm competition by restraining hospitality developers' and their hotel employees' rights to recognize a union or choose not to do so. As discussed above, there are benefits to working at non-union hotels.

252. These restraints imposed by Defendants in the Relevant Market have substantial anticompetitive effects, both actual and potential, and do not follow naturally from the elimination of competition over wages and working conditions in the Relevant Market. In reality, as discussed in detail herein, Defendants have engaged in their illegal behavior to advance their own economic interests, often acting directly against the interests of their employee-members.

### INJURY TO PLAINTIFFS

253. Plaintiffs have sustained injury to their business and property and have therefore suffered antitrust injury and damages. As a direct and proximate result of Defendants' anticompetitive activities, Evans Hotels has suffered more than $100 million in business injuries and/or loss of property. Plaintiffs' damages include but are not limited to the loss of their right to develop the Bahia in accordance with the

10794295.1

MBMPU, the lost opportunity to develop a non-union SeaWorld branded hotel, the loss of the opportunity to develop and operate a hotel at the redeveloped Seaport Village, loss of goodwill, lost profits, and lost property value.  Evans Hotels has suffered, and will continue to suffer, irreparable harm if Defendants are not enjoined from engaging in their anticompetitive conduct.

254.   Defendants continue to maintain and increase their monopoly in the Relevant Market, harm participants and consumers in the Relevant Market, and violate the antitrust laws, meaning its liability continues to accrue.

## DEFENDANTS' CONDUCT IS NOT PROTECTED
## BY THE *NOERR-PENNINGTON* DOCTRINE

255.   *Noerr-Pennington* protects neither unions nor management from unlawful activity and both conduct and context matter in its application.[12]  Only lawful, *legitimate* petitioning activity designed to *genuinely* influence government bodies is subject to its protections; it does not create immunity for all conduct designed to increase union membership.  As an extreme illustration from labor history, no Court would extend First Amendment protection to the McNamara brothers for the 1910 fire-bombing of the *Los Angeles Times* on the grounds that their goal was to increase union membership.  Likewise,  *Noerr-Pennington* did not protect the UFW from liability for its actions in connection with the Imperial Valley lettuce strikes in 1979.[13]  While the conduct here is not violent, it is also not lawful.

---

[12] *See Golden Eye Media United States, Inc. v. Trolley Bags UK, Ltd*., 525 F. Supp. 3d 1145, 1242 (S.D. Cal. 2021) ("the *Noerr-Pennington* doctrine does not apply to immunize a defendant's conduct from liability for tort claims,…"); *United Nurses Associations of Cal./Union of Health Care Professionals, NUHHCE, AFSCME v. NLRB*, 871 F.3d 767, 787 (9th Cir. 2017) (management's conduct in discovery demands fell outside the protection of the *Noerr-Pennington* doctrine because it reflects an illegal objective); *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc*., 690 F.2d 1240, 1263 (9th Cir. 1982) ("An antitrust violation does not enjoy immunity simply because an element of that violation involves an action which itself is not illegal.").

[13] See *Maggio, Inc., ,v. United Farm Workers of America*,. Cal Ct. of Appeals Fourth District Div.1,  No.  D006453 {Decided: February 15, 1991}.

10794295.1

256.   Here, the *Noerr-Pennington* doctrine does not apply because, as alleged in detail herein: (i) Defendants' unlawful and coercive conduct (which included sham petitioning, repeated unlawful meetings with City Councilmembers, unlawful secondary boycotts, false statements, bribery, and threats) is entirely beyond the pale of anything resembling legitimate petitioning, and (ii) Defendants have no genuine interest in producing the government actions for which they petitioned, explaining to Plaintiffs that they will drop their petitions and support Plaintiffs once they cave to Defendants' demands.

257.   *Noerr-Pennington* does not apply to Defendants' unlawful secondary boycotts or speech and conduct incidental to those boycotts.  *N.L.R.B. v. Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Local 229, AFL-CIO*, 941 F.3d 902, 905-07 (9th Cir. 2019); *United Nurses Ass'ns of Cal. v. N.L.R.B.*, 871 F.3d 767 (9th Cir. 2017).  Defendants' threats to SeaWorld and Evans Hotels were not made to influence the City Council on unknown and yet unstated grounds of opposition to SeaWorld's future development plans but were instead intended to (i) force SeaWorld to cease doing business with Evans Hotels and (ii) force Evans Hotels to capitulate to Defendants' demands that Evans Hotels agree to a card check neutrality agreement and PLA.

258.   Defendants' conduct also is not protected by *Noerr-Pennington* to the extent it involves communications with government officials in violation of the Brown Act or the disclosure requirements of the San Diego Municipal Code.  This not only applies to violations actionable against Defendants, but also to Defendants' lobbying that induces illegal actions by city officials (*e.g.*, lobbying that induces City Councilmembers to violate the Brown Act).  Defendants' repeated and unlawful off-the-record meetings with a majority of City Councilmembers to ensure opposition to the Bahia are either unlawful actions by Defendants or actions that induced illegal actions by City Councilmembers and are not protected under *Noerr-Pennington*. Nonetheless, Defendants engage in these unlawful actions because they cannot openly lobby City

Councilmembers to condition approval of a project on the developers' agreement to a card check neutrality agreements and PLA.  The City Attorney has said such conditions are unlawful.

259.   Defendants' conduct also is not protected under *Noerr-Pennington* because their oppositions, lobbying, and lawsuits are shams.  Sham petitioning occurs when a defendant's actions are not genuinely intended to influence favorable government action.  Sham petitioning is distinct from sham litigation and courts apply different standards to each context.

260.   The sham exception in the litigation context takes one of two forms relevant here: (1) sham based on a series of litigation activities ("serial litigation"); and (2) sham based on a single suit ("single litigation").

261.   Under the serial litigation exception, litigation is a sham when a defendant engages in serial and automatic petitioning "without regard to and regardless of the merits of said petitions."  *USS-POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council, AFL–CIO*, 31 F.3d 800, 811 (9th Cir. 1994).  The fact some of the litigation may turn out to have merit does not prevent this exception from applying.  *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc*., 806 F.3d 162, 182-83 (3d Cir. 2015).  The defendant also must engage in that petitioning activity "for an unlawful purpose[.]"  *Sosa v. DIRECTV*, 437 F.3d 923 (9th Cir. 2006). In the real estate development context, courts have refused to apply Noerr-Pennington where defendants use sham petitioning to delay development. *See Hanover 3201 Realty, LLC v. Village Supermarkets, Inc*., 806 F.3d 162, 176 (3d Cir. 2015).

262.   The serial litigation exception is applicable to administrative or adjudicative decisions of legislative bodies.  Approvals of individual projects within the scope of an existing plan, such as variances, conditional use permits, and subdivision map approvals, are adjudicative acts.  *Park at Cross Creek, LLC v. City of Malibu*, 12 Cal. App. 5th 1196, 1204 (2017); *Citizens for Planning Responsibly v. Cnty. Of San Luis Obispo*, 176 Cal. App. 4th 357, 367 (2009).  The same is true of a city council's decision

to enter into a contract, such as sales or leases of a city's property. *San Bruno Comm. for Econ. Justice v. City of San Bruno*, 15 Cal. App. 5th 524, 534-35 (2017) (city's sale of property was adjudicative act); *Worthington v. City Council of Rohnert Park*, 130 Cal.App.4th 1132, 1142-43 (2005) (city's contract with Indian tribe was administrative task); *Martin v. Smith*, 184 Cal.App.2d 571, 577 (1960) (city council's decision to approve sublease was administrative action).

263.    The decision to amend the Bahia lease agreement between the City and Evans Hotels is an adjudicative act. So too are many of the decisions made by the City Council, Port of San Diego, and Coastal Commission in connection with hotel projects proposed by other developers, including the Exclusive Negotiation Agreement and Development and Disposition Agreement for the Cisterra, the approval of permits for the Lane Field development, the approval of the Sunroad restaurant and the single hotel, the selection of a developer for Seaport Village, and the approval of coastal development permits for the Hotel Del Coronado.

264.    As an adjudicative or administrative decision, approval of the Bahia lease amendment requires public hearings, written and oral arguments, permits representation by counsel, and is subject to judicial review.

265.    Defendants reflexively oppose projects proposed by hotel developers, including Evans Hotels, that refuse to enter into card check neutrality agreements and PLAs. They make sham arguments about CEQA and land use requirements (like retaining Gleason Road) without regard for their merits and for the sole and unstated purpose of forcing their opponents to agree to unionize. Defendant Lemmon freely admitted to Bill Evans during their June 30, 2018 meeting at the Catamaran that Defendants' challenges are "greenmail" and Defendant Browning bragged to Mr. Evans at the November 27, 2018 meeting that Defendants create arguments against the projects out of "thin air."

266.    To the extent Defendants engaged in lobbying efforts outside of the litigation context, their efforts are likewise not protected by *Noerr-Pennington* because

Defendants do not seek to genuinely influence government action through their lobbying; rather, their lobbying efforts are an abuse of the governmental process designed to harm competition.  They have no interest in the environmental challenges they assert or ensuring compliance with land use laws and regulations.  Defendants seek to use their oppositions to obstruct projects to drive up costs, threaten project funding, and lessen project profits.  Faced with financial losses, developers often have no choice but to agree to Defendants' demands.  Defendants do not actually want to block the projects entirely; they merely want to block the projects until the developer agrees to a card check neutrality agreement and PLA.  Once those agreements are obtained, Defendants abandon their challenges with, at most, negligible mitigation measures that create the façade of good faith settlement negotiations and then actively support the same projects that they once opposed.

267.   That Defendants so freely abandon their challenges to a project proves their sole motivation in asserting those claims is to obtain unrelated labor concessions.  Defendants have fiduciary duties to their memberships to expend union funds prudently.  Although Defendants expend substantial funds for attorneys to argue CEQA and land use claims that they ostensibly bring to protect the health and welfare of their members (*e.g.*, to prevent them from being adversely affected by toxic chemicals, unsafe air and water, and lack of affordable accommodations), the claims are almost always dropped or dismissed without any actual changes to the development plans.  The only justification for this pattern of conduct is that those CEQA and land use claims are mere vehicles for Defendants to accomplish their true objective – obtaining card check neutrality agreements and PLAs with developers.

268.   This is illustrated by Defendants' about-face on numerous projects, as detailed above.  After lengthy opposition in multiple government bodies claiming the projects violated CEQA and other land use restrictions, once Defendants obtained card check neutrality agreements and PLAs, they not only dropped their opposition, but they affirmatively supported virtually the exact same projects they previously opposed.

THIRD AMENDED COMPLAINT

269.   Defendants' history of opposing previous developments is relevant to their actions against Evans Hotels, because they are using the same playbook.  As with their previous challenges, Defendants began by opposing the projects before the government bodies that voted to approve or deny the projects.  In those oppositions, Defendants asserted lengthy objections listing numerous CEQA violations – objections that must be raised during the approval process before filing a lawsuit.  If Defendants were unsuccessful in lining up sufficient "no votes" before the public hearing, such as in the case with the Cisterra project, Defendants then file lawsuits against those projects, arguing that the approval process did not comply with CEQA or land use measures.  If, as was the case in their lawsuits over Cisterra  and the first Convention Center Expansion, Defendants' lawsuits are rejected by the Superior Courts, they appeal the dismissals.  None of those appeals has been successful.  Of course now the projects rarely reach litigation because Defendants "own" the majority votes on City Council, and/or they exercise their control over the Mayor's office to prevent the project from getting docketed for a public hearing until the necessary votes are surreptitiously lined up and agreed to by a majority of the Councilmembers.

270.   That pattern is consistent with the actions Defendants have taken against the Bahia redevelopment.  Currently, Defendants are trying to block approval for the redevelopment by asserting their claims about Gleason Road.  Should the Bahia redevelopment project receive approval from the City Council (which Defendants have assured Plaintiffs it will not), Defendants have threatened future lawsuits with arguments created out of "thin air."  Indeed, Defendants have pointed to their prior actions to block or delay other developments as cautionary tales, warning Evans Hotels that the same thing will happen to it unless it capitulates to Defendants' demands.

271.   Serial sham conduct is particularly pernicious when it denies parties "meaningful access to" government process.  *Cal. Motor Trans. Co. v. Trucking Unlimited*, 404 U.S. 508, 512 (1972).

10794295.1

272.   In recent years, especially after Defendants extracted the agreement with the Mayor that permits them to block projects even from being docketed, Defendants have used their power to deny developers like Evans Hotels meaningful and timely access to the City Council and a public hearing.

273.   Defendants' actions have been taken for an unlawful purpose – to force Evans Hotels to enter into a PLA and card check neutrality agreement.  PLAs in the construction industry are lawful only if they are entered into voluntarily.  *N.L.R.B. v. Local Union 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, AFL-CIO*,  434 U.S. 335, 347 n.10 (1978).

274.   The same is true of coerced card check neutrality agreements.  The First Amendment and § 8(c) of the NLRA protect an employers' right to speak in opposition to unionization.  That "free speech right . . . cannot be infringed by a union[.]"  *N.L.R.B. v. Gissel Packing Co*., 395 U.S. 575, 617 (1969).  However, card check neutrality agreements restrict employer speech by preventing employers from expressing opinions against unionization.

275.   Defendants' conduct towards the Bahia also violates the standard for single sham.  This occurs when a party's claims are objectively baseless and for an improper or unlawful purpose.  *Sosa*, 437 F.3d at 934, 938.

276.   Defendants' claims about the Bahia redevelopment are objectively baseless.  Defendants know and have been told repeatedly by government officials that the MBMPU does not require retention of Gleason Road.  Nonetheless, Defendants persist in arguing that it is required.

## <u>FIRST CLAIM FOR RELIEF</u>

### (Unlawful Secondary Boycott)

### (Against Defendants UNITE HERE! Local 30 and San Diego County Building and Construction Trades Council, AFL-CIO)

277.   Evans Hotels incorporates by reference the allegations contained in Paragraphs 1 through 276, as if fully set forth herein.

10794295.1

278.   Evans Hotels brings this action pursuant to Section 303 of the Labor Management Relations Act ("LMRA"), which states in pertinent part that "[i]t shall be unlawful . . .  for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title."  29 U.S.C. § 187(a).

**Unlawful Secondary Boycott by Pressuring SeaWorld to Cease Doing Business with Plaintiffs.**

279.   Section 8(b)(4) of the National Labor Relations Act ("NLRA") states in pertinent part that "[i]t shall be an unfair labor practice for a labor organization or its agents . . . to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is . . . forcing or requiring any person . . . to cease doing business with any other person."  29 U.S.C. § 158(b)(4)(ii).

280.   By using the word "coerce," Congress "did not intend to proscribe only strikes or picketing but intended to reach any form of economic pressure of a compelling or restraining nature."  *Associated Gen. Contractors v. N.L.R.B.*, 514 F.2d 433, 438 (9th Cir. 1975).  Particular statements constitute prohibited "coercive threats" if, based on the specific language used and surrounding conduct and events, they reasonably can be expected to threaten parties with "ruin or substantial loss."  *N.L.R.B. v. Retail Store Employees Union Local 1001*, 447 U.S. 607, 614 (1980).

281.   Local 30 is a "labor organization" under Section 303(a) of the LMRA and Section 8(b)(4) of the NLRA.

282.   Sea World LLC is a "person" under 29 U.S.C. § 152(1).  SeaWorld is engaged in "commerce" and/or activities that "affect commerce," including (but not limited to) operating SeaWorld branded theme parks.

283.   SeaWorld and Evans Hotels, through EHSW, LLC, entered into a Joint Venture in January 2018 to develop, own and operate a SeaWorld hotel.  SeaWorld and Evans Hotels began working on the Joint Venture before April 2015, when they first

10794295.1

entered into a letter of intent and had already started the initial stage of getting the approvals for the project.

284.   Defendants knew about the Joint Venture and the significance of this opportunity for Evans Hotels' business, because the plans to develop a SeaWorld branded hotel were released to the public on November 9, 2015.  Defendants also knew about the importance to SeaWorld of increasing sales by maintaining a positive public image and meeting its business objective to get its new attractions passed through the Coastal Commission.

285.   When Defendants were unsuccessful in getting Evans Hotels to agree to sign a card check neutrality agreement and a PLA with respect to the redevelopment of the Bahia, they decided to increase the pressure by targeting SeaWorld, Evans Hotels' partner in the recently signed Joint Venture (i.e., a secondary party).

286.   Defendants Mr. Lemmon and/or Ms. Browning communicated with representatives of SeaWorld, including Ms. Rolfe, in the Spring/Summer 2018 and told them that if Evans Hotels did not agree to a card check neutrality agreement at the Bahia they would target not just Evans Hotels' other projects, but also SeaWorld.  Specifically, Defendants threatened that they would impede SeaWorld's ability to get attractions approved at the Coastal Commission, engage in union-organizing tactics against SeaWorld, collaborate with SeaWorld opponents (e.g., People for the Ethical Treatment of Animals) to disrupt SeaWorld's business and harm its name and reputation, and/or engage in other acts of reprisal against SeaWorld in the backdrop of the historical conflict between Evans Hotels and Local 30.  Given that SeaWorld's labor force is not organized, Defendants' threatened union-organizing tactics against SeaWorld could reasonably be construed as threats to unionize parts of SeaWorld's labor force, with the object of pressuring SeaWorld to cease doing business with Evans Hotels.

287.   After these meetings with Defendants, SeaWorld did a sudden about face and, within months of signing a deal that had been negotiated and developed over more than three years, it announced to Evans Hotels in a meeting that took place on August

10, 2018 that it could no longer move forward as planned with the SeaWorld hotel. When pressed as to what prompted SeaWorld to suddenly abandon a project that it had so eagerly pursued for years, SeaWorld stated its concern that if Evans Hotels did not come to an agreement with Ms. Browning and Local 30 regarding the Bahia, that Defendants would target SeaWorld based on its relationship with Evans Hotels. SeaWorld said that while it understood why Evans Hotels did not want to do a deal with Defendants, SeaWorld did not want Defendants to come after SeaWorld with "pitchforks in air," including but not limited to blocking its new projects that were pending City and Coastal Commission approval, engaging in efforts to force unionization, and/or mounting a full-scale corporate campaign against SeaWorld through rallies, demonstrations, boycotts, walkouts, pickets, media, and websites attacking SeaWorld's brand.

288.   On September 19, 2018, SeaWorld notified Evans Hotels of its decision to terminate the Joint Venture.

289.   SeaWorld's decision to terminate was a direct result of Defendants' threat to target SeaWorld based on its relationship with Evans Hotels.

290.   Defendants' conduct was designed to and has in fact injured Evans Hotels. As a direct result of Defendants' unlawful conduct, Evans Hotels has suffered substantial injury to its property and/or business, including but not limited to, lost profits in excess of $100 million in connection with the opportunity to build a SeaWorld branded hotel, legal fees and other costs incurred because of, and in response to, Defendants' coercive threats made in violation of NLRA Section 8(b)(4).

291.   That Defendants' threats included the threat of organizing SeaWorld's labor force does not prevent that threat from violating § 8(b)(4).  To the contrary, even if Defendants actually directed their threat at SeaWorld as a potential primary employer, it is an unlawful labor practice if the threat also has a secondary objective.  *Mead v. Retail Clerks Int'l Ass'n, Local Union No. 839, AFL-CIO*, 523 F.2d 1371, 1379 n.9 (9th Cir. 1975) (that a union acts with "mixed motives" to place pressure on an employer to both

10794295.1

unionize that employer's employees but also to pressure that employer to cease doing business with another employer "does not bar relief" under Section 8(b)(4)); *Mautz & Oren, Inc. v. Teamsters, Local No. 279*, 882 F.2d 1117, 1120-21 (7th Cir. 1989) ("it is not necessary to find that the sole object . . . was secondary so long as one of the union's objectives was to influence the secondary employer to bring pressure to bear on the primary").  Defendants intended for their threat to SeaWorld to have a secondary objective – to force SeaWorld to cease doing business with Evans Hotels unless it agreed to Defendants' demands.

**Unlawful Secondary Boycott by Pressuring Plaintiffs to Sign a PLA to Force Contractors and Subcontractors to Employ Union Labor.**

292.    Section 8(b)(4) of the NLRA also states in pertinent part that "[i]t shall be an unfair labor practice for a labor organization or its agents . . . to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is . . . forcing or requiring any employer . . . to enter into any agreement which is prohibited by subsection (e)[.]" 29 U.S.C. **§** 158(b)(4)(ii)(A).

293.    Section 8(e) of the NLRA also states in pertinent part that "[i]t shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person[.]" 29 U.S.C. § 158(e).

294.    Building Trades is a "labor organization" under Section 303(a) of the LMRA and Section 8(b)(4) of the NLRA.

295.    Evans Hotels is not engaged primarily in the building and construction industry and does not employ workers engaged in the building and construction industry.  Evans Hotels does not directly control labor relations of any potential construction site connected to the Bahia redevelopment. Nor does the pre-hire agreement that the Building Trades seeks for "future maintenance" relate to work to be

performed at the at the site of the construction, alteration, painting, or repair of a building or structure.

296.   Evans Hotels is not and never has been engaged in a collective bargaining relationship with the Building Trades.

297.   Mr. Lemmon, on behalf of the Building Trades, communicated to Bill Evans that it will oppose the Bahia redevelopment project, as well as other Evans Hotels developments, by supporting sham environmental and land use challenges and/or taking any and all other impeding actions, including any corporate campaigns, unless Evans Hotels agrees to a PLA requiring the use of union workers for its upcoming construction developments and future maintenance work.

298.   Mr. Lemmon has demanded the PLA as a condition for Evans Hotels to "go forward with your project" and put the pin back in the "grenade," a threat that Evans Hotels reasonably construed to cover a range of conduct with a secondary objective against the historical backdrop of past threats to picket Evans Hotels' clients.

299.   Mr. Lemmon's threats are broad based and include any and all acts, not simply sham litigation.

300.   Given that Evans Hotels is not an employer primarily engaged in the construction industry, does not control labor relations at any construction sites, is not engaged in a collective bargaining relationship with the Building Trades, does not directly employ members of the Building Trades, and some of the work for which the Building Trades seeks a pre-hire agreement is not at a construction site, this conduct amounts to a secondary boycott and unfair labor practices in violation of NLRA Section 8(b)(4) and a violation of NLRA Section 8(e), because the Building Trades has threatened Evans Hotels with opposition and financial harm unless it agrees to a PLA for the construction of the Bahia redevelopment project and other developments, as well as future maintenance work that does not involve building or affixing into the land. These threats seek to apply economic pressure on Evans Hotels to employ only union contractors and cease or refrain from doing business with nonunion contractors.

10794295.1

301.    The Building Trades' conduct was designed to and has in fact injured Evans Hotels.  As a direct result of the Building Trades' unlawful conduct, Evans Hotels has suffered substantial injury to its property and/or business, including but not limited to, legal fees and other costs incurred because of, and in response to, Defendants' coercive threats made in violation of NLRA Section 8(b)(4).

302.    As a direct and proximate result of Local 30's and the Building Trades' unfair labor practices, Evans Hotels has suffered business injuries and/or loss of property.  Plaintiffs' damages include but are not limited to the loss of its right to develop the Bahia in accordance with the Master Plan, the loss of its Joint Venture with SeaWorld to develop, own and operate a SeaWorld hotel, loss of goodwill, lost profits, and lost property value.

## SECOND CLAIM FOR RELIEF

### Attempted Monopolization in Violation of Section 2 of the Sherman Act
### (Against All Defendants)

303.    Evans Hotels incorporates by reference the allegations contained in Paragraphs 1 through 302, as if fully set forth herein.

304.    In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Defendants have attempted to acquire monopoly power in the Relevant Market. Defendants engaged in conduct with anticompetitive effects directed at accomplishing the unlawful objective of preventing competition in the Relevant Market.

305.    As a result of Defendants' conduct, which included sham petitioning, repeated unlawful meetings with City Councilmembers, unlawful secondary boycotts, false statements, bribery, and threats, the barriers to entry and expansion in the Relevant Market are significant and often insurmountable.

306.    There is a dangerous probability that Defendants will succeed in their attempt to monopolize the Relevant Market. Through implementation of their playbook, particularly their control of City Council and the Mayor's office, Defendants have and will continue to (i) prevent non-union hotels from entering or expanding in the Relevant

Market and (ii) force developers/owners to unionize. This has the effect of ensuring Defendants' share of the Relevant Market continues to grow.

307.   Defendants' anticompetitive activities also reduce competition and supply in the Relevant Market; benefit and enhance the market positions of incumbents to the detriment of competitors (particularly union incumbents); block entry and reduce desirability of entry into the Relevant Market by non-union hotels and developers; block expansion in the Relevant Market by non-union hotels; cause lost revenue to non-union hotel owners and developers due to unlawful delays; cause lost rental and tax income for the City; increase prices; and lower the quality of rooms and services for end consumers in the Relevant Market due to the lack of meaningful market competition. Defendants combine with each other and other non-labor groups (including several participants in the Relevant Market) to unleash their unlawful tactics and achieve these outcomes.

308.   In addition, the PLA that the Building Trades forces on developers (including the PLA it is trying to force on Evans Hotels) indiscriminately excludes nonunion contractors and subcontractors from construction of luxury destination resorts in the Cities of San Diego and Coronado, regardless of whether their competitive advantages were derived from efficiency.  The PLAs do not simply prohibit contracting and subcontracting to any nonunion firm; rather, they prohibit subcontracting to any firm that does not have a contract with the Building Trades.  Like in *Connell Const. Co., Inc. v. Plumbers and Steamfitters Local Union No. 100*, 421 U.S. 616 (1975), the Building Trades has complete control over contract and subcontract work offered by developers and hotel operators that have signed their PLA. Such control produces significant adverse effects in the Relevant Market, including higher prices and lower quality construction.  And this kind of direct restraint on the business market— unrestricted to a particular construction site—has substantial anticompetitive effects, both actual and potential, that do not follow naturally from the elimination of competition over wages and working conditions.  It also contravenes antitrust policies to

a degree not justified by congressional labor policy, particularly because Evans Hotels is not in a collective bargaining relationship with the Building Trades, much less party to a collective bargaining agreement with the Building Trades.

309.   As a proximate result of the wrongful acts herein alleged, Plaintiffs have been damaged in excess of $100 million.  Plaintiffs are entitled to recover treble damages, costs of suit, and attorneys' fees, as well as an injunction that terminates the ongoing violations alleged herein.

## THIRD CLAIM FOR RELIEF

### Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act
### (Against All Defendants)

310.   Evans Hotels incorporates by reference the allegations contained in Paragraphs 1 through 309, as if fully set forth herein.

311.   For purposes of the conspiracy, Defendants Browning and Local 30 on the one hand and Defendants Lemmon and the Building Trades on the other hand have combined, conspired, and agreed among themselves to monopolize the Relevant Market in violation of Section of the Sherman Act, 15 U.S.C. § 2.

312.   Neither Defendants nor their members compete amongst themselves.  Yet, as described herein, each has subordinated its economic interests to their collective interests in pursuing the conspiracy alleged herein.

313.   Defendants have willfully acquired or maintained substantial power in the Relevant Market by, among other things: engaging in abusive and unlawful secondary boycotts, sham petitioning and litigation, false statements, extortion, bribery, threats, intimidation, and other acts and practices as alleged herein. Defendants now dominate and control more than 75% of the Relevant Market.

314.   Defendants combine with each other and use their collective presence in the Relevant Market and their unlawful practices to prevent non-union hotels from entering the market or increasing their share of the Relevant Market.  As alleged above, Defendants have relied on their unlawful playbook to halt or stop the development of

ten or more new non-union hotels in the San Diego market and permit development of hotels only if the owners agree to a card check neutrality agreement and a PLA.

315.   Defendants are not involved in a labor dispute for the purpose of acting on behalf of their members.  Evans Hotels is not unionized and there is not a petition for an election.  Further, the unfair and unlawful business practices described herein are not traditional organizational activities.  Local 30's use of these practices demonstrates that it is acting illegitimately, not within the confines of traditional organizational activities, and outside its legitimate self-interest.

316.   Defendants have specific intent to monopolize the Relevant Market and prevent competition from non-union hotels.  As Ms. Browning has stated repeatedly, Defendants' goal is not to better working conditions of non-union employees but, instead, to unionize "each and every hotel in San Diego."

317.   Defendants committed overt acts and engaged in other conduct pursuant to, and in furtherance of, the conspiracy, including the acts alleged herein.

318.   Defendants' power in the Relevant Market is durable and protected by significant barriers to entry. And due to their exclusionary and anticompetitive conduct, Defendants have obtained and maintained their monopoly in the Relevant Market.  This has allowed Defendants to unlawfully exclude competitors from the Relevant Market.

319.   Defendants' anticompetitive activities also reduce competition and supply in the Relevant Market; benefit and enhance the market positions of incumbents to the detriment of competitors; block entry and reduce desirability of entry into the Relevant Market by non-union hotels and developers; block expansion in the Relevant Market by non-union hotels; cause lost revenue to non-union hotel owners and developers due to unlawful delays; cause lost rental and tax income for the City of San Diego; increase prices; and lower the quality of rooms and services for end consumers in the Relevant Market due to the lack of meaningful market competition.

THIRD AMENDED COMPLAINT

10794295.1

320.   As a proximate result of the wrongful acts herein alleged, Plaintiffs have been damaged in excess of $100 million.  Plaintiffs are entitled to recover treble damages, costs of suit, and attorneys' fees.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Evans Hotels, LLC, BH Partnership LP, and EHSW, LLC respectfully request that the Court issue the following relief:

**ON THE FIRST CLAIM FOR RELIEF:**

    A.  Compensatory damages;

    B.  Costs of suit incurred, including all costs, expenses, attorneys' and experts' fees;

    C.  Punitive damages; and

    D.  Such other relief as the Court deems just and proper.

**ON THE SECOND AND THIRD CLAIMS FOR RELIEF:**

    A.  Defendants and their agents be enjoined during this litigation and permanently thereafter, from ongoing and future acts constituting violations of federal antitrust laws to maintain and/or secure a monopoly, as provided by 15 U.S.C. § 26;

    B.  Treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15, arising from harm Evans Hotels has suffered as a result of Defendants' violation of section 2 of the Sherman Act, 15 U.S.C. § 2;

    C.  Prejudgment interest;

    D.  Costs of suit incurred, including all costs, expenses, attorneys' and experts' fees; and

    E.  Such other relief as the Court deems just and proper.

///
///
///
///

10794295.1

# JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: February 7, 2022                    HIGGS, FLETCHER & MACK LLP


By: _/s/ William M. Low_
      WILLIAM M. LOW
      EDWIN M. BONISKE
      GEOFFREY M. THORNE
      JACOB T. SPAID
      Attorneys for Plaintiffs
      EVANS HOTELS, LLC; BH
      PARTNERSHIP LP; and EHSW,
      LLC


DATED: February 7, 2022                    MOGINRUBIN LLP


By: _/s/ Daniel J. Mogin_
      DANIEL J. MOGIN
      JENNIFER M. OLIVER
      TIMOTHY Z. LA COMB
      Attorneys for Plaintiffs
      EVANS HOTELS, LLC; BH
      PARTNERSHIP LP; and EHSW,
      LLC


DATED: February 7, 2022                    LITTLER MENDELSON, P.C.


By: _/s/ Lawrence D. Levien_
      LAWRENCE D. LEVIEN
      Attorneys for Plaintiffs
      EVANS HOTELS, LLC; BH
      PARTNERSHIP LP; and EHSW,
      LLC