1   Stacey M. Leyton, SBN 203827
    ALTSHULER BERZON LLP
2   177 Post Street, Suite 300
    San Francisco, CA 94108
3   Telephone: (415) 421-7151
    Fax: (415) 362-8064
4   sleyton@altber.com

5   *Attorney for Defendants Tom Lemmon and San Diego County Building and*
6   *Construction Trades Council, AFL-CIO*

7   Richard G. McCracken, SBN 62058
    Paul L. More, SBN 228589
8   Luke Dowling, SBN 328014
    McCRACKEN, STEMERMAN & HOLSBERRY LLP
9   475 14th Street, Suite 1200
    Oakland, CA 94612
10  Telephone: (415) 597-7200
    Fax: (415) 597-7201
11  rmccracken@msh.law
    pmore@msh.law
12  ldowling@msh.law
13

14  *Attorneys for Defendants UNITE HERE Local 30 and Brigette Browning*

15  *(Counsel continued on next page)*

16
                    UNITED STATES DISTRICT COURT
17                SOUTHERN DISTRICT OF CALIFORNIA

18  EVANS HOTELS, LLC, a California        CASE NO. 3:18-cv-02763-RSH-AHG
19  limited liability company, *et al.*,
                                           **DEFENDANTS UNITE HERE LOCAL 30**
20              Plaintiffs,                 **AND BRIGETTE BROWNING'S**
                                           **MEMORANDUM OF POINTS OF**
21              v.                          **AUTHORITIES IN SUPPORT OF**
                                           **MOTION TO DISMISS THIRD**
22  UNITE HERE LOCAL 30, *et. al.*,         **AMENDED COMPLAINT**
23              Defendants.
                                           The Honorable Robert S. Huie
24                                         Date: November 7, 2022
                                           Courtroom: 3B
25
                                           **PER CHAMBERS RULES, NO ORAL**
26                                         **ARGUMENT UNLESS SEPARATELY**
27                                         **ORDERED BY THE COURT**
28

Steven T. Coopersmith, SBN 184646
Philippa S. Grumbley, SBN 265135
THE COOPERSMITH LAW FIRM
2 Columbia Place
1230 Columbia Street, Suite 680
San Diego, California 92101
Telephone: (619) 238-7360
Fax: (619) 785-3357
stc@stevecoopersmithlaw.com
psg@stevecoopersmithlaw.com

*Attorneys for Defendant Tom Lemmon*

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

PROCEDURAL BACKGROUND .......................................................................... 1

LEGAL STANDARD .............................................................................................. 5

ARGUMENT ........................................................................................................... 5

I.   *Noerr-Pennington* doctrine bars Plaintiffs' remaining claims .................. 5

A. Defendants' alleged petitioning and conduct incidental to
petitioning are protected under *Noerr-Pennington* .................................... 6

1.  The 3AC is based on petitioning and conduct incidental to
petitioning. ........................................................................................ 7

B.   Plaintiffs do not meet their burden to demonstrate that
Defendants' petitioning is a "sham." ......................................................... 9

1.  The Ninth Circuit applies different "sham" petitioning
standards based on the branch of government petitioned .................. 10

2.  Defendants' petitioning against the Bahia Hotel's
expansion onto public land was not a "sham." ................................ 12

3.  Defendants' alleged threat of future petitioning against
SeaWorld's expansion was not a sham. ............................................. 15

4.  Plaintiffs cannot rely on the "serial litigation" line of cases. ............. 18

II.   The Third Amended Complaint fails to state a claim. .............................. 19

A. The 3AC fails to state a claim under LMRA §303. ................................. 19

1.  Plaintiffs do not state a claim under NLRA §8(b)(4)(ii)(B). .............. 19

a.  NLRA §8(b)(4)(ii) is interpreted narrowly to avoid the
significant First Amendment problems that its text creates ......... 19

b.  Defendants' alleged threats of petitioning are not coercion......... 22

c.  An alleged threat of negative publicity cannot be coercion. ........ 24

d.  A "threat" to unionize SeaWorld employees is not coercion ....... 25

iii

            e.   Alleged economic harm does not equate to coercion. ..................25

            f.   Plaintiffs' legal claim that the First Amendment does not
                 apply to "secondary boycotts" is entirely baseless ......................28

      2.  Plaintiffs do not state a claim under NLRA §8(b)(4)(ii)(A). ..............29

   B.  The 3AC fails to state claims under Section 2 of the Sherman Act .........33

      1.  The 2021 Order correctly held Plaintiffs cannot plead antitrust
          injury because they do not participate in Defendants' market ..........33

      2.  The 2021 Order correctly held allegations of injury to
          consumers conclusory and implausible. .............................................36

      3.  The 2021 Order correctly held that Plaintiffs do not adequately plead
          market share as required for their monopolization claims. ..............38

      4.  The non-statutory antitrust exemption shields Defendants'
          conduct .................................................................................................39

CONCLUSION ...............................................................................................41

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*,
  141 F.3d 947 (9th Cir. 1998) ................................................................... 37

*Alexander v. United States*,
  509 U.S. 544 (1993) ............................................................................... 25

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
  486 U.S. 492 (1988) ......................................................................... 14, 15

*American Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
  190 F.3d 1051 (9th Cir. 1999) .................................................... 33, 35, 36

*Animal Legal Def. Fund v. Wasden*,
  878 F.3d 1184 (9th Cir. 2018) ................................................................... 8

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................... 5, 32

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of
  Carpenters*,
  459 U.S. 519 (1983) ......................................................................... 34, 39

*B&G Foods N. Am., Inc. v. Embry*,
  29 F.4th 527 (9th Cir. 2022) ............................................... 6, 7, 10, 18

*In re BE&K Constr. Co.*,
  351 NLRB 451 (2007) ............................................................................. 22

*BE&K Constr. Co. v. NLRB*,
  536 U.S. 516 (2002) ......................................................................... 21, 23

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................... 5, 32

*Bhan v. NME Hosps., Inc.*,
  772 F.2d 1467, 1470-71 (9th Cir. 1985) ................................................ 33

*Blue Shield of Va. v. McCready*,
   457 U.S. 465 (1982) ........................................................................... 36

*Bodine Produce, Inc. v. United Farm Workers Org. Comm.*,
   494 F.2d 541 (9th Cir. 1974) ............................................................ 40

*Boone v. Redevelopment Agency*,
   841 F.2d 886 (9th Cir. 1988) ............................................................ 11

*Brantley v. NBC Universal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012) .......................................................... 36

*Brown & Root, Inc. v. Louisiana State AFL-CIO*,
   10 F.3d 316 (5th Cir. 1994) ........................................................ 21, 23

*Building & Const. Trades Council of Metro. Dist. v. Assoc. Builders &*
   *Contractors of Mass/R.I., Inc.*,
   507 U.S. 218 (1993) ..................................................................... 2, 30

*Building Indus. Elec. Contractors Ass'n v. City of New York*,
   678 F.3d 184 (2d Cir. 2012) ............................................................... 2

*In re Century Aluminum Co. Sec. Litig.*,
   729 F.3d 1104 (9th Cir. 2013) .......................................................... 32

*City of Columbia v. Omni Outdoor Advertising, Inc.*,
   499 U.S. 365 (1991) ..................................................... 11, 12, 14, 17

*Continental Maritime of San Francisco, Inc. v. Pacific Coast Metal*
   *Trades Dist. Council*,
   817 F.2d 1391 (9th Cir. 1987) .......................................................... 40

*CP Anchorage Hotel 2, LLC v. Unite Here! Loc. 878*,
   2019 WL 1903385 (D. Alaska Apr. 29, 2019) ................................ 24

*CP Anchorage Hotel 2, LLC v. Unite Here! Loc. 878*,
   558 F.Supp.3d 800 (D. Alaska 2021), *aff'd*, 2022 WL 2953697 (9th
   Cir. July 26, 2022) ........................................................................... 24

*In re Dan Farr Prods.*,
   874 F.3d 590 (9th Cir. 2017) ............................................................ 25

*Danielson v. Inslee*,
   945 F.3d 1096 (9th Cir. 2019) .......................................................... 40

*Eagle v. Star-Kist Foods, Inc.*,
   812 F.2d 538 (9th Cir. 1987) ............................................................... 35

*Edward J. DeBartolo Corporation v. Florida Gulf Coast Building &*
   *Construction Trades Council*,
   485 U.S. 568 (1988) .................................................................... *passim*

*Exhibitors' Serv., Inc. v. Am. Multi-Cinema, Inc.*,
   788 F.2d 574 (9th Cir. 1986) .......................................................... 34, 35

*Franchise Realty Interstate Corp. v. San Francisco Loc. Joint Exec. Bd.*
   *of Culinary Workers*,
   542 F.2d 1076 (9th Cir. 1976) ...................................................... 11, 17

*In re Garab*,
   333 NLRB 16 (2001) ......................................................................... 33

*George v. National Ass'n of Letter Carriers*,
   185 F.3d 380 (5th Cir. 1999) ...................................... 21, 24, 26, 27

*H.A. Artists & Assoc., Inc. v. Actors' Equity Ass'n*,
   451 U.S. 704 (1981) ......................................................................... 39

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*,
   806 F.3d 162 (3d Cir. 2015) ............................................................. 23

*Huber, Hunt & Nichols, Inc. v. Plumbers & Pipefitters, Local 38*,
   282 F.3d 746 (9th Cir. 2002) ........................................................... 31

*Hunt v. Crumboch*,
   325 U.S. 821 (1945) ......................................................................... 39

*Kottle v. NW Kidney Ctrs.*,
   146 F.3d 1056, 1060 (9th Cir. 1998) ........................................ *passim*

*Kohn v. Sw. Reg'l Council of Carpenters*,
   289 F.Supp.2d 1155 (C.D. Cal. 2003) ............................................. 26

*Legal Econ. Evaluations, Inc. v. Metropolitan Life Ins. Co.*,
   39 F.3d 951 (9th Cir. 1994) .................................................. 35, 36, 38

*Les Shockley Racing, Inc. v. National Hot Rod Ass'n*,
   884 F.2d 504 (9th Cir. 1989) ........................................................... 37

*Mackey v. Nat'l Football League*,
   543 F.2d 606 (8th Cir. 1976) ........................................................39, 40

*Manistee Town Ctr. v. City of Glendale*,
   227 F.3d 1090 (9th Cir. 2000) ............................................6, 10, 11, 14

*Nelson v. Int'l Bhd. of Elec. Workers, Local 46*,
   899 F.2d 1557 (9th Cir. 1990) ................................................................30

*NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*,
   377 U.S. 58 (1964) ....................................................................................27

*NLRB v. Iron Workers, Local 229*,
   941 F.3d 902 (9th Cir. 2019) ............................................................28, 29

*NLRB v. Ironworkers Local 433*,
   850 F.2d 551 (9th Cir. 1988) ............................................................23, 32

*NLRB v. Retail Store Employees Union Local 1001*,
   447 U.S. 607 (1980) ..........................................................................26, 27

*NLRB v. Servette, Inc.*,
   377 U.S. 46 (1964) ....................................................................................21

*Oltz v. St. Peter's Cmty. Hosp.*,
   861 F.2d 1440 (9th Cir. 1988) ................................................................34

*Oregon Natural Resources Council v. Mohla*,
   944 F.2d 531, 534-35 (9th Cir. 1991) ....................................................18

*Overstreet v. United Bhd. of Carpenters, Local 1506*,
   409 F.3d 1199 (9th Cir. 2005) ..........................................................*passim*

*Painters Dist. Council 51 (Mgmt. Corp.)*,
   299 NLRB 618 (1990) ..............................................................................30

*Plumbers & Pipefitters Local 32 v. NLRB*,
   912 F.2d 1108 (9th Cir. 1990) ..........................................................23, 32

*Prime Healthcare Servs., Inc. v. SEIU*,
   2013 WL 3873074 (S.D. Cal. July 25, 2013) ........................................36

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*,
    508 U.S. 49 (1993) ................................................................................*passim*

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ........................................................... 36, 38

*Sacramento Valley, Chapter of the Nat. Elec. Contractors Ass'n v. Int'l Bhd. of Elec. Workers, Local 340*,
    888 F.2d 604 (9th Cir. 1989) ..................................................................... 39

*Service Employees v. St. Vincent Med. Ctr.*,
    344 F.3d 977 (9th Cir. 2003) ....................................................................... 2

*Shah v. Harristown Dev. Corp.*,
    2013 WL 6567764 (M.D. Pa. Dec. 13, 2013) ..................................... 34

*Sheet Metal Workers Local 15 v NLRB*,
    491 F.3d 429 (D.C. Cir. 2007) ............................................................. 21, 24

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ..............................................................*passim*

*Southeastern Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975) .................................................................................... 25

*Storer Comms. v. Nat'l Ass'n of Broadcast Employees & Technicians*,
    854 F.2d 144 (6th Cir. 1988) ..................................................................... 22

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) ................................................................... 34

*Terminalift LLC v. Int'l Longshore & Warehouse Union Local 29*,
    2013 WL 2154793, *3-4 (S.D. Cal. May 17, 2013) ........................... 38

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
    546 F.3d 991 (9th Cir. 2008) ..................................................................... 10

*U.S. Futures Exch., LLC v. Bd. of Trade of the City of Chicago, Inc.*,
    953 F.3d 955 (7th Cir. 2020) ..................................................................... 15

*United Nurses Associations of California v. NLRB*,
    871 F.3d 767 (9th Cir. 2017) ....................................................................... 9

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ............................................................................. 34

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades
    Council*,
    31 F.3d 800 (9th Cir. 1994) ..................................................... 9, 18, 25

*Warshawsky & Co. v. NLRB*,
    182 F.3d 948 (D.C. Cir. 1999) ...................................................... 28, 29

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ..................................................... 10, 14

**Statutes**

15 U.S.C. §17 ......................................................................................... 39

29 U.S.C. §151 ....................................................................................... 40

29 U.S.C. §157 ....................................................................................... 25

29 U.S.C. §158(b)(4)(i)(B) ..................................................................... 28

29 U.S.C. §158(b)(4)(ii)(A) ................................................... 29, 30, 31, 32

29 U.S.C. §158(b)(4)(ii)(B) ............................................................ *passim*

29 U.S.C. §158(e) ............................................................... 30, 31, 32

**Other**

I Phillip E. Areeda & Herbert Hovenkamp, Fundamentals of Antitrust
    Law §2.03[F] (2017) ............................................................................ 11

105 Cong. Rec. 17,898–99 (1959) ......................................................... 21

**INTRODUCTION**

In the almost four years this case has been pending, Plaintiffs' claims have been dismissed twice. After four opportunities to plead and replead their claims, it is time for their remaining claims to be dismissed in their entirety, without leave to amend.

In 2020, this Court dismissed all of Plaintiffs' claims under the *Noerr-Pennington* doctrine, holding that the conduct on which the claims were based was First Amendment-protected petitioning activity. After Plaintiffs made immaterial amendments to their complaint, in 2021 this Court dismissed, again on *Noerr-Pennington* grounds, most of the allegations underlying Plaintiffs' remaining Labor Management Relations Act ("LMRA") claim, dismissed Plaintiffs' Sherman Act claims as failing to state a claim, and dismissed Plaintiffs' state-law claims as preempted. Despite stating that it was not revisiting the 2020 decision, however, the Court allowed Plaintiffs to proceed with an LMRA claim based on two narrow sets of allegations, reaching a conclusion that was diametrically opposed to the legal rulings contained in its 2020 order. This Court should resolve those conflicts in Defendants' favor by dismissing Plaintiffs' LMRA claim without leave to amend.

The minimal amendments Plaintiffs have made to the allegations underlying their Sherman Act claims do nothing to correct the fatal defects this Court previously identified, and those claims must be dismissed without leave to amend as well.

**PROCEDURAL BACKGROUND**

Plaintiffs own three hotels in the San Diego area, while Defendants are two labor unions and two current or former labor officials. Doc. 114 ¶¶13-20.

Plaintiffs filed a 184-paragraph, 48-page Complaint on December 7, 2018, asserting that Defendants violated various state and federal laws by lobbying public officials against an amendment of Plaintiffs' "Bahia" hotel lease with the City of San Diego (which, if approved, would have allowed expansion of their hotel onto public land) and by supposedly threatening SeaWorld that if it pursued its joint venture with Plaintiffs then Defendants would, through petitioning and publicity campaigns,

oppose SeaWorld's own expansion.  Doc. 1.  Defendants' alleged objective was to unionize more hotel and construction workers by pressuring Plaintiffs to agree to a "card-check" agreement regarding Plaintiffs' hotel workers and a project labor agreement ("PLA") regarding any construction activities.  *Id.* ¶¶3, 21-27.[1]

After Defendants moved to dismiss, Plaintiffs mooted the motions by filing a 295-paragraph, 79-page First Amended Complaint asserting the same claims.  Doc. 19.  Defendants again moved to dismiss and on January 7, 2020, this Court (Hayes, J.) dismissed *all* of Plaintiffs' claims under the *Noerr-Pennington* doctrine, which immunizes First Amendment-protected petitioning activity from statutory liability.  Doc. 60 at 25 ("2020 Order").  The Court concluded that Plaintiffs' lawsuit threatened to burden Defendants' right to petition, that Plaintiffs' allegations concerned conduct that was petitioning or related conduct, and that Plaintiffs could not invoke the "serial-litigation" line of cases in the context of legislative lobbying (and in any case had not alleged facts supporting liability under that doctrine).  Doc. 60 at 10-15, 15-17.

The Court further held that Plaintiffs' allegations concerning two letters that Local 30's attorney sent to the Mayor and City Council members did not establish "sham" petitioning.  Doc. 60 at 19.  The Court recognized these letters as a form of legislative lobbying and held that "the 'extraordinarily narrow' lobbying sham exception" did not apply to them.  Doc. 60 at 20 & n.3.

Similarly, the Court held that Plaintiffs did not meet their burden of establishing that Defendants' alleged future petitioning against SeaWorld's attractions fell within the "sham" exception.  The Court recognized that the burden of demonstrating that

---

[1] PLAs are "large-scale contracts" between construction contractors and labor unions that "are often signed before construction begins."  *Building Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184, 185 (2d Cir. 2012).  They are "common in the construction industry" and were "expressly legalized" by Congress.  *Id.*; *see Building & Const. Trades Council v. Assoc. Builders & Cont. of Mass/R.I., Inc.*, 507 U.S. 218, 231 (1993) ("*Boston Harbor*").  "Card-check" agreements set rules for organizing and allow for a "card-check" process for union recognition.  They are commonplace and legal.  *See Service Employees v. St. Vincent Med. Ctr.*, 344 F.3d 977, 979 (9th Cir. 2003).  Plaintiffs' suggestion that such agreements are not "traditional, statutory and lawful," Doc. 114 ¶28, is categorically false.

1  petitioning is a "sham" falls on Plaintiffs, and that their allegations did not suffice.

2  Doc. 60 at 17.  The Court held that it also could not simply infer that a "future

3  negative publicity campaign" against SeaWorld would be unprotected.  *Id.* at 21.

4     After obtaining leave to amend, Doc. 75, Plaintiffs filed a 377-paragraph, 120-

5  page Second Amended Complaint ("2AC").  Doc. 76.  They re-pled claims regarding

6  conduct the Court had held constitutionally protected.  The 2AC also added new

7  allegations that Defendants had bribed public officials, violated local lobbying laws,

8  and violated the Brown Act by meeting with public officials.  Doc. 76 ¶¶49, 57, 59-

9  63, 79, 176, 183, 191, 193.  Despite the Court's ruling, the 2AC pled no new factual

10  allegations supporting an inference that Defendants' alleged future SeaWorld-related

11  petitioning would be baseless or a sham.  Doc. 76 ¶¶193-214; *cf.* Doc. 60 at 18.

12     Defendants moved to dismiss for the third time.  Docs. 79, 80, 81.  After the

13  motions were fully briefed the case was transferred, Doc. 88, and on August 26, 2021,

14  this Court (Robinson, J.) "conclud[ed] that the majority of Defendants' alleged

15  conduct is protected by the *Noerr-Pennington* doctrine."  Doc. 93 at 27 ("2021

16  Order").  The Court held that Defendants' lobbying of public officials and threats of

17  litigation concerning Plaintiffs' proposed developments were petitioning or

18  petitioning-related activity and so immune from statutory liability.  *Id.* at 24-25.  In

19  doing so, the Court again rejected Plaintiffs' argument that *Noerr-Pennington*'s

20  "sham" exception applied, ruling that allegations that Defendants' lobbying violated

21  California's Brown Act and the City's lobbying ordinance were irrelevant, that the

22  "bribery" allegations were speculative and implausible, and that Plaintiffs could not

23  allege that the threats to file litigation against Plaintiffs' proposed development were

24  objectively baseless.  *Id.* at 18-21, 24-26, 48.  The Court made clear that Defendants'

25  prior litigation against unrelated hotel developments was First Amendment-protected,

26  because Defendants had succeeded on most of their actions.  *Id*. at 19-21.

27     On two points related to *Noerr-Pennington* immunity, however, the 2021 Order

28  reached opposite conclusions from the 2020 Order.  First, the 2020 Order held that

Local 30's legal letters to the City urging greater transparency and challenging the Bahia expansion's legal basis were protected under *Noerr-Pennington*, Doc. 60 at 20, and both Orders agreed that the letters' *contents* were not "objectively baseless," Doc. 60 at 20 & n.3; Doc. 93 at 19 ("Plaintiffs fail to show that Defendants' environmental concerns regarding the Bahia redevelopment were objectively baseless").  But the 2021 Order held that that the Plaintiffs stated a claim that these letters were a "sham" because the 2AC alleged that Defendants' unstated *purpose* in sending the letters was "solely to delay approval of the Bahia redevelopment."  Doc. 93 at 25.

Second, the 2020 Order recognized that *Plaintiffs* had the burden to prove that Defendants' alleged future lobbying related to SeaWorld's expansion would be a sham and that the Court could not assume such future lobbying would be baseless.  It rejected "Plaintiffs' request [that] the Court conclude that *any* future Coastal Commission petition filed by Defendants against Sea World would be objectively baseless" and that the Court "infer" that future lobbying "would not be aimed at securing denial of the development."  Doc. 60 at 17, 21.  By contrast, the 2021 Order—addressing the same alleged substantive allegations as the 2020 Order—concluded that Plaintiffs could proceed with their claim of a "sham" because the Court found it "difficult to imagine in what way Defendants could intend to influence government action or know that their objections would be meritorious without yet knowing the nature of SeaWorld's future attractions."  Doc. 93 at 27.

Having held "the majority" of Plaintiffs' allegations of misconduct to be precluded by the *Noerr-Pennington* doctrine, the Court also dismissed Plaintiffs' Sherman Act claims based on their failure to plead both antitrust standing and an adequate market share.  Doc. 93 at 38-41.  The Court further held that the statutory labor exemption from antitrust liability precluded Plaintiffs from basing an antitrust claim on one union's entry into a PLA with a single developer and subsequent support for that developer in relation to another construction project.  *Id.* at 32-35.

The Court gave Plaintiffs "one final opportunity to amend" to "address[] the …

1  identified deficiencies," Doc. 93 at 61, and Plaintiffs filed a 320-paragraph, 104-page

2  Third Amended Complaint ("3AC") that continued to make hundreds of allegations

3  the Court had *twice* held not to be actionable.  *See, e.g.,* Doc. 114 ¶¶58-65, 66-175.

**LEGAL STANDARD**

4

5       To withstand a motion to dismiss, a complaint must allege sufficient facts "to

6  state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550

7  U.S. 544, 570 (2007).  Conclusory legal statements are not accepted as true, and

8  "naked assertions devoid of further factual enhancement" do not suffice.  *Ashcroft v.*

9  *Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and alteration omitted). If "the

10  well-pleaded facts do not permit the court to infer more than the mere possibility of

11  misconduct," the complaint should be dismissed.  *Id.* at 679.

**ARGUMENT**

12

13  **I.   *Noerr-Pennington* doctrine bars Plaintiffs' remaining claims.**

14       Two judges have agreed that "the majority of Defendants' alleged conduct is

15  protected by the *Noerr-Pennington* doctrine[.]"  Doc. 93 at 27; *cf.* Doc. 60 at 11-22

16  (finding *all* of Defendants' alleged conduct to be protected by *Noerr-Pennington*).

17  The 3AC does not contain any new allegations that could alter these conclusions.

18  But the 2020 and 2021 Orders came to opposite conclusions on two points.

19       First, the 2020 Order held two letters that Local 30's attorney sent to the City

20  concerning the Bahia Hotel's expansion onto public lands protected by *Noerr-*

21  *Pennington*.  Doc. 60 at 20 & n.3.  While the 2021 Order agreed that the two letters'

22  contents had legal merit, Doc. 93 at 19 ("Plaintiffs fail to show that Defendants'

23  environmental concerns regarding the Bahia redevelopment were objectively

24  baseless"), it held that that Plaintiffs adequately pled that these letters were not

25  constitutionally protected because Defendants' alleged *subjective intent* in sending

26  them was "to delay approval of the Bahia redevelopment[.]"  Doc. 93 at 25.  The

27  2021 Order's conclusion is incompatible with governing precedent.

28       Second, the 2020 Order rejected "Plaintiffs' request [that] the Court conclude

that *any* future Coastal Commission petition filed by Defendants against Sea World would be objectively baseless[.]" Doc. 60 at 17. It declined to "infer" that Defendants' *future* lobbying against SeaWorld attractions would be a "sham," noting that Plaintiffs have the "burden to allege facts sufficient to show that Defendants' lobbying and related conduct was a sham." Doc. 60 at 21. The 2021 Order, by contrast, presumed (based on the same substantive allegations) that Defendants' threat of future lobbying was *necessarily* a sham, because it was "difficult to imagine in what way Defendants could intend to influence government action or know that their objections would be meritorious without yet knowing the nature of SeaWorld's future attractions." Doc. 93 at 27. Again, the 2020 Order was correct, while the 2021 Order incorrectly placed the burden on Defendants to "disprove" a future sham.

## A. Defendants' alleged petitioning and conduct incidental to petitioning are protected under *Noerr-Pennington*.

The *Noerr–Pennington* doctrine derives from the Petition Clause of the First Amendment and provides that "those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006). "The doctrine immunizes petitions directed at any branch of government, including the executive, legislative, judicial and administrative agencies." *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000).

To determine whether *Noerr-Pennington* immunizes a defendant's conduct, courts in the Ninth Circuit "apply a three-step analysis to determine: (1) 'whether the lawsuit imposes a burden on petitioning rights,' (2) 'whether the alleged activities constitute protected petitioning activity,' and (3) 'whether the statute[ ] at issue may be construed to [avoid] that burden.'" *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 535 (9th Cir. 2022) (internal citation omitted). "If the answer at each step is 'yes,' then a defendant's conduct is immunized under *Noerr-Pennington*." *Ibid*.

Two previous orders of this Court have held that "Plaintiffs' lawsuit would

burden Defendants' petitioning activity [and] that the laws under which Plaintiffs are suing may be construed to preclude liability based on petitioning conduct protected under *Noerr-Pennington*." Doc. 93 at 12 & n.4. Plaintiffs have not previously challenged those conclusions. *Ibid*. Thus, Defendants have demonstrated the first and third prongs of the test for *Noerr-Pennington* immunity.

### 1. The 3AC is based on petitioning and conduct incidental to petitioning.

The *Noerr-Pennington* doctrine applies both to direct petitioning of the government and to "conduct incidental" to petitioning, like pre-suit demand letters, lobbying-related press campaigns, settlement exchanges, and other "communications between private parties ... so long as they are sufficiently related to petitioning activity." *Sosa*, 437 F.3d at 933-38. Protecting conduct incidental to petitioning is necessary to give "adequate 'breathing space' to the right of petition." *Id.* at 932.

Both Orders held that all of Defendants' alleged conduct was petitioning or incidental to petitioning. After the dismissal of the 1AC, Plaintiffs added speculative allegations to the 2AC to "attempt to escape Judge Hayes' prior conclusion that 'each alleged threat was made in the context of petitioning activity.'" Doc. 93 at 15 (quoting Doc. 60 at 14). The 2021 Order rejected this ruse, Doc. 93 at 15-17, and the 3AC makes no new factual allegations that could change these legal conclusions.

The 3AC continues to allege that Defendants engaged in the following conduct with regard to the proposed amendment of the Bahia Resort's lease with the City: (1) having Local 30's lawyer send letters to the City Council and Mayor in February and May 2018, setting forth Local 30's legal position (Doc. 114 ¶¶180, 181); (2) lobbying city councilmembers against the proposed lease amendment and to delay a vote until after newly elected councilmembers took office (*id.* ¶¶187, 189, 222-23); (3) putting up a website setting forth Local 30's position on the lease amendment (*id.* ¶193); and (4) meeting with Plaintiffs' representatives and threatening to continue Defendants' opposition to the lease amendment if Plaintiffs did not settle for a PLA and "card-check agreement" (*Id.* ¶¶191-92, 194, 199, 224).

Both Orders correctly held that these are all forms of petitioning or conduct incidental to such petitioning. Doc. 60 at 12, 14; Doc. 93 at 15-16.

With regard to SeaWorld, Defendants allegedly threatened—through Alison Rolfe, an environmental consultant hired by SeaWorld—to "interfere with SeaWorld's ability to get approval for a master plan amendment at City Council and the Coastal Commission" and to "drum up negative publicity against Sea World." Doc. 114 ¶211. Both Orders held that these threats of future lobbying are conduct incidental to petitioning. Doc. 60 at 13, 14-15; Doc. 93 at 16-17.[2]

After the 2020 Order dismissed the 1AC, Plaintiffs sought to avoid it by adding speculative, implausible allegations that Defendants were threatening to engage in non-petitioning activity. Though the 2021 Order rejected this approach, Doc. 93 at 15-16, the 3AC contains the same allegations, essentially unchanged.

As to the Bahia lease amendment, Plaintiffs continue to allege that picketing took place at one of Plaintiffs' hotels over 25 years ago and so Defendants' present-day threats should be interpreted to include picketing or other undefined forms of union action. Doc. 114 ¶¶177, 298. But 3AC (like the 1AC and 2AC) contains "no allegations that Defendants mentioned, let alone threatened, picketing or any other conduct aside from their intended picketing." Doc. 93 at 15.

As to SeaWorld, Plaintiffs continue to allege (as did the 2AC) that the "negative publicity" Defendants threatened might be "unrelated to SeaWorld's future attractions, but would be on subjects like animal cruelty" (Doc. 114 ¶¶211, 286) so would not be incidental to future petitioning.[3] Plaintiffs also continue to posit that SeaWorld might have understood Defendants to threaten to unionize SeaWorld's

---

[2] Plaintiffs' 3AC (like previous complaints) attempts to connect Defendants' petitioning and threats to petition against the Bahia and SeaWorld to a so-called "playbook" of past lobbying and litigation against various real-estate developments in San Diego dating back over a decade. Doc. 114 ¶¶66-169. Plaintiffs have never disputed that these allegations relate to petitioning.

[3] Even if this speculation about what Defendants might say in the future were adequately pled, which both previous orders held it was not, publicizing animal-rights issues is core political speech protected by the First Amendment's Speech Clause. *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1190 (9th Cir. 2018).

1  employees.  *Id.* ¶211.  But as before, Plaintiffs "fail to allege sufficient facts to

2  support that Defendants' conduct was not ... related to petitioning activity" and "do

3  not allege that the threats were made in the context of discussions concerning

4  anything other than Defendants' anticipated petitioning."  Doc. 93 at 16-17.

5      Finally, Plaintiffs again plead that *United Nurses Associations of California v.*

6  *NLRB*, 871 F.3d 767 (9th Cir. 2017), holds that labor unions' "conduct incidental to

7  petitioning" is not protected under *Noerr-Pennington*.  Doc. 114 ¶257; *see* Doc. 82 at

8  6.  Defendants have explained at length elsewhere why this argument

9  mischaracterizes the case's holding, Doc. 69 at 12-18; Doc. 86 at 8, and the Court

10  addressed and rejected it roundly, Doc. 93 at 13-15.  As the Court held, *United*

11  *Nurses* did *not* hold that *Noerr-Pennington* is inapplicable to indirect petitioning.

12  Doc. 93 at 14.  And as it further held, *United Nurses* arose in a completely different

13  context—an employer-initiated subpoena interrogating employees about their union

14  membership that was found to be an unfair labor practice—which matters because

15  the employer's purported petitioning directly impacted employees' countervailing

16  right of association.  *Id.* at 14-15; *see also United Nurses*, 871 F.3d at 785-87.  In this

17  case, by contrast, there are no countervailing First Amendment rights, as "only

18  "Defendants' First Amendment rights are at issue."  Doc. 93 at 15.

19
20  **B. Plaintiffs do not meet their burden to demonstrate that Defendants' petitioning is a "sham."**

21      Plaintiffs bear the burden to prove that Defendants' petitioning was, and future

22  petitioning will be, a "sham."  *Professional Real Estate Investors, Inc. v. Columbia*

23  *Pictures Industries, Inc.*, 508 U.S. 49, 61 (1993) ("*PRE*") (burden is on "plaintiff to

24  disprove the challenged lawsuit's legal viability"); *USS-POSCO Indus. v. Contra*

25  *Costa Cnty. Bldg. & Const. Trades Council*, 31 F.3d 800, 811 (9th Cir. 1994).

26      Complaints that do not adequately plead "sham" petitioning must be

27  dismissed.  *See, e.g.*, *B&G Foods*, 29 F.4th at 539, 542; *Sosa*, 437 F.3d at 929-30;

28  *Kottle v. NW Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998); *Manistee Town*

*Ctr.*, 227 F.3d at 1092; *see also PRE*, 508 U.S. at 63 ("Whether petitioning is 'objectively baseless'" is "matter of law"); *Kottle*, 146 F.3d at 1063 (claims based on constitutionally protected conduct raise "danger that the mere pendency of the action will chill the exercise of First Amendment rights").

### 1. The Ninth Circuit applies different "sham" petitioning standards based on the branch of government petitioned.

As the Court has recognized, the standard that applies to determine whether petitioning is a sham depends on the branch of government petitioned. Doc. 60 at 16; Doc. 93 at 21-22. Where the defendant filed a lawsuit or engaged in quasi-judicial executive or legislative branch petitioning, the "sham" test set forth in *PRE*, 508 U.S. at 60-61, applies. The court first determines whether the lawsuit was "objectively baseless" in the sense that "no reasonable litigant could realistically expect success on the merits." *Id.* at 60. "Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation." *Ibid*. A lawsuit is subjectively non-genuine if it attempts to use the process of litigation, rather than its outcome, to violate the law that the plaintiff invokes (such as interfering with a competitor under the antitrust laws). *Id.* at 60-61; *see also Kottle*, 146 F.3d at 1060.[4] But "an objectively reasonable effort to litigate cannot be sham regardless of subjective intent," *PRE*, 508 U.S. at 57, and "a court may not even consider the defendant's allegedly illegal objective unless it first determines that his lawsuit was objectively baseless." *White v. Lee*, 227 F.3d 1214, 1232 (9th Cir. 2000); *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1008 (9th Cir. 2008).

In the context of *lobbying* legislative bodies, executive-branch officials, or administrative agencies that do not engage in quasi-judicial decision making, the

---

[4] The Ninth Circuit has identified two other ways that litigation can be a sham: if it is part of a "series" of lawsuits brought without regard to their merit (addressed *infra* at 18), or if it involved "a party's knowing fraud upon, or its intentional misrepresentations to, the court" (which is not alleged here). *Kottle*, 146 F.3d at 1060 (internal citation and quotation omitted).

"sham" exception to *Noerr-Pennington* is even more demanding.  *Kottle*, 146 F.3d at 1061 (exception is "extraordinarily narrow").  That is because there are effectively "no enforceable standards" for holding lobbying to be "objectively baseless." *Manistee Town Ctr.*, 227 F.3d at 1094; *Kottle*, 146 F.3d at 1061 ("[I]t would seem quite pointless to ask whether the lobbying effort was 'objectively baseless.'"); *see also* I PHILLIP E. AREEDA & HERBERT HOVENKAMP, FUNDAMENTALS OF ANTITRUST LAW §2.03[F] (2017) (in context of legislative petitioning, "it is virtually impossible to identify the sham").  Misrepresentations are condoned (indeed common) in the legislative realm.  *Kottle*, 146 F.3d at 1062; *Boone v. Redevelopment Agency*, 841 F.2d 886, 894 (9th Cir. 1988); *Franchise Realty Interstate Corp. v. San Francisco Loc. Joint Exec. Bd. of Culinary Workers*, 542 F.2d 1076, 1079 (9th Cir. 1976).

But the fact that objective unreasonableness is near-impossible to prove when it comes to lobbying does not mean that it *does not have to be proven*.  In *PRE*, the Supreme Court made clear that petitioning must *always* be shown to be *objectively* unreasonable to be a sham, and that a subjectively non-genuine intent—such as a purported intent to delay or to block the entry of a competitor into the market—is *never* sufficient by itself to render petitioning a sham.  508 U.S. at 58 ("we have consistently assumed that the sham exception contains an *indispensable objective component*.") (emphasis added).  The Court has "repeatedly reaffirmed that evidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham."  *Id*. at 59; *see also id.* ("neither *Noerr* immunity nor its sham exception turns on subjective intent alone.").

While *PRE* involved litigation, the Court made clear that the same rule applies to lobbying, noting that it had found subjective intent alone to be insufficient in *City of Columbia v. Omni Outdoor Advertising, Inc*., 499 U.S. 365 (1991) ("*Omni*), which involved allegations that lobbying to modify a zoning code was a sham because the defendant's true purpose was to delay its competitor's ability to enter the billboard market.  *PRE* explained that *Omni* had also "held that challenges to allegedly sham

11

petitioning activity must be resolved according to *objective criteria*" and while subjective intent might "render the manner of lobbying improper or even unlawful" that did not equate to a "sham."  *PRE*, 508 U.S. at 59-60 (citations omitted).

### 2. Defendants' petitioning against the Bahia Hotel's expansion onto public land was not a "sham."

Plaintiffs allege that Defendants engaged in sham petitioning when Local 30's lawyer sent letters to the Mayor and City Council setting forth Local 30's legal position on the Bahia lease amendment; by lobbying the City Council against the lease amendment and to delay hearing the matter until after elections took place; by putting up a website explaining their opposition to the lease amendment; and by threatening to continue opposing the lease amendment before the City and Coastal Commission.  Doc. 114 ¶¶180, 181, 187, 189, 191-92, 193, 194, 199, 222-23, 224.

The 2020 and 2021 Orders agreed that Defendants' alleged lobbying of councilmembers and Local 30's website were protected under *Noerr-Pennington*. Doc. 60 at 19-20 & n.3; Doc. 93 at 25.  And the 2021 Order held that Defendants' alleged lobbying of councilmembers to delay hearing on the Bahia lease amendment was *Noerr-Pennington*-protected lobbying because Defendants "sought—and obtained—the requested delay" so it could not be inferred that "Defendants did not genuinely seek the governmental action for which they lobbied."  Doc. 93 at 25.[5]

But the two previous Orders came to opposite conclusions on whether the two letters that Local 30's counsel to the City Council and Mayor in February and May 2018 were *Noerr-Pennington* protected.  *See* Doc. 60 at 19-20; Doc. 93 at 25.

Local 30's counsel's February 2018 letter described its concerns about the project, including the loss of vehicular beach access and elimination of 270 beach-adjacent parking spaces.  Doc. 114 ¶180; Request for Judicial Notice ("RJN"), Ex. 1 at 2.  It "express[ed] concern regarding the lack of transparency and access to

---

[5] The 2021 Order also rejected Plaintiffs' arguments that Defendants' lobbying lost its protection because of alleged Brown Act and lobbyist registration infractions and due to purported "bribery."  Doc. 93 at 25-26; *see also* Doc. 60 at 21-22.

information pertaining to environmental review of the proposed Lease Amendment," and "urge[d] the Mayor and Council to take all necessary steps to ensure that Local 30 and other interested stakeholders are provided access to any technical studies ... to determine whether environmental impacts specific to the Project" were addressed in the Project's environmental impact report.  *Id*. at 1-2.  The letter did not ask the Council to delay deliberations, only for transparency.

The May 2018 letter contained a legal analysis of the proposed Bahia lease amendment's shortcomings, arguing that the plan to eliminate Gleason Road—a public-access road along the length of Bahia Point—would "contravene[e] the Mission Bay Master Plan Update's ('MBMPU') explicit direction that development on Bahia Peninsula must 'Retain Gleason Road.'"  RJN, Ex. 2 at 1.[6]  The letter further argued that removing vehicular access to Bahia Point through the elimination of Gleason Road—the only means for recreational boaters to reach Bahia Point— would conflict with the Coastal Act's requirement of "'maximum access ... and recreational opportunities for all the people'" and instruction that "'*non-water-dependent land uses that congest access corridors* and preclude boating support facilities" be "limited."  RJN, Ex. 2 at 3 (citing Cal. Pub. Res. Code §§30210, 30224).  Plaintiffs have never disputed the merits of this latter argument.

The 2021 Order concluded that the two letters "addressed [Defendants'] environmental concerns at length" and had an objectively sound legal basis.  Doc. 93 at 18-19 ("Plaintiffs fail to allege facts showing that Defendants' environmental concerns regarding the Bahia redevelopment were objectively baseless").  Indeed, not only was the legal position set forth in the letters objectively reasonable, *it was successful*.  The basis of Plaintiffs' lawsuit is that Defendants' lobbying of the City

---

[6] The letter submitted a map from the MBMPU that indicated "Retain Gleason Road."  *Id*., Ex. 2 at Ex. A.  The parties dispute which version of the MBMPU applies or whether the "Retain Gleason Road" language on it has been superseded. *Compare* RJN, Ex. 2 at 2-3 *with* Doc. 114 ¶182.  As the 2020 Order pointed out, even if Plaintiffs were correct in their view of the applicable MBMPU, "the 'extraordinarily narrow' lobbying sham exception would still not apply."  Doc. 60 at 20 (quoting *Kottle*, 146 F.3d at 1061).

1    Council and Mayor, including these letters on Local 30's legal position, convinced

2    the City not to approve Plaintiffs' lease amendment.  Doc. 114 ¶253.

3         The question then becomes whether lobbying letters that are *objectively*

4    *reasonable* on their legal merits and that *successfully* convince legislators can be

5    held a "sham" based on the alleged *subjective intent* that motivates them.  The 2021

6    Order concluded that they could, holding the letters unprotected based on Plaintiffs'

7    allegations that Defendants do not subjectively care whether they are successful in

8    their environmental challenges and that their true intent is to delay.  Doc. 93 at 24-25

9    (citing Doc. 76 ¶¶175, 234-35, 239); *see* Doc. 114 ¶¶182, 266-67, 270.

10        But this conclusion conflicts directly with the rule that sham petitioning has

11   "an indispensable objective component."  *PRE*, 508 U.S. at 58.  Subjective non-

12   genuineness is never enough, *id*. at 60-61; *White*, 227 F.3d at 1232, including under

13   the "extraordinarily narrow" test for sham lobbying.  *See PRE*, 508 U.S. at 59-60

14   (*Omni*, 499 U.S. at 381, "dispelled the notion that an antitrust plaintiff could prove a

15   sham merely by showing that its competitor[]" had the purpose to "delay").

16        Moreover, "successful petitioning cannot be a sham."  *Columbia Pictures*

17   *Indus., Inc. v. Professional Real Estate Investors, Inc.*, 944 F.2d 1525, 1531 n.8 (9th

18   Cir. 1991); *see also Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492,

19   502 (1988) (effort to influence governmental action cannot be sham in light of actual

20   adoption of lobbied-for statutes and local ordinances); *Omni*, 499 U.S. at 380-81

21   (billboard company's successful lobbying of city to enact zoning ordinance not

22   "sham"); *Manistee Town Ctr.*, 227 F.3d at 1091 (lobbyists successfully opposed

23   leasing agreement for a county justice center).

24        Plaintiffs previously relied on *Omni*'s statement that the "purpose of delaying

25   a competitor's entry into the market does not render lobbying activity a 'sham,'

26   unless ... the delay is sought to be achieved only by the lobbying process itself, and

27   not by the governmental action that the lobbying seeks."  499 U.S. at 381; *see also*

28   Doc. 93 at 24 (citing this language).  But this quote merely describes the nature of

the courts' inquiry into subjective motives once the objective test has been met; it does not replace the need to first apply the "indispensable objective component." *PRE*, 508 U.S. at 58; *see also U.S. Futures Exch., LLC v. Bd. of Trade of the City of Chicago, Inc.*, 953 F.3d 955, 965 (7th Cir. 2020) (applying objective-baselessness standard to claim that legislative petitioning was solely intended to delay; noting that "the right of the people to petition for desired outcomes 'cannot properly be made to depend upon their intent in doing so'") (quoting *PRE*, 508 U.S. at 58).

In any case, Plaintiffs allege no basis for concluding that Defendants subjectively intended the two letters to cause delay through the *process* of lobbying, rather than its *outcome*.  The February 2018 letter merely asks that the City proceed transparently by providing Local 30 (and other stakeholders) additional documents. RJN, Ex. 1.  The May 2018 letter lobbies the City (successfully, as it turns out) to reject the proposed lease amendment based on the identified legal problems or, at least, to require Evans to submit a revised proposal that does not eliminate Gleason Road and thereby violate "the MBMPU, the California Constitution, and the Coastal Act." RJN, Ex. 2 at 4.  These are not efforts to harm Evans through the *process* of lobbying—the "process" of responding to two legal letters to the Council imposes no procedural burden whatsoever—but through its (to date, successful) *outcome*.

Accepting Plaintiffs' attempt to hold Defendants liable based on allegations that they do not subjectively care about environmental outcomes would "fail to supply 'real 'intelligible guidance.'" *PRE*, 508 U.S. at 60 (quoting *Allied Tube,* 486 U.S. at 508 n. 10).  Far from giving petitioning the "breathing space" the First Amendment requires, *Sosa*, 437 F.3d at 933, this standard would suffocate it.

### 3. Defendants' alleged threat of future petitioning against SeaWorld's expansion was not a sham.

Plaintiffs also allege that Defendants, through SeaWorld's environmental consultant, threatened to "interfere with SeaWorld's ability to get approval for a master plan amendment at the City Council and the Coastal Commission[.]"  Doc.

114 ¶211.[7]  The 2020 and 2021 Orders agreed that this was an alleged threat of future *lobbying* (rather than litigation or quasi-judicial action) and so was subject to the "extraordinarily narrow" lobbying standard.  Doc. 60 at 20; Doc. 93 at 23-24.[8]  The 3AC does not add any allegations that could alter this conclusion.

The 2020 Order rejected Plaintiffs' "request [that] the Court conclude that *any* future Coastal Commission petition filed by Defendants against Sea World would be objectively baseless, without stating 'specific allegations' that show the petitions would be meritless."  Doc. 60 at 17.  Nor could the Court "infer that lobbying the City Council to deny future SeaWorld development would not be aimed at securing denial of the development."  *Id.* at 21.

Plaintiffs did not add any new "specific allegations" showing that future lobbying against SeaWorld would be objectively baseless, *see* Doc. 62-3 (redline of 2AC),[9] nor do they add any such allegations to the 3AC, *see* Declaration of Stacey Leyton ("Leyton Decl."), Ex. 1.  But the 2021 Order came to the opposite conclusion as the 2020 Order, holding that Defendants' alleged threat to lobby against SeaWorld's expansion was *necessarily* a "sham" because it was "difficult to imagine" how Defendants "could intend to influence government or know that their objections would be meritorious without yet knowing the nature of SeaWorld's future attractions."  Doc. 93 at 27.

The 2020 Order was correct, and the 2021 Order was incompatible with Ninth Circuit precedent, for several reasons.  First, it is *Plaintiffs' burden* to allege facts plausibly supporting the conclusion that Defendants' threatened lobbying would fail

---

[7] Plaintiffs allege that they had numerous conversations with SeaWorld officials, Doc. 114 ¶¶213, 215, 216, 219, but do not (and so apparently cannot) allege that SeaWorld informed them of any specific threat to lobby against future attractions.

[8] *See also Kottle*, 146 F.3d at 1062.  The 2021 Order also held that Defendants' alleged threats to petition other forums, such as the City, Port of San Diego, and Planning Commission, involved lobbying, rather than litigation.  Doc. 93 at 23.

[9] Instead, Plaintiffs added allegations to the 2AC speculating that SeaWorld understood Defendants' threats to be of various forms of non-petitioning activity, such as an "animal-rights" campaign or the unionization of SeaWorld's employees, all of which the 2021 Order rejected as insufficiently pled.  Doc. 93 at 16.

1    to meet the "extraordinarily narrow" standard for lobbying to be a sham.  *See* Doc.

2    93 at 23; *Sosa*, 437 F.3d at 942.  If there is ambiguity about whether the future

3    petitioning would be a "sham" or protected, then Plaintiffs have not met their burden.

4    *Ibid.* ("[I]n light of the burden RICO liability would impose on [defendant]'s right to

5    petition the courts," court would not impose liability for "arguably ambiguous

6    statements ... absent a showing that the statement meets the standard for the sham

7    exception").  Threats to oppose an antagonist's interests in the future—including by

8    wielding political power through lobbying—are commonplace; and "lobbying is the

9    *sine qua non* of democracy." *Kottle*, 146 F.3d at 1061-62.  Requiring *Defendants* to

10   prove that ambiguous statements to SeaWorld (which they are not even alleged to

11   have communicated themselves) did *not* threaten a sham reverses the burden.

12       Second, the 2021 Order concluded that Defendants' future lobbying is a sham

13   unless it is "meritorious." Doc. 93 at 27.[10]  But that is not the standard.  *Noerr-*

14   *Pennington* protects *lobbying* even if founded on misrepresentations and intentional

15   deception (and so is "non-meritorious").  *See Omni*, 499 U.S. at 383-84 ("In *Noerr*

16   itself, where the private party 'deliberately deceived the public and public officials'

17   in its successful lobbying campaign, we said that 'deception, reprehensible as it is,

18   can be of no consequence so far as the Sherman Act is concerned.'") (citation

19   omitted); *see also Kottle*, 146 F.3d at 1061; *Franchise Realty*, 542 F.2d at 1079

20   ("The relatively precise legal standards in light of which certain arguments may be

21   characterized as 'frivolous' are simply absent from the rough and tumble of the

22   political arena; almost any position, including the self-interested plea of one

23   competitor that another should be denied a permit, may be urged before such a

24   political body.").

25       Finally, the 2021 Order concluded that the alleged "threatened lobbying

26   _____

27   [10] The 3AC's allegations support the conclusion that any future petitioning by
     Defendants regarding SeaWorld's attractions *would* have an "objective basis,"
     including that past SeaWorld attractions were the subject of meritorious challenges,
28   Doc. 114 ¶204, and that most of Defendants' past petitioning had *not* been "filed
     without regard for merit and for the purpose of harassment," Doc. 93 at 19.

against SeaWorld is akin to 'protests ... filed automatically and without regard to merit.'" Doc. 93 at 27 (internal citation omitted). But this standard comes from the *serial-litigation* test for sham petitioning; there is no *Noerr-Pennington* doctrine of *serial lobbying* "without regard to merit." *See infra* at 18.

**4. Plaintiffs cannot rely on the "serial litigation" line of cases.**

The Court has twice rejected Plaintiffs' attempt to tie Defendants' petitioning and threatened petitioning about the Bahia lease amendment and SeaWorld to a "playbook" of past lobbying and litigation over various real-estate developments dating back nearly fifteen years that did not involve Plaintiffs. Doc. 60 at 16-18; Doc. 93 at 19-21. Under the "serial-litigation" standard, a defendant may be found to have engaged in "sham" petitioning if it files a "series" of lawsuits "brought pursuant to a policy of starting legal proceedings without regard to the merits." *USS-POSCO*, 31 F.3d at 811. But the serial-litigation test applies only to litigation, not to lobbying. *Kottle*, 146 F.3d at 1061 ("[S]ubjecting [a] defendant to antitrust liability because it engaged in numerous unsuccessful attempts to lobby a state legislature . . . would eviscerate the Petition Clause."); Doc. 60 at 16; Doc. 93 at 19 n.7, 24.

The 2021 Order held that the past litigation alleged in the 2AC did not meet the serial-litigation "sham" test because "[o]f the seven lawsuits Plaintiffs identify, five settled or were at least partially successful." Doc. 93 at 20-21; *see also USS-POSCO*, 31 F.3d at 811 (no sham when "more than half" of adjudicated actions "turn[ed] out to have merit"); *B&G Foods*, 29 F.4th at 539 (dismissing action where allegations did not rule out that majority of actions had been successful). Nothing in the 3AC's amendments justifies changing this conclusion.[11]

Accordingly, the *Noerr-Pennington* doctrine requires dismissal of the 3AC.

---

[11] *See* Leyton Decl., Ex. 1 ¶¶ 88, 104, 108, 115, 166-69 (allegations re legal theories in past litigation and lobbying about Mission Valley redevelopment). Even if this were not the case, the serial-petitioning doctrine does not even apply to lawsuits filed against different parties. *See Oregon Natural Resources Council v. Mohla*, 944 F.2d 531, 534-35 (9th Cir. 1991). Its rationale is wholly inapplicable in that context. *See USS-POSCO*, 31 F.3d at 811.

**II.     The Third Amended Complaint fails to state a claim.**

Even if the *Noerr-Pennington* doctrine did not immunize Defendants' petitioning, the 3AC fails to state claims that Defendants violated LMRA §303 (29 U.S.C. §187) or Section 2 of the Sherman Act.

**A. The 3AC fails to state a claim under LMRA §303.**

**1.   Plaintiffs do not state a claim under NLRA §8(b)(4)(ii)(B).**

Plaintiffs allege that Defendants violated NLRA §8(b)(4)(ii)(B), and derivatively LMRA §303 (29 U.S.C. §187), by threatening SeaWorld with future lobbying before the City and Coastal Commission; with a "negative publicity campaign" that would perhaps focus on "animal cruelty" and a "corporate campaign ... attacking SeaWorld's brand"; and with the unionization of SeaWorld's employees, if SeaWorld did not cancel its joint venture with Plaintiffs.  Doc. 114 ¶¶211, 287, 291.[12]  This claim fails because the conduct that Plaintiffs allege Defendants engaged in or threatened is not "coercion" under Section 8(b)(4)(ii).

**a.   NLRA §8(b)(4)(ii) is interpreted narrowly to avoid the significant First Amendment problems that its text creates.**

Section 8(b)(4)(ii)(B) makes it an unfair labor practice for a labor organization "to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where ... an object thereof is ... forcing or requiring any person ... to cease doing business with any other person[.]"  29 U.S.C. §158(b)(4)(ii)(B).

In *Edward J. DeBartolo Corporation v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568 (1988) ("*DeBartolo*"), the Court rejected the notion that union activity violates §8(b)(4)(ii) merely because it is intended to put pressure on a secondary target (that is, a business other than the "primary" target of the union's labor dispute) and causes economic harm.  *DeBartolo* instructs courts to

---

[12] The 2021 Order held that Plaintiffs had sufficiently pled a cause of action under LMRA §303 based on "petitioning [that] 'lacked a reasonable basis[,]'" but not on Plaintiffs' other theories.  Doc. 93 at 29.  As explained below, the 2021 Order erred in conflating the *Noerr-Pennington* standard with analysis of §8(b)(4)(ii)'s scope and by presuming that Defendants' future petitioning would be a "sham."

1    read §8(b)(4)(ii) narrowly to avoid conflicts with the First Amendment.

2         *DeBartolo* involved union handbilling at a retail mall, a tenant of which had

3    hired a general contractor that was using a non-union subcontractor. *Id*. at 570. The

4    union sought to pressure the mall's owner and other tenants to intervene in the

5    union's primary labor dispute by "asking mall customers not to shop at any of the

6    stores in the mall 'until the Mall's owner publicly promises that all construction at

7    the Mall will be done using contractors who pay their employees fair wages and

8    fringe benefits.'" *Ibid*. The National Labor Relations Board ("NLRB") held that the

9    hand-billing violated §8(b)(4)(ii), because "'[a]ppealing to the public not to patronize

10   secondary employers is an attempt to inflict economic harm on the secondary

11   employers by causing them to lose business,' and 'such appeals constitute "economic

12   retaliation" and are therefore a form of coercion.'" *Id*. at 572 (citation omitted).

13        The Court rejected this reasoning. It focused on the means used—handbilling,

14   as opposed to picketing—rather than on the objective of the union's conduct or its

15   economic effect. *Id*. at 580. "[P]icketing is qualitatively different from other modes

16   of communication," the Court held, because "picketing is a mixture of conduct and

17   communication and the conduct element often provides the most persuasive deterrent

18   to third persons about to enter a business establishment." *Ibid*. (quotations omitted).

19   Noting that §8(b)(4)(ii)'s reference to "threats, coercion, or restraints" is

20   "'nonspecific, indeed vague," the Court held that these words "should be interpreted

21   with 'caution' and not given a 'broad sweep[.]'" *Id*. at 578. Construing §8(b)(4)(ii)

22   to prohibit the union's peaceful handbilling would raise significant First Amendment

23   problems, *id*. at 576, and the Act's legislative history evinced no intent to proscribe

24   such speech as "coercion." *Id*. at 586-87; *see also Overstreet v. United Bhd. of

25   Carpenters, Local 1506*, 409 F.3d 1199, 1212 (9th Cir. 2005) ("only … 'ambulatory

26   picketing' of secondary businesses" is "clearly proscribed by the statute").[13]

27   ───────────

28        [13] Both *DeBartolo*, 485 U.S. at 586-87, and *Overstreet*, 409 F.3d at 1212, cite
     Senator John F. Kennedy, the Chairman of the House–Senate Conference

Following *DeBartolo*, courts read §8(b)(4)(ii) narrowly and refuse to interpret "threats, coercion, or restraints" to encompass forms of communication or petitioning that would raise difficult First Amendment issues.  Thus, demonstrating with a banner "sham[ing]" retailers and advising them to protect their firms by refusing to hire non-union contractors does not violate §8(b)(4)(ii)(B).  *Overstreet*, 409 F.3d at 1202, 1216.  Nor does leading a funeral procession to protest a hospital's use of a non-union contractor, *Sheet Metal Workers Local 15 v NLRB*, 491 F.3d 429, 433-34, 439 (D.C. Cir. 2007) or a letter-writing campaign in support of an economic boycott, *George v. National Ass'n of Letter Carriers*, 185 F.3d 380, 385-92 (5th Cir. 1999), or threats about lobbying state legislators, *Brown & Root, Inc. v. Louisiana State AFL-CIO*, 10 F.3d 316, 326-27 (5th Cir. 1994).

While guided by similar constitutional avoidance concerns that inform *Noerr-Pennington*, the scope of the term "coercion" in §8(b)(4)(ii) is a distinct interpretive question.  *Compare DeBartolo*, 485 U.S. at 574, *with Sosa*, 437 F.3d at 931 & n.5.  Analysis of whether petitioning can violate §8(b)(4)(ii) must both address that statute's particular legislative history and provide "breathing space" for Petition Clause rights by protecting even "litigation [that] is not immunized by the First Amendment right to petition."  *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 530-31 (2002); *id*. at 535-36 (avoiding "difficult First Amendment issue[s]" that holding litigation "coercive" under NLRA would raise, and determining that legislative history indicated no "clear intent" to cover unsuccessful, retaliatory lawsuits).

Where conduct does not fall within §8(b)(4)(ii)'s definition of "coercion," "threats" to engage in that conduct cannot either.  *See, e.g.*, *NLRB v. Servette, Inc.*, 377 U.S. 46, 57 (1964) ("protection for the distribution of handbills would be

---

Committee, who explained that House conferees were "persuaded … to agree that the union shall be free to conduct informational activities short of picketing.  In other words, the union can hand out handbills at the shop, can place advertisements in the newspapers, can make announcements over the radio, and can carry on *all publicity short of having ambulatory picketing in front of a secondary site*."  105 Cong. Rec. 17,898–99 (1959) (emphasis added).

1  undermined if a threat to engage in protected conduct were not itself protected");

2  *Storer Comms. v. Nat'l Ass'n of Broadcast Employees & Technicians,* 854 F.2d 144,

3  147 (6th Cir. 1988) ("Since the handbilling itself was not proscribed activity,

4  peaceful warnings that handbilling will occur are not unlawful.").

### b. Defendants' alleged threats of petitioning are not coercion.

6        Plaintiffs allege that Defendants conveyed a message (through Rolfe) to

7  SeaWorld threatening to "impede SeaWorld's ability to get [future] attractions

8  approved at the Coastal Commission" by lobbying against them.  Doc. 114 ¶286.  As

9  explained, this alleged threat to lobby is protected by *Noerr-Pennington*.  But even if

10  it were not, threats of future lobbying may not be equated with unlawful "coercion,"

11  and Ninth Circuit precedent precludes the Court from presuming that Plaintiffs'

12  future lobbying would be done in a manner that violates §8(b)(4)(ii)(B).

13        In evaluating whether petitioning is prohibited by §8(b)(4)(ii), the Court does

14  "not decide whether the First Amendment *does* protect [the petitioning in question],

15  or even whether it probably does."  *See Overstreet*, 409 F.3d at 1209.  Rather, the

16  "narrow inquiry" is whether holding the petitioning unlawful would "present[] a

17  *significant risk* that the First Amendment will be infringed."  *See ibid.* (citing *NLRB*

18  *v. Catholic Bishop of Chi.*, 440 U.S. 490, 502 (1979)).  If such a "significant risk"

19  exists, then the Court looks to whether "the legislative history of the relevant

20  amendment to this text, passed in 1959, indicate[s] a 'clear intent' to bar" the

21  petitioning.  *Id*. at 1212 (citing *BE&K*, 536 U.S. at 535).

22        In the context of litigation (or other petitioning) that has been *completed* and

23  was unsuccessful, application of this standard is relatively straightforward.  Only if

24  the completed petitioning was both objectively baseless and subjectively non-

25  genuine may it be found to violate the NLRA.  *In re BE&K Constr. Co.*, 351 NLRB

26  451, 457 (2007); *see PRE*, 508 U.S. at 60.

27        But Plaintiffs here seek to impose liability based on alleged threats of lobbying

28  that has not occurred and so cannot be judged objectively baseless, and that would be

22

1  subject only to the "extraordinarily narrow" test for "sham" lobbying when it did

2  occur, *see Kottle*, 146 F.3d at 1061.  No court has held threats of future lobbying to

3  violate §8(b)(4)(ii),[14] and nothing in §8(b)(4)(ii)'s text supports the conclusion that

4  Congress intended to outlaw such threats.  *See Brown & Root*, 10 F.3d at 327 ("We

5  cannot discern in the language of section 8(b)(4)(ii)(B) any clear indication that

6  governmental lobbying alone 'coerces' secondary employers.  Neither do we find

7  any clear indication in the legislative history that Congress intended to proscribe

8  such lobbying.").  At a minimum, imposing §8(b)(4)(ii) liability on threats of future

9  lobbying would raise a "difficult First Amendment issue[.]"  *BE&K*, 536 U.S. at 535.

10  That at least a "significant constitutional question" exists here is demonstrated by

11  this Court's previous holding that the Petition Clause *affirmatively protected*

12  Plaintiffs' alleged threat to lobby against SeaWorld.  Doc. 60 at 12-14.  *BE&K* and

13  *Overstreet* compel the Court to interpret §8(b)(4)(ii)'s reference to "coercion" to

14  exclude this threat.

15       Even if it were proper to interpret the term "coercion" as encompassing threats

16  of future lobbying, Plaintiffs' theory would conflict with Ninth Circuit precedent

17  holding that courts may not presume that threatened conduct that may be carried out

18  in a lawful manner will be carried out in a manner that violates §8(b)(4)(ii).  *NLRB v.*

19  *Ironworkers Local 433*, 850 F.2d 551, 557 (9th Cir. 1988) (rejecting presumption

20  that union's threat of picketing that could be carried out lawfully would be done in

21  manner that violated §8(b)(4)(ii), citing "general legal principle that people should

22  be presumed to be acting lawfully until proven otherwise"); *Plumbers & Pipefitters*

23  *Local 32 v. NLRB*, 912 F.2d 1108, 1110 (9th Cir. 1990) (presumption of unlawful

24  means "is without foundation in the Act, relevant case law or any general legal

25  principles"); *see also* Doc. 60 at 21 (refusing to presume that Plaintiffs' "future

26  lobbying or publicity campaigns fall within the sham exception to the *Noerr-*

27  _____

28  [14] Plaintiffs cite *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc*., 806 F.3d 162, 176 (3d Cir. 2015), but there the defendants *actually filed* unsuccessful adjudicative complaints and lawsuits that were held baseless.  *Cf.* Doc. 114 ¶261.

1    *Pennington* doctrine") (citing *Plumbers & Pipefitters Local 32*, 912 F.2d at 1110).

2         Such a presumption would be particularly inappropriate in this case.

3    Defendants' alleged threat to lobby against SeaWorld is subject to an

4    "extraordinarily narrow" sham exception to *Noerr-Pennington*.  *Kottle*, 146 F.3d at

5    1061.  The Court has twice held that Defendants' *actual past petitioning* against

6    other real-estate developments was not a sham.  Doc. 60 at 17; Doc. 93 at 20-21.

7    Plaintiffs themselves recognize that past Coastal Commission challenges to

8    SeaWorld expansion were meritorious, Doc. 114 ¶204, and the Court has twice held

9    that Defendants' actual lobbying against the Bahia expansion had an objectively

10   sound legal basis.  Doc. 60 at 20 & n.3; Doc. 93 at 19.  Defendants may not,

11   consistent with Ninth Circuit precedent, be presumed to have made a threat to

12   engage in an unlawful course of conduct under §8(b)(4)(ii) when a lawful one was

13   available to them.

14              **c.  An alleged threat of negative publicity cannot be coercion.**

15        Plaintiffs further allege that Defendants threatened a "negative publicity

16   campaign" about SeaWorld's animal-rights record, as well as "rallies,"

17   "demonstrations," "boycotts," and "websites."  Doc. 114 ¶¶48, 211, 286-87.

18        These forms of protest are protected under the First Amendment's *speech

19   clause*.  They are precisely the types of union activities that *DeBartolo,* 85 U.S. 568,

20   distinguished from picketing and held are beyond §8(b)(4)(ii)'s prohibition.  *See,

21   e.g.*, *Overstreet*, 409 F.3d at 1212-13; *Sheet Metal Workers Local 15*, 491 F.3d at

22   433–34, 439; *George*, 185 F.3d at 385-92; *CP Anchorage Hotel 2, LLC v. Unite

23   Here! Loc. 878*, 558 F.Supp.3d 800, 806, 813-14 (D. Alaska 2021), *aff'd*, 2022 WL

24   2953697 (9th Cir. July 26, 2022) (union website containing attacks on hotel related

25   to "asbestos, lead, rodents, and police reports" could not be "coercive" under

26   §8(b)(4)(ii)); *see also CP Anchorage Hotel 2, LLC v. Unite Here! Loc. 878*, 2019

27   WL 1903385, *1 (D. Alaska Apr. 29, 2019).

28        Imposing LMRA §303 damages on Defendants based on a vaguely alleged

threat of non-defamatory *future speech* about SeaWorld's business practices would be akin to a prior restraint.  *See, e.g. Overstreet*, 409 F.3d at 1218 ("injunction issued 'before an adequate determination that it is unprotected by the First Amendment' presents the 'special vice of a prior restraint.'") (quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 390 (1973)); *see also Alexander v. United States*, 509 U.S. 544, 553 (1993); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) ("It is always difficult to know in advance what the individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable."); *In re Dan Farr Prods.*, 874 F.3d 590, 596 n.8 (9th Cir. 2017).

### d.  A "threat" to unionize SeaWorld employees is not coercion.

Plaintiffs allege, on information and belief, that SeaWorld understood Defendants to communicate (through Rolfe) a "coercive" threat to unionize SeaWorld's workforce.  Doc. 114 ¶¶211, 286.  But the Court previously held that the Plaintiffs failed to plead sufficient facts to support this theory or to allow an inference that Defendants' alleged "threats were made in the context of discussions concerning anything other than Defendants' anticipated petitioning."  Doc. 93 at 16, 17.  Plaintiffs' 3AC does not plead any additional facts to support their conclusory allegation that SeaWorld understood the alleged "threats" to be to unionize SeaWorld employees, so this basis for §8(b)(4)(ii) liability is untenable.  *See* Leyton Decl., Ex. 1, ¶¶211, 224.

Even if the 3AC did contain plausible allegations that Defendants threatened to unionize SeaWorld, unionizing an employer's workforce (or threatening to) is not "coercion" under §8(b)(4)(ii).  Such organizing is affirmatively *protected* by the NLRA, 29 U.S.C. §157; *USS-POSCO*, 31 F.3d at 809 ("Encouraging the use of unionized labor is an objective well within the legitimate interests of labor unions").

### e.  Alleged economic harm does not equate to coercion.

Plaintiffs contend that petitioning or speech can be deemed "coercive" if it

1   imposes sufficient economic harm.  Doc. 114 ¶280 (citing *NLRB v. Retail Store*

2   *Employees Union Local 1001*, 447 U.S. 607, 614 (1980) ("*Safeco*")).  This argument

3   is incompatible with *DeBartolo* and misrepresents *Safeco*'s holding.[15]

4          In *DeBartolo*, the Supreme Court foreclosed the notion that "threats of

5   economic harm" are "coercive" under §8(b)(4)(ii) even if the conduct at issue would

6   not otherwise qualify as "coercion."  The Court held that union handbilling calling

7   for a total boycott of a secondary mall owner did not violate §8(b)(4)(ii)(B).  The

8   Court rejected reasoning like Plaintiffs': that the union's "'appeals constitute

9   "economic retaliation" and are therefore a form of coercion.'"  *DeBartolo*, 485 U.S.

10  at 573 (citation omitted).  The Court held that "economic harm" caused by otherwise

11  non-actionable conduct could not be equated with "coercion," finding it "untenable"

12  that "appeals to a secondary employer to cease doing business with the employer

13  involved in the labor dispute is 'coercion' within the meaning of §8(b)(4)(ii)(B) if it

14  has some economic impact on the neutral."  *Id*. at 579.

15         While the entire point of the consumer boycott in *DeBartolo* (as with any

16  boycott) was to inflict the maximum economic harm on the secondary retail mall,

17  *DeBartolo*'s holding did not depend on whether the handbilling at issue was

18  effective in imposing such harm.  *George*, 185 F.3d at 390.  Rather, the Court

19  distinguished the non-coercive *means* used from the picketing that §8(b)(4)(ii) was

20  intended to proscribe.  *See also, e.g., Kohn v. Sw. Reg'l Council of Carpenters*, 289

21  F.Supp.2d 1155, 1167 (C.D. Cal. 2003) ("[T]he Supreme Court has made it clear that

22  'economic coercion' in this sense does not rise to a statutory violation, and that some

23  sort of intimidation is required before speech-related activities will transgress the

24  prohibitions of §8(b)(4)(ii)(B)."); *Overstreet v. Carpenters, Local 1506*, No. 03-cv-

25  0773 J(JFS), 2003 WL 23845186, *5 (S.D. Cal. May 7, 2003), *aff'd*, 409 F.3d 1199

26  (9th Cir. 2005) ("[E]conomic impact on the secondaries is insufficient to elevate

27  _____

28  [15] The 2021 Order adopted Plaintiffs' interpretation of *Safeco* without squaring it
with *DeBartolo* or explaining why the Court's treatment of the secondary *picketing*
involved in that case extended to arguably First Amendment protected conduct.

Respondent's peaceful boycott activities to the level of coercion.").

Plaintiffs' citation to *Safeco*, Doc. 114 ¶280, is misleading. *Safeco* addressed the question whether secondary *picketing*—conduct clearly within §8(b)(4)(ii)'s definition of "coercion"—was prohibited. An earlier case, *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 72 (1964) ("*Tree Fruits*"), had held that secondary picketing of retail stores to persuade customers not to buy the primary employer's product did not violate §8(b)(4)(ii)(B), even though it caused the stores economic harm. The *Safeco* Court distinguished the single-product picketing in *Tree Fruits* because in *Safeco* the picketed secondary employer's *only product* was that of the primary employer, such that the picketing was "reasonably calculated to induce customers not to patronize the neutral parties at all" and so "reasonably can be expected to threaten neutral parties with ruin or substantial loss." 447 U.S. at 614-15. The Court did not hold that conduct that otherwise falls outside of §8(b)(4)(ii)'s ambit is "coercive" when it threatens a sufficient degree of economic harm. Rather, the Court distinguished two forms of *product picketing* based on the picketed product's centrality to the secondary employer's business.

*DeBartolo* made clear that *Safeco*'s conclusion rested on the fact that picketing—not peaceful protest or other arguably First Amendment-protected activity—was involved, holding that that "picketing is qualitatively 'different from other modes of communication.'" 485 U.S. at 579-80; *see Overstreet*, 409 F.3d at 1210 ("Justice Stevens' *Safeco* concurrence, rather than Justice Powell's plurality opinion, provided the rationale for prohibiting secondary picketing consistent with the First Amendment that a majority of the Court eventually adopted.'").

The Fifth Circuit explained why *Safeco* does not stand for the principle that Plaintiffs urge, holding that "[t]he possibility of economic ramifications … does not transform otherwise lawful conduct into 'threats, coercion, or restraint' under the statute." *George*, 185 F.3d at 389. The court noted that *Safeco*'s "evaluat[ion of] the economic realities of the boycott … was limited to the inquiry of whether the

*picketing* was in fact the 'isolated evil' which the statute proscribed," and that "[t]he Court did not … examine Safeco's economic predicament without first finding (at least potentially) prohibited conduct."  *Ibid.* (if Plaintiffs' characterization of *Safeco* were correct, then "any form of publicity, such as the proposed letter-writing or an aggressive advertising campaign, would constitute 'coercion, threats, or restraint' if it effectively persuaded consumers not to patronize a secondary employer....  *DeBartolo* forecloses the possibility of this interpretation of Section 8(b)(4)(ii).").

### f.  Plaintiffs' legal claim that the First Amendment does not apply to "secondary boycotts" is entirely baseless.

Plaintiffs' 3AC makes the baseless legal claim that *NLRB v. Iron Workers, Local 229*, 941 F.3d 902, 905-07 (9th Cir. 2019), holds that "*Noerr-Pennington* does not apply to Defendants' unlawful secondary boycotts or speech and conduct incidental to those boycotts."  Doc. 114 ¶257.  But *Iron Workers Local 229* does not hold that the First Amendment fails to protect unions alleged to have violated §8(b)(4)(ii).  Rather, *Iron Workers Local 229* concerned a labor union's admitted violation of a *different* NLRA provision, §8(b)(4)(*i*)(B), by inducing a neutral construction contractor's employees to *strike*.  941 F.3d at 903-04.[16]

*Iron Workers Local 229* rejected the union's argument that §8(b)(4)(i)(B)'s prohibition on inducing unlawful strikes was unconstitutionally content-discriminatory, noting that the Supreme Court had held that the federal labor prohibition against engaging in *secondary strikes*, and inducing neutral employees to engage in them, does not raise a First Amendment problem.  941 F.3d at 905-06 (citing *Int'l Bhd. of Electrical Workers v. NLRB*, 341 U.S. 694 (1951); *Warshawsky & Co. v. NLRB*, 182 F.3d 948, 952 (D.C. Cir. 1999)).  *Iron Workers Local 229* thus addresses a *different* provision of the NLRA (§8(b)(4)(i)), and expressly

---

[16] Section 8(b)(4)(*i*)(B) makes it unlawful for a union to "engage in, or to induce or encourage any [employee]... to engage in, a strike or a refusal ... to perform any services" where the object is "forcing or requiring any person ... to cease doing business with any other person."  29 U.S.C. §158(b)(4)(i)(B).

*distinguishes* that provision from those at issue here (§§8(b)(4)(*ii*)(A) and (B))—which, unlike §8(b)(4)(*i*), contain the "*threaten, coerce, or restrain*" language.  The court made clear that its holding did not apply to cases involving §8(b)(4)(*ii*): "*DeBartolo* addressed the issue of whether a different provision of the statute, Section 8(b)(4)(ii), protected handbills urging consumers to lawfully boycott a neutral employer."  *Iron Workers Local 229*, 941 F.3d at 906 (emphasis omitted).

Section 8(b)(4)(*i*)'s "inducement" to strike and Section 8(b)(4)(*ii*) "threats and coercion" are fundamentally different because the former involves pressuring neutral employees to engage in non-expressive, non-petitioning conduct—a strike—that is *independently unlawful* under the NLRA, while the objective at issue under §8(b)(4)(ii)(B)—one business ceasing to do business with another—is perfectly lawful.  *Iron Workers Local 229*, 941 F.3d at 905-06, expressly relied on a D.C. Circuit decision that explains that the constitutional issue presented by §8(b)(4)(i) "is fundamentally different" from that presented by §8(b)(4)(ii), as analyzed in *DeBartolo*, "because, as the Supreme Court observed, the mall's potential customers were being urged 'to follow a *wholly legal* course of action, namely, not to patronize the retailers doing business in the mall.'  [485 U.S.] at 575 (emphasis added)....  By contrast, the conduct sought by a union that directly *induces* or encourages a secondary strike is itself unlawful under §8(b)(4)(i)."  *Warshawsky*, 182 F.3d at 952.[17]  Here, the course of action that the Defendants allegedly "coerced" SeaWorld to follow—ceasing its business relationship with Plaintiffs—was lawful, as Plaintiffs recognize, Doc. 114 ¶212, foreclosing their reliance on *Iron Workers Local 229*.

**2. Plaintiffs do not state a claim under NLRA §8(b)(4)(ii)(A).**

Plaintiffs further plead that Defendant Building Trades violated NLRA §8(b)(4)(ii)(A) (29 U.S.C. §158(b)(4)(ii)(A)), which makes it unlawful for a union "to threaten, coerce, or restrain any person" where "an object thereof is ... forcing or

---

[17] Holding that the First Amendment does not apply under §8(b)(4)(ii) would require overruling *DeBartolo,* 485 U.S. 568, and *Overstreet*, 409 F.3d at 1210.

1   requiring any employer ... to enter into any agreement which is prohibited by

2   subsection (e) [29 U.S.C. §158(e)]," by threatening lobbying and litigation regarding

3   the Bahia hotel in order to obtain a PLA.  Doc. 114 ¶¶292-302.

4   　　　But PLAs such as the one Defendant Building Trades allegedly demanded are

5   subject to the "construction-industry proviso" contained in NLRA §8(e) (29 U.S.C.

6   §158(e)).  PLAs are not "prohibited by [§8(e)]" because they are agreements

7   between unions and construction-industry employers "relating to the contracting or

8   subcontracting of work to be done at the site of the construction ... of a building,

9   structure, or other work."  29 U.S.C. §158(e).  The purpose of the construction-

10  industry proviso was *to protect PLAs* and other "pre-hire" contracts.  *Boston Harbor*,

11  507 U.S. at 231 (Congress enacted §8(e)'s proviso to "authoriz[e]" PLAs and

12  "accommodate conditions specific to [the construction] industry," including "the

13  short-term nature of employment" that makes post-hire bargaining difficult).

14  　　　Plaintiffs make three meritless arguments that the PLA at issue here was not

15  covered by the construction-industry proviso.

16  　　　 First, Plaintiffs argue that a PLA is unlawful under §8(e) if it is "coerced"

17  rather than arrived at through some undefined form of goodwill between labor and

18  management.  Doc. 114 ¶44.  But this has it backwards.  The Ninth Circuit and the

19  NLRB hold that there can be no "coercion" under §8(b)(4)(ii)(A) if the agreement

20  that is the supposed object of the "coercion" is not itself prohibited by §8(e).  *Nelson*

21  *v. Int'l Bhd. of Elec. Workers, Local 46*, 899 F.2d 1557, 1561 n.3 (9th Cir. 1990)

22  ("The violation of section 8(b)(4)(ii)(A) is dependent upon the 8(e) allegation in that

23  the coercion proscribed by section 8(b)(4)(ii)(A) must have as its object forcing the

24  employer into an agreement prohibited by 8(e)."); *Painters Dist. Council 51 (Mgmt.*

25  *Corp.)*, 299 NLRB 618, 635 (1990) ("A clause which is protected by the

26  construction industry proviso is not an agreement 'prohibited by Section 8(e).'

27  Therefore Section 8(b)(4)(A) does not prohibit a labor organization from engaging in

28  strike or other economic pressure to obtain such an agreement.").  Because any PLA

1  that the Building Trades allegedly demanded is not an unlawful §8(e) agreement,

2  there can be no unlawful "coercion" under §8(b)(4)(ii)(A).

3      Second, Plaintiffs argue that the construction-industry proviso does not apply

4  because Evans Hotels is not itself a "construction-industry employer" and the

5  proviso only applies "to an agreement between a labor organization and

6  an employer in the construction industry." Doc. 114 ¶300; 29 U.S.C. §158(e). But

7  the 3AC's *only* relevant factual allegation is that Defendant Lemmon texted to

8  Plaintiffs' representative, "Robert I'd like to see all construction and future

9  maintenance be done by Union signatory contractors." Doc. 114 ¶199. There is no

10  allegation that the Building Trades sought an agreement with Evans Hotels *itself*.[18]

11      Nor would any such allegation be plausible. PLAs are agreements between

12  unions and construction developers or general contractors, because it is the developer

13  or general contractor that is responsible for managing the worksite. *See, e.g., Boston*

14  *Harbor*, 507 U.S. at 221 (PLA between project manager and building trades unions);

15  *Huber, Hunt & Nichols, Inc. v. Plumbers & Pipefitters, Local 38*, 282 F.3d 746, 747-

16  48 (9th Cir. 2002) (PLA between general contractor and labor unions); *accord* Doc.

17  114 ¶43. A PLA with Evans Hotels (an alleged non-construction-industry employer)

18  would be both unenforceable (because it would be prohibited by §8(e)) and

19  meaningless (because Evans would not manage or employ anyone on the

20  construction site). Nothing in the 3AC supports an inference that, notwithstanding

21  the ordinary practice, Lemmon sought an unenforceable, meaningless agreement

22  with Evans when he texted, vaguely, that he would "like to see all construction and

23  future maintenance be done by Union signatory contractors." Doc. 114 ¶199.

24      Plaintiffs' request that the Court assume that Defendant Building Trades sought

25  an unenforceable PLA with Evans Hotels is untenable under governing precedent.

26

27  _____
[18] That Defendant Building Trades allegedly coerced a "person" (Evans Hotels)
who was not a construction-industry employer is irrelevant. Section 8(b)(4)(ii)(A)

28  makes clear that the "person" coerced and the "employer" who is party to the alleged
§8(e) agreement can be different entities. *See* 29 U.S.C. §158(b)(4)(ii)(A).

Any such holding would contravene the *Iqbal/Twombly* pleading standard, under which if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed. *Iqbal*, 556 U.S. at 679 (internal quotations and alteration omitted). In the Ninth Circuit, "[w]hen faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (citation omitted). "Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true ... in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*." *Id.* (citations omitted). Plaintiffs plead no facts excluding the (infinitely more probable) explanation that Defendants sought a lawful and enforceable PLA covered by the construction-industry proviso. In fact, the 2021 Order *expressly recognized* that Defendants sought a "PLA between a *general contractor* and the Trades Council Defendants." Doc. 93 at 36-37 (emphasis added).[19]

Plaintiffs' request also directly conflicts with the Ninth Circuit rule that, when interpreting §8(b)(4)(ii), courts may not presume that threats that could be carried out lawfully will in fact be carried out in a manner that violates the Section. *Ironworkers Local 433*, 850 F.2d at 557; *Plumbers & Pipefitters Local 32*, 912 F.2d at 1110.

Finally, Plaintiffs argue that the construction-industry proviso does not apply to maintenance work. Doc. 114 ¶¶295, 300. But the construction-industry proviso expressly applies to post-construction repairs. 29 U.S.C. §158(e) (referencing

---

[19] Nonetheless, the 2021 Order held that Plaintiffs stated a claim under §8(b)(4)(ii)(A). Doc. 93 at 31. This conclusion was based solely on Plaintiffs' allegations "that they are 'not an employer primarily engaged in the construction industry.'" Doc. 93 at 31 (citing 2AC ¶269). But the 2021 Order did not address how this conclusion could be squared with *Ironworkers Local 433* and *Plumbers & Pipefitters Local 32*, the far more plausible interpretation that the text sought an enforceable PLA with Evans' general contractor, or 2021 Order's own conclusion that the PLA would be with a general contractor.

1   agreements "relating to the ... *repair* of a building, structure, or other work.")

2   (emphasis added); *see In re Garab*, 333 NLRB 16, 22–23 (2001) (NLRB interprets

3   "construction" in Section 8(e) as "cover[ing] repairs to and replacement of 'integral

4   parts' of any immobile structure" in "both new and existing structures.").

5   **B. The 3AC fails to state claims under Section 2 of the Sherman Act.**

6          This Court previously dismissed Plaintiffs' antitrust claims on three

7   independent grounds:  Plaintiffs (1) lack antitrust standing because they do not

8   participate in the same market as Defendants; (2) make conclusory and implausible

9   allegations of injury to competition, which are inadequate to plead antitrust standing;

10  and (3) do not plead a market share that suffices for purposes of their attempted

11  monopolization or conspiracy to monopolize antitrust claims.  Plaintiffs' 3AC fixes

12  none of these problems, and must be dismissed without further leave to amend.

13  **1. The 2021 Order correctly held Plaintiffs cannot plead antitrust injury**
14     **because they do not participate in Defendants' market.**

15         In dismissing Plaintiffs' antitrust claims, this Court held that "for an injury to

16  be of the type that antitrust laws were intended to prevent" (as required for antitrust

17  standing), "'the "injured party [must] be a participant in the same market as the

18  alleged malefactors."  Doc. 93 at 39 (quoting *American Ad Mgmt., Inc. v. Gen. Tel.*

19  *Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999)).   "Parties whose injuries, though

20  flowing from that which makes the defendant's conduct unlawful, are experienced in

21  another market do not suffer antitrust injury." *American Ad Mgmt.*, 190 F.3d at

22  1057.  The test for "whether the injured party and malefactor 'participate in the same

23  market … focus[es] … upon the reasonable interchangeability of use or the cross-

24  elasticity of demand between the services provided by' both."  Doc. 93 at 39

25  (quoting *Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1470-71 (9th Cir. 1985)).

26         As the Court correctly ruled, Plaintiffs cannot plausibly plead that Defendant

27  labor unions and union officials "participate in the same market" as Plaintiffs or offer

28  services that are interchangeable with those offered by Plaintiffs.  Doc. 93 at 39.  The

alleged "Relevant Product Market [is] the market for luxury destination resorts" in the geographic area.  Doc. 114 ¶236; *cf.* Doc. 76 ("2AC") ¶273.[20]  But Defendant labor unions and union officials do not purchase, sell, or otherwise participate in the luxury hotel room market.  "Simply stated, a consumer seeking to rent a hotel room on the San Diego coast could not procure such a service from Defendants, and hospitality or construction workers seeking to unionize would not seek Plaintiffs' assistance."  Doc. 93 at 39.  Since "the requirement … is that the plaintiff and conspirators compete in the 'market in which trade was *restrained*,'" Plaintiffs cannot establish antitrust standing.  *Exhibitors' Serv., Inc. v. Am. Multi-Cinema, Inc.*, 788 F.2d 574, 579 (9th Cir. 1986) (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 539 (1983)).

Plaintiffs make the conclusory assertion that "Plaintiffs and Defendants are … inextricably intertwined participants in the Relevant Market" because "the Relevant Market would not exist or be able to function day-to-day without the contributions of Plaintiffs (luxury hotel operators/developers) and Defendants (luxury hotel service workers and building trades)."  Doc. 114 ¶240.[21]  This is wrong, for multiple reasons.

Initially, the allegation misunderstands what unions do.  The Defendant unions and union officials are not the employees who work in and construct luxury hotels; they are separate entities that represent the interests of workers who provide such labor and collectively bargain on their behalf.  *See Associated Gen. Contractors of Cal.*, 459 U.S. at 539 (holding union "was neither a consumer nor a competitor in the

---

[20] A properly defined market "includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand."  *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988); *see also United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 380-81 (1956)).  "Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim."  *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001).

[21] Plaintiffs also allege Defendants participate in the Relevant Market by restraining it.  Doc. 114 ¶241.  But this is circular: the victims of any alleged restraint would always be part of the same market as the perpetrators.  *See Shah v. Harristown Dev. Corp.*, 2013 WL 6567764, *6 (M.D. Pa. Dec. 13, 2013) (rejecting "tactic of defining this relevant secondary market based on the allegedly offending act").

1   market in which trade was restrained" and its "primary goal is to enhance the

2   earnings and improve the working conditions of its membership").  Defendants are

3   not the ones working in or constructing hotels in the Relevant Market.

4        More fundamentally, the important role workers play in Plaintiffs' operation

5   does not make them participants in the same market such that they *compete against*

6   *Plaintiffs* and their services *could reasonably be interchanged*—as antitrust standing

7   requires.  If it did, the antitrust standing inquiry would be meaningless: travel agents

8   and laundry, catering, electrician, and all other service providers would be deemed to

9   operate in the same market as luxury hotel resorts.  That would defeat the purpose of

10  the antitrust standing requirement that the parties be participants in the market where

11  competition is restrained, which limits antitrust claims to those "of the type the

12  antitrust laws were intended to" reach.  *American Ad Mgt.*, 190 F.3d at 1055.

13       In fact, the Ninth Circuit has directly held that workers and a labor union that

14  represented them lacked antitrust standing to challenge anticompetitive practices in

15  the market in which they labored, even when the practices at issue had a negative

16  impact on the workers' compensation.  In *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d

17  538, 540-41 (9th Cir. 1987), fishing crew members and their union challenged a

18  cannery conspiracy to set fish prices artificially low, which they said resulted in

19  reduced wages and fewer jobs.  *Id.* at 539.  But the court held this "alleged injury"

20  was not "of the type that antitrust laws were intended to forestall," because the

21  workers were not "buyers or sellers of raw tuna" and so did not participate in the

22  "relevant market."  *Id.* at 540-41.  Ninth Circuit precedent is consistent.  *See Legal*

23  *Econ. Evaluations, Inc. v. Metropolitan Life Ins. Co.*, 39 F.3d 951, 955 (9th Cir.

24  1994) (no antitrust injury when harm to competition occurs in market in which

25  plaintiff does not compete); *Exhibitors' Serv.*, 788 F.2d at 578-79 (though plaintiff

26  "was injured as a result of activity that also violated the antitrust laws," it lacks

27  antitrust standing because it "is neither a consumer of defendants' goods or services

28  nor a competitor of the defendants in the restrained market").

Plaintiffs' 3AC cites *Blue Shield of Va. v. McCready*, 457 U.S. 465, 491 (1982).  Doc. 114 ¶240.  But *McCready* did not address a situation like this, where the allegedly *injured parties* operate in the allegedly restrained market but the alleged *wrongdoers* do not.[22]  It "carved a *narrow* exception to the market participant requirement" for *plaintiffs* whose injuries "are 'inextricably intertwined' with the injuries of market participants," *American Ad Mgmt.*, 190 F.3d at 1057 n.5, and "borne in the *same* market" as the anticompetitive restraint, *Legal Econ. Evaluations*, 39 F.3d at 956.  *McCready*'s "narrow exception" does not support Plaintiffs' assertion of injury in the Relevant Market from conduct by non-market participants.

## 2. The 2021 Order correctly held allegations of injury to consumers conclusory and implausible.

An antitrust claim requires pleading "that the plaintiff's injuries are caused by an anticompetitive aspect of the defendant's conduct that also injures competition and consumers."  Doc. 93 at 40 (internal quotations omitted); *see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) (antitrust injury is injury to competition that "harms consumer welfare").  This Court also correctly held that Plaintiffs lacked antitrust standing because their allegations that Defendants had injured competition were conclusory and implausible.  Doc. 93 at 39-40.

Plaintiffs' 3AC did not fix this fatal defect.  Their claims that Defendants' conduct harms consumer welfare, for example, by increasing prices or reducing the quality of goods, remain conclusory and implausible. *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012) (injury to competition requires "allegations of supporting factual detail") (citation omitted); *Prime Healthcare Servs., Inc. v.*

---

[22] *McCready* involved a *plaintiff* who was *directly* injured (her insurer denied reimbursement for her treatment by a psychologist) by the restraint in a relevant market (her insurer's agreement with an association of psychiatrists not to reimburse mental health services provided by psychologists).  457 U.S. at 468-70.  McCready was not herself "a competitor of the conspirators."  *Id.* at 483-84.  But since "the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market," and McCready was the only person injured (because she had paid the psychologist's bill), the Court concluded that she had antitrust standing to pursue her claims.  *Id.* at 475, 484.

1  *SEIU*, 2013 WL 3873074, *13 (S.D. Cal. July 25, 2013) (conclusory allegations

2  about price increases and reduced quality insufficient to plead injury to competition).

3       Plaintiffs assert in a conclusory manner that Defendants' anticompetitive

4  combination has "prevented or significantly delayed entry or expansion of non-union

5  hotels" and so "significantly reduced the number of competitors and hotel rooms in

6  the Relevant Market," causing increased costs that "are passed to (and harm) end

7  consumers …." Doc. 114 ¶¶248-50.  But Plaintiffs fail to explain how preventing

8  the market entry or expansion of *specific* hotel developers and operators causes such

9  harms, other than the assertion that *unionized labor* is bad for price and quality

10  (which is Plaintiffs' real complaint, *id.* ¶250).  But unionization of workers is

11  favored by federal law and does not inflict an antitrust injury.  *See infra* at 39-40.

12       Moreover, Plaintiffs' theory is implausible.  Even if the 2021 Order's *Noerr-*

13  *Pennington* conclusions were correct (they are not), Plaintiffs' antitrust claims could

14  only be based on (1) Local 30's lawyer's two letters to the City Council opposing

15  Plaintiffs' requested lease amendment to expand one hotel, and (2) Defendants'

16  alleged threats to coerce SeaWorld into ending its joint venture with Plaintiffs to

17  develop one hotel.  *See supra* at 4-8.[23]  Both of these, Plaintiffs allege, prevented

18  them from expanding their hotel operations in ways they desired.  Doc. 114 ¶253.

19  That, at most, pleads injury to Plaintiffs themselves—the exclusion of some of

20  Plaintiffs' desired projects from the Relevant Market.  But excluding one or more

21  competitors from a market is not an injury to competition conveying antitrust

22  standing.  *See Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d

23  947, 952 (9th Cir. 1998); *Les Shockley Racing, Inc. v. National Hot Rod Ass'n*, 884

24     [23] The 2021 Order held that Defendants' lobbying and threats of legal action
against the Bahia development, and litigation and petitioning against other, unrelated

25  developments over the past fifteen years, is shielded by the *Noerr-Pennington*
doctrine.  Doc. 93 at 17-24, 25-26.  That Order *also* held that the statutory labor

26  exemption immunizes from antitrust liability Defendants' entry into card-check
agreements or PLAs with other developers and resultant support for those developers

27  before various public bodies.  *Id.* at 33-35.  Thus, Plaintiffs' attempt to plead
antitrust injury based on the effect of Defendants' petitioning regarding other

28  developments must be disregarded.  Doc. 114 ¶¶230-31, 243-52.

F.2d 504, 508 (9th Cir. 1989); *Legal Econ. Evaluations*, 39 F.3d at 954.  Nor could it possibly "significantly reduce[] the number of competitors and hotel rooms in the Relevant Market."  Doc. 114 ¶249.[24]  Since Plaintiffs cannot allege antitrust injuries besides their own lost opportunities, they cannot establish antitrust standing.

### 3. The 2021 Order correctly held that Plaintiffs do not adequately plead market share as required for their monopolization claims.

The 2021 Order also held that Plaintiffs' monopolization claims must be dismissed because they "failed to allege that Defendants possess a sufficiently substantial market share."  Doc. 93 at 41.  Nor could they.

"To pose a threat of monopolization, one firm alone must have the power to control market output and exclude competition."  *Rebel Oil*, 51 F.3d at 1443.  As this Court held, allegations regarding *unionized hotels and hotel developers* (or those with PLAs and/or card-check agreements) are insufficient, because Defendant labor unions and officials are not participants in the Relevant Market at all.  Doc. 114 at 41-42.  Moreover, as this Court held, a threat of monopolization is not presented by unionized hotels that compete against one another.  *Id.* at 42 ("The very phrase 'shared monopoly' is paradoxical") (quoting *Terminalift LLC v. Int'l Longshore & Warehouse Union Local 29*, 2013 WL 2154793, *3-4 (S.D. Cal. May 17, 2013) (rejecting conspiracy to monopolize claim because association members competed and no single employer member dominated market)).  Plaintiffs do not even attempt to allege that any single market participant poses a threat of monopolization.

Moreover, even if labor unions and union officials could monopolize a market in which they do not participate, Plaintiffs' allegations that Defendants control the market by excluding non-union participants rest on their allegations regarding conduct that this Court has held immunized by the *Noerr-Pennington* doctrine and/or the statutory labor exemption.  *See supra* n. 23; Doc. 93 at 35 (holding statutory exemption inapplicable *only* to Bahia project allegations).

---

[24] The 3AC fails to explain why other (union or non-union) hotel developers and operators cannot fill in any market gaps that result from Plaintiffs' exclusion.

### 4. The non-statutory antitrust exemption shields Defendants' conduct.

Finally, efforts to unionize a labor market do not violate the antitrust laws. Congress specified in 1914 that "[t]he labor of a human being is not a commodity or article of commerce," thereby directing courts not to construe antitrust laws to prevent labor unions from carrying out their legitimate objectives. 15 U.S.C. §17. To the contrary, "'a separate body of labor law' was 'specifically designed to *protect* and *encourage* the organizational and representational activities of labor unions.'" *Sacramento Valley, Chapter of the Nat. Elec. Contractors Ass'n v. Int'l Bhd. of Elec. Workers, Local 340*, 888 F.2d 604, 608 (9th Cir. 1989) (quoting *Associated Gen. Contractors of Cal.*, 459 U.S. at 539-40) (emphases added).  As such, anti-competitive restraints directed at increasing a labor market's unionization are not actionable.  The Sherman Act "prohibits only restraints on commercial competition" and "unions are not liable where they merely further their own goals in the labor market." *H.A. Artists & Assoc., Inc. v. Actors' Equity Ass'n*, 451 U.S. 704, 715 n.16 (1981) (quotations omitted); *see also Hunt v. Crumboch*, 325 U.S. 821, 824 (1945).

The 2021 Order applied the "*Mackey* test" to determine the applicability of the non-statutory antitrust exemption, under which "'[a]n alleged agreement restraining trade is shielded from antitrust liability only if the following three … [elements] are satisfied: "(1) the restraint primarily affects the parties to the agreement and no one else[;] (2) the agreement concerns wages, hours, or conditions of employment that are mandatory subjects of collective bargaining[;] and (3) the agreement is produced from bona fide, arm's-length collective bargaining."'"  Doc. 93 at 36 (quoting *ILWU v. ICTSI Or., Inc.*, 863 F.3d 1178, 1189 (9th Cir. 2017)).[25]  The Court held that the first and second elements were established, Doc. 93 at 36-37, but that the exemption was inapplicable because Defendants allegedly used "pressure" rather than "'bona fide, arm's-length' bargaining" to seek the Bahia PLA and "card-check" agreements,

---

[25] For purposes of this motion, Defendants do not contest whether the test set forth in *Mackey v. Nat'l Football League*, 543 F.2d 606, 614 (8th Cir. 1976), is appropriately applied outside of the collective-bargaining context, nor whether the statutory exemption to antitrust liability applies to all of Defendants' conduct.

*id.* at 38.  That misapplied *Mackey* and ignored Ninth Circuit precedent.

The requirement that an agreement result from arm's length bargaining makes the non-statutory exemption inapplicable to agreements that are *collusive* or *unilaterally* imposed—as in *Mackey* itself, 543 F.2d at 615-16.  *See Continental Maritime of San Francisco, Inc. v. Pacific Coast Metal Trades Dist. Council*, 817 F.2d 1391, 1393 (9th Cir. 1987) ("labor-management agreement designed to drive [the employers'] competitors out of business" not entitled to non-statutory immunity).  It does not render the exemption inapplicable to agreements that result from union *pressure*.  (If it did, the exemption would be a virtual nullity, because collective bargaining agreements are almost always secured in part through implied or express threats to strike or take other economic action.)  In fact, the Ninth Circuit has specifically held the non-statutory exemption applicable to agreements sought or obtained through coercive pressure:  As the 2021 Order acknowledged, *Bodine Produce, Inc. v. United Farm Workers Org. Comm.*, 494 F.2d 541, 558-60 (9th Cir. 1974), held the non-statutory exemption *does* apply to agreements procured through "threats of financial ruin, coercion, intimidation, and other activities" and that decision "remains good law."  Doc. 93 at 37.[26]  Under *Bodine Produce*, the non-statutory exemption immunizes Defendants' conduct from antitrust liability.

Plaintiffs are clearly frustrated that Defendants have unionized many workers, and do not like unions, PLAs, or card-check agreements.  *See* Doc. 114 ¶¶34, 45, 250.  But Congress long ago precluded employers' use of antitrust laws to restrain unions from operating in the labor market to increase unionization.  *See supra* at 39; NLRA Section 1 (29 U.S.C. §151) (federal policy favors collective bargaining).

---

[26] The Court declined to apply this "good law" because *Bodine* (1974) predated the Ninth Circuit's adoption of the *Mackey* test in *Continental Maritime* (1987).  Doc. 93 at 38.  But one Ninth Circuit panel cannot overrule another, and to the extent two decisions are in tension, courts must reconcile them.  *See Danielson v. Inslee*, 945 F.3d 1096, 1099 (9th Cir. 2019).  Here, reconciliation is easy.  *Continental Marine* did not purport to overrule *Bodine*, nor could it have, because *Continental Marine* did not involve an agreement procured through threats or pressure so did not consider the relevance of coercive conduct to the labor exemption—the issue directly considered and decided in *Bodine*.  *Bodine*, not *Continental Marine*, applies here.

40

1

## CONCLUSION

2      The Court should dismiss Plaintiffs' 3AC without leave to amend.

3

4   Dated: September 20, 2022          Respectfully submitted,

5

6                                      By:  /s/ Stacey M. Leyton

7

8                                      Stacey M. Leyton, SBN 203827
                                       ALTSHULER BERZON LLP

9
                                       *Attorney for Defendants Tom Lemmon*
10                                     *And San Diego County Building and*
                                       *Construction Trades Council*
11

12                                     By:  /s/ Paul L. More

13                                     Richard G. McCracken, SBN 62058
                                       Paul L. More, SBN 228589
14                                     Luke Dowling, SBN 328014
                                       McCRACKEN, STEMERMAN &
15                                        HOLSBERRY LLP

16

17                                     *Attorneys for Defendants UNITE HERE*
                                       *Local 30 and Brigette Browning*
18

19                                     By:  /s/ Steven T. Coopersmith

20                                     Steven T. Coopersmith, SBN 184646
                                       Philippa S. Grumbley, SBN 265135
21                                     THE COOPERSMITH LAW FIRM

22
                                       *Attorneys for Defendant Tom Lemmon*
23

24

25

26

27

28