1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EVANS HOTELS, LLC, a California limited liability company; BH PARTNERSHIP LP, a California limited partnership; EHSW, LLC, a Delaware limited liability company,<br><br>           Plaintiff,<br><br>v.<br><br>UNITE HERE! LOCAL 30; BRIGETTE BROWNING, an individual; SAN DIEGO COUNTY BUILDING and CONSTRUCTION TRADES COUNCIL, AFL-CIO; TOM LEMMON, an individual; and DOES 1-10,<br><br>           Defendants. | Case No.:  18-CV-2763-RSH-AHG<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT AND DENYING PLAINTIFFS' MOTION FOR LEAVE TO FILE A SURREPLY AS MOOT**<br><br>**[ECF Nos. 143, 155]** |

   Pending is a motion to dismiss the operative Third Amended Complaint and a request for judicial notice of two documents, filed by Defendants Tom Lemmon, Brigette Browning, San Diego County Building and Construction Trades Council, AFL-CIO (the "Trades Council"), and UNITE HERE Local 30 ("Local 30"). ECF No. 143. The motion has been fully briefed (*see* ECF Nos. 144–45), and Plaintiffs Evans Hotels, LLC ("Evans Hotels"), BH Partnership, LP ("BH"), and EHSW, LLC ("EHSW") have submitted their

1

objections to Defendants' request for judicial notice (ECF No. 144-1). Also before the Court is Defendants' Notice of Supplemental Authority, which provides a January 20, 2023 order in *Relevant Group, LLC v. Nourmand*, No. CV 19-05019 PSG (KSx) (C.D. Cal.). ECF No. 151. The Court finds the matter suitable for disposition without oral argument. *See* Civ. L.R. 7.1(d).

For the reasons discussed below, the Court grants Defendants' motion to dismiss (ECF No. 143), and denies as moot Defendants' request for judicial notice (ECF No. 143-3) and Plaintiffs' motion for leave to file a surreply (ECF No. 155).

# I.   BACKGROUND

## A.   Procedural History

The Court incorporates the detailed procedural background from its prior Orders. *See* ECF Nos. 93, 113, 140. As relevant here, Plaintiffs filed their initial Complaint on December 7, 2018, bringing nine claims: (1) unlawful secondary boycott in violation of section 303 of the Labor-Management Relations Act ("LMRA"), (2) attempted monopolization in violation of section 2 of the Sherman Act, (3) conspiracy to monopolize in violation of section 2 of the Sherman Act, (4) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), (5) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), (6) violation of RICO by conspiring to violate 18 U.S.C. § 1962(a), (7) violation of RICO by conspiring to violate 18 U.S.C. § 1962(b), (8) interference with prospective economic advantage, and (9) attempted extortion. ECF No. 1. In February 2019, Defendants filed motions to dismiss and anti-SLAPP motions. ECF Nos. 15–18.

On March 7, 2019, Plaintiffs filed a First Amended Complaint, containing the same nine claims. ECF No. 19. The Court ruled that the filing of an amended complaint mooted the motions that were pending as to the initial complaint. ECF No. 24. On April 15, 2019, Defendants again filed motions to dismiss as well as motions to strike. ECF Nos. 29–32.

On January 7, 2020, the Court dismissed all of Plaintiffs' claims (hereinafter, the "2020 Order"), ruling that Plaintiffs had failed to plead facts establishing that Defendants' conduct was not protected under the *Noerr–Pennington* doctrine. ECF No. 60. The Court

denied the anti-SLAPP motions as moot and provided that Plaintiffs could request leave to amend. *Id.* at 25. Plaintiffs requested and were granted leave to amend. *See* ECF No. 75.

On April 21, 2020, Plaintiffs filed their Second Amended Complaint ("SAC"). ECF No. 76. The SAC added a new state claim for unfair competition, and withdrew two RICO conspiracy claims, for a total of eight claims. *Id.*

On August 26, 2021, the Court dismissed without prejudice all claims in the SAC, except Plaintiff's first claim for unlawful secondary boycott (hereinafter, the "2021 Order"). ECF No. 93 at 61. The Court also afforded Plaintiffs one final opportunity to amend their complaint. *Id.* Before Plaintiffs did so, Defendants moved for reconsideration of the 2021 Order. ECF No. 100. The Court denied the motion, noting that upon consideration of the SAC and Defendants' arguments, the Court was "not persuaded that [the 2021 Order] was incorrect." ECF No. 113 at 11. Further, the Court directed that "Plaintiffs must file their Third Amended Complaint within ten (10) days of this order" and "[a]bsent a motion demonstrating good cause, that complaint must not contain any new claims for relief." *Id.* at 113.

Plaintiffs timely filed the Third Amended Complaint ("TAC") on February 7, 2022.[1] ECF No. 114. The TAC contains only three claims, none of which are new: (1) unlawful secondary boycott in violation of section 303 of the LMRA, and (2)–(3) attempted monopolization and conspiracy to monopolize in violation of section 2 of the Sherman Act. *See id.*

## B.   Allegations in TAC

The TAC is largely similar to the SAC, the main difference being the addition of allegations concerning Plaintiffs' antitrust claims. *See* ECF No. 144 at 14; ECF No. 143-2. The Court therefore incorporates Plaintiffs' factual allegations as set forth in the 2021 Order, ECF No. 93, and summarizes the relevant portions below. For purposes of the

---

[1]   The TAC remains the operative pleading after the Court denied Plaintiffs' request to file a fourth amended complaint. *See* ECF No. 140.

Court's analysis of Defendants' instant motion to dismiss, Plaintiffs' factual allegations are accepted "as true." *See Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1050 (9th Cir. 2019) (citing *Karam v. City of Burbank*, 352 F.3d 1188, 1192 (9th Cir. 2003)).

Plaintiffs operate three hotels in the San Diego, California area, including the Bahia Resort Hotel (the "Bahia") in Mission Bay Park which does not have a unionized workforce.[2] TAC ¶¶ 10, 13–15. Defendants are two labor unions and two of their current or former leaders. *Id.* ¶¶ 17–21. According to Plaintiffs, Defendants have developed a "playbook" (hereinafter, the "Playbook") of anticompetitive, exclusionary conduct to unionize all labor in the construction and operation of large-scale hospitality properties in greater San Diego. *Id.* ¶¶ 6–7, 47. This Playbook consists of two parts. First, Defendants attack non-union projects on sham environmental grounds and land use issues. *Id.* ¶¶ 48–49. Second, while pursuing these challenges, Defendants threaten public officials as well as third parties in business with targeted owners or developers of the non-union projects. *Id.* ¶¶ 55–57. Defendants have used their Playbook over the last decade to delay the development of non-union projects or stop them entirely. *Id.* ¶ 68.

The instant action arises from Defendants' alleged use of their Playbook against Plaintiffs, beginning in 2018. Defendants sought to block a redevelopment project for the Bahia (hereinafter, the "Bahia Project") until Plaintiffs signed a card check neutrality agreement ("CCNA") and a Project Labor Agreement ("PLA"). Under the CCNA, an employer pledges to remain neutral to Local 30's organizing campaigns, not to communicate with its employees regarding the ramifications of unionization, and to recognize a union if Local 30 collects signed authorization cards from a majority of employees sought to be unionized.[3] *Id.* ¶¶ 7, 31–32. The PLA requires employers to work

---

[2] Plaintiff BH owns the Bahia and is a party to the Bahia's lease with the City of San Diego. TAC ¶ 15. Members of the Evans Hotels family own and control both Plaintiffs BH and EHSW. *Id.* ¶ 15–16.

[3] After the union is recognized, the CCNA requires the employer to provide Local 30, on a monthly basis, a complete list of employees, including their job classifications and

only with a unionized general contractor which, in turn, would subcontract work only to unionized entities or individuals.[4] *Id.* ¶¶ 7, 43.

### 1. *Part 1 of Defendants' Playbook*

Per the first "part" of the Playbook, Defendants lobbied City Councilmembers against approving an amendment to the Bahia's lease agreement with the City of San Diego (the "City"). *See id.* ¶¶ 11, 48–54, 178–99. Since the 1950s, the Bahia has operated under long-term leases from the City for the land. *Id.* ¶ 10. In 1994, the City adopted the Mission Bay Park Master Plan Update ("MBMPU"), a comprehensive land-use plan for the entirety of Mission Bay Park. *Id.* Consequently, any significant redevelopment of the Bahia requires a lease amendment from the City that is compliant with the MBMPU. *Id.* ¶¶ 10–11.

On February 28, 2018, Defendants' attorney sent a letter to the Mayor and City Councilmembers "to express concern regarding the lack of transparency and access to information pertaining to environmental review of the proposed Lease Amendment for the Bahia Resort Hotel Renovation Project." *Id.* ¶ 180. Defendants' attorney sent a second letter on May 11, 2018, contending that the proposed Bahia Project was not compliant with the MBMPU because it would eliminate Gleason Road. *Id.* ¶ 181. Defendants also created a website, "nomissionbaylandgrab.org," and a related Facebook page to disseminate this claim. *Id.* ¶ 182. Defendants further met and/or communicated individually with a majority of the City Council to secure its opposition to the lease amendment. *Id.* ¶ 183.

/ / /

---

contact information. TAC ¶ 32. The CCNA also allows Local 30 to engage in organizing efforts, such as union-sponsored speeches during work hours, on the premises. *Id.* Finally, the employer waives its right to bargain the terms and conditions of employment to impasse, instead agreeing to submit disputed terms and conditions to arbitration. *Id.*

[4]     Plaintiffs allege that PLAs dramatically increase the costs of construction on real estate development project by reducing the number of qualified bidders and weakening the developer's bargaining power. TAC ¶ 45.

Plaintiffs first learned of Defendants' actions in February or March of 2018 after William Evans, co-founder of Evans Hotels, spoke with an unnamed City Councilmember about the Bahia Project. *Id.* ¶ 184. Although this Councilmember initially expressed support for the project, she later withdrew her support and indicated that she would have to oppose the project unless Plaintiffs agreed to a CCNA with Defendants. *Id.* ¶¶ 187, 190. Plaintiffs believe Defendants pressured the Councilmember by conditioning future funding and political support on opposition to the Bahia Project, unless Plaintiffs signed a CCNA, and that Defendants have contacted at least four other Councilmembers. *Id.* ¶¶ 187, 190

On June 30, 2018, Defendant Lemmon met with Evans about signing a CCNA. *Id.* ¶¶ 191–92. When Evans refused to do so voluntarily, Lemmon acknowledged that Defendants' attorney had sent letters to the Mayor and City Council. *Id.* ¶ 192. Lemmon then threatened to use environmental challenges, including under the California Environmental Quality Act ("CEQA"), to hold up the Bahia Project. *Id.* Lemmon closed by promising that the Bahia Project would be "doomed" if Plaintiffs did not capitulate to Defendants because "[they] know how to do it, [they] do it all the time." *Id.*

On September 11, 2018, Defendants posted links on its Facebook pages to a website that it funded and created called "No Mission Bay Land Grab at Bahia Point by UNITE HERE Local 30," which pertained to the Bahia Project and whether it violated a purported requirement to retain Gleason Road. *Id.* ¶ 193.

In October 2018, Plaintiffs learned that the Bahia lease agreement was not placed on the agenda for a mid-October City Council Committee meeting, even though only three matters had been calendared. *Id.* ¶¶ 195–97. That same month, a representative of Plaintiffs spoke with a staff member of another Councilmember, who allegedly refused to calendar the lease agreement because of a close, personal friendship with Defendant Browning. *Id.* ¶ 196.

On October 19, 2018, Lemmon and Browning texted Plaintiffs' CEO, Robert Gleason. *Id.* ¶ 199. In this text exchange, Lemmon told Browning to "send Robert [Gleason] [her] card check language in advance . . . . [because Lemmon has] got the feeling

he's gonna need it." *Id.* Lemmon added that he would "like to see all construction and future maintenance done by Union signatory contractors." *Id.*

Plaintiffs' problems persisted following City Council elections in November 2018. *See id.* ¶¶ 222–23. The City Council President allegedly indicated that she would not docket the Bahia lease amendment because the unions had given her "hundreds of thousands of dollars to win this thing," and Defendants would be upset if the project were docketed before the new City Councilmembers took office. *Id.* ¶ 222. Plaintiffs then sought help from the Mayor, without success. *See id.* ¶ 223. According to Plaintiffs, the Mayor had entered into a "secret agreement" in mid-2017, giving Defendants veto power over any non-union projects they opposed, and had agreed not to docket the Bahia lease amendment. *Id.* ¶¶ 3, 81, 223.

On November 27, 2018, Defendants met with Gleason and Evans. *Id.* ¶ 224. When asked why Plaintiffs should agree to the card check neutrality agreement and PLA, Browning responded, "[S]o that you can go forward with your project," adding that Defendants would "stop at nothing" to prevent the Bahia project from going forward. *Id.* ¶ 224. Browning and Lemmon stated that they had the new City Council President's vote "all locked up," and indicated that Plaintiffs would fare no better under future City Councils. *Id.* Lemmon likened Defendants' conduct to a "grenade with the pin out on the table," adding that, although the pin had been taken out, there was still time to put it back in. *Id.*

### 2. *Part 2 of Defendants' Playbook*

Per the second part of Defendants' alleged playbook, Defendants threatened Sea World LLC ("SeaWorld") that they would oppose SeaWorld's plan to build new attractions, unless it terminated its business relationship with Plaintiffs. *Id.* ¶¶ 200–21. In 2015, Plaintiffs and SeaWorld signed a letter of intent and a Preliminary Project Agreement regarding a potential hotel adjacent to SeaWorld's park in San Diego (the "Joint Venture"). *Id.* ¶ 201.

According to Plaintiffs, Defendants knew that it was important to SeaWorld to build new attractions in its park. *Id.* ¶ 204. SeaWorld requires approval from the California Coastal Commission (the "Coastal Commission") for such attractions and has struggled to obtain approval with previous projects in the past. *Id.* Consequently, SeaWorld worked with an environmental consultant, Allison Rolfe, to facilitate its dealings with the Coastal Commission and environmental groups. *Id.* ¶ 205. Rolfe is allegedly a "very close friend" of Browning and acts as an "intermediary" between Defendants and their targets, including Plaintiffs. *See id.* ¶¶ 206, 209.

In June or July 2018, Defendants communicated to SeaWorld, through Rolfe, that it would face severe opposition from unions and their allies against SeaWorld's new attractions if it continued its partnership with Plaintiffs. *Id.* ¶ 211. Specifically, Defendants threatened to interfere with SeaWorld's ability to obtain approval for its plans from the City Council and California Coastal Commission, and to "drum up negative publicity" on subjects like animal cruelty. *Id.* In mid-July, SeaWorld's CEO called Evans, stating he understood that Plaintiffs had "a big problem" with Defendants and informing Evans that SeaWorld could not afford to be involved with anyone that would delay its ability to obtain approval of its plans and/or adversely impact its business. *Id.* ¶ 213.

After months of discussing the issues SeaWorld would face if Plaintiffs did not agree to a deal with Defendants, SeaWorld abandoned the Joint Venture. *Id.* ¶¶ 215–18. Plaintiffs allege that a SeaWorld executive later confirmed that the reason it terminated the Joint Venture was because the unions threatened to target SeaWorld. *Id.* ¶ 221.

## II.  LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). To survive a 12(b)(6) motion, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). The Court "disregard[s] '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir.

2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)). "After eliminating such unsupported legal conclusions, we identify 'well-pleaded factual allegations,' which we assume to be true, 'and then determine whether they plausibly give rise to an entitlement to relief.'" *Id.* A claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## III.   THE *NOERR–PENNINGTON* DOCTRINE

The Court begins by addressing whether the *Noerr–Pennington* doctrine bars Plaintiffs' claims.[5] ECF No. 143-1 at 5. *See Harbor Performance Enhancement Ctr., LLC v. City of Los Angeles Harbor Dep't*, No. CV203251, 2021 WL 1676281, at \*12 (C.D. Cal. Mar. 24, 2021) (addressing the applicability of *Noerr–Pennington* before determining whether plaintiffs have stated a claim), *aff'd*, No. 21-55416, 2022 WL 1239055 (9th Cir. Apr. 27, 2022); *see also White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000) ("The *Noerr–Pennington* doctrine ensures that those who petition the government for redress of grievances remain immune from liability for statutory violations, notwithstanding the fact that their activity might otherwise be proscribed by the statute involved.").

As discussed in the Court's prior Orders, "[t]he *Noerr–Pennington* doctrine derives from the First Amendment's guarantee of 'the right of the people . . . to petition the Government for a redress of grievances.'"[6] *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th

---

[5]   The Court has twice addressed the applicability of the *Noerr–Pennington* doctrine to Plaintiffs' allegations, not including on Defendants' motion for reconsideration. *See* ECF No. 60 at 15; ECF No. 93 at 12. To the extent Defendants urges the Court to reconcile any differing outcomes of its previous holdings, the Court declines. *See* ECF No. 143-1 at 5–6. The Court's 2020 Order and 2021 Order addressed two different versions of the Complaint—both of which have since been superseded by amendment. The Court reapplies the law to the facts, as pleaded in the TAC.

[6]   The doctrine developed from two Supreme Court cases—*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965)—which held "that the First Amendment Petition Clause immunizes acts of petitioning the legislature from antitrust liability." *Theme*

9

Cir. 2006) (quoting U.S. Const. amend. I). Under this doctrine, "those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Id.* "[T]he *Noerr–Pennington* doctrine sweeps broadly and is implicated by both state and federal antitrust claims that allege anticompetitive activity in the form of lobbying or advocacy before any branch of either federal or state government." *Kottle v. Nw. Kidney Centers*, 146 F.3d 1056, 1059 (9th Cir. 1998).[7] *See Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948, 956 (S.D. Cal. 1996) (concluding that *Noerr–Pennington* immunity "bars any claim, federal or state, common law or statutory, that has as its gravamen constitutionally-protected petitioning activity").

To determine whether a defendant's conduct is immunized, courts apply a three-part test: (1) "whether the lawsuit imposes a burden on petitioning rights," (2) "whether the alleged activities constitute protected petitioning activity," and (3) "whether the statute[ ] at issue may be construed to [avoid] that burden." *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 535 (9th Cir. 2022) (quoting *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 644 (9th Cir. 2009)). "If the answer at each step is 'yes,' then a defendant's conduct is immunized under *Noerr–Pennington*." *Id.*

However, this immunity is not absolute. *See Kearney*, 590 F.3d at 644. "Sham petitioning is not protected. *Noerr–Pennington* immunity is not a shield for petitioning conduct that, although ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *B&G Foods*, 29 F.4th at 536 (internal citations and quotations omitted). Whether the sham exception applies is determined within "step two" of *Noerr–Pennington*'s three-part analysis. *Id.* at 535.

_____

*Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1006 (9th Cir. 2008). "The doctrine has since been applied to actions petitioning each of the three branches of government, and has been expanded beyond its original antitrust context." *Id.*

[7]    However, the doctrine "does not protect lobbying efforts directed at private organizations." *Kottle*, 146 F.3d at 1059.

10

In claims involving the right to petition governmental bodies under *Noerr–Pennington*, a heightened pleading standard is applied, requiring a plaintiff to "satisfy more than the usual 12(b)(6) standard." *Or. Natural Res. Council v. Mohla*, 944 F.2d 531, 533 (9th Cir. 1991). Under this heightened standard, "the complaint will be dismissed unless it includes allegations of specific activities which bring the defendant's conduct into one of the *Noerr–Pennington* exceptions." *Meridian Project Sys., Inc. v. Hardin Const. Co.*, LLC, 404 F. Supp. 2d 1214, 1221 (E.D. Cal. 2005) (internal quotation marks omitted). *See Boone v. Redevelopment Agency of City of San Jose*, 841 F.2d 886, 894 (9th Cir. 1988) ("In order not to chill legitimate lobbying activities, it is important that a plaintiff's complaint contain specific allegations demonstrating that the *Noerr–Pennington* protections do not apply."). "Conclusory allegations are not sufficient to strip a defendant's activities of *Noerr–Pennington* protection." *Mohla*, 944 F.2d at 533.

## A.   Step One: Burden on Petitioning Activity

Step one asks whether the success of Plaintiffs' instant lawsuit would constitute a burden on Defendants' petitioning rights. *See Kearney*, 590 F.3d at 645. In conducting this inquiry, the Court does not consider any alleged misconduct tied to the petitioning activities. *B&G Foods*, 29 F.4th at 535. *See Kearney*, 590 F.3d at 645 ("[T]he question at this stage is not whether the conduct at issue is fraudulent and abusive . . . .").

Here, Plaintiffs seek to impose liability under the LMRA and Sherman Act based on the following activities by Defendants: (1) sending letters to City Councilmembers and the Mayor in February and May 2018 opposing the Bahia Project (TAC ¶¶ 180–81); (2) lobbying City Councilmembers to oppose the proposed Bahia lease amendment and delay the hearing until new Councilmembers took office (*id.* ¶¶ 187, 189, 222–23); (3) creating a website and posting links to that website on a Facebook page that stated the proposed Bahia Project violates the MBMPU (*id.* ¶¶ 182, 193); (4) threatening to continue opposing the Bahia Project, including by filing legal challenges under CEQA, if Plaintiffs refused to sign a CCNA and PLA (*id.* ¶¶ 192, 265); and (5) threatening SeaWorld with opposition to future attractions, by interfering with its ability to get approval from the City Council and

the California Coastal Commission and with negative publicity campaigns, if SeaWorld continued its business relationship with Plaintiffs (*id.* ¶¶ 204–11).

Although Plaintiffs argue that the *Noerr–Pennington* doctrine does not apply to "[m]uch of Defendants' petitioning," Plaintiffs do not dispute that the instant action would burden Defendants' petitioning activity. *See* ECF No. 144 at 39. Indeed, a successful suit by Plaintiffs would burden these alleged activities, including Defendants' ability to lobby elected government officials, file lawsuits, and create web content, or launch publicity campaigns aimed at influencing public opinion. *See, e.g.*, *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 510 (1988) (noting that "concerted efforts to influence those governments through direct lobbying, publicity campaigns, and other traditional avenues of political expression" are means of petitioning); *Kearney*, 590 F.3d at 644 (stating that lawsuits are "the very act of petitioning"); *Sosa*, 437 F.3d at 938 (finding that "prelitigation settlement demands" are protected by the Petition Clause).

Accordingly, the Court concludes that Plaintiffs' lawsuit would burden Defendants' petitioning activity.

## B.      Step Two: Protected Petitioning Activity

At step two of the *Noerr–Pennington* analysis, the Court must determine whether Defendants' conduct qualifies as "*protected* petitioning activity." *See B&G Foods*, 29 F.4th at 535 (emphasis in original). In making this determination, the Court must first decide whether the Petition Clause extends to Defendants' alleged conduct. *See id.* If it does, the Court must next consider whether the sham exception applies. *See id.*

### 1.      *Whether the Petition Clause Extends to Defendants' Conduct*

Protected petitioning activity includes "petitions directed at any branch of government, including the executive, legislative, judicial and administrative agencies." *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000) (citing *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)). "A complaint, an answer, a counterclaim and other assorted documents and pleadings, in which plaintiffs or defendants make representations and present arguments to support their

request that the court do or not do something, can be described as petitions . . . ." *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005). But the *Noerr–Pennington* doctrine is not strictly limited to petitions. To preserve the breathing space required for the effective exercise of the rights the Petition Clause protects, conduct "incidental to" petitioning may also be immunized. *Kearney*, 590 F.3d at 646. *See Sosa*, 437 F.3d at 934 ("[T]o exercise its petitioning rights meaningfully, a party may not be subjected to liability for conduct intimately related to its petitioning activities.").

Here, all categories of Defendants' alleged conduct above qualify as either petitioning activity or conduct incidental to such activity. Sending letters to City Councilmembers to express concern about or oppose the Bahia Project, TAC ¶¶ 180–81, falls squarely under the scope of Petition Clause. *See Empress LLC v. City & Cnty. of San Francisco*, 419 F.3d 1052, 1056 (9th Cir. 2005) (holding that, where sham exception did not apply, writing a letter requesting that city officials make a zoning determination was protected petitioning activity); *Evers v. County of Custer*, 745 F.2d 1196, 1204 (9th Cir. 1984) (finding that activity of property owners who urged county officials not to close what they believed was a public road "falls within the first amendment's protection of the right to petition the government for redress of grievances"). *See also Christian Gospel Church, Inc. v. City & Cnty. of San Francisco*, 896 F.2d 1221, 1226 (9th Cir. 1990) (neighbors who opposed zoning permit application by church "by circulating a petition, testifying before the Planning Commission and writing letters to the editor" were "fully protected by the first amendment"), *superseded on other grounds by* 42 U.S.C. § 2000e.

Likewise, Defendants' lobbying of City Councilmembers is petitioning activity. *See Kottle*, 146 F.3d at 1062 ("[L]obbying is the sine qua non of democracy."); *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800, 810 (9th Cir. 1994) (stating that *Noerr–Pennington* protection "extends to the lobbying of government officials"); *In re Airport Car Rental Antitrust Litig.*, 693 F.2d 84, 88 (9th Cir. 1982) (holding that "concerted lobbying efforts" of officials was petitioning and exempted by *Noerr–Pennington*). Even if, as Plaintiffs allege, Defendants secretly met with or

contacted the City Councilmembers to oppose the Bahia Project, that conduct would be protected. *See Boone*, 841 F.2d at 894–95 (holding that private meetings between government officials and individuals seeking to lobby the government is a form of advocacy protected under *Noerr–Pennington*).[8]

Further, Defendants' creation and dissemination of online content to influence public opinion regarding the Bahia Project "amounted to petitioning" the City Council and its Councilmembers. *See Affordable Hous. Dev. Corp. v. City of Fresno*, 433 F.3d 1182, 1193 (9th Cir. 2006) (finding that making and distributing flyers encouraging the public to oppose a construction project, among other things, "amounted to petitioning the city council"). Although Plaintiffs allege that the website Defendants funded and created "contain[ed] false and misleading information" regarding whether the Bahia Project would violate the MBMPU, TAC ¶ 193, the Supreme Court has noted that misrepresentations are "condoned in the political arena." *See Trucking Unlimited*, 404 U.S. at 513; *see also Kottle*, 146 F.3d at 1062 ("Misrepresentations are a fact of life in politics . . . ."); *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1261 (9th Cir. 1982) ("There is an emphasis on debate in the political sphere, which could accommodate false statements and reveal their falsity.").

Finally, the Petition Clause also extends to Defendants' contemplated future petitioning activity. *See Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343, 351 (9th Cir. 2014) (holding that prelitigation material and threats of litigation are immune under *Noerr–Pennington*, unless the threatened lawsuit is a sham); *Sosa*, 437 F.3d

---

[8]     To the extent Plaintiffs allege that Defendants "condition[ed] future funding and political support" for Councilmembers on the Councilmembers' opposition to the Bahia Project, that conduct is incidental to Defendants' lobbying efforts. *See* ECF No. 114 ¶¶ 187–90; *Boone*, 841 F.2d at 895 ("[A]llegations concerning campaign contributions do not convert into a Sherman Act violation conduct which *Noerr* held was not covered by the Act.") (quoting *Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220, 231 (7th Cir. 1975)).

at 937 (noting same). In the TAC, Plaintiffs allege that Defendants threatened to "use CEQA and other challenges to hold the Bahia redevelopment project hostage." TAC ¶ 192. At a June 30, 2018 meeting, Defendant Lemmon allegedly told Evans that, if Plaintiffs did not accede to Defendant Browning's demands, the Bahia Project "would be doomed" because "the union would hold it up by any and all means—stating 'we know how to do it, we do it all the time.'" *Id.* At a November 27, 2018 meeting, Defendants Lemmon and Browning allegedly stated that Evans should agree to a PLA and CCNA so that he could move forward with the Bahia Project and pursue other opportunities in San Diego. *Id.* ¶ 224. Defendants allegedly stated that they had the vote of the presumptive incoming City Council President "all locked up" and future City Councils would be even worse for Plaintiffs. *Id.* Defendant Lemmon then allegedly likened the unions' conduct to a "grenade with the pin out on the table," and threatened that, although the "pin" had been taken out, there was still time to put it back in. *Id.* According to Plaintiffs, Defendant Browning stated that Defendants "would stop at nothing" to stop the Bahia Project and "made clear that the alternative for [Plaintiffs] would not be pretty," citing prior litigation she had brought to oppose other development projects. *Id.*

In addition, Defendants allegedly threatened, through SeaWorld's consultant Rolfe, that SeaWorld would face "severe opposition from the unions and union allies in connection with its plan to open new attractions every year" if SeaWorld continued its partnership with Plaintiffs:

> Defendants not only would interfere with SeaWorld's ability to get approval for a master plan amendment at the City Council and the Coastal Commission (the usual greenmail), but also would drum up negative publicity against SeaWorld designed to undermine SeaWorld's business by damaging its reputation and public image.

*Id.* ¶ 211.

Defendants' alleged threats to bring CEQA and environmental challenges in the courts, lobby the City Council, petition the Coastal Commission, and engage in a negative publicity campaign to delay or stop the Bahia Project are threats to engage in petitioning

activity and therefore immunized under *Noerr–Pennington*. *See Noerr*, 365 U.S. at 533 (negative publicity campaign was immunized); *Kottle*, 146 F.3d at 1061–62 (petitioning administrative agency fell within the scope of *Noerr–Pennington*); *USS-POSCO*, 31 F.3d at 810 (filing a series of lawsuits was petitioning conduct).

Moreover, Defendants' other alleged threats made were "incidental" to their petitioning activity. *See Sosa*, 437 F.3d at 934. Defendant Lemmon's June 30, 2018 threat that the Bahia Project would be "doomed" or held up "by any and all means" was allegedly made while he was discussing Defendants' efforts to lobby elected officials and file lawsuits to prevent the Project.[9] *See* TAC ¶¶ 191–92. Defendant Lemmon's November 27, 2018 threat warning Plaintiffs of the metaphorical "grenade" was allegedly made while he was discussing "the issue of numerous environmental challenges" to the Bahia Project and lobbying City Councilmembers. *See id.* ¶ 224. Defendant Browning's November 27, 2018 threat to oppose the Bahia Project was allegedly made while she was "[c]iting" other lawsuits she had brought to oppose other development projects. *See id.*

Similarly, Defendants' alleged threats to SeaWorld, communicated through Rolfe, were made in the context of discussing Defendants' future lobbying of the City Council and the Coastal Commission to oppose SeaWorld's future attractions. *See id.* ¶ 211. According to Plaintiffs' allegations, Defendants threatened SeaWorld that it "would face severe opposition from the unions and union allies *in connection with its plans to open new attractions every year*"—attractions that would require "both City Council approval and Coastal Commission approval." *See id.* ¶¶ 204, 211 (emphasis added). In context, Defendants' alleged threats to "interfere with SeaWorld's ability to get approval" and

---

[9]     Plaintiffs allege that given Defendants' past conduct, they understood Defendants' threats to mean picketing of Plaintiffs and their clients. *See* TAC ¶¶ 192, 224, 298. This characterization of Defendants' statements is, however, unsupported by any specific factual allegations.

"drum up negative publicity against SeaWorld" thus constitute petitioning activity or conduct incidental to such activity.

Although Plaintiffs add that the threatened negative publicity "attacks would be unrelated to SeaWorld's future attractions," but rather "subjects like animal cruelty," Plaintiffs do not allege that these threats were ever made outside the discussions about Defendants' contemplated petitioning. *See id.* ¶ 211. To the extent any allegations regarding Defendants' threats to SeaWorld are vague or ambiguous, Plaintiffs bear the burden of stating sufficient factual allegations which "demonstrate[e] that *Noerr– Pennington* protections do not apply." *See Boone*, 841 F.2d at 894 ("Although we may be more generous in reviewing complaints in other contexts, our responsibilities under the first amendment in a case like this one require us to demand that a plaintiff's allegations be made with specificity."). *See also Kottle*, 146 F.3d at 1064 (concluding that "vague allegations of misrepresentation" cannot overcome *Noerr–Pennington* protection); *Franchise Realty Interstate Corp. v. San Francisco Loc. Joint Exec. Bd. of Culinary Workers*, 542 F.2d 1076, 1082 (9th Cir. 1976) (stating that, where plaintiff is seeking relief for conduct that is "prima facie protected by the First Amendment," "a complaint must include allegations of the specific activities"). The Court concludes that the Petition Clause also extends to Defendants' threats against SeaWorld, and Plaintiffs have not sufficiently alleged facts establishing that *Noerr–Pennington* does not apply. *See id.*

In opposing Defendants' motion to dismiss, Plaintiffs argue that *Noerr–Pennington* does not apply to Defendants' unlawful secondary boycotts against SeaWorld or "petitioning that was illegal," such as Defendants' secret meetings with City Councilmembers or undisclosed lobbying.[10] ECF No. 144 at 38–39. *See* TAC ¶¶ 2, 8, 58–

---

[10]     Relying on *National Labor Relations Board v. International Association of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Loc. 229, AFL-CIO*, 941 F.3d 902 (9th Cir. 2019) ("*Iron Workers*"), Plaintiffs argue that the First Amendment does not apply to unlawful secondary boycotts. ECF No. 144 at 15. However, *Iron Workers* does not address the relevant provision of the statute at issue here (29 U.S.C. § 158(b)(4)(ii)),

62, 65, 258. However, this argument essentially "collapses the question of petitioning conduct with that of the sham exception's application."[11] *See Kearney*, 590 F.3d at 646;

---

*Noerr–Pennington*, or the First Amendment right to petition. Rather, the Ninth Circuit in *Iron Workers* discussed the constitutionality of 29 U.S.C. § 158(b)(4)(i), stating that the "First Amendment is not at all implicated when activities prohibited by Section 8(b)(4)(i) are proscribed." *Iron Workers*, 941 F.3d at 9055 (internal quotation marks omitted).

To the extent Plaintiffs are requesting that the Court determine whether Defendants actions were unlawful (i.e., that Defendants threatened or coerced Plaintiffs and SeaWorld) before applying *Noerr–Pennington*, "[t]his is backwards." *Harbor Performance Enhancement Ctr.*, 2021 WL 1676281, at *12. "Courts apply *Noerr–Pennington* to 'construe statutes so as to avoid burdens on activity arguably falling within the scope of the Petition Clause of the First Amendment.'" *Id.* (citing *Sosa*, 437 F.3d at 942). First deciding whether Defendants' action violate the LMRA or NLRA "would put the cart before the horse and risk interpreting the statute so broadly that it interferes with the [Defendants'] petitioning rights." *Id.* (citing *White*, 227 F.3d at 1231).

[11] Notably, courts have held that conduct like that alleged in the TAC qualifies as protected petitioning activity or as conduct incidental to such activity. *See Allied Tube*, 486 U.S. at 499–500 ("A publicity campaign directed at the general public, seeking legislation or executive action, enjoys antitrust immunity even when the campaign employs unethical and deceptive methods."); *Boone*, 841 F.2d at 895 (finding that "allegations of misrepresentations, payments to public officials, and 'secret backroom dealings'" that did not occur in a judicial or quasi-judicial setting was immunized under *Noerr–Pennington*); *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1364 (5th Cir. 1983) ("The mere fact that a boycott forms a part of the petitioning conduct does not vitiate the immunity of such conduct."). "Furthermore, there is no 'conspiracy' exception to the *Noerr–Pennington* doctrine that applies when government officials conspire with a private party to employ government action as a means of depriving other parties of their federal constitutional or statutory rights." *Empress LLC*, 419 F.3d at 1057 (explaining that "[i]n such circumstances, a remedy lies only against the conspiring government officials, not against private citizens"); *see Omni*, 499 U.S. at 383 (concluding that "a 'conspiracy' exception to *Noerr* must be rejected").

In addition, Plaintiffs' allegations of "extortion" and "bribery" are conclusory. *See* TAC ¶¶ 64, 187, 222. Although bribery may be treated "as analogous to sham petitioning activity," *Clipper Exxpress*, 690 F.2d at 1256 n.23, Plaintiffs fail to specify "who, when, how much, or for what purpose." *See Boone*, 841 F.2d at 895. "More important, even if these allegations had been made with the requisite specificity, the alleged activities are facially valid. . . . Payments to public officials, in the form of . . . campaign contributions, is a legal and well-accepted part of our political process." *Id.*

*Sosa*, 437 F.3d at 938 ("Finding that the protections of the Petition Clause extend to [the conduct at issue] . . . does not mean that such [conduct is] . . . absolutely protected from liability.").

Accordingly, the Court finds that the misconduct Plaintiffs alleges is protected petitioning conduct or conduct incidental to such conduct and turns to whether the sham exception applies.

### 2. *Whether the Sham Exception Applies*

As stated above, sham petitioning is not protected. "*Noerr–Pennington* immunity is not a shield for petitioning conduct that, although 'ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor.'" *B&G Foods*, 29 F.4th at 536 (quoting *Sosa*, 437 F.3d at 938). The exception extends to threats of sham petitioning. *See United States v. Koziol*, 993 F.3d 1160, 1171 (9th Cir. 2021) (stating that *Noerr–Pennington* does not protect "threats of sham litigation").

The scope of the sham exception depends on the type of governmental entity involved. *Kottle*, 146 F.3d at 1060 (citing *California Motor Transp.*, 404 U.S. at 513). "If it is the legislature, the sham exception is extraordinarily narrow. But if it is the judicial branch, this circuit recognizes three categories of anticompetitive behavior that can amount to a sham and, therefore, outside the protection of the *Noerr–Pennington* doctrine." *Id. See Boone*, 841 F.2d at 895–96 (stating that "illegal or fraudulent lobbying activities that would normally be immunized by *Noerr–Pennington* lose their protection if they occur in a judicial or quasi-judicial setting"). The inquiry is complicated where the executive branch is involved because that branch is "radically diverse." *Kottle*, 146 F.3d at 1061 (discussing that the sham exception standard for some executive entities should be the same as for judicial bodies, but for others that would be "far too broad"). "[E]xecutive entities are treated like judicial entities only to the extent that their actions are guided by enforceable standards subject to review." *Id.* at 1062.

/ / /

### a. Sham litigation

In the litigation context, the Ninth Circuit has identified three sham exceptions:

> first, where the lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful; second, where the conduct involves a series of lawsuits brought pursuant to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose; and third, if the allegedly unlawful conduct consists of making intentional misrepresentations to the court, litigation can be deemed a sham if a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.

*Sosa*, 437 F.3d at 938 (internal citations and quotation marks omitted).

Here, the Parties dispute whether the second exception applies to Defendants' alleged past or threatened litigation.[12] *See* ECF No. 144 at 43; ECF No 145 at 5–6. Where a series of legal proceedings is brought, "the question is not whether any one of them has merit . . . but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." *USS-POSCO*, 31 F.3d at 811. "The inquiry in such cases is prospective: Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?" *Id.*

There is no exact number of legal proceedings sufficient to trigger the second sham exception. The Ninth Circuit has held that 29 proceedings were enough, but two lawsuits were not. *See USS-POSCO*, 31 F.3d at 811; *Amarel v. Connell*, 102 F.3d 1494, 1519 (9th Cir. 1996), *as amended* (Jan. 15, 1997). If a defendant prevails in more than half of its lawsuits, it is unlikely that the lawsuits are meritless. *See USS-POSCO*, 31 F.3d at 811 ("The fact that more than half of all the actions . . . turn[ed] out to have merit cannot be reconciled with the charge that the [defendants] were filing lawsuits and other actions willy-nilly without regard to success.").

---

[12]   Because Plaintiffs do not discuss the other two exceptions, the Court does not address their application here.

In opposing Defendants' motion to dismiss, Plaintiffs contend that "Defendants have initiated and threatened to initiate sham environmental and land use challenges against new construction or redevelopment projects in the Relevant Market[13] to force developers to agree to a [CCNA] and/or a PLA." ECF No. 144 at 45. In addition to Defendants' threatened CEQA and other environmental challenges against the Bahia Project, Plaintiffs allege that, over the span of more than a decade, Defendants have:

(1) filed a petition for writ of mandate regarding the proposed San Diego Convention Center expansion and appealed the judgment when the action was dismissed;

(2) filed a separate CEQA lawsuit regarding the proposed San Diego Convention Center expansion;

(3) filed a petition for writ of mandate regarding the "Cisterra Development" and appealed the judgment when the petition was denied;

(4) filed two appeals to the Coastal Commission regarding the approval of a coastal development permit for the "Lane Field Development";

(5) presented written objections to the Wetlands Advisory Board and the Planning Commission regarding the "Town and Country Development";

(6) filed a petition for writ of mandate regarding the "Fat City Project";

(7) filed a CEQA lawsuit regarding the "Sunroad Project";

(8) filed an appeal to the Coastal Commission regarding the approval of coastal development permits for the Hotel Del Coronado and filed a separate CEQA lawsuit in San Diego Superior Court;

(9) filed a petition for writ of mandate regarding the San Diego Marriott Marquis & Marina hotel; and

---

[13]   Plaintiffs define the Relevant Market as "the market for luxury destination resorts in the Cities of San Diego and Coronado." TAC ¶ 236.

(10)   threatened to interfere with SeaWorld's ability to get approval for

future attractions from the Coastal Commission.

TAC ¶¶ 69–175, 211.[14] Plaintiffs allege that Defendants eventually abandoned most of these challenges and, in some instances, provided support for the projects after the developers agreed to sign favorable union agreements. *See id.*

Setting aside the issue of whether some of these entities, such as the Coastal Commission, qualify as a "judicial or quasi-judicial setting" for the purposes here,[15] the

_____

[14]   This list excludes three projects that did not involve litigation or pre-litigation demands. The Seaport Village project involved several developers, including one who was in a partnership with Plaintiffs, bidding for a Port of San Diego project. TAC ¶¶ 136–43. The Legacy International Center was a hotel development project pending City Council approval, which Defendants opposed until they allegedly learned they could not unionize the workers. *Id.* ¶¶ 161–165. The San Diego State University Mission Valley project is a development project that has allegedly been stalled "[e]ven though Defendants have secured an agreement that Local 30 would represent the hotel workers and a portion of the stadium workers and that the construction project would use as much union labor as practical." *Id.* ¶¶ 166–69.

[15]   The serial sham litigation exception does not apply outside the context of a "judicial or quasi-judicial setting." *See Boone*, 841 F.2d at 896–97. Courts must consider "the totality of the circumstances" when determining whether an entity operates "in a sufficiently non-political way to warrant application of the judicial sham exception, including whether the entity "conducts public hearings, accepts written and oral arguments, permits representation by counsel, . . . allows affected persons to question witnesses. . . . issue[s] written findings after its hearing[,] . . . [and issues] decision[s] [that are] appealable." *Kottle*, 146 F.3d at 1062. Here, the TAC offers conclusory allegations that the Coastal Commission, Port of San Diego, Wetlands Advisory Board, Planning Commission, Centre City Development, the City, or local city councils made "adjudicative decision[s]." *See, e.g.*, TAC ¶¶ 97, 100, 113–14, 120, 128, 143, 145. Although Plaintiffs allege that some of these entities conducted public hearings and issued written decisions, it is unclear on the record here whether these hearings involve written and oral arguments, permit representation by counsel, or allow questioning of witnesses. *See Kottle*, 146 F.3d at 1062. Significantly, Plaintiffs fail to allege that these entities are governed by enforceable standards subject to review. *See id.* Such allegations are therefore insufficient to support the inference that these entities more closely resemble a judicial rather than a legislative body for the purposes of the sham exception.

Court cannot infer from the facts alleged that Defendants' past filings against other San Diego developments demonstrate that Defendants were "improperly motivated" in initiating any legal proceeding against Plaintiffs—i.e., filed without regard to the merits. *See Mohla*, 944 F.2d at 534. Notably, none of these legal proceedings involved Plaintiffs or their related entities.[16] And of the seven lawsuits identified above, five settled or were at least partially successful. *See Theme Promotions*, 546 F.3d at 1008 ("The fact that this ongoing litigation settled suggests that the original suit was not objectively baseless."); *USS-POSCO*, 31 F.3d at 811 (holding that a series of lawsuits did not trigger the sham exception where over half "turn out to have merit").

Nor can the Court conclude, based on the facts alleged, that Defendants filed the alleged sham lawsuits or threatened future litigation "for the purpose of injuring a *market rival*." *See USS-POSCO*, 31 F.3d at 811 (emphasis added). Plaintiffs are hotel owners and developers, and Defendants are unions and union leaders. Although Plaintiffs allege that Defendants "can exclude competitors and/or competition," Plaintiffs never allege that Defendants and Plaintiffs are competitors. *See* TAC ¶¶ 172, 244.

Accordingly, the Court concludes that Plaintiffs have not met their burden of alleging specific facts showing that the serial sham litigation exception applies.

### b.   Sham lobbying

In the lobbying context, the sham exception applies where "persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) ("*Omni*"). In other words, a sham situation "involves a defendant whose activities are not

---

[16]   The TAC does not allege that Defendants have filed any lawsuit, let alone a series of lawsuits, against Plaintiffs. As the Ninth Circuit explained, "the filing of a whole series of lawsuits and other legal actions without regard to merits has far more serious implications than filing a single action" because "[l]itigation is invariably costly, distracting and time-consuming; having to defend a whole series of such proceedings can inflict a crushing burden on a business." *USS-POSCO*, 31 F.3d at 811.

genuinely aimed at procuring favorable government action at all," rather than one who seeks a governmental result "but does so through improper means." *Id.* at 380 (internal quotation marks and citations omitted). Further, the abuse of the governmental process must "directly" have an anticompetitive effect. *Manistee Town Ctr.*, 227 F.3d at 1090.

Where, as here, the alleged lobbying takes place in a non-judicial setting, the sham exception is "extraordinarily narrow."[17] *See Kottle*, 146 F.3d at 1061. Intent alone is insufficient to trigger this sham exception. *See Omni*, 499 U.S. at 380 ("That a private party's political motives are selfish is irrelevant: '*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.'"). Indeed, the Supreme Court has consistently held that "evidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham." *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 59 (1993) ("*PREI*"); *see id.* ("[N]either *Noerr* immunity nor its sham exception turns on subjective intent alone.").

Here, Plaintiffs allege that Defendants: (1) sent a letter to the Mayor and City Councilmembers on February 28, 2018 that expressed concern "regarding the lack of transparency and access to information pertaining to environmental review" of the Bahia Project, TAC ¶ 180; (2) sent a letter to the Mayor and City Councilmembers on May 11, 2018 arguing that the Bahia Project's elimination of Gleason Road was inconsistent with

---

[17] As previously discussed, *supra* note 14, Plaintiffs fail to sufficiently allege that Coastal Commission, Port of San Diego, Wetlands Advisory Board, Planning Commission, Centre City Development, the City, or local city councils are judicial or quasi-judicial bodies. Further, the Court concludes that the City Council—which was allegedly subject to much of Defendants' lobbying conduct—is a legislative body. *See* City of San Diego Charter, art. III § 11 ("All legislative powers of the City shall be vested, subject to the terms of this Charter and of the Constitution of the State of California, in the Council, except such legislative powers as are reserved to the people by the Charter and the Constitution of the State."); *see also Boone*, 841 F.2d at 896 ("[E]ven though proceedings before the [city's redevelopment] agency have some of the trappings normally associated with adjudicatory procedures, all final decisions are made by the [city] council, a distinctly legislative body.").

the MBMPU, *id.* ¶ 181; (3) created and sponsored a website, "nomissionbaylandgrab.org," and a related Facebook page to "disseminate the false message that the Bahia redevelopment violates the MBMPU," *id.* ¶ 182; (4) met with City Councilmembers to demand that they revoke or change their position regarding the Bahia Project unless Plaintiffs agreed to sign a CCNA and/or PLA, *id.* ¶ 183; (5) demanded that the Mayor and City Council delay and not docket the vote on the proposed lease amendment for the Bahia Project, *id.* ¶¶ 196–98; and (6) threatened SeaWorld through Rolfe that Defendants would interfere with its ability to get future attractions approved by City County and the Coastal Commission as well as engage in a negative publicity campaign, *id.* ¶ 211.[18]

In opposing Defendants' motion to dismiss, Plaintiffs argue that Defendants "have no interest in procuring the environmental or land use relief for which they lobby or in blocking the projects entirely; rather, if Plaintiffs agree to a [CCNA] and a PLA, then Defendants will drop their challenges and support the projects." ECF No. 144 at 41. Plaintiffs allege in the TAC:

> Defendants do not actually want to block the projects entirely; they merely want to block the projects until the developer agrees to a card check neutrality agreement and PLA. Once those agreements are obtained, Defendants abandon their challenges with, at most, negligible mitigation measures that create the facade of good faith settlement negotiations and then actively support the same projects that they once opposed.
>
> That Defendants so freely abandon their challenges to a project proves their sole motivation in asserting those claims is to obtain unrelated labor concessions. . . . The only justification for this pattern of conduct is that those

---

[18] Plaintiffs also argue that the Court should analyze the Defendants' various lobbying efforts under the serial sham petition exception. ECF No. 144 at 43. The Court declines. As both the 2020 and 2021 Orders made clear, the serial sham petition exception applies only to petitions to a court or adjudicatory administrative agency and conduct incidental to filing a petition. *See* ECF No. 60 at 16; ECF No. 93 at 24. It does not apply to lobbying. *See Kottle*, 146 F.3d at 1061 ("[T]he second and third variants of the litigation sham exception do not make sense in the legislative realm.").

CEQA and land use claims are mere vehicles for Defendants to accomplish their true objective – obtaining [CCNAs] and PLAs with developers.

TAC ¶¶ 266–67.

As an initial matter, the Court cannot infer from these allegations that Defendants were "not seeking official action by a government body." *See Franchise Realty*, 542 F.2d at 1081. *See also Omni*, 499 U.S. at 380 ("A sham situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all . . . .") (internal quotation marks omitted). In fact, Plaintiffs' allegations in other places in the TAC indicate that Defendants actively sought to delay or stop the Bahia Project. *See, e.g.*, TAC ¶¶ 198, 200, 224, 248. Plaintiffs also acknowledge that Defendants were "careful not to discredit the environmental opposition" to the Bahia Project. *See id.* ¶ 224.

Significantly, that Defendants had an ulterior motive for lobbying does not vitiate *Noerr–Pennington* protection. *See Omni*, 499 U.S. at 380 (stating that "a concerted effort to influence public officials" is immunized "regardless of intent or purpose"). Nor is Defendants' lobbying a sham because Plaintiffs allege that Defendants' opposition to the Bahia Project lacked merit. Plaintiffs allege that the two letters sent by Defendants' counsel in 2018 and the creation of the website and related Facebook page were spurious because Defendants "knew or had reason to know that the retention of Gleason Road was not a part of the MBMPU." *See id.* ¶¶ 182, 193. Plaintiffs explain that, while the words "Retain Gleason Road" appear on an unapproved, amended graphic that was prepared after approvals for the Bahia Project were articulated, this requirement was not in the administrative record. *Id.* ¶ 182. Further, the Coastal Commission, the City's Planning Department, and two advisory boards confirmed that the Bahia's proposed lease amendment did not require an amendment of the MBMPU. *See id.* But whether the 2018 letters, website, and related Facebook page had any objective basis is not dispositive. *See Kottle*, 146 F.3d at 1061 (stating that "it would seem quite pointless to ask whether [a] lobbying effort was 'objectively baseless'" because "there are few, if any, [objective standards] in the political realm of legislation, against which to measure [a] defendant's

26

conduct"). The same is true to the extent Plaintiffs allege that the content of these letters and webpages was misleading, or that Defendants otherwise acted in an unethical manner. *See Noerr*, 365 U.S. at 140, 145 (stating that attempts to influence public officials may occasionally result in "deception of the public, manufacture of bogus sources of reference, [and] distortion of public sources of information" but "that deception, reprehensible as it is can be of no consequence so far as the Sherman Act is concerned"); *Boone*, 841 F.2d at 894 (stating that "[w]hile we do not condone misrepresentations, we trust that [governmental bodies], acting in the political sphere, can accommodate false statements and reveal their falsity") (internal quotation marks omitted). *See also Allied Tube,* 486 U.S. at 499–500 ("A publicity campaign directed at the general public, seeking legislation or executive action, enjoys antitrust immunity even when the campaign employs unethical and deceptive methods.").

Further, Plaintiffs do not allege that the process of sending letters, creating online content directed at the general public, and lobbying elected officials itself imposed any cost on Plaintiffs or effected any delay in realizing the Bahia Project. *See Omni*, 499 U.S. at 381. "Any lobbyist or applicant, in addition to getting himself heard, seeks by procedural and other means to get his opponent ignored." *Id.* at 382 (further stating that "[p]olicing the legitimate boundaries of such defensive strategies, when they are conducted in the context of a genuine attempt to influence governmental action, is not the role of the Sherman Act"). For example, Plaintiffs do not allege that Defendants' conduct directly imposed any procedural, administrative, or regulatory burden on Plaintiffs or automatically stayed the Bahia Project. *See Manistee Town Ctr.*, 227 F.3d at 1090 (emphasizing that the abuse of the governmental process must "directly" have an anticompetitive effect). Rather, any delay that Defendants allegedly sought resulted from persuading government officials to consider their objections. *See Omni*, 499 U.S. at 381 (holding that a billboard company's successful lobbying of a city to enact a zoning ordinance that hampered its competitor's ability to compete did not fall within the sham exception because it was not the process of lobbying, but the result of the effort, that interfered with its competitor's business). The

TAC fails to allege that Defendants used the governmental processes, "as opposed to the *outcome* of those processes, as a mechanism to injure [Plaintiffs]." *Empress LLC*, 419 F.3d at 1057 (emphasis added). As such, "no matter what [Defendants'] motives were," their petitioning activity is immunized under *Noerr–Pennington*. *See id.*

Similarly, the Court cannot infer that Defendants' alleged threats against SeaWorld regarding future lobbying of the City Council and the Coastal Commission or negative publicity campaigns incidental to such petitioning activity would be a sham. *See United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada, Loc. 32, AFL-CIO v. N.L.R.B.*, 912 F.2d 1108, 1110 (9th Cir. 1990) (stating that a court may not presume "a union's threat to picket the job [would be] a threat to picket contrary to the law, when picketing at the job could be done in a lawful manner"). *See also Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) ("[E]njoining or preventing First Amendment activities before demonstrators have acted illegally or before the demonstration poses a clear and present danger is presumptively a First Amendment violation."). As previously discussed, Plaintiffs allege that Defendants threatened to interfere with SeaWorld's ability to get new attractions approved by the City Council and Coastal Commission. *See* TAC ¶ 211. Even if Defendants threatened to oppose all of SeaWorld's proposed future attractions for the purpose of exerting pressure on Plaintiffs to sign a PLA or CCNA, as Plaintiffs allege, this intent alone "cannot transform otherwise legitimate activity into a sham." *See PREI*, 508 U.S. at 59. The TAC must include "allegations of the specific activities" which would "bring [Defendants'] conduct into one of the exceptions to the *Noerr–Pennington* protection." *See Mohla*, 944 F.2d at 533. Plaintiffs fail to indicate that Defendants' threatened conduct would use the process of lobbying City Council and the Coastal Commission or the process of engaging in negative

publicity campaigns incidental to that lobbying—as opposed to the outcome of such activities—as an anticompetitive weapon.[19] *See Omni*, 499 U.S. at 380.

Given that the sham exception is "extraordinarily narrow" in the context pleaded here, the Court concludes that Plaintiffs have not met the heightened pleading standard required. *See Kottle*, 146 F.3d at 1061, 1065. Accordingly, the Court concludes that Plaintiffs have failed to show that any of the sham exceptions could apply based on the allegations and turns to the final part of the *Noerr–Pennington* analysis.

## C.    Step Three: Statutory Construction

At step three, the Court asks whether the LMRA or Sherman Act can be construed to avoid burdening Defendants' protected petitioning rights.[20] *See B&G Foods*, 29 F.4th at 540. Under the *Noerr–Pennington* rule of statutory construction, courts "must construe federal statutes so as to avoid burdening conduct that implicates the protections afforded by the Petition Clause unless the statute clearly provides otherwise." *Sosa*, 437 F.3d at 931).

Plaintiffs' first claim alleges that Defendants violated section 303 of the LMRA, which makes it unlawful for a union to "engage in any activity or conduct defined as an unfair labor practice" in section 8(b)(4) of the National Labor Relations Act ("NLRA"). TAC ¶¶ 277–302. *See* 29 U.S.C. § 187. Section 8(b)(4)(ii), which is the provision at issue here, in turn makes it an unfair labor practice for a labor organization to "threaten, coerce, or restrain any person engaged in commerce" with the object of "forcing or requiring any

---

[19]    Nor do Plaintiffs "allege any *independent* conduct apart from [Defendants' future] lobbying efforts" or conduct incidental to such lobbying, that would make *Noerr–Pennington* protection unavailable. *See Harbor Performance Enhancement Ctr.*, 2021 WL 1676281, at *13 (finding that plaintiffs failed to include specific allegations that union defendants' conduct falls outside *Noerr–Pennington* protection and therefore dismissing plaintiffs' NLRA and Sherman Act claims) (emphasis in original).

[20]    Neither Plaintiffs nor Defendants appear to dispute that the LMRA, NLRA, and Sherman Act may be construed to preclude liability based on petitioning conduct protected under *Noerr–Pennington*.

employer . . . to enter into any agreement prohibited by subsection (e)"[21] or "forcing or requiring any person . . . to cease doing business with any other person." 29 U.S.C. § 158(b)(4)(ii)(A)–(B). There is nothing in either the LMRA or NLRA that "unavoidably" requires the statutes to be read to include, as an unfair labor practice, threats to engage in protected petitioning activity. *See Sosa*, 437 F.3d at 940; *Harbor Performance Enhancement Ctr., LLC v. City of Los Angeles Harbor Dep't*, No. 21-55416, 2022 WL 1239055, at *2 (9th Cir. Apr. 27, 2022) ("The third prong [of the *Noerr–Pennington* analysis] is satisfied because Section 8(b)(4)(ii) of the NLRA . . . may be construed to exclude the union defendants' petitioning conduct."). *See also, e.g.*, *BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 526 (2002) (applying *Noerr–Pennington* in the NLRA context); *Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*, 863 F.3d 1178, 1189 (9th Cir. 2017) (holding that *Noerr–Pennington* immunized a lawsuit brought under LMRA); *USS-POSCO*, 31 F.3d at 811 (holding that unions' lobbying efforts were immunized from LMRA liability under *Noerr–Pennington*). Section 303 of the LMRA and Section 8(b)(4) of the NLRA are "susceptible of a construction that avoids the serious constitutional question of Petition Clause immunity." *See Sosa*, 437 F.3d at 939.

Plaintiffs' remaining two claims are for attempted monopolization and conspiracy to monopolize in violation of section 2 of the Sherman Act. Section 2 provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . ." 15 U.S.C. § 2. The Supreme Court in *Pennington* held: "Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not

---

[21]   Subsection (e) states, in relevant part, that "[i]t shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person . . . ." 29 U.S.C. § 158(e).

illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." *Pennington*, 381 U.S. at 670; *see also Noerr*, 365 U.S. at 135 (holding that "no violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws"). Section 2 of the Sherman Act is likewise susceptible of a construction that avoids the question of Petition Clause immunity here.

Accordingly, the Court concludes that the *Noerr–Pennington* doctrine immunizes Defendants' conduct in the context of Plaintiffs' claims. *See* TAC ¶¶ 286–87, 297–98, 305, 313.

## IV.   LEAVE TO AMEND

As the Court has previously observed, this case has been pending at the pleadings stage for over four years. Plaintiffs have had ample opportunity to sufficiently plead their claims in the instant action. The 2021 Order stated that it was providing Plaintiffs with "one final opportunity to amend their complaint." ECF No. 93 at 61. Given the Court's prior Orders and the analysis above, the Court concludes that further amendment of the complaint, already in its fourth iteration, would be futile. *See Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir.1989) ("The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint."). *See also Fid. Fin. Corp. v. Fed. Home Loan Bank of San Francisco*, 792 F.2d 1432, 1438 (9th Cir. 1986) (refusing to allow plaintiff to file a fourth amended complaint where "[t]he factual bases of the claims were known to [plaintiff] long before"). Nor have Plaintiffs proffered any proposed amendments that would suggest otherwise. The Court therefore grants Defendants' motion to dismiss the TAC with prejudice. *See Californians for Renewable Energy v. California Pub. Utilities Comm'n*, 922 F.3d 929, 935 (9th Cir. 2019) ("The 'district court does not err in denying leave to amend where the amendment would be futile, or where the amended complaint would be subject to dismissal.'") (quoting *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991)).

/ / /

/ / /

## V. CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** Defendants' Motion to Dismiss Plaintiffs' TAC. ECF No. 143. Further, the Court **DENIES** Defendants' request for judicial notice (ECF No. 143-3)[22] and Plaintiff's motion for leave to file a surreply as moot. ECF No. 143-3. The action is **DISMISSED** with prejudice, and the Clerk of Court is **DIRECTED** to close the case.

**IT IS SO ORDERED**.

Dated:  July 6, 2023

Hon. Robert S. Huie
United States District Judge

---

[22]    The Court did not rely on the documents attached in ruling on Defendants' instant motion to dismiss.